# EXHIBIT 1

**JAMS**

| | |
|---|---|
| THE RESOURCE GROUP INTERNATIONAL LTD.,<br>Claimant and Counter-Respondent,<br>v.<br>MUHAMMAD ZIAULLAH KHAN CHISHTI,<br>Respondent and Counterclaimant. | JAMS No. 542000846<br>**PARTIAL FINAL AWARD** |

The Tribunal, having been designated in accordance with the Parties' relevant agreement and having duly heard the proofs and arguments of the Parties in this proceeding, hereby rules as follows:

## I. Introduction and Brief Summary of Certain Facts[1]

Respondent/Counterclaimant Muhammad Ziaullah Khan Chishti ("Respondent" or "Mr. Chishti") is an entrepreneur who founded Claimant The Resource Group International Limited ("Claimant" or "TRG-I") in 2002, along with its parent company, TRG Pakistan Limited ("TRG-P"). TRG-P is domiciled in Pakistan and was publicly listed in 2003, on what is now the Pakistan Stock Exchange ("PSX"). TRG-P owns an equity interest in TRG-I, which is privately held and domiciled in Bermuda. TRG-I has made investments in U.S.-based companies operating in the business process outsourcing sector, principally Ibex Limited ("Ibex"), which is publicly listed on the NASDAQ, and Afiniti Limited ("Afiniti"), which is privately held.

[1] The facts set forth in this Summary section are generally undisputed. To the extent that any might be disputed, the statements in this Summary section reflect the Tribunal's findings regarding any such issues. The Summary section also assumes knowledge of other relevant facts and of certain terms.

In 2005, TRG-I sold $30 million of its preferred shares to entities affiliated with financial institution AIG ("AIG"). To facilitate that investment, several parties – including TRG-I, AIG, Respondent, and certain other individuals (the "Management Shareholders" – a defined term that also includes Respondent) – entered into a Preferred Stock Purchase Agreement dated October 4, 2005 (the "SPA"). It is the terms of the SPA that are fundamentally at issue in this proceeding.

Specifically, as discussed more fully below, Section 8.6(a) of the SPA, entitled "Restrictions on Transfer", establishes – as the name suggests – various restrictions on the Transfer (as that term is defined in the SPA) of TRG-I and TRG-P shares. It is undisputed that after the SPA was executed, and for more than 15 years thereafter, Respondent made various Transfers of TRG-I and TRG-P shares that fall under the aegis of Section 8.6(a) of the SPA. Those Transfers included the sale and pledging (as well as the removal of pledges) of TRG-I and TRG-P shares.

No issue arose under the SPA with respect to Respondent's Transfers until in or about October, 2022, by which time Respondent had resigned his positions as CEO and Director of TRG-P, and as Chairman and Director of TRG-I.[2] On October 10, 2022 and October 13, 2022, Claimant's Counsel sent letters to various financial institutions and informed them of Claimant's position that, in substance, Respondents' pledging activity in relation to his TRG-I and TRG-P

---

[2] Respondent's resignation from TRG-P and TRG-I occurred on or about November 28, 2021, and was impelled by, inter alia, the public reaction to testimony given to a U.S. Congressional Committee regarding alleged sexual harassment/assault by Respondent. The Tribunal notes that Claimant initially made detailed factual allegations regarding this issue – including the details of the allegations of sexual harassment and the findings against Respondent in an arbitration related thereto – but, given various rulings made by the Tribunal, Respondent ultimately submitted very limited evidence in any way relating to those allegations during the Hearing, including no proof regarding the allegations of the sexual harassment itself. Accordingly, the Tribunal clarifies that this issue, and the evidence related thereto – with the sole exception of the Financial Statement discussed below – have had little or no relevance to the substantive legal issues presented by the Parties' respective affirmative claims, and have played, at most, a minimal role in this proceeding, and none in this decision. (See generally, Appendix A at 15 (discussing Tribunal's rulings on related motion(s) in limine); see also Footnote 9, infra).

shares constituted a violation of Section 8.6(a) of the SPA. Respondent promptly contacted Claimant's Counsel and expressed his disagreement with Claimant's interpretation of the SPA as reflected in the afore-mentioned letters.

Ultimately, the Parties' dispute regarding the Transfer Restrictions established in the SPA gave rise to Claimant's Demand for Arbitration dated January 12, 2023, that initiated this proceeding. Therein, based upon detailed factual allegations, Claimant asserts that Respondent's various Transfers of TRG-P and TRG-I shares over the course of years violated the Transfer Restrictions established within Section 8.6(a) of the SPA. As remedies, Claimant seeks declaratory and injunctive relief against both Respondent and his wife Sarah Pobereskin; Claimant alleges that the latter acquired certain TRG-I and TRG-P shares that must be considered "beneficially owned" by Respondent, and therefore also subject to Section 8.6(a) of the SPA.[3] Respondent has lodged an affirmative counterclaim seeking a declaration that, in sum, his various Transfers of TRG-P and TRG-I shares did not violate Section 8.6(a) of the SPA.

The Tribunal notes there is no dispute that the Parties' affirmative claims and requests for relief are arbitrable in this proceeding pursuant to Section 10.16 of the SPA, entitled "Arbitration", that establishes: "[a]ll disputes and controversies arising under or in connection with this Agreement shall be settled by arbitration conducted in accordance with the arbitration procedures described in this Section 10.16." (CX-1) (emphasis in original). There is also no dispute that: pursuant to Section 10.16 of the SPA, the JAMS Comprehensive Arbitration Rules & Procedures (effective June 1, 2021) are applicable with respect to procedural issues (the "JAMS Rules"); and pursuant to Section 10.11 of the SPA, entitled "Governing Law", laws of the State of New York are applicable with respect to substantive legal issues.

---

[3] It is undisputed that Ms. Pobereskin is neither a Party to this proceeding nor to the SPA.

Finally, the Tribunal notes that as of the date of this Partial Final Award, the Tribunal understands that a Pakistani Court has issued and maintains an injunction in aid of this proceeding that prevents Respondent (and his wife) from Transferring TRG-I and TRG-P shares, including de-hypothecating TRG-I shares and TRG-P shares that had been pledged, or selling TRG-P shares that had been bought on the public market. (See generally, Appendix A at 2-4, Footnote 3 (discussing the Tribunal's rulings related to injunction proceedings before the Pakistani Court)).

## II. History of the Proceeding

The Tribunal was appointed on or around June 15, 2023.

The Preliminary Arbitration Management Conference took place on August 2, 2023, over the objection of Respondent who had requested an adjournment pending the resolution by the JAMS National Arbitration Committee of an application by Respondent to consolidate with this proceeding another arbitration pending between all or some of the Parties (or related parties). The Tribunal ruled on this request for an adjournment stating: ". . . because the parties do not agree on delaying the conference, and since no stay has been entered in this case, we are proceeding with scheduling and convening the preliminary conference like we would in any other matter."[4]

In an email dated August 8, 2023, the Tribunal directed the Parties to negotiate a schedule taking "into account the guidance given" by the Tribunal on August 8 to the effect that: "A. The Schedule should commence as of now, and should not await a resolution of the request for consolidation;" and "C. . . . should not be based on the parameters of the JAMS Expedited Arbitration Procedures, but should reflect the sense of urgency indicated in the governing arbitration clause."

---

[4] On or around September 18, 2023, the request for consolidation was denied by the JAMS National Arbitration Committee.

In an email dated August 16, 2023, setting forth a draft schedule, which became the basis for the schedule that applied thereafter, the Tribunal noted that "I believe that the below balances the governing arbitration clause's mandate for some level of urgency with procedures and timelines that are fair to both parties."

The ensuing proceeding was conducted in a very litigious manner, resulting in multiple issues being brought to the attention of the Tribunal – some purely procedural, some procedural with substantive implications, some clearly substantive and some evidentiary. Set forth in Appendix A is a description of the most important of those issues, including a brief statement of the request that was made, the arguments of the Parties and the ruling from the Tribunal. The Tribunal deems the issues discussed in Appendix A to be the most important of all the issues brought to its attention in that these issues either defined certain rights or obligations of the Parties or otherwise established substantive "law of the case."

The events described in Appendix A ultimately led to a five-day Hearing that took place between September 9 and September 13, 2024. Claimant called four fact witnesses, including Mr. Chishti as an adverse witness, and one expert witness, Professor Robert Rock. The only witness called by Respondent was Mr. Chishti. In conjunction with the Hearing, several hundred exhibits were considered as admitted into the record, most by stipulation of the Parties, and a comparatively smaller number admitted based upon guidance provided by the Tribunal.

There were a limited number of post-Hearing issues that arose and/or were brought to the attention of the Tribunal, but none are material to the ultimate resolution of the proceeding. The Parties concurrently submitted post-Hearing briefs on October 24, 2024, and the Parties conducted final, oral argument on November 13, 2024.

During the oral argument, there was some discussion as to whether the Tribunal might, sua sponte, order the production by Claimant of TRG-P Board Minutes. This issue arose as part of a colloquy addressing the significance to the "course of dealing" argument insofar as Respondent had only offered a limited number of TRG-P Board Minutes during the Hearing; the Tribunal was concerned that, given the initial record presented to it, the Tribunal had not previously fully appreciated – at the time it limited discovery of TRG-P – the interlocking nature of the Boards of TRG-I and TRG-P. The Tribunal reserved on this possible step. (See generally, Appendix at Footnote 9 (discussing the relationship between TRG-I and TRG-P Boards)).

On December 12, 2024, the Tribunal communicated to the Parties that "having thoroughly considered the substantial evidentiary record developed by the Parties and the many legal arguments that have been made," the Tribunal was satisfied that "the record with respect to all issues except a potential award of attorneys' fees and costs is complete – i.e., with respect to liability and the requested remedies – and can formally be deemed closed." Accordingly, the Tribunal set the date of issuance of what it "anticipate[d] to be a Partial Final or Interim Award" (given the need to consider, once liability was determined, a request for reimbursement of costs) to be January 13, 2025, or thirty-days thereafter pursuant to the JAMS Rules. On January 9, 2025, the Parties consented to an extension of the due date of this Award until January 24, 2025, which was again extended, with the consent of the Parties, to January 27, 2025.

The Tribunal timely issued an Interim Award on January 27, 2025. The following day, Claimant submitted a letter pursuant to JAMS Rule 24(j) requesting that the Tribunal alter the Interim Award in three ways: (1) re-issue the Interim Award as a Partial Final Award; (2) correct certain typographical misspellings of Respondent's full name; and (3) in Sections (III)(3) and (V), below, replace certain references to the term "Transfer Restrictions" with the term "sale

restrictions". Respondent submitted a letter in response on January 30, 2025; therein, Respondent stated that he does not object to the first two alterations requested by Claimant, but does object to the replacement of the term "Transfer Restrictions" with the term "sale restrictions".

For the reasons explained in an email order issued to the Parties on February 4, 2025, the Tribunal concludes that Claimant's requested corrections are appropriate and therefore its January 28, 2025 request has been granted. (See generally, 2/4/25 Order (explaining in sum that good cause exists for the requested revisions "to avoid any doubt or confusion" and "more accurately reflect[] the Tribunal's decision with respect to Respondent's ability to sell certain shares"). The Tribunal clarifies that no other alterations, changes or revisions of any kind have been made to the Interim Award that was issued on January 27, 2025, which is hereby reissued as this Partial Final Award. For the avoidance of any doubt, the Tribunal clarifies that this Partial Final Award wholly replaces and renders ineffectual the Interim Award that was issued by the Tribunal on January 27, 2025.

Finally, the Tribunal recognizes and appreciates the high quality of both the oral and written presentations by all Counsel throughout these extensive and contentious proceedings. It follows that this Partial Final Award is based solely upon the Tribunal's review of the evidentiary record and applicable law and that the result is not a reflection on any disparity in the quality of the Parties' respective presentations.

## III. Analysis and Rulings on Issues Presented

### 1. Relevant Contractual Provisions

As noted above, the contract at issue in this matter is the "Preferred Stock Purchase Agreement" executed October 4, 2005 (the "SPA"). (CX-1). The provisions of the SPA that are most relevant to the Parties' dispute are as follows:

**8.6 Restrictions on Transfer**. As a material inducement for the parties to enter into this Agreement and consummate the transactions contemplated hereunder, the parties have agreed to be bound by the following restrictions on Transfer of Shareholders Shares.

(a) No Transfers by Parent or Management Shareholders. Until the Purchasers or their Permitted Transferees cease to own AIG Shares, neither Parent nor any Management Shareholder (nor any of their Permitted Transferees) shall directly or indirectly Transfer any of the Other Shareholder Shares held by them without the prior written consent of holders of at least a majority of the then issued AIG Shares, except for (i) Transfers expressly permitted by this Section 8.6(a), (ii) Transfers pursuant to an Approved Sale or pursuant to a sale conducted in accordance with Section 8.6(b) or (c), and (iii) Transfers permitted by Section 8.6(d). Any attempted or purported Transfer of Other Shareholders Shares which does not comply with the provisions of this Section 8.6(a) shall be void and the Company shall not recognize or give effect to any such Transfer.

(iv) Except as specifically prohibited in this Section 8.6(a), there shall be no restriction on (A) the Transfer of Other Shareholders Shares by the Management Shareholders, or (B) the sale by Mr. Chishti of Parent Shares he acquires after the date hereof (other than shares issued with respect to Parent Shares he owns on the date hereof in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization). For the avoidance of doubt, the Parent Shares now held or subsequently acquired by any Management Shareholder other than Mr. Chishti shall neither constitute Other Shareholders Shares for purposes of this Agreement nor be subject to any restrictions on the Transfer notwithstanding any provision of this Agreement to the contrary.[5]

**10.6 Amendment and Waiver**. No amendment of any provision of this Agreement shall be effective, unless the same shall be in writing and signed by the Company and the holders of at least a majority of the then issued AIG Shares. No amendment to any provision affecting the rights and obligations of the Management Shareholders shall be effective unless the same shall also be signed by the holders of a majority of the then issued Other Shareholders Shares held by Management Shareholders. Except as otherwise

[5] Subsections (i-iii) of Section 8.6(a) have been omitted, but in sum, each permit the Management Shareholders collectively and/or Mr. Chishti individually to sell Other Shareholders Shares under certain circumstances and/or subject to certain conditions. The foregoing capitalized terms are defined below.

> expressly set forth herein, any failure of the Company or any Management Shareholder to comply with any provision hereof may only be waived in writing by the holders of at least a majority of the then issued AIG Shares, and any failure of any holder of AIG Shares to comply with any provision hereof may only be waived in writing by the Company. No such waiver shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure by any party to any action against any breach of this Agreement or default by any other party shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action. For all purposes hereof, any action required of the Purchasers, collectively, shall be deemed to have been taken if approved by the holders of a majority of the then issued AIG Shares held by all Purchasers.

(CX-1) (emphasis in original).

In addition, the SPA defines the following terms that are relevant to the Parties' dispute, either substantively or for the purpose of context:

> **ARTICLE I**
> **DEFINITIONS; INTERPRETATION**
>
> **1.1 Definitions**. For purposes of this Agreement, the following terms have the indicated meanings:
>
> "Management Shareholders" shall have the meaning set forth in the preamble. [Which identifies "Messrs. Muhammad Ziahullah Khan Chishti, Mohammed Khaishgi, Mohammed Ali Jameel and Haslan Aslam" as each being a "Management Shareholder". Importantly though, at times throughout the SPA, Respondent is individually identified and made subject to certain provisions to which the other Management Shareholders are not.]
>
> "Other Shareholders Shares" means (i) any Common Shares or other equity securities of the Company that are owned or acquired, in each case directly or indirectly and beneficially or of record, by any of Parent, the Management Shareholders or their Affiliates, (ii) any shares of Parent Stock or other equity securities of Parent that are owned or acquired, in each case directly or indirectly and beneficially or of record by Mr. Chishti, and (iii) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clauses (i) and (ii) in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization. Any

> particular shares constituting Other Shareholder Shares that are Transferred in compliance with the provisions of this Agreement shall continue to constitute Other Shareholders Shares in the hands of any such transferee; such shares shall cease to be Other Shareholders Shares only when they have been sold pursuant to a Public Sale or Approved Sale.
>
> "Parent Stock" or "Parent Shares" means (i) the ordinary shares of Parent and (ii) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clause (i) in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization.
>
> "Public Sale" means (i) with respect to sales of Shareholder Shares that that are subject to U.S. Securities laws, any sale to the public pursuant to an offering registered under the Securities Act or to the public effected through a broker, dealer or market maker pursuant to the provisions of Rule 144 or Rule 144A (if such rule is available) under the Securities Act (or any similar rule or rules then in effect); and (ii) with respect to all other sales of Shareholder Shares, sales on the public market pursuant to an offering or transaction that is conducted in accordance with Applicable Laws and the rules of any applicable securities exchange or trading system.
>
> "Shareholder Shares" means, collectively, the AIG Shares and the Other Shareholder Shares.
>
> "Transfer" has the meaning set forth Section 8.6(b). [Which defines a "Transfer" as: "any sale, assignment, transfer, pledge, hypothecation, give away, or any other disposition of or encumbrance upon, whether voluntary or by operation of law, whether for consideration or for no consideration (but not including a conversion or exchange of Preferred Shares into Conversion Shares or Parent Shares, as applicable) . . . .]

(Id.) (emphasis in original).

### 2. Breach of the SPA

The foundational issue in this proceeding is Claimant's contention that Respondent breached Section 8.6(a) of the SPA on numerous occasions by Transferring TRG-P and TRG-I shares without AIG's prior written consent. Respondent disagrees and argues that all his Transfers

were permitted by Section 8.6(a). Accordingly, while the Parties dispute certain facts related to Respondent's Transfers, their core disagreement is the proper interpretation of Section 8.6(a) of the SPA – and more specifically, Section 8.6(a)(iv).

For the reasons explained below, having considered the Parties' arguments under controlling New York law in conjunction with the evidentiary record, the Tribunal concludes that Claimant's proffered interpretation of Section 8.6(a) of the SPA is correct, and therefore, that Respondent's unauthorized Transfers breached the SPA.

### A. Legal Standard

Under New York law, "[t]he fundamental, natural precept of contract interpretation is that agreements are construed in accord with the parties' intent." Greenfield v. Phillies Records, Inc., 98 N.Y.2d 562, 569 (N.Y. 2002) (citation omitted). "[T]he best evidence of what parties to a written agreement intend is what they say in their writing . . . [and] courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467-68 (2d Cir. 2010) (citation omitted). It follows that courts applying New York law "have repeatedly applied the 'familiar and eminently sensible proposition of law [ ] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'" Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (N.Y. 2004) (quoting W.W.W. Assoc. v. Giancontieri, 77 N.Y.2d 157, 162 (N.Y. 1990)). Stated differently, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield, 98 N.Y.2d at 569.

Moreover, "when interpreting a contract under New York law, words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning

and effect to all of its provisions. LaSalle Bank Nat'l v. Nomura Asset Cap., 424 F.3d 195, 206 (2d Cir. 2005) (cleaned up). "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" Id. (cleaned up).

Ultimately, "[i]t well settled that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." Macy's Inc. v. Martha Stewart Living Omnimedia, Inc., 127 A.D.3d 48, 54 (1st Dep't 2015) (cleaned up). "The aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." Id. (quoting Brown Bros. Elec. Contrs. v. Beam Constr. Corp., 41 N.Y.2d 397, 400 (N.Y. 1977)). In doing so, "the rules of construction of contracts require [the court] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." Id. (quoting Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (N.Y. 1956)).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts." W.W.W. Associates, Inc., 77 N.Y.2d at 162 (N.Y. 1990) (citation omitted). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield, 98 N.Y.2d at 569-70 (cleaned up). "Thus, if the agreement on its face is reasonably susceptible to only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." Id. at 570 (cleaned up). "Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324 (2007).

However, a contract is ambiguous if the relevant terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Law Debenture Tr. Co. of N.Y., 595 F.3d at 466 (cleaned up). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." Kass v. Kass, 91 N.Y.2d 554, 566 (N.Y. 1998). Importantly though, a court may "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed" when determining whether ambiguity exists. Id.

The Tribunal notes that in Altruis Grp., LLC v. ProSight Specialty Mgmt. Co., Inc., 2023 WL 4784233, at *3 (S.D.N.Y. July 26, 2023) – a recent decision cited by Respondent in his Post-Hearing Brief – the court aptly summarized the current standard for considering extrinsic evidence in the context of an ambiguous contract, as follows:

> When an agreement is ambiguous, courts may consider extrinsic evidence "to ascertain the parties' intent at the formation of the contract." Olin Corp. v. OneBeacon America Ins. Co., 864 F.3d 130, 148 (2d Cir. 2017); see also Sound Distrib. Corp. v. Richmond, 213 A.D.2d 178, 179, 625 N.Y.S.2d 3, 3 (1st Dep't 1995) (considering parol evidence "to establish the intent of the parties.") It is the mutual intent of the parties that is relevant. See, e.g., World Trade Ctr. Properties, LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003), rev'd on other grounds by Wachovia Bank v. Schmidt, 546 U.S. 303 (2006) ("The cardinal principle for the construction and interpretation of . . . contracts . . . is that the intentions of the parties should control"); Kenevan v. Empire Blue Cross & Blue Shield, 791 F. Supp. 75, 79 (S.D.N.Y. 1992) ("If a court finds that [a contract] is ambiguous, it must consider extrinsic evidence to assist it in determining the mutual intent of the parties in entering the contract." (emphasis added)). The undisclosed unilateral intent of one party is not relevant. See, e.g., Thomson Corp. v. Emps. Reinsurance Corp., No. 06-CV-741, 2008 WL 11384181, at *6 (S.D.N.Y. Jan 9, 2008) ("Determination of the intent of the parties at the time they entered into the contract is not

> governed by their unexpressed subjective views, but rather by what they wrote, their acts, conduct and all surrounding circumstances.") quoting Lubrication & Maint., Inc. v. Union Res. Co., 522 F.Supp. 1078, 1081 (S.D.N.Y. 1981)). Similarly, evidence evincing "unilateral expressions of one party's postcontractual subjective understanding of the terms of the agreement . . . [are] not probative as an aid to the interpretation of the contract." Faulkner v. Nat'l Geographic Soc., 452 F.Supp. 2d 369, 379 (S.D.N.Y. 2006) (cleaned up), aff'd sub nom. Ward v. Nat'l Geographic Soc., 284 F. App'x 822 (2d Cir. 2008).

Notably, after the Tribunal denied the Parties' respective Rule 18 motions, some uncertainty arose with respect to the proper application of the terms "parol evidence" and "extrinsic evidence" in the context of discovery. The Tribunal clarified that "parol evidence" is a type of "extrinsic evidence" and comprises evidence relating to the negotiation of the relevant provision prior to the SPA's execution, while "extrinsic evidence" is a broader term and encompasses both "parol evidence" and other evidence beyond the four-corners of the contract that might aid in the interpretation of the Parties' intent or the contract's meaning – e.g., course of dealing evidence that postdates the SPA's execution. The terms "parol evidence" and "extrinsic evidence" have been so understood throughout the latter phases of this proceeding.

**B. The Parties' Competing Interpretations**

As crystalized in their Post-Hearing Briefs and during Closing Oral Argument, the Parties proffer competing interpretations of Section 8.6(a) that are substantively disparate.

On the one hand, Claimant argues that Section 8.6(a) should be interpreted to reflect essentially four components that operate conjunctively. Specifically, Claimant contends that: (1) the "Prefatory Language" found at the beginning of the Section functions to express the Parties' basic mutual intent; (2) the "Restriction" found within Subsection (a) reflects the broad restriction on the Transfer of Other Shareholders Shares that the Parties allegedly agreed upon, as initially reflected in the Term Sheet; (3) the "Exceptions" found within Subsections (i-iii) each establish

conditional exceptions to the restriction found within Subsection (a) based upon the occurrence of certain future events; and (4) Subsection (iv) simply serves as "confirmation" or "further assurance" that no other Transfer Restrictions exist elsewhere within the SPA or were agreed upon by the Parties. Claimant concedes that under its proffered interpretation, Subsection (iv) is at least partially superfluous.

On the other hand, Respondent argues that Section 8.6(a) should be interpreted to establish a general prohibition on the Transfer of Other Shareholders Shares subject to specific exceptions that, in turn, permit Respondent to pledge (with Restrictions) all of his TRG-P and TRG-I shares, to sell (with Restrictions) all of his TRG-I shares and those TRG-P shares that he acquired before the SPA was executed, and to freely sell (without Restrictions) the TRG-P shares that he acquired after the SPA was executed. Specifically, while Respondent acknowledges that Subsection (a) establishes a general prohibition on his ability to Transfer either his TRG-P or TRG-I shares, Respondent asserts that the "specific" exceptions found in Subsections (i-iii) indicate that Subsection (iv) is an additional exception that permits the Transfers of TRG-P and TRG-I shares that Respondent indisputably made during the relevant time period without AIG's prior written consent.[6]

In support of his proffered interpretation, and in particular, as a way of explaining the initial clause on Section 8.6(a)(iv), Respondent acknowledges that his TRG-I shares, and the TRG-P shares that he owned when the SPA was executed, remain Other Shareholders Shares in the hands

---

[6] Both Parties accuse the other of offering different interpretations of Section 8.6(a)(iv) at various times since the dispute arose and during this proceeding. The Tribunal has taken note of these accusations and has factored same into its analysis. The Tribunal notes in this instance the additional concern that this interpretation as now offered by Respondent is also inconsistent with the course of dealing evidence wherein, as discussed below, Respondent sought permission for sales of TRG-I shares and sold such shares only after permission was granted. (See, infra at 43 (discussion of Respondent's post-SPA Transfers)).

of any Transferee. He contends, however, that any TRG-P shares acquired after the SPA was executed are not subject to Transfer Restrictions of any kind. The preceding is also the way that Respondent explains how Section 8.6(a)(iv)(A) fits in with Section (a)(iv)(B).

Not only do both Parties contend that their respective interpretations reflect the Parties' reasonable intentions when entering into the SPA, but also that the language is unambiguous, therefore making any resort to extrinsic evidence unnecessary. Nevertheless, each also argues that it or his interpretation is supported by the available extrinsic evidence.

### C. The Tribunal's Interpretation

#### i. Section 8.6(a)(i-iii)

At the outset, the Tribunal establishes an important point that is either undisputed or not reasonably disputable, namely: with the exception of Subsection (iv), Section 8.6(a) is not ambiguous as a matter of New York law.[7] Indeed, with Subsection (iv) set aside, the balance of Section 8.6(a) clearly establishes that: (1) in the preamble, the Parties agreed that the "restrictions on Transfer of Shareholders Shares" reflected in Section 8.6(a) were a "material inducement" to

[7] The Tribunal clarifies that for at least three reasons, its considering whether an ambiguity exists on the face of Section 8.6(a) remains a necessary and appropriate inquiry, notwithstanding the prior denial of the Parties' respective Rule 18 motions. First, as explained below, both Parties continue to expressly argue that Section 8.6(a) is unambiguous as a matter of law based upon their respective proffered constructions – and thus, a renewal of the inquiry previously undertaken by the Tribunal in the context of Rule 18 is necessitated by the Parties' own arguments. Second, and relatedly, a comparison of the Parties' respective Rule 18 submissions and the arguments made at the Hearing makes clear that their positions have subsequently evolved since the Rule 18 stage – at least to some degree – and therefore present new issues. Third, the Tribunal concludes that renewal of the inquiry is appropriate in any event, because, pursuant to New York law, a court may, inter alia, "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed" when determining whether ambiguity exists. Kass, 91 N.Y.2d at 566. Accordingly, that holistic contractual examination is appropriately undertaken by the Tribunal in light of the fulsome evidentiary record developed in conjunction with the Hearing, which was unavailable at the Rule 18 stage. (See generally, Appendix A at 10-11 (discussing the Tribunal's rulings on the Parties' Rule 18 motions)).

their entering into the SPA; (2) at Subsection (a), the Parties agreed to broad restrictions on the Transfer of Other Shareholders Shares by either TRG-P or any Management Shareholders "without the prior written consent of the holders of at least a majority of the then issued AIG Shares", subject only to, as relevant here, "Transfers expressly permitted by this Section 8.6(a)"; and (3) at Subsections (i-iii), the Parties agreed to three discrete exceptions pursuant to which Respondent individually or the Management Shareholders collectively could conditionally sell Other Shareholders Shares if certain events occurred in the future – and to date none of those events have occurred.

Accordingly, Section 8.6(a), inclusive of Subsections (i-iii) but excluding Subsection (iv), requires no interpretation or construction because those provisions individually and collectively have "a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of option." Greenfield, 98 N.Y.2d at 569-70 (cleaned up). The Tribunal therefore concludes that Section 8.6(a), inclusive of Subsections (i-iii) but excluding Subsection (iv), is unambiguous as a matter of New York law.

**ii. Section 8.6(a)(iv)**

It follows that any ambiguity within Section 8.6(a) exists solely within Subsection (iv), which for the benefit of context, again states as follows:

> (iv) Except as specifically prohibited in this Section 8.6(a), there shall be no restriction on (A) the Transfer of Other Shareholders Shares by the Management Shareholders, or (B) the sale by Mr. Chishti of Parent Shares he acquires after the date hereof (other than shares issued with respect to Parent Shares he owns on the date hereof in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization). For the avoidance of doubt, the Parent Shares now held or subsequently acquired by any Management Shareholder other than Mr. Chishti shall neither constitute Other Shareholders Shares for purposes of

> this Agreement nor be subject to any restrictions on the Transfer notwithstanding any provision of this Agreement to the contrary.

(CX-1).

With respect to the presence or absence of ambiguity, the relevant inquiry is whether Subsection (iv): "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Law Debenture Tr. Co. of N.Y., 595 F.3d at 466 (cleaned up). Or, stated even more succinctly, whether Subsection (iv) "on its face is reasonably susceptible to only one meaning . . . ." Greenfield, 98 N.Y.2d at 569-70 (cleaned up).

As explained above, the Parties have advanced substantively disparate interpretations of Subsection (iv), and both have argued in their Post Hearing Briefs and during Closing Oral Arguments that based upon their respective proffered interpretations, Section 8.6(a) generally and Subsection (iv) specifically is unambiguous. In view of that posture, the Tribunal is required to determine the reasonableness of each Party's proffered interpretation: if both are reasonable, then an ambiguity exists on the face of Subsection (iv) as a matter of New York law; but if only one is reasonable, then Subsection (iv) is unambiguous as a matter of New York law because it has been effectively established that Subsection (iv) "on its face is reasonably susceptible to only one meaning".

**a. Claimant's Proffered Interpretation**

Undertaking that task, the Tribunal is persuaded that the interpretation proffered by Claimant is reasonable. To that end, similar to the Tribunal's analysis above, Claimant's proffered interpretation acknowledges, adopts and relies upon the clear and unambiguous meaning of Section 8.6(a) and Subsections (i-iii). Indeed, Claimant argues that, as signaled by its opening

clause, Subsection (iv) provides "confirmation" or "further assurance" that simply reinforces the preceding straight-forward elements of Section 8.6(a). Thus, Claimant fundamentally argues that Subsection (iv) establishes no independent substantive rights, duties and/or obligations under the SPA; but rather that its function is limited to "clarifying" the metes and bounds of the substantive rights, duties and/or obligations found elsewhere in the SPA – and to give Respondent and the Other Management Shareholders comfort that there are no additional Transfer Restrictions in the SPA other than those found in Section 8.6(a).

More specifically, Claimant argues that the opening clause of the first sentence within Subsection (iv) – i.e., "Except as specifically prohibited in this Section 8.6(a)" – establishes and/or signals the "clarifying" purpose of Subsection (iv) as a whole. It refers back to the restrictions found in Section 8.6(a) and makes clear that, whatever else follows in Subsection (iv), the restrictions in Section 8.6(a) remain valid.

Furthermore, Claimant argues that the subsequent clauses – "(A)" and "(B)" within the first sentence, as well as the second full sentence that begins "For the avoidance of doubt" – are reinforcement of concepts that exist elsewhere in the SPA by virtue of defined terms. Thus, pursuant to Claimant's interpretation, because the clause that follows "(A)" – i.e., "the Transfer of Other Shareholders Shares by the Management Shareholders" – inherently captures/subsumes through the use of defined terms the clause that follows "(B)" – i.e., "the sale by Mr. Chishti of Parent Shares he acquires after the date hereof" – "(B)" is redundant and/or superfluous. In addition, the final sentence of Subsection (iv) similarly confirms the status of "Parent Shares now held or subsequently acquired by any management Shareholder other than Mr. Chishti", a point that is already established by the defined term Other Shareholders Shares.

While Claimant concedes – as it must – that its proffered interpretation renders aspects of Subsection (iv) superfluous and/or redundant – such as the clause following "(A") – the Tribunal is nevertheless persuaded that Claimant's proffered interpretation is reasonable because, critically, its adoption foists no ambiguity upon the other relevant unambiguous provisions of the SPA – i.e., the balance of Section 8.6(a) and the defined term Other Shareholders Shares. Moreover, Claimant's proffered interpretation harmonizes with the expressed purpose of Section 8.6(a), which is to establish restrictions on the "Transfer of Shareholders Shares" as a "material inducement" for the Parties to enter into the SPA. In doing so, Claimant's proffered interpretation "does no violence" to any other provision within the SPA, including the other provisions within Section 8.6(a) that undisputedly establish material Transfer Restrictions on Other Shareholders Shares.

The primary shortcoming identified by Respondent regarding Claimant's proffered interpretation is that it renders all of Subsection (iv) "superfluous", "meaningless" or "redundant" in purported contravention of New York law. (See, e.g., Resp.'s Post Hr'g Br. at 9 (quoting LaSalle Bank Nat'l, 424 F.3d at 206)). However, the Tribunal is not persuaded that Respondent's argument has merit for at least two reasons.

First, accepting as reasonable Claimant's position that the overall purpose of Subsection (iv) is to "confirm" the meaning of Section 8.6(a) and other provisions within the SPA, it does not follow – as Respondent appears to assume – that Subsection (iv) is rendered wholly "superfluous", "meaningless" or "redundant". To the contrary, that "confirmation" with respect to the material terms of a complex transactional agreement is, of itself, substantively meaningful – albeit, perhaps, nominally "superfluous" or "redundant" if the balance of the agreement is clear and unambiguous. For that reason, it is unsurprising that Respondent has failed to cite any case applying New York

law – or the law of any jurisdiction – that renders categorically ineffectual the type of confirmatory contractual language Claimant argues exists in Subsection (iv).

Second, and relatedly, as Claimant's Counsel correctly asserted during Closing Oral Argument, the decision in LaSalle Bank Nat'l upon which Respondent primarily relies – as well as New York law more generally – does not proscribe the interpretation of a contract to include confirmatory-type language that is arguably "superfluous", "meaningless" or "redundant" given the presence of other unambiguous contractual provisions. Rather, the decision LaSalle Bank Nat'l simply recites the commonsense maxim under New York law that such a construction "is not preferred and will be avoided if possible." The Tribunal is not persuaded that either LaSalle Bank Nat'l, or any other case applying New York law cited by the Parties, requires a construction of Subsection (iv) that is different than the one proffered by Claimant under the circumstances presented.

Indeed, it would be strange for New York law to require – as Respondent appears to urge – that an unartfully drafted but otherwise unremarkable contractual provision that was negotiated by sophisticated counsel must be accorded substantive meaning that is plainly at odds with other terms – here, Section 8.6(a) – that are unquestionably material to the Parties' overall agreement. To avoid such a result, New York law instead requires the Tribunal to undertake the more holistic approach previously referred to in order to determine whether contractual ambiguity exists. See Kass, 91 N.Y.2d at 566 (N.Y. 1998) (establishing that a court may "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed" when determining whether ambiguity exists.) Id.

### b. Respondent's Proffered Interpretation

Conversely, the Tribunal is not persuaded that Respondent's proffered interpretation of Subsection (iv) is reasonable for several reasons.

In his post-Hearing brief, Respondent illustrates his proffered interpretation of Section 8.6(a) as follows:

> 8.6(a) **General prohibition** on TRG-P and all Management Shareholders (including Mr. Chishti) from any pledging and selling of their shares providing for "expressly permitted" exceptions.
>
> 8.6(a)(i) **Exception** for Mr. Chishti to sell his ***pre-SPA*** TRG-P shares in proportion to AIG selling its TRG-I shares.
>
> 8.6(a)(ii) **Exception** for Management Shareholders (including Mr. Chishti) to sell TRG-I or TRG-P shares upon a TRG-I IPO ***but prohibiting any sales during underwriter lockups in such an event***.
>
> 8.6(a)(iii) **Exception** for TRG-P and Management Shareholders (including Mr. Chishti) to sell TRG-I or TRG-P shares upon AIG publicly selling its shares ***but prohibiting any sales during underwriter lockups in such an event***.
>
> 8.6(a)(iv) **Exception**, subject to ***specific*** restrictions of §8.6(a), for (A) all Management Shareholders (including Mr. Chishti) to pledge and sell TRG-P and TRG-I shares with restrictions continuing "in the hands" of the transferee, and (B) for Mr. Chishti to sell his ***post-SPA*** TRG-P shares with no restrictions continuing to the acquiror.

(Resp. Post Hr'g Br. at 4 (emphasis in original)).

#### 1. An Exception Cannot Obviate a Rule

While Respondent acknowledges that Section 8.6(a) establishes a general prohibition on Transfers, Respondent's interpretation of Subsection (iv), in substance, requires the Tribunal to determine that this general prohibition is then eliminated. Respondent argues that the opening clause of Subsection (iv) – i.e., "Except as specifically prohibited in this Section 8.6(a)" – means only the specifically articulated restrictions of Section 8.6(a) apply. In particular, he states that the

only <u>specific</u> <u>prohibitions</u> within Section 8.6(a) are found in Subsections (ii) and (iii), which impose "lock-up" restrictions on the Management Shareholders in the event of, respectively, a Qualified Public Offering of TRG-I or a Public Sale of certain shares by AIG. (Emphasis added). Respondent concedes that both of those "specific prohibitions" would "travel with" any TRG-I or TRG-P shares that are Transferred under his interpretation of Section 8.6(a)(iv)(A).

But the Tribunal agrees with Claimant that Respondent's foregoing interpretation does not reflect a reasonable or even plausible reading of Section 8.6(a) considered as a whole. To the contrary, Respondent's proposed construction of the term "specifically prohibited" would cause the opening clause of Subsection (iv) to render effectively meaningless the clear and unambiguous "general prohibition" on the Transfers that Respondent acknowledges is established by Section 8.6(a), and that the Tribunal finds to be the foundation of the entire contractual provision. Notwithstanding Respondent's arguments to the contrary, he has simply not reconciled the general prohibition on Transfers that is indisputably established by Section 8.6(a) with the broad (yet nuanced) permissions on Transfer that he contends Subsection (iv) should be interpreted to establish.

For that reason, the Tribunal concludes that Respondent's proffered interpretation violates several basic cannons of contract interpretation, perhaps most fundamentally that: "when interpreting a contract under New York law words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all its provisions." <u>LaSalle Bank Nat'l</u>, 424 F.3d 195 at 206). Axiomatically, even if one views Subsection (iv) as an exception to Section 8.6(a), an exception to a rule cannot reasonably or plausibly be construed to obviate the rule itself – which, in practical effect, is the result Respondent's interpretation would achieve.

**2. Inconsistent and Directly Conflicting Terms**

Further, Respondent's proffered interpretation requires the Tribunal to engage in a complex linguistic exercise that results in grafting substantive meaning onto undefined and uncapitalized terms within Subsection (iv) that are inconsistent with the corresponding capitalized defined terms throughout the SPA. To use a prominent example, Respondent places great importance on the uncapitalized term "sale" that is used within Subsection (iv)(B) – i.e., "the sale by Mr. Chishti of Parent Shares he acquires after the date hereof". (Emphasis added). Respondent contends that within the context of Subsection (iv)(B), the term "sale" must have the same meaning as the defined term "Public Sale", with the supposed result that Subsection (iv)(B) affirmatively grants Respondent permission to freely sell all of the TRG-P shares that he acquired after the SPA was executed, with no restrictions "traveling with" those shares. But that argument is without merit on at least three levels.

First, from the standpoint of basic contract construction, Respondent's contention that the uncapitalized and undefined term "sale" used in Section (iv)(B) must have the same meaning as the capitalized defined term "Public Sale" is unfounded and illogical: when the meaning of a defined term is intended, the drafters of a contract will use the defined term. Contrarily here, the drafters used an undefined and more generic term. Logic and circumstances therefore dictate that the drafters did not intend the undefined and generic term "sale" to have the same meaning as the more specific defined term "Public Sale" that they chose not to use.

Second, and more importantly, even grafting the meaning of the defined term "Public Sale" onto the uncapitalized and undefined term "sale", a "Public Sale" is included within the definition of "Transfer" through the words "any sale". That is critical because Subsection (iv)(A) uses the term "Transfer" as follows: "there shall be no restriction on, (A) the Transfer of Other Shareholders

Shares by the Management Shareholders . . . ." Thus, on its face – and as Claimant argues – Subsection (iv)(A) wholly subsumes and renders inherently superfluous and/or redundant Subsection (iv)(B), which simply describes an event that the defined terms in Subsection (iv)(A) already capture – namely, "Transfer" expressly includes "sale" (and thereby "Public Sale") in its definition; and the term "Other Shareholders Shares" in Subsection (iv)(A) is defined to include TRG-P Shares that Mr. Chishti acquired after the SPA was executed. Thus, the substantive distinction that Respondent attempts to draw between the meaning of Subsection (iv)(A) and Subsection (iv)(B) simply does not exist within Subsection (vi).

Lastly, and perhaps most critically, even accepting all of Respondent's proposed linguistic gyrations, the substantive result that Respondent seeks to achieve is in direct conflict with the plain language of the two other Sections within the SPA that Respondent affirmatively relies upon. More specifically, Respondent argues that Subsection (iv)(A) should be interpreted to establish that he can freely Transfer his TRG-I or TRG-P shares without AIG's consent, but that the restrictions established within Section 8.6(b) ("Right of First Refusal") and Section 8.6(c) ("Tag Along Rights") will continue to "travel with" those shares in the hands of the acquiror. Respondent relies upon that interpretation to distinguish Subsection (iv)(B), which he argues should be interpreted to establish that he can freely Transfer the TRG-P shares that he acquired after the SPA was executed without AIG's consent and without any restrictions "travelling with" those shares.

But Respondent's argument overlooks the same plain and unambiguous term that appears within Section 8.6(b) and Section 8.6(c), which both provide an express exception to their respective applicability in the event of, <u>inter</u> <u>alia</u>, "a sale permitted under Section 8.6(a)". Therefore, Respondent's proffered interpretation of Subsection (iv) is in direct conflict with both Section 8.6(b) and Section 8.6(c), because both of those Sections are, on their face, not applicable

to any "sale permitted under Section 8.6(a)" – and of course, the gravamen of Respondent's position in this proceeding is that Subsection (iv) permits him to sell TRG-P and TRG-I shares. Thus, for the Tribunal to accept Respondent's proffered interpretation of Subsection (iv), it would have to actively ignore or effectively excise other clear and unambiguous terms within the SPA.

**3. Conclusion on Respondent's Proffered Interpretation**

For all these reasons, the Tribunal concludes that Respondent has failed – both at a higher conceptual level, and a more granular level – to proffer an interpretation of Subsection (iv) that is reasonable as a matter of New York law. To the contrary, as the analysis above illustrates, Respondent's proffered interpretation suffers from several elemental flaws, the most important of which are, on the one hand, a failure to accord plain meaning to material terms that are clear and unambiguous on their face, and on the other hand, an effort to ascribe substantive meanings to terms that either find no support within the balance of the SPA, or worse, generate direct conflict. Either of those flaws can be dispositive under New York law – the presence of both, as here, is fatal to Respondent's position.[8]

**iii. Conclusion on Interpretation**

For the reasons explained above, the Tribunal concludes that Claimant's proffered interpretation of Section 8.6(a) is reasonable as a matter of New York law, while Respondent's is not. Claimant's proffered interpretation requires the Tribunal to accept that Section 8.6(a) is – at least in part – "superfluous", but New York law does not require a different interpretation under

[8] Ultimately, as Claimant argues, the Tribunal is left with the impression that throughout this proceeding, Respondent's proffered interpretation has been iteratively re-molded to fit the facts that were established during the course of discovery, as opposed to resting upon a solid foundation built from the four-corners of the SPA and fundamental principles of contract interpretation under New York law. (See Clmt. Post Hr'g Br. at 8-11).

the circumstances presented. Therefore, the Tribunal further concludes, also as a matter of New York law, that Section 8.6(a) is unambiguous and must be interpreted in the manner that Claimant has proffered. That conclusion forms an independent basis for the Tribunal's resolution of the Parties' respective affirmative claims in Claimant's favor.

### D. Analysis of Ambiguity

The Tribunal's foregoing conclusion is independently dispositive with respect to the interpretation of Section 8.6(a) as a matter of New York law. Additionally, for the reasons explained below, the Tribunal separately concludes based upon a review of the evidentiary record developed in conjunction with the Hearing that – had Respondent's proffered analysis been reasonable, thus requiring a resort to extrinsic evidence – the relevant extrinsic evidence also supports Claimant's proffered interpretation. That conclusion forms a second independent basis for the Tribunal's resolution of the Parties' respective affirmative claims in Claimant's favor.

#### i. Parol Evidence

As noted above, the Tribunal has defined the term "parol evidence" to mean evidence of the Parties' negotiations prior to execution of the SPA. The parol evidence in the record takes two forms: testimony from fact witnesses at the Hearing; and documentary evidence related to the drafting of the SPA. (See generally, Appendix A at 11-14 (discussing the Tribunal's rulings on parol/extrinsic evidence following denial of the Parties' Rule 18 motions)). The Tribunal discusses each in turn.

First, two fact witnesses appeared at the Hearing who had knowledge of the negotiations that gave rise to the SPA and therefore provided testimony that can be considered parol evidence: John Leone, who was called by Claimant, has been a member of both the TRG-P and TRG-I Board of Directors since approximately 2006, and was a principal negotiator for AIG in relation to the

SPA; and Respondent, who was the founder of TRG-P and TRG-I, as well as the CEO of both entities when the SPA was negotiated. While both of those individuals testified at length during the Hearing, for purposes of the present parol evidence analysis, their relevant testimony can be summarized as follows:

- Mr. Leone testified that he negotiated and principally drafted the Term Sheet dated May 5, 2005, which memorialized the core provisions of the business agreement reached between TRG-I and AIG. As reflected in the Term Sheet, it was agreed that Mr. Chishti would not be allowed to Transfer any of his shares in either TRG-P or TRG-I without the prior written consent of AIG. Mr. Leone further testified that that aspect of the business agreement/Term Sheet was subsequently formalized in Section 8.6(a) of the SPA. The purpose of the Transfer Restrictions was to prevent Respondent from having the ability to Transfer any TRG-P or TRG-I shares without AIG's consent before AIG could itself Transfer shares and drew no distinction between TRG-P and/or TRG-I shares that Respondent possessed at the time the SPA was executed versus those that he subsequently acquired. (See generally, 9/9/25 Hr'g Tr. at 247-283; CX-41).
- Respondent testified that while he did not directly participate in the negotiations that led to the Term Sheet and later the SPA, he was the ultimate authority at TRG-I, and he consistently made clear to his representatives during the negotiations with AIG – e.g., Mohammed Kaishgi – that he needed to retain the ability to pledge all of his TRG-P and/or TRG-I shares, and to freely sell any TRG-P share that he subsequently acquired. (See e.g., 9/13/24 Hr'g Tr. at 1510-1511). Respondent further testified that it was never represented to him that Section 8.6(a) of the SPA reflected absolute restrictions on his Transfer of TRG-

P and/or TRG-I shares, and that he would not have executed the SPA if he believed that, inter alia, it restricted his ability to pledge the shares he owned. (Id. at 1602-1603).

Thus, from the standpoint of parol evidence, the relevant fact witness testimony of Mr. Leone and Respondent essentially reflects the disparate positions on the interpretation of Section 8.6(a) that the Parties respectively espouse in this proceeding.[9]

More probative, however, is the relevant documentary evidence. On that point, while the Parties have introduced a series of revisions to the SPA that were exchanged between the Parties' counsel during the approximately five-months that a draft of the SPA was being finalized (i.e., between May and October, 2005), those iterative drafts are not of themselves particularly significant as parol evidence, because they typically reflect red-lined revisions that are not accompanied by any commentary or explanation. Instead, the Tribunal is persuaded that two documents shed meaningful light upon the Parties' intentions before they entered into the SPA and are therefore probative as parol evidence.

The first, of course, is the Term Sheet that was signed on May 5, 2005. (CX-5). Therein, among other aspects of their business agreement, the Parties memorialized their agreement to the following under the heading "Transfer Restrictions":

> Except as described below, until the sale by the Investor [AIG] of all of its Series A Preferred Stock and of any equity securities held by Investor, each of TRGP, Zia Chishti and the certain other members of senior management (to be mutually agreed) agree not

---

[9] Notably, while Respondent argues that his testimony should carry great weight as parol evidence – or even be considered unrebutted – because he is the only signatory to the SPA that testified during the Hearing, that argument overlooks that Mr. Leone was a principal negotiator of the underlying business agreement between TRG-I and AIG, as well as the principal draftsman of the Term Sheet. While Mr. Leone may not have been a signatory to the SPA, he was unquestionably a principal for AIG throughout the negotiation process and has direct personal knowledge thereof. By contrast, Respondent's direct participation in the underlying negotiations appears to have been minimal and infrequent. As such, the Tribunal is not persuaded that Respondent's testimony should be accorded any greater weight as parol evidence than Mr. Leone's testimony.

> to sell or transfer directly or indirectly any shares in the Company or TRGP, without the written consent of the Investor.
>
> Disposition of TRGP Shares: As of the date hereof, Zia Chishti currently owns approximately [12]% of the outstanding capital stock of TRGP on a fully-diluted basis. In connection with any public sale of equity by the Investor, Zia Chishti shall be permitted to sell up to 35% of his pro rata portion of his existing shares of TRGP (e.g., if Investor is selling 50% of the shares originally acquired, then Zia Chishti shall be permitted to sell up to 35% of 50% of his TRGP shares in a separate, independent sale (i.e., it is not a tag-along/piggyback right)). Zia Chishti's TRGP shares shall be subject to lock-up for the same period of time as shares of the Company are locked-up in connection with the Company's IPO. Following expiration of the IPO Lockup period described above, the restriction on transfer set forth in the first sentence of this paragraph shall terminate; provided that in no event shall Zia Chishti sell more than 60% of the TRGP shares he owns as of the date hereof until the earlier of (i) five years from the Closing Date and (ii) such time as Investor holds less than 5% of the outstanding shares of Common Stock of the Company. In the event of a private partial sale of equity to the Investor, Management investors in TRGP shall not be permitted to sell their pro-rata portion of their existing shares of TRGP.
>
> Disposition of Company Shares: In connection with any public sale of equity by the Investor, any shares of Common Stock held by management shall be subject to the customary lock-up required by the managing underwriter of such public sale (the "Lockup"). Following expiration of any such Lockup management shall be permitted to sell its shares of Common Stock subject to applicable law, rule, regulation and Company policy.

(CX-41 at 5).

The Tribunal is persuaded that on its face, the Term Sheet – albeit not binding, but considered as an aide to interpretation – more clearly supports Claimant's proffered interpretation of Section 8.6(a) – and the testimony of Mr. Leone – than that proffered by Respondent. Indeed, the opening sentence of the Term Sheet unambiguously reflects that the Parties broadly agreed "not to sell or transfer directly or indirectly any shares in the Company or TRGP, without the written consent" of AIG, subject only to the exceptions described below with respect to the "Disposition" of TRG-P and TRG-I shares. As the Tribunal has determined, that concept is

reflected in Section 8.6(a). Similarly, the exceptions described in the second paragraph of the Term Sheet essentially track the exceptions that are reflected in Section 8.6(a)(i-iii). But nowhere does the Term Sheet state or imply that the Parties agreed to any of the nuanced exceptions that Respondent contends exist by virtue of Section 8.6(a)(iv) with respect to his ability to pledge any of his TRG-P and/or TRG-I shares, and to freely sell his subsequently acquired TRG-P shares. At most, the Term Sheet makes a single reference to Respondent's "existing shares of TRGP" – but that single reference, which in context discretely relates to Respondent's ability to sell TRG-P shares in relation to a public sale by AIG – does not plausibly suggest any broader import or application.

Next, on October 1, 2005 – just days before the Parties executed the SPA on October 1, 2025 – Claimant's Counsel Mark Seneca sent an email to a group that included Mr. Leone and Mr. Kaisghi, and addressed numerous revisions to the draft SPA. Therein, as relevant here, Mr. Seneca stated as follows:

> The definition of "Other Shareholders Shares" was changed to exclude TRG Pakistan (parent shares) held by any management shareholder other than Mr. Chishti so that such shares are not subject to the transfer restrictions applicable to TRG International (company shares) held by such management shareholders. Please note that the parties agreed from the outset that only Mr. Chishti would be restricted as to his parent shares, so the change was made to correct a definitional mistake rather than to implement any substantive change to the business deal. This same concept was further clarified through the addition of the last sentence of 8.6(a)(iv).

(RX-144).

The Tribunal is persuaded that Mr. Seneca's foregoing email is generally supportive of Claimant's proffered interpretation for several reasons. Most importantly, it is direct documentary evidence establishing the Parties' understanding that at least the last sentence of Section 8.6(a)(iv) was intended to be a "clarification" of a substantive concept established elsewhere within the SPA

– i.e., in the definition of "Other Shareholders Shares". In turn, that provides direct support for Claimant's proffered interpretation of Subsection (iv). Moreover, the foregoing email also provides support for Claimant's position that at a very late stage of the Parties' negotiations, no "substantive change to the business deal" had occurred – i.e., to the Parties' agreement as reflected in the Term Sheet.

Finally, and relatedly, the foregoing email serves to illustrate an important overarching point: Respondent has produced no parol evidence, other than his own testimony, that provides any support for the notion that prior to the execution of the SPA, the Parties intended Section 8.6(a) to be interpreted in the way that Respondent now urges in this proceeding. Indeed, using the foregoing email as an example, commonsense dictates that such a "substantive change to the business deal" reflected in the Term Sheet – and to the "business deal" as contained in the draft SPA up until the final language was added to Section 8.6(a)(iv) late in the drafting process – would have somehow been documented by these sophisticated Parties' during the months of negotiations with the assistance of clearly capable counsel at major law firms that culminated in execution of the SPA. The absence of any such documentary parol evidence necessarily supports Claimant's position.

In sum, the Tribunal concludes that on balance, the weight of parol evidence – and particularly the relevant documentary evidence – supports Claimant's proffered interpretation of Section 8.6(a), and provides comparatively little support for Respondent's proffered interpretation.

**ii. Other Extrinsic Evidence**

As noted above, the Tribunal has defined the term "extrinsic evidence" to mean, in addition to parol evidence, other evidence beyond the four-corners of the SPA that might aid in the interpretation of the Parties' intent or the SPA's meaning. The other extrinsic evidence in the

record takes essentially three forms: the Financial Statement that Respondent submitted in the Spottiswoode Arbitration; email correspondence that addressed Respondent's Transfer Restrictions; and evidence related to the Parties' "course of dealing" with respect to Respondent's sales and pledging of TRG-P and TRG-I shares. The Tribunal discusses each in turn.

**a. The Financial Statement**

Respondent submitted a "Statement of Financial Condition" (the "Financial Statement") to the arbitrator in the prior Spottiswoode arbitration proceeding (the "Spottiswoode Arbitration" or the "Spottiswoode Arbitrator"). (CX-24). The Financial Statement was prepared at Respondent's request by the accounting firm Gross, Mendelsohn & Associates, P.A, and purports to reflect Respondent's financial condition as of December 31, 2018 – in substance, Respondent's net worth and income for the year ended 2018.

The cover letter for the Financial Statement represents that "Muhammad Ziaullah Khan Chishti is responsible for the accompanying statement of financial condition as of December 31, 2018 and the related notes to the statement of financial condition in accordance with accounting principles generally accepted in the United States of America." The cover letter further represents as follows in pertinent part:

> As discussed in Notes 3 and 4, <u>the statement of financial condition includes investments in The Resource Group International Limited (TRGI) and TRG Pakistan Limited (TRGP) which are subject to restrictions prohibiting Mr. Chishti from transferring any of his shares in TRGI and TRGP without the prior written consent of certain preferred shareholders of TRGI</u>. As a result of the restrictions, Mr. Chishti has estimated that his shares in TRGI and TRGP have a current value equal to the total amount of debt secured by those shares as of December 31, 2018. The estimated value determined may differ significantly from the values that would have been used had a ready market existed or had an appraisal been prepared for those restricted shares, and the differences could be material to the statement of financial condition.

(CX-24) (emphasis added).

In turn, Note 3 of the Financial Statement, entitled "Investment and Notes Payable – The Resource Group International Limited", represents as follows in pertinent part:

> Pursuant to the terms and provisions of a Preferred Stock Purchase Agreement, Zia Chishti is prohibited from transferring any of his shares in TRGI and TRG Pakistan Limited (TRGP) without the prior written consent of certain preferred shareholders of TRGI. As a material inducement for an investor group to purchase $30 million of TRGI preferred stock, the management shareholders of TRGI (which includes Zia Chishti) and TRGP (the parent company of TRGI) agreed to be bound by restrictions prohibiting transfers of their shares of stock in TRGI and TRGP (see Note 4). The agreement states that any attempted transfer of shares shall be void and that TRGI shall not recognize or give effect to such transfer. As a result of this restriction, prohibiting Zia Chishti from transferring shares, it has been estimated that his TRGI shares have a current value of as of December 31, 2018 equal to the total debt (principal and accrued interest) secured by those shares which totals $561,000 . . . .

(Id. at 5) (emphasis added).

And Note 4 of the Financial Statement, entitled "Investment – TRG Pakistan Limited", similarly represents as follows:

> Zia Chishti owns 84,808,789 shares of TRG Pakistan Limited, a publicly traded company listed on the Karachi Stock Exchange. The market value of those shares based on the closing price at December 31, 2018 totals $13,569,400 before consideration of the impact on value resulting from restrictions on the transferability of the shares. As disclosed in Note 3, pursuant to the terms and conditions of a Preferred Stock Purchase Agreement, Zia Chishti is prohibited from transferring any of his shares in TRGI and TRG Pakistan Limited without the prior written consent of certain preferred shareholders of TRGI. As a result of this restriction prohibiting Zia Chishti from transferring shares, it has been estimated that his TRGP shares have a current value as of December 31, 2018 equal to the total debt (principal and accrued interest) secured by those shares which totals $1,119,700 . . . .

(Id. at 7) (emphasis added).

Claimant argues based upon the foregoing representations in the Financial Statement that Respondent should be judicially estopped from taking a contrary position in this proceeding. In support of that argument, Claimant contends that at multiple points in the Financial Statement, Respondent affirmatively represented to Spottiswoode Arbitrator that: the SPA prohibits Respondent from transferring "any of his shares" in either TRG-I or TRG-P without AIG's prior written consent; and resultantly, Respondent's shares of both TRG-I and TRG-P were worth a fraction of their fair market value. Alternatively, Claimant asserts that if Respondent is not judicially estopped, the Tribunal should consider the Financial Statement a judicial admission in this proceeding.

Respondent counters that the representations made in the Financial Statement are "wholly reconcilable with the positions he has taken in front of this Tribunal" for several reasons – e.g., based upon such factors as Pakistani currency control regulations and that the transfer restrictions that "travel" with any Transfer he makes would lower the value of the securities – and that in any event, the requirements for judicial estoppel have not been met. (See generally, Resp. Post Hr'g Br. at 39).

With respect to Claimant's request for judicial estoppel, the Second Circuit has recently explained the applicable standard:

> Under New York law, the equitable doctrine of judicial estoppel provides that, "'[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 147 (2d Cir. 2005) (quoting New Hampshire v. Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). The doctrine applies if: "1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two

> positions would derive an unfair advantage against the party seeking estoppel." DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (quotation marks omitted).

United States v. Swartz Fam. Tr., 67 F.4th 505, 519 (2d Cir. 2023).

Further, as to the second and third prongs of the foregoing analysis, the Second Circuit has stated that: "judicial estoppel applies only when a tribunal in a separate proceeding has relied on a party's inconsistent factual representations and has rendered a favorable decision." Wal-Mart Stores Inc. v. Visa U.S.A, Inc., 396 F.3d 96, 120 (2d Cir. 2005). The Second Circuit has also clarified that: "we further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain. This latter requirement means that judicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements." In re Adelphia Recover Tr., 634 F.3d 678, 696 (2d Cir. 2011) (cleaned-up).

New York state courts have adopted an analysis that is consistent with the Second Circuit, but arguably more explicit about the requirement for a favorable prior judgment. As the Second Department explained: "the doctrine of judicial estoppel precludes a party from framing his [or her] pleadings in a manner inconsistent with a position taken in a prior judicial proceeding . . . the doctrine will be applied only where a party to an action has secured a judgment in his or her favor by adopting a certain position and then has sought to assume a contrary position in another action simply because his [or her] interests have changed." One Beacon Ins. Co. v. Espinosa, 37 A.D.3d 607, 608 (2d Dep't 2007) (cleaned up).

Applying that standard here, the Tribunal is not persuaded that judicial estoppel is appropriate. Based upon the present record, it is unclear whether the Spottiswoode Arbitrator actually considered or relied upon the Financial Statement for any purpose. On that point, while Claimant established that the Financial Statement was physically submitted to the Spottiswoode

Arbitrator by Respondent, Claimant did not establish that the Financial Statement was considered, cited to or otherwise referenced as part of the Spottiswoode Arbitrator's determination regarding the appropriate measure of punitive damages that were awarded against Respondent in the Spottiswoode Arbitraton. Moreover, Claimant has not established that any representation made by Respondent in the Financial Statement resulted in a judgment favorable to Respondent. To the contrary, it appears undisputed that the Spottiswoode Arbitrator found Respondent liable for several million dollars in punitive damages – a result that cannot, at least without more, be considered favorable to Respondent. Finally, the Tribunal perceives no risk of inconsistent results or adverse impact upon judicial integrity under the circumstances presented. For these reasons, the Tribunal concludes that Claimant's request to apply the equitable doctrine of judicial estoppel with respect to the Financial Statement must be denied.

However, the Tribunal is persuaded that the Financial Statement should be considered a judicial admission under New York law. With respect to judicial admissions, the New York Court of Appeals has explained as follows:

> Informal judicial admissions are recognized as "facts incidentally admitted during the trial or in some other judicial proceeding, as in statements made by a party as a witness, or contained in a deposition, a bill of particulars, or an affidavit" (Prince, Richardson on Evidence § 8-219, at 529 [Farrell 11th ed] [citations omitted]). "A formal judicial admission in one action may become an admission in the evidentiary sense in another action, and would be classified as an informal judicial admission in the later action" (Richardson, op. cit., at 530). To be sure, they are not conclusive, though they are "evidence" of the fact or facts admitted (Richardson, op. cit., at 530).

In re Liquidation of Union Indem. Ins. Co. of N.Y., 674 N.E.2d 313, 318 (N.Y. 1996).

Applying that standard here, because Claimant has established that Respondent affirmatively submitted the Financial Statement to the Spottiswoode Arbitrator for substantive

consideration, the Tribunal is persuaded that the Financial Statement is appropriately considered a judicial admission in this proceeding. Therefore, while the Financial Statement is not "conclusive" of any facts contained therein, it is nevertheless evidence in this proceeding, and as such must be accorded appropriate weight in the Tribunal's discretion.

Considering the substantive contents of the Financial Statement and the circumstances under which it was generated and submitted to the Spottiswoode Arbitrator, the Tribunal concludes that the Financial Statement must be accorded very significant weight as evidence for the dual purposes of: demonstrating Respondent's understanding prior to the commencement of this proceeding with respect to the Transfer Restrictions that exist under the SPA; and concomitantly, impeaching Respondent's credibility with respect to his testimony during the Hearing that was contrary to the representations that he made in the Financial Statement.

Indeed, as to both points, the Tribunal concludes that the representations made by Respondent in the Financial Statement clearly and unequivocally support the interpretation of Section 8.6(a) that Claimant has proffered, and Respondent's post hac efforts during his testimony (and in his post-Hearing submissions) to reconcile those representations with the interpretation of Section 8.6(a) that he has proffered in this proceeding are specious and wholly unavailing.

More specifically, Respondent argues that the Financial Statement is accurate and/or reconcilable with his proffered interpretation of Section 8.6(a) because the information therein: reflects "estimates of value for ***both*** *his TRG-I and TRG-P shares on* ***both*** *a restricted and unrestricted* basis"; is accurate regarding "all TRG-I shares and *pre-SPA* TRG-P shares"; and is accurate "in the context of whether Mr. Chishti could sell those shares to pay a punitive damages award in the U.S." based upon Pakistani currency control regulations. (Resp. Post Hr'g Br. at 39-40 (emphasis in original)). But Respondent's foregoing arguments all fail to address the most

critical aspect of the Financial Statement for purposes of this proceeding: namely, the fact that on three separate and distinct occasions in the Financial Statement, Respondent represented to the Spottiswoode Arbitrator without qualification that pursuant to the SPA, in substance, he is "prohibited from transferring any of his shares in TRGI and TRG Pakistan Limited (TRGP) without the prior written consent of certain preferred shareholders of TRGI." None of Respondents' various explanations impact upon the straightforward meaning of those repeated representations, which are facially antithetical to Respondents' proffered interpretation of Section 8.6(a).[10] Stated differently, Respondent has provided no plausible (or, in fact, credible) explanation of how his straightforward and unequivocal representations in the Financial Statement regarding the Transfer Restrictions in the SPA can be construed as consistent with the nuanced and substantively permissive interpretation of Section 8.6(a) that he now urges the Tribunal to accept.

For these reasons, the Tribunal concludes that while the Financial Statement cannot appropriately give rise to judicial estoppel under New York law, it should be considered a judicial admission and is accorded very significant weight as evidence in favor of Claimant's proffered interpretation of Section 8.6(a).[11]

---

[10] The incongruity of Respondent's explanation is amplified when considering the inconsistency in the language of the cover letter – "The estimated value determined may differ significantly from the values that would have been used had a ready market existed . . . for those restricted shares . . . ." – with the fact that under Respondent's interpretation of the restrictions as relates to his "after-acquired" TRG-P public shares, a ready, liquid market does exist and could have been used to value the shares if, as Respondent now argues, he was free to sell on the public exchange.

[11] In so concluding, the Tribunal clarifies its determination that the Financial Statement, as well as the circumstances related to its submission and possible consideration in the Spottiswoode Arbitration, comprise the only relevant extrinsic evidence developed in conjunction with the Spottiswoode Arbitration and/or Claimant's allegations regarding Respondent's misconduct. While the Tribunal has considered all evidence developed in conjunction with the Hearing, any evidence generally related to the Spottiswoode Arbitration and/or Claimant's allegations regarding Respondent's misconduct ultimately have had no bearing upon the substantive legal issues

b. **Email Correspondence**

On numerous occasions after the SPA was executed, Respondent received emails from various TRG personnel that discussed aspects of Respondent's Transfer Restrictions under Section 8.6(a) of the SPA. For example, on at least three occasions between August 6, 2019 and January 27, 2020, Hasnain Aslam – a Management Shareholder under the SPA – emailed Respondent and expressed his understanding of applicable Transfer Restrictions imposed by the SPA, which appear to have generally aligned with Claimant's proffered interpretation of Section 8.6(a). (See CX-29; CX-30; and CX-32). As other examples, on at least seven occasions between January 15, 2019 and July 21, 2021, Pat Costello – General Counsel of TRG Holdings (a subsidiary of TRG-I), who testified as a fact witness at the Hearing – emailed Respondent and similarly discussed his understanding of applicable Transfer Restrictions imposed by the SPA, which also appear to have generally aligned with Claimant's proffered interpretation of Section 8.6(a). (See CX-25; CX-28; CX-29; CX-30; and C-31). However, it appears that on none of the foregoing occasions did Respondent manifest any disagreement with the views expressed by Messrs. Hasnain and Costello.

Based upon the foregoing evidentiary landscape, Claimant argues that Respondent's repeated silence should be deemed an "adoptive admission" under New York law. Respondent disagrees and argues, inter alia, that the viewpoints expressed by Messrs. Hasnain and Costello at times reflected indisputably erroneous interpretations of Section 8.6(a), and therefore, commonsensically, Respondent's silence could not rise to the level of an admission.

The primary authority cited by Claimant for the existence of an "adoptive admission" under New York law is People v. Campney, 94 N.Y.2d 307, 311 (N.Y. 1999), which is a criminal case

---

presented by the Parties' respective affirmative claims in this proceeding, and as such, are not discussed further herein. (See generally, Appendix A at 14-15 (discussing the Tribunal's rulings on motions in limine related to the afore-mentioned evidence); see also Footnote 2, supra).

that relates to a defendant's purported adoption of a confession of guilt via third-party statement. It appears that the only case cited by Claimant reflecting the existence of an "adoptive admission" under New York law in the civil context is Experience Hendrix, LLC v. Chalpin, 461 F. Supp. 2d 165, 171-172 (S.D.N.Y. 2007), in which the Court stated that: "a failure of a witness to deny an accusation in circumstances in which such denial reasonably would be expected constitutes an adoptive admission." But in support of that proposition, the Court cited two federal criminal cases – one from the Supreme Court of the United States and the other from the Second Circuit. It thus seems likely that the Court was extrapolating a concept generally derived from the Federal Rules of Evidence and/or from federal common law – neither of which are applicable in this proceeding or binding upon the Tribunal.

In any event, the Tribunal is not persuaded that Claimant has adequately established that the "adoptive admission" doctrine it seeks to impose upon Respondent is well recognized as a matter of substantive New York civil law. The Tribunal therefore concludes that Claimant's request must be denied.

In so concluding, however, the Tribunal clarifies that the email correspondence upon which Claimant's request is based unquestionably comprises probative extrinsic evidence – as does Respondent's silence – and that extrinsic evidence collectively carries considerable weight in favor of Claimant's proffered interpretation of Section 8.6(a). Indeed, the Tribunal finds it significant that during the relevant time period, senior TRG personnel – including fellow Management Shareholders – repeatedly expressed views to Respondent on the SPA's Transfer Restrictions that are materially different than the position Respondent has taken in this proceeding; yet at no time did Respondent express any disagreement with the views being expressed to him, and he certainly did not articulate his current position. The Tribunal finds that lack of refutation all the more

meaningful when viewed in the context of all the evidence that has been developed – including Respondent's own extensive testimony at the Hearing – that established Respondent was generally proactive and engaged.[12]

For these reasons, the Tribunal concludes that while the email correspondence at issue – and Respondent's consistent failure to disagree with the views stated therein – cannot be considered an "adoptive admission" under New York law, it collectively comprises probative extrinsic evidence and is accorded considerable weight in favor of Claimant's proffered interpretation of Section 8.6(a).

**c. Course of Dealing**

Finally, it is undisputed that in the years following execution of the SPA, Respondent periodically Transferred TRG-P and TRG-I shares.

More specifically, as the Parties' post-Hearing briefs collectively discuss, the evidentiary record establishes the following relevant facts:

- In eight discrete transactions that occurred between March, 2017 and December, 2017, Respondent sold a total of 20,416,475 TRG-P shares.

[12] For the avoidance of doubt, the relevant issue is not the truth or correctness of the views expressed by Messrs. Hasnain and Costello in the underlying emails; but rather, that those individuals expressed views in conflict with the interpretation of Section 8.6(a) that Respondent has proffered in this proceeding, and Respondent expressed no contemporaneous objection thereto. For that reason, the so-called "smoking gun" email sent from Pat Costello to Respondent on September 14, 2020 – in which, as relevant here, Mr. Costello stated his (erroneous) view that only the pre-SPA TRG-P shares owned by Respondent are restricted – does not materially impact upon the Tribunal's foregoing analysis or conclusion regarding the overall weight of this extrinsic evidence. (RX-91). Moreover, to the extent that the Tribunal considers the substance of these communications, Mr. Costello's September 14, 2020 email is quantitatively outweighed by numerous other emails that Respondent received – several of which were sent by Mr. Costello himself – that express different views of the Transfer Restrictions in the SPA.

- Each of those sales were disclosed in the TRG-P Annual Report for the year in which the sale occurred.
- For at least the first two of those transactions – i.e., Respondent's sale of 4,177,000 TRG-P shares on March 12, 2014, and Respondent's sale of 10,000,000 TRG-P shares on July 26, 2014 – the Minutes for the corresponding quarterly Board of Directors meetings reflect that the TRG-P Board was expressly "acquainted about" those sales.
- Respondent did not seek or receive AIG's prior written consent for any of those sales.
- In various transactions between 2013 and 2021, Respondent pledged and subsequently released pledges on at least 51,854,000 TRG-P shares.
- Most if not all of those pledges were disclosed in the TRG-P Annual Report for the year in which the pledge occurred and/or was released – albeit on a net basis and not on a detailed transaction-by-transaction basis.
- On six discrete occasions between December, 2019 and January, 2022, Claimant requested and received AIG's prior written consent to sell TRG-I shares.
- On one occasion, Claimant requested AIG's prior written consent to sell TRG-I shares, but was denied.

Importantly, Respondent also established that Hasaan Farooq – the CFO of TGR-I, who testified at the Hearing – routinely assisted Respondent during the relevant time period with his Transfers of TRG-P and TRG-I Shares and kept detailed records for compliance purposes. Indeed, Respondent established that due primarily to Mr. Farooq's efforts (and that of his staff), apparently all of the aforementioned Transfers were duly reported to the appropriate Pakistani regulatory authorities.

Respondent argues that the foregoing evidentiary landscape comprises compelling post-SPA execution "course of dealing evidence" in support of Respondent's proffered interpretation of Section 8.6(a). Indeed, Respondent contends that every one of the Transfers described above accords precisely with his proffered interpretation, namely: that he sought and obtained AIG's prior written consent before selling any TRG-I Shares; but was not required to and therefore did not obtain AIG's prior written consent, either to pledge his TRG-I or TRG-P Shares or to freely sell his post-SPA acquired TRG-P Shares.

But as Claimant correctly observed during Closing Oral Argument, Respondent has provided no legal authority in support of his arguments that fall under the general aegis of "course of dealing." Filling that important void, Claimant argues in its Post-Hearing Brief that under New York law, for course of dealing evidence "to become relevant to interpretation" it must establish a "mutual understanding over a period of time" between the Parties. (Clmt. Post Hr'g Br. at 32 (quoting Sharon Steel v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982)). Claimant also cites the Second Circuit's more recent decision in Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 112 (2d Cir. 2006). (Id. at fn. 147). Therein, the Second Circuit explained the following largely historical standard:

> In interpreting an ambiguous contract provision, the factfinder "should, when possible, apply the same measure as the parties have applied in performing their obligations." William C. Atwater & Co. v. Panama R. Co., 255 N.Y. 496, 501, 175 N.E. 189, 191 (1931); see, e.g., Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118, 33 S. Ct. 967, 57 L.Ed. 1410 (1913) (of "great" significance is the "practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy"). "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202(4) (1979); see also

> Brooklyn Life Insurance Company of New York v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410 (1877) ("There is no surer way to find out what the parties meant, than to see what they have done . . . Parties in such cases often claim more, but rarely less, than they are entitled to.").

Meyers, 442 F.3d 101 at 112. Claimant further notes that the Second Circuit has also made clear that "a course of dealings analysis does require, of course, an indication of the common knowledge and understanding of the parties." (Clmt. Post Hr'g Br. at n. 177 (quoting New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24, 31 (2d Cir. 1997)).

Applying that standard here, the Tribunal is persuaded that while the aforementioned course of dealing evidence presents a much closer question than the other extrinsic evidence previously discussed, it nevertheless ultimately fails to provide determinative support for Respondent's proffered interpretation of Section 8.6(a).

To that end, Respondent has convincingly established that the various Transfers described above were publicly disclosed and therefore non-secret and objectively "knowable". But even more than that, Respondent has also convincingly established that Claimant TRG-I must reasonably be charged with actual knowledge of Respondent's Transfers for multiple reasons.[13]

First, Mr. Farooq, Claimant's CFO, routinely assisted Respondent during the relevant time period with his Transfers of TRG-P and TRG-I Shares and kept detailed business records thereof for compliance purposes. The Tribunal is persuaded that under the circumstances, Mr. Farooq's

[13] Notwithstanding the importance of the AIG role – given its particular interest in the enforcement of Section 8.6(a) and as discussed below in the text – TRG-I is also a party to the SPA and therefore has an interest in the enforcement of its provisions. As noted by Respondent frequently throughout this proceeding, TRG-I is the Claimant, not AIG; and as noted in response by Claimant, TRG-I is a Party to the proceedings because it indeed does have such an interest in enforcing the SPA and has the standing to do so. Accordingly, TRG-I's knowledge of transfers and its non-objection thereto is relevant course of dealing evidence, even if, as discussed below in the text, its interest, knowledge or lack of knowledge, and non-objection, are not as significant as that of AIG.

knowledge and activities as CFO is sufficient to impute actual knowledge to Claimant TRG-I. Second, Respondents' Transfers were reported to the Pakistani regulatory authorities by TRG-P and disclosed in TRG-P's Annual Reports. The Tribunal finds that those corporate actions are conclusive evidence of TRG-P's actual knowledge and therefore imputes such knowledge to TRG-I given the interlocking/overlapping nature of the TRG-P and TRG-I Board and senior leadership, as discussed immediately below.

Third, the two sets of TRG-P Board Minutes that were produced by Respondent as part of discovery establish – albeit through the use of unorthodox phraseology – that at least two of Respondent's sales of TRG-P shares were affirmatively disclosed to the TRG-P Board of Directors as part of the subsequent quarterly Board of Directors meeting.[14] On that point, it has been established that pursuant to the terms of the SPA, the Boards of Directors for TRG-I and TRG-P were apparently identical at all relevant times; and thus, any information disclosed to the TRG-P Board of Directors was, ipso facto, simultaneously disclosed to the TRG-I Board of Directors. In light of those facts, the Tribunal can (and does) infer in sum that: if TRG-P knew; then TRG-I – i.e., Claimant – also knew.[15]

---

[14] The Tribunal concludes that it is appropriate to infer that Respondent's additional sales of TRG-P shares were similarly disclosed to the Board of Directors at the subsequent quarterly Board of Directors meetings, although no additional Board Minutes were produced in discovery. That inference is appropriate because, as explained above, Respondent's sales of TRG-P shares were contemporaneously known to TRG-P, and logic dictates that if Respondent's sales were disclosed during the two Board of Directors meetings for which Minutes have been produced, they would similarly have been disclosed during the other Board of Director meetings for which Minutes have not been produced. While Claimant argues that it was never required to produce TRG-P Board Minutes in discovery, Claimant does not contend that it was unable to produce them, and given Claimant's arguments in this context, commonsense dictates that Claimant would have produced additional TRG-P Board Minutes if they demonstrated that Respondent's sales of TRG-P shares had not in fact been disclosed to the TRG-P Board of Directors.

[15] In drawing that inference, the Tribunal clarifies its explicit conclusion that while Claimant TRG-I and TRG-P are formally separate corporate/legal entities, in reality they are the corporate equivalent of conjoined twins because: they share the same founder, the same senior executives,

For all of these reasons, the Tribunal finds that Claimant TRG-I had actual knowledge of Respondent's Transfers during the relevant time period.

The Tribunal is also persuaded that Respondent has established that AIG consistently had sufficient knowledge of Respondent's purchases and sales of TRG-P shares such that AIG must reasonably be found to have actual knowledge thereof.

Relevant to that finding, during his testimony at the Hearing, John Leone – who was one of AIG's two representatives on the TRG-P and TRG-I Boards – testified that: he was not aware of Respondent's Transfers other than the TRG-I Transfers for which he sought AIG's approval; he did not read the TRG-P Annual Reports; and the detailed financial disclosure portions of the TRG-P Annual Reports in which Respondent's Transfers were disclosed were not included within the materials that the Board of Directors was required to review and approve – a fact that was confirmed by the testimony of Mr. Farooq during his testimony.

But even crediting Mr. Leone's testimony, the Tribunal concludes that in view of all the facts established above, AIG must also be charged with reasonably contemporaneous knowledge of at least Respondent's purchases and sales of TRG-P shares. More specifically, given the explicit disclosure of those purchases and sales both at the Board of Directors Meetings and in the TRG-P Annual Reports, Claimant's contention that AIG can plausibly be considered to have had no knowledge simply defies common sense, and under the circumstances, would require the Tribunal to find a level of persistent disconnectedness by the AIG-appointed Board Members with respect to relevant factual matters that the Tribunal is not persuaded could plausibly have existed

---

and many if not all of the same Board Members. Thus, based upon the facts that have been established here, the actual knowledge of one corporate entity is, ipso facto, the actual knowledge of the other.

throughout responsibly governed corporate entities, which both TRG-I and TRG-P appear to have been during the relevant time period.

Importantly though, there is insufficient evidence that AIG had actual knowledge – direct or imputed – of Respondent's extensive pledging of TRG-I and TRG-P Shares during the relevant time period, which were of course also subject to the Transfer Restrictions. In contrast to Respondent's explicitly-disclosed purchases and sales of TRG-P shares, Respondent's pledging activity was apparently not disclosed to the Board of Directors as part of Board Meetings, and as noted above, the disclosures of Respondent's pledging activity in the TRG-P Annual Reports – while consistently made – were at best opaque.[16]

In view of all the facts and circumstances discussed above, the Tribunal concludes that the considerable volume of "course of dealing" extrinsic evidence in the record is relevant and establishes that: Claimant TRG-I had actual knowledge of Respondent's Transfers during the relevant time period; AIG also must be charged with actual knowledge of Respondent's purchases and sales of TRG-P shares during the relevant time period; but AIG cannot be charged with actual or constructive knowledge of Respondent's pledging activity with respect to either TRG-I or TRG-

[16] Unknowable based upon the evidentiary record is how, if at all, the testimony of Patrick McGinnis – the second AIG representative on the TRG-I and TRG-P Boards – might have affected upon the Tribunal's foregoing analysis. It appears that, unlike Mr. Leone, Mr. McGinnis also served on the TRG-P Board's Audit Committee, which theoretically might have resulted in his having more direct involvement with reviewing the disclosures that were made as part of TRG-P's Annual Reports, and therefore, additional knowledge of the various Transfers that were made by Respondent during the relevant time period – e.g., of the 2013 "repo" transaction that drew the attention of Pakistani regulators and required the involvement of TRP-P's auditor, KPMG. But Mr. McGinnis did not testify during the Hearing, and little if any evidence was produced in relation to him throughout the proceeding. Therefore, the Tribunal has no basis to make any further findings or inferences beyond what is reflected above. And on a more general but nevertheless related point, the Tribunal notes that throughout this proceeding, Respondent has highlighted the absence of certain witnesses, including Mr.McGinnis, but has never requested that the Tribunal issue a third-party subpoena for the testimony of any individual under the control of AIG or TRG-P.

P shares during the relevant time period. Viewed collectively, the Tribunal accords the afore-mentioned facts considerable weight in favor of Respondent's proffered interpretation of Section 8.6(a) of the SPA.

Nevertheless, as the case law cited above makes clear, for course of dealing evidence "to become relevant to interpretation", there must be "an indication of the common knowledge and understanding of the parties", or expressed differently, "mutual understanding over a period of time." And in the present context, the most important counterparty whose "mutual understanding" and "common knowledge" forms the most critical touchstone is AIG – not Claimant TRG-I – because it is AIG that possessed the consent rights in Section 8.6(a) that are fundamentally at issue in this proceeding.

Here, the Tribunal cannot conclude – as Respondent fundamentally urges – that the "course of dealing" extrinsic evidence sufficiently establishes "mutual understanding over a period of time" as between the parties to the SPA – and most critically AIG – with respect to all of Respondent's Transfers such that the "course of dealing" extrinsic evidence can be considered determinative in favor of Respondent's proffered interpretation of Section 8.6(a) of the SPA – overriding all other evidence to the contrary. The Tribunal is simply not persuaded that AIG's non-objection to Respondent selling TRG-P shares on a handful of occasions over the course of approximately a decade, paired with AIG's lack of knowledge with respect to Respondent's much more extensive pledging activity, fully satisfies the high standard established under New York law to dictate – irrespective of the other extrinsic evidence – the adoption of Respondent's proffered interpretation of Section 8.6(a) of the SPA based upon "course of dealing" extrinsic evidence.[17]

---

[17] In so concluding, the Tribunal clarifies that to the extent Respondent has argued that the course of dealing extrinsic evidence has resulted in the substantive waiver of any rights under the SPA, that argument is without merit. As noted above the SPA contains a non-waiver clause at Section

Rather, the Tribunal concludes that it is appropriate for the relevant "course of dealing" extrinsic evidence discussed above – and the findings made by the Tribunal in respect thereto – to be weighed against all other extrinsic evidence developed in conjunction with the Hearing.

**d. Conclusion Regarding Other Extrinsic Evidence**

The Tribunal concludes that on balance, the clear weight of relevant other extrinsic evidence supports Claimant's proffered interpretation of Section 8.6(a), and provides comparatively less support for Respondent's proffered interpretation.

With respect to the Financial Statement, the Tribunal concludes that while judicial estoppel is not appropriate, the Financial Statement is nevertheless a judicial admission, and carries very significant – indeed, almost independently determinative – weight as evidence in favor of Claimant's proffered interpretation of Section 8.6(a) for the dual purpose of demonstrating Respondent's understanding prior to the commencement of this proceeding with respect to the Transfer Restrictions that exist under the SPA; and concomitantly, impeaching Respondent's credibility with respect to his testimony during the Hearing that was contrary to the representations that he made in the Financial Statement.

With respect to the email correspondence that Respondent received from various TRG personnel that expressed views on the SPA's Transfer Restrictions that are materially different

---

10.6, which expressly establishes that: "No failure by any party to any action against any breach of this Agreement or default by any other party shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action." Notwithstanding Respondent's arguments to the contrary, "[n]o waiver clauses are valid and enforceable under New York law." Park Irmat Drug Corp v. Optumrx, Inc., 152 F. Supp. 3d 127 (S.D.N.Y. 2016). And in any event, "waiver is an intentional relinquishment of a known right and should not be lightly presumed." Condor Funding, LLC v. 176 Broadway Owners Corp., 46 N.Y.S.3d 99, 101 (1st Dep't 2017). Thus, even in the absence of the non-waiver clause at Section 10.6 of the SPA, for all of the same reasons explained above, Respondent did not establish that AIG intentionally relinquished any known right established within the SPA by its actions and/or omissions.

than the position Respondent has taken in this proceeding, and with which Respondent did not contemporaneously disagree, the Tribunal concludes that while that extrinsic evidence is not an "adoptive admission" by Respondent under New York law, it nevertheless collectively comprises probative evidence that is accorded significant – albeit not independently determinative – weight in favor of Claimant's interpretation of Section 8.6(a).

Lastly, with respect to the "course of dealing" extrinsic evidence, the Tribunal concludes that Respondent has established that: Claimant TRG-I must reasonably be charged with actual knowledge of his various Transfers during the relevant time period; AIG must reasonably be charged with actual knowledge of his purchases and sales of TRG-P shares during the relevant time period; but AIG cannot reasonably be charged with actual or constructive knowledge of Respondent's pledging activity with respect to either TRG-I or TRG-P shares during the relevant time period. Those facts carry significant weight in favor of Respondent's proffered interpretation of Section 8.6(a). However, the Tribunal does not conclude that the "course of dealing" extrinsic evidence is determinative in favor of Respondent's proffered interpretation of Section 8.6(a).

In sum, had the Tribunal been required to consider the relevant other extrinsic evidence in an effort to determine which of the Parties' proffered interpretations is correct, the Tribunal concludes that, on balance, the weight of extrinsic evidence supports Claimant's proffered interpretation of Section 8.6(a). While Respondent has established facts through other extrinsic evidence that weigh in favor of his proffered interpretation of Section 8.6(a), those facts are outweighed – both qualitatively and quantitatively – by the facts established by Claimant through other extrinsic evidence in favor of Claimant's proffered interpretation of Section 8.6(a).

### E. Conclusion on Breach of the SPA

Based upon the entire analysis above, the Tribunal reaches two conclusions that each independently form a basis to resolve the Parties' respective affirmative claims in Claimant's favor: (1) that Section 8.6(a) is unambiguous as a matter of New York law and must be construed in the manner proffered by Claimant[18]; and (2) the weight of relevant parol evidence and other extrinsic evidence militates in favor of Claimant's proffered interpretation of Section 8.6(a), and provides comparatively less support for Respondent's proffered interpretation. Accordingly, based upon either or both of those conclusions, the Tribunal further concludes that Claimant has established Respondent's liability for breach of Section 8.6(a) of the SPA, because it is undisputed and has otherwise been established that after the SPA was executed, Respondent on multiple occasions Transferred Other Shareholders Shares – i.e., pledged TRG-P and TRG-I Shares and sold TRG-P Shares without seeking or obtaining the prior written approval of AIG – in violation of the Transfer Restrictions established within Section 8.6(a).

---

[18] In light of the conclusion that Section 8.6(a) is unambiguous, Respondent's arguments under the doctrine of contra proferentem are moot, because that doctrine is only potentially applicable as an aid to resolve contractual ambiguity. See e.g., Aircraft Services Resales LLC v. Oceanic Capital Co., Ltd., 2013 WL 4400453 at *4 (S.D.N.Y. Aug. 14, 2013) ("New York law provides that ambiguities in a contract must be construed against the drafter."). But in any event, the Tribunal is not persuaded that the doctrine of contra proferentem could be appropriately applied in this case, given that the SPA was extensively negotiated by sophisticated parties represented by counsel. See e.g., Flannigan v. Vulcan Cap. Mgmt., Inc., 2008 WL 11517448, at *5 (S.D.N.Y. Apr. 30, 2008) (the doctrine of contra proferentem "does not apply when both parties participate in the [contractual] negotiation and drafting process."). Even if Mr. Chishti were not separately represented by counsel, the evidence adduced at the Hearing – including evidence offered by Mr. Chishti – showed that he was actively involved "behind the scenes" in the negotiation of the SPA and, as the senior shareholder and Chairman of TRG-I, had significant, if not overriding, influence over that party's negotiating position. In addition, the Tribunal explicitly rejects the position taken by Respondent that because AIG's counsel prepared the first draft of Section 8.6(a)(iv), and TRG-I chose to accept that language, even though it could have negotiated it, then the doctrine of contra proferentem applies; New York law does not allow for that application of the doctrine under those circumstances.

**3. Remedies**

Following the conclusion that Respondent's Transfers of Other Shareholders Shares breached Section 8.6(a) of the SPA, the Tribunal must consider Claimant's requested remedies. To that end, in its post-Hearing brief, Claimant clarifies the remedies that it seeks against Respondent in this proceeding:

> Claimant respectfully requests that the Tribunal (1) declare Mr. Chishti to have breached the SPA, (2) permanently enjoin Mr. Chishti from directly or indirectly Transferring any TRG-I or TRG-P securities owned by him (which includes his beneficially owned securities in the name of his wife) without the prior written consent of AIG, and (3) declare all existing pledges by Respondent of TRG-I and TRG-P securities to be void.

(Clmt. Post Hr'g Br. at 48). The Tribunal shall discuss each of the foregoing remedies requested by Claimant in turn.

As a threshold matter, the Tribunal is persuaded that the basic declaratory relief Claimant seeks with respect to Respondent's breach of Section 8.6(a) is appropriate. As explained above: (1) the Tribunal has adopted Claimant's proffered interpretation of Section 8.6(a) both as a matter of law and in light of the relevant parol and other extrinsic evidence; and (2) Respondent's Transfers of Other Shareholders Shares – for which he neither sought nor received AIG's prior written approval – violate what the Tribunal has concluded are the plain and unambiguous terms of Section 8.6(a) of the SPA, including Section 8.6(a)(vi). Thus, the declaratory relief requested by Claimant with respect to Respondent's breach of Section 8.6(a) shall be GRANTED.

Next, the Tribunal is not persuaded that the declaratory relief Claimant requests with respect to Respondent's existing pledges of TRG-I and TRG-P Shares can or should be granted as framed; but rather, that another form of declaratory relief provides an appropriate remedy under the circumstances. More specifically, it has been established that Respondent's existing pledges

of TRG-P and/or TRG-I Shares are in substance contractual lending agreements between Respondent and third-party financial institutions located outside the United States – e.g., JS Bank. Further, the Parties have informed the Tribunal that a Pakistani Court has enjoined Respondent from, inter alia, releasing the existing pledges on his TRG-P and/or TRG-I Shares, despite Respondent's express request on numerous occasions – made both to the Tribunal and apparently to the Pakistani Court – that he be granted leave to do so.

In view of that complicated factual and procedural landscape, the Tribunal cannot conclude that Respondent's existing pledges on his TRG-P and/or TRG-I Shares can simply be declared "void" under Section 8.6(a), because those pledges are third-party contracts involving non-parties to this proceeding that are currently subject to an injunction. Instead, the Tribunal is persuaded that an appropriate remedy is declaratory relief that unequivocally establishes the Tribunal's determinations that: (1) all of Respondent's existing pledges on his TRG-P and/or TRG-I Shares violate the Transfer Restrictions established within Section 8.6(a) of the SPA, because Respondent did not seek or receive AIG's prior written approval for those pledges; and (2) if and when the Pakistani Court lifts or modifies the current injunction, Respondent is affirmatively required to specifically perform his obligations under Section 8.6(a) of the SPA by immediately taking all steps necessary to obtain releases of all existing pledges on his TRG-P and/or TRG-I Shares.[19] Indeed, an affirmative requirement that Respondent take all steps necessary – when and if the Pakistani Court lifts or modifies the current injunction – to obtain releases of all existing pledges on his TRG-P and/or TRG-I Shares as soon as possible should be uncontroversial, because

[19] As the Tribunal discusses below, the Parties expressly agreed, at Section 10.9 of the SPA, that specific performance was an available remedy for any breach.

Claimant has requested that Respondent be required to take that action, and Respondent has requested the ability to take it – thus, there appears to be no actual controversy on this point.

Accordingly, the Tribunal concludes that the afore-mentioned declaratory relief provides an appropriate remedy with respect to Respondent's existing pledges on his TRG-P and/or TRG-I Shares, and that relief shall be GRANTED.

Finally, the Tribunal is persuaded that the permanent injunction Claimant requests with respect to Respondent's future performance under Section 8.6(a) of the SPA is also appropriate. On that point, the Tribunal agrees with Claimant that a finding of irreparable harm is not a necessary predicate to granting injunctive in this proceeding because: (1) at Section 10.9 of the SPA, entitled "Specific Performance", the Parties expressly agreed that "money damages would not be a sufficient remedy for any breach of this Agreement" and that "the parties shall be entitled to specific performance and injunctive relief as remedies for any such breach, these remedies being in addition to any of the remedies to which they may be entitled at law or equity"; and (2) in any event, during the discovery phase of this proceeding, Respondent effectively stipulated that irreparable harm need not be established, which has since become the "law of the case". (See Clmt' Post Hr'g Br. at 48-49; Appendix A at 5-7 (discussing the Tribunal's decisions related to, inter alia, irreparable harm as a predicate for prospective injunctive relief)).

The remaining question then is whether the requested permanent injunction is appropriate as a matter of equity. The Tribunal is persuaded that a forward-looking permanent injunction plainly is appropriate because, given Respondent's undisputed history of not performing in accordance with the Transfer Restrictions that the Tribunal has concluded are unambiguously established by Section 8.6(a), it is manifestly reasonable and equitable to affirmatively require Respondent to abide by those Transfer Restrictions in the future. Accordingly, the Arbitrator

concludes that as a matter of equity, it is an appropriate remedy to permanently enjoin Respondent from any future non-compliance with or other violation of the clear and unambiguous Transfer Restrictions established by Section 8.6(a) of the SPA, as they have been interpreted herein.[20]

However, the Tribunal is not persuaded that equity supports enforcement of the sale restrictions within Section 8.6(a) in relation to any TRG-P shares: (1) that Respondent currently owns; and (2) were purchased by Respondent between October 4, 2005 – i.e., the date the SPA was executed – and October 10, 2022 – i.e., the date that Respondent first corresponded with

[20] In so concluding, the Tribunal briefly addresses the Parties' arguments and requests for relief in relation to the TRG-I and/or TRG-P shares that Respondent's wife Sarah Pobereskin currently owns or may acquire in the future. Under New York law, the two primary touchstones for determining "beneficial ownership" of equity securities are the "shared control" thereof, and the "common benefit" derived therefrom. See generally, Jammies Int'l Inc. v. Lazarus, 713 F. Supp. 83 (S.D.N.Y. 1989) (discussing, e.g., Whiting v. Dow Chemical Co., 523 F.2d 680 (2d Cir. 1975)). Applying those touchstones here, the Tribunal is persuaded that Claimant has established Respondent's "beneficial ownership" of the TRG-P shares that Ms. Pobereskin currently owns because: the testimony of Ms. Pobereskin and Respondent collectively supports Claimant's contention that they are actively pursuing a common plan to regain control of the TRG entities through the acquisition of publicly traded TRG-P shares; Respondent exercised a measure of control over the bank accounts and trading activity that facilitated Ms. Pobereskin's prior acquisition/sale of TRG-P shares; Respondent at times provided Ms. Pobereskin with the funds used to acquire TRG-P shares; and on at least one occasion, after selling TRG-P shares, Ms. Pobereskin returned the proceeds of that sale to Respondent. The Tribunal concludes that the foregoing facts establish "beneficial ownership" as a matter of New York law, irrespective of the Parties' marital relationship and/or their pre/post nuptial agreements. Nevertheless, Ms. Pobereskin is not a party to the SPA or this proceeding, and the Tribunal agrees with Respondent that no basis for arbitral jurisdiction over Ms. Pobereskin (or her property) has been demonstrated to exist. Accordingly, the Tribunal is without authority to grant any relief against Ms. Pobereskin in law or equity as part of this proceeding. For that reason, the Tribunal declines to issue any form of declaratory or injunctive relief with respect to the TRG-I or TRG-P shares that Ms. Pobereskin currently owns or may acquire in the future. Instead, the Tribunal concludes that while Claimant might have a plausible cause of action against Ms. Pobereskin under New York law in relation to Respondent's "beneficial ownership" of certain TRG-I or TRG-P shares – either now or in the future – Claimant must pursue any such cause of action and/or requested relief against Ms. Pobereskin (or her property) in a different forum.

Claimant's Counsel regarding the Parties' dispute related to the Transfer Restrictions that ultimately gave rise to this proceeding.

To that end, as explained above, Respondent has established that Claimant TRG-I had actual knowledge of most or all of Respondent's Transfers of Other Shareholders Shares since the time that the SPA was executed – and, in fact, actively provided Respondent with accounting and compliance support for those Transfers, primarily via Mr. Farooq. Moreover, the Tribunal has also concluded that AIG had knowledge of at least the sale of certain TRG-P shares. But despite that actual knowledge of Claimant TRG-I and AIG, and the active support of TGR-I in facilitating some of these Transfers, the record is devoid of evidence that at any time prior to October 10, 2022, Claimant TRG-I or AIG – through Mr. Farooq, the Management Shareholders, or the Board of Directors – raised any affirmative objection to Respondent's Transfers on any basis, including Section 8.6(a). In light of those facts, the Tribunal cannot conclude that equity supports enjoining Respondent from selling any TRG-P shares that he acquired during the above-specified time when, based upon Claimant's conduct and irrespective of Section 8.6(a), Respondent might reasonably have expected to be able to freely sell without objection from Claimant TRG-I and/or AIG.

For these reasons, the Tribunal concludes that Claimant's request to permanently enjoin Respondent from any future non-compliance with or other violation of the clear and unambiguous Transfer Restrictions established by Section 8.6(a) of the SPA, as they have been interpreted herein, shall be GRANTED. However, the sale restrictions within Section 8.6(a) shall not apply in relation to any TRG-P shares currently owned by Respondent that were purchased between October 4, 2005 and October 10, 2022 – which, the Tribunal clarifies, Respondent may freely sell.

## IV. Future Proceedings

Based upon the Tribunal's analysis and conclusions herein, the only remaining issue is a determination of the amount that shall be awarded pursuant to Section 10.16 of the SPA, entitled "Arbitration", that establishes as follows in pertinent part:

> In order to encourage the amicable and rapid resolution of all issues that may arise hereunder without resort to arbitration, and to prevent frivolous and unreasonable claims and actions by any Party, in every case in which a matter is submitted to arbitration pursuant to this Section 10.16, the non-prevailing party in such arbitration shall pay to the prevailing party the full costs of the arbitration, the full and reasonable costs incurred by the prevailing party in preparing for and participating in the arbitration (including reasonable attorney's fees and expert fees).

(CX-1).

Axiomatically, because Claimant has prevailed on its affirmative claims and Respondent has not, the Tribunal concludes that Claimant is the prevailing party in this proceeding and therefore entitled to a further award pursuant to the foregoing terms of Section 10.16.

In an effort to promptly and efficiently resolve Claimant's prospective application for an award of attorneys' fees and costs pursuant to Section 10.16, the Tribunal instructs the Parties to proceed as follows:

- Not later than 14 days after the date that JAMS issues this Partial Final Award to the Parties, Claimant shall submit any application for an award of attorneys' fees and costs pursuant to Section 10.16. For the avoidance of doubt, Claimant's previously-expressed position that its prospective application need only represent, inter alia, the amounts incurred by Claimant unsupported by any documentation – i.e., the procedure adopted in some international arbitrations – is not accepted by the Tribunal. Instead, Claimant's prospective application shall generally accord with the procedure appliable to similar requests made in courts under substantive New York

law and therefore provide both the Tribunal and Respondent with sufficient legal argument and factual detail (e.g., in the form of law firm billing records, redacted as necessary) to allow an objective assessment of the reasonableness of Claimant's request.

- Not later than 14 days after the date Claimant submits the foregoing application, Respondent shall submit any response;

- Not later than 7 days after the date Respondent submits its response, Claimant shall submit any reply.

The Tribunal notes that the Parties may agree upon different dates to make the afore-mentioned submissions, and if they do, they shall promptly notify the Tribunal.

***************************************

All other substantive arguments, affirmative claims and/or requests for relief by the Parties have been considered by the Tribunal and rejected.

**V. Partial Final Award**

Based on the analysis and conclusions set forth above, the Tribunal makes the following Partial Final Award:

1) Claimant's affirmative claim that Respondent breached Section 8.6(a) of the SPA has been established and is therefore GRANTED.

2) Claimant's request for declaratory relief in relation to Respondent's breach of Section 8.6(a) of the SPA is GRANTED, and the Tribunal accordingly hereby declares that: (1) the Tribunal has adopted Claimant's proffered interpretation of Section 8.6(a) both as a matter of law and in light of the relevant parol and other extrinsic evidence; and (2) Respondent's Transfers of Other Shareholders Shares – for which he neither sought nor received AIG's prior written approval

– violate what the Tribunal has concluded are the plain and unambiguous terms of Section 8.6(a) of the SPA.

3) Claimant's request for declaratory relief in relation to Respondent's existing pledges of TRG-I and TRG-P shares is GRANTED, to the extent the Tribunal hereby declares that: (1) all of Respondent's existing pledges on his TRG-P and/or TRG-I shares violate the Transfer Restrictions established within Section 8.6(a) of the SPA, because Respondent did not seek or receive AIG's prior written approval for those pledges; and (2) if and when the Pakistani Court lifts or modifies the current injunction, Respondent is affirmatively required to specifically perform his obligations under Section 8.6(a) of the SPA by immediately releasing all existing pledges on his TRG-P and/or TRG-I shares.

4) Claimant's request for a permanent injunction against Respondent is GRANTED, to the extent that the Tribunal hereby enjoins Respondent from any future non-compliance with or other violation of the clear and unambiguous Transfer Restrictions established by Section 8.6(a) of the SPA, as they have been interpreted herein. However, the sale restrictions within Section 8.6(a) shall not apply in relation to any TRG-P shares currently owned by Respondent that were purchased between October 4, 2005 and October 10, 2022 – which, the Tribunal clarifies, Respondent may freely sell.

5) To the extent that Claimant has requested that the Tribunal grant any relief or remedy with respect to Ms. Pobereskin or any TRG-I and/or TRG-P shares that she currently owns, or that she acquires in the future, that request is DENIED given the lack of jurisdiction of the Tribunal over Ms. Pobereskin.

6) Respondent's affirmative counterclaim/request for declaratory relief in relation to, inter alia, Section 8.6(a) of the SPA is DENIED, as are any and all other affirmative counterclaims, defenses, and/or requests for relief lodged by Respondent in this proceeding.

7) The Parties shall proceed in accordance with Section (IV), above, with respect to Claimant's prospective application of an award of attorneys' fees and costs pursuant to Section 10.16 of the SPA.

8) All other affirmative claims and/or requests for relief are DENIED.

9) Finally, for the avoidance of doubt, the Tribunal clarifies that this Partial Final Award fully resolves all substantive issues in this proceeding other than Claimant's prospective request for an award of attorney's fees and costs pursuant to Section 10.16 of the SPA. Accordingly, to the extent necessary, either Party may submit this Partial Final Award to the Pakistani Court, which the Tribunal understands has issued the current injunction against Respondent in aid of this proceeding.

Michael Young

Michael D. Young
Arbitrator

DATED: February 4, 2025, New York, NY

**APPENDIX A**

## II. HISTORY OF THE PROCEEDING[1]

### A. Appointment

The Tribunal was appointed on or around June 15, 2023.

### B. Preliminary Arbitration Management Conference, and Consolidation and Schedule Issues

The Preliminary Arbitration Management Conference ("PAMC") took place on August 2, 2023, over the objection of Respondent who had requested an adjournment pending the resolution by the JAMS National Arbitration Committee of a motion by Respondent to consolidate with this proceeding another arbitration pending between all or some of the Parties (or related parties). The Tribunal ruled on this request for an adjournment stating: ". . . because the parties do not agree on delaying the conference, and since no stay has been entered in this case, we are proceeding with scheduling and convening the preliminary conference like we would in any other matter."

In an email dated August 8, 2023, the Tribunal directed the Parties to negotiate a schedule taking "into account the guidance given" by the Tribunal on August 8, to the effect that: "A. The Schedule should commence as of now, and should not await a resolution of the request for consolidation;" and "C. . . . should not be based on the parameters of the JAMS Expedited Arbitration Procedures, but should reflect the sense of urgency indicated in the governing arbitration clause."[2]

In an email dated August 16, 2023, setting forth a draft schedule, which became the basis for the schedule that applied thereafter, the Tribunal noted that "I believe that the below balances

---

[1] Not all pre-Hearing events or rulings are described in this section – only those with potential substantive implications.

[2] On or around September 18, 2023, the request for consolidation was denied by the JAMS National Arbitration Committee.

the governing arbitration clause's mandate for some level of urgency with procedures and timelines that are fair to both parties."

**C. Respondent's First Request for Injunction vis-à-vis Pakistan Litigation**

On September 12, 2023, Respondent filed an "Emergency Motion for Relief Enjoining the Further Prosecution of the Pakistani Litigation by TRG-I and TRG-P in Violation of the SPA." Respondent argued that TRG-I and TRG-P had secured an ex parte order from a court in Karachi, Pakistan that temporarily enjoined Mr. Chishti from transferring his shares in TRG-P, pending a further hearing by that court; and that the Tribunal should both rule that the Pakistani litigation violated the SPA by litigating in Pakistan in court what should be litigated in arbitration and issue an order (prior to the then-upcoming hearing in Pakistan) enjoining TRG-I and TRG-P from prosecuting that litigation.

Claimant responded that its motion in Pakistan was "not only explicitly permitted under the JAMS Rules . . . [it] is an exercise of a fundamental right in arbitration – the right of a party to obtain interim measures from a court . . . to preserve the ability of an arbitrator to grant ultimate relief." Claimant further argued that "the Pakistani order . . . makes clear that Claimant does not now and has never sought ultimate relief from a Pakistani court and is solely interim until the conclusion of this arbitration."

On September 17, 2023, the Tribunal denied Respondent's request for an injunction on the following basis:

> 1. I start by rejecting the premise of one of Respondent's arguments – that Claimant has initiated a parallel proceeding in court in Pakistan seeking the same relief in another way in a different forum, all in violation of Section 10.16 of the Preferred Stock Purchase Agreement ("SPA"), which requires the adjudication of all disputes in arbitration. . . . Claimant is not seeking to litigate a parallel proceeding in Pakistan and is not seeking final relief in that proceeding. As the High Court's temporary order makes clear,

> Claimant is seeking in Pakistan an injunction in "aid of arbitration" which will presumably terminate once there is a final resolution in this arbitration proceeding . . . .
>
> 2. I also reject the Respondent's argument that the broad "scope of arbitration" language in Section 10.16 of the SPA and the absence of language specifically authorizing the Parties to go to court for relief in "aid of arbitration," precludes Claimant from seeking the relief it does before the High Court of Sindh. I find, to the contrary, that there is authority under both US and Pakistan law for Claimant to initiate just such a proceeding. . . .
>
> 3. What is less clear are the two arguments made by Respondent relating to whether Claimant should have chosen to seek relief in New York or in Pakistan: first, whether a court in Pakistan has the authority to grant such relief in "aid of arbitration" when the arbitration is taking place outside of Pakistan (as it is here); and whether the "exclusive venue in New York" language of Section 10.14 of the SPA requires that any party seeking such preliminary relief do so in New York.
>
> . . . Given [some] lack of clarity on this issue, I find that the Pakistan court which is hearing the request for relief in "aid of arbitration" is better suited than I am to determine whether it, as a Pakistan court, has jurisdiction to award such relief in "aid of an arbitration" being heard in New York.
>
> As for the second issue, I acknowledge Respondent's argument that Section 10.14 is very broadly written . . . and, when viewed alone the preceding suggests that any legal proceeding whatsoever, [so] long as it is not one required to be arbitrated, can be brought only in New York . . . . I find ultimately persuasive Claimant's argument that the preceding language cannot be construed so broadly . . . .

Finally, the Tribunal rejected on two grounds Respondent's argument that Claimant is not really seeking in Pakistan relief in "aid of arbitration", as it was seeking different relief that it is seeking in the arbitration. First, the Tribunal ruled that "even if the nature of the relief sought in the court in Pakistan is somewhat different than the relief sought here – and it is not clear that it is – the relief sought in Pakistan is at least close enough to the relief sought here that it comes within the type of relief that could be considered valid as a way of 'aiding' the arbitration proceeding."

Second, the Tribunal also ruled that "the acceptance or rejection of this argument on the merits is for the High Court of Sindh . . . . That Court may or may not be persuaded that Claimant's request for relief is beyond the scope of relief sought in the underlying arbitration and therefore inappropriate as a provisional measure in 'aid of arbitration.'"[3]

[3] It appears as if the hearing for an injunction – as opposed to the hearing for the temporary restraining order described in the text – may not yet have taken place in Pakistan. Respondent sought the same or similar relief as described in the text at various subsequent points in the arbitration proceeding and the Tribunal rejected the request for said relief on various bases. For example, on August 5, 2024, approximately one month before the Hearing was to commence, Respondent again moved for an anti-suit injunctive relief, making the argument that the proof it would present at the upcoming Hearing would conclusively show that its interpretation of the relevant contractual language was correct. The Tribunal again denied the requested relief, ruling that:

> . . . [T]he Tribunal is not persuaded that Respondent has clearly established good cause to revisit the issue of anti-suit relief on an emergency basis at this time; instead, the Tribunal will RESERVE DECISION on Respondent's request, and will consider the issue of anti-suit relief as a potential remedy in conjunction with the forthcoming Arbitration Hearing.
>
> . . . [T]he Tribunal agrees with Claimant to the extent that: (1) it appears that the fundamental basis upon which Respondent seeks to revisit the Tribunal's September, 2023 decision not to issue anti-suit relief – i.e., the Tribunal's determination that Section 8.6(a) of the SPA is ambiguous – has been the law of this case for several months since the Tribunal's May 6, 2024 Order, and Respondent has offered no explanation for its delay in making the present request; and (2) Respondent's contentions regarding extrinsic evidence are purely subjective, strongly disputed by Claimant, and will be a central focus of the forthcoming Arbitration Hearing. The Tribunal concludes that both of those factors militate against Respondent's request for emergency relief – as, of course, does the close proximity to the Arbitration Hearing.

**D. Initial Discovery Disputes and Attendant Substantive Stipulations**

In justifying certain of the categories of documents that it requested that Respondent produce, Claimant argued as follows in an October 12, 2023 communication to the Tribunal:

> There are primarily two independent bases for our discovery requests about Respondent's sexual harassment and assault, establishment of a competing business and efforts to gain control of TRG-I and its parent through his violations of his contractual obligations. The first, as you note, is irreparable harm. We would obviously be delighted for the Tribunal to find right now (or Respondent to stipulate) that Claimant need not prove irreparable harm and that we are entitled to injunctive relief so long as we establish a breach [of the SPA]. If, however, Respondent may argue otherwise and the Tribunal is unwilling to foreclose those arguments at this time, it is imperative that we receive irreparable harm discovery.
>
> Second, and independent of irreparable harm, Respondent has now advanced the argument . . . that Claimant's prior approval of or failure to object to the hypothecation of shares by himself and others either forecloses Claimant from enforcing the contractual restrictions now or, at a minimum, are facts that should be considered by the Tribunal. As a result (even though we disagree with this argument as a legal matter), Claimant must have the right to obtain discovery supporting its position that the circumstances under which any prior hypothecations took place (including with respect to Mr. Chishti himself years ago) are far different than those facts and circumstances that exist today and irrespective of Claimant's prior approvals/non-objections, the threats presented today by Respondent's status as someone who has been found to have engaged in sexual harassment and assault in a highly publicized award, his competing business and his efforts to regain control of TRG-I and its parent justify a different decision by Claimant. . . .

After receipt of a communication regarding the above from Respondent, the Tribunal stated that:

> Both sides appear to have manifested a willingness to consider a stipulation (or some other form of agreement) that would either obviate or circumscribe any need for the disputed discovery requests that are generally directed towards "irreparable harm". . . . Accordingly, I request that the Parties promptly meet-and-confer and endeavor to achieve that outcome.

On October 25, 2023, the Tribunal issued an Order relating to the preceding as follows:[4]

> During the short conference on the evening of October 23, 2023, it appeared based upon the Tribunal's colloquy with counsel that a tacit agreement had been reached that Claimant need not prove "irreparable harm" as a component of its affirmative claim/request for relief, and therefore all or most of the Parties' respective disputed discovery requests directed towards the issue of "irreparable harm" are effectively moot. However, the Parties were unable to reach a formal stipulation on that issue (and perhaps other issues) in light of Respondent's "course of dealing" defense and its potential impact upon the disputed discovery requests.
>
> … As the Tribunal previously noted, based upon the Parties' tacit agreement that "irreparable harm" need not be proven/established . . . these requests have been rendered effectively moot because they are no longer "directly relevant" to any "substantial issues in this case." Accordingly, the Tribunal concludes that Claimant's request to compel Respondent's production of the requested discovery shall be generally DENIED, subject to one narrow exception. [5]

Shortly thereafter, on November 1, 2023, in response to a request for "clarification" from the Claimant, and following a response to that request from Respondent, the Tribunal issued another order relating to whether there is a need to show "irreparable harm" and to the contours of

[4] The Tribunal recognized the following as relating to the interplay between the permissible scope of discovery and the "sense of urgency" reflected in the governing arbitration clause: "The Arbitration Clause governing this proceeding requires, by its terms, reasonable urgency in the scheduling of the merits Hearing in this matter. Respondent sought a sooner Hearing than has been ordered by Tribunal and Claimant sought one that was further out in time. In choosing the date of the Hearing, the Tribunal attempted to comply with the dictate of the Parties' Arbitration Clause that the Hearing be conducted on an expedited basis, but, at the same time, allowing for reasonable discovery and pre-Hearing activity . . . . [A]s a consequence of the Arbitration Clause's dictate that the merits Hearing take place on a reasonably expedited basis, discovery must necessarily be less extensive than what otherwise might occur in an arbitration such as this one between two sophisticated Parties."

[5] The "exception" was to discovery "related to Respondent's alleged efforts to 'gain control of TRG-P through coordination of board votes and efforts to nominate and elect allies at the TRG-P Annual General Meetings,' which the Tribunal ruled "is also 'directly relevant' to Respondent's 'course of dealing' defense, insofar as that discovery could contextualize Claimant's decision making with respect to enforcement of the SPA. . . ."

the "course of dealing" issue. As for the first issue, the Tribunal first noted the Respondent's position that:

> . . . Respondent "does not oppose" a determination "that the only element TRG-I must prove at the hearing on its request for specific performance is breach or threatened breach of the SPA and that TRG-I need not prove irreparable harm or balance of the equities" so long as it is clear that such determination means both that (i) TRG-I need not prove irreparable harm or balance of the equities and (ii) evidence going towards these elements is therefore not relevant and not admissible.

In response, the Tribunal ruled that "Respondent's foregoing proffer sufficiently documents the Parties' agreement on this issue and reasonably satisfies Claimant's request." As to the second point noted by Respondent in its proffer relating to the relevance and admissibility of evidence, the Tribunal clarified that "because the issues of irreparable harm and balance of the equities have effectively been removed from this case, evidence that is solely related to those issues is clearly irrelevant; however, to the extent that either Party may argue that evidence is relevant to those issues as well as others . . . the Tribunal will determine the relevance, admissibility and ultimately weight of such evidence in its discretion at the appropriate time."[6]

In its October 25 and November 1, 2023 rulings, the Tribunal also determined other discovery disputes (with possible substantive implications), including the following:

> . . . the Tribunal cannot conclude that Respondent has carried its burden under New York law of establishing that Claimant has 'possession, custody or control' over non-party entities TRG-P, IBEX or Afiniti such that Claimant can be compelled to produce

[6] The Tribunal noted that it was leaving open "whether or not 'adequacy of the remedy at law' need ultimately be shown. It may not be necessary under the circumstances of this case (i.e., the terms of the SPA) for Claimant prove – when seeking specific performance – that there is an inadequate remedy at law, but the Tribunal is not so ruling at this time. . . ." Counsel for Respondent clarified Mr. Chishti's position on this issue at the September 3 final pre-Hearing conference when he stated, on page 205, that "I would phrase it this way: If we win on the contract, he's allowed to sell. If they win on the contract, he's not . . . ."

> responsive information from those entities. Accordingly, the Tribunal concludes that Respondent's request to compel production from those entities shall be DENIED. However, Claimant has in fact collected and produced documents from Messrs. Khaishigi and Aslam, who are directors and officers of TRG-I . . . . In view of that, the Tribunal concludes that Respondent's request to compel the production of responsive information from those individuals – as well as any other directors/officers of TRG-I – shall be GRANTED . . . .[7]

Finally, the Tribunal rejected Claimant's argument that the status of Ms. Pobereskin as Respondent's wife, and the alleged status of Mr. Mahmood as Respondent's accountant, is in and of itself sufficient for Tribunal to conclude that Respondent has control over their documents such that the Tribunal can, and should, compel Respondent to secure and produce such documents in this proceeding. The Tribunal further ruled that, to the extent either Respondent's wife or accountant are in possession of responsive documents that either belong to Respondent or to which Respondent may have a legal right to obtain, Respondent shall demand such documents and then shall turn them over to Claimant.[8]

**E Respondent's Motion to Amend His Answer to Include Counterclaims**

On December 13, 2023, the Tribunal ruled that:

> Respondent's motion to amend its answer to include a counterclaim for breach of contract [and for damages] is denied. While, ordinarily, amendment of pleadings to add claims is liberally granted, here: (a) Respondent offers no persuasive rationale for why its breach of contract counterclaim could not have been asserted much earlier in time; and (b) I agree with Claimant that if the breach of contract counterclaim is asserted now, in order to avoid prejudice to the Claimant, the discovery process – even as modified in the proposed revision to the Scheduling Order – would have to be re-

[7] The Tribunal ruled. on January 30, 2024, that under relevant New York law Respondent, as a former director of TRG-P and TRG-I, was not entitled by virtue of that status to obtain corporate documents that had not been otherwise produced.

[8] The Tribunal ruled, on January 30, 2024, that under relevant New York law Respondent had to answer those questions at his deposition which he had previously refused to answer on the basis of the marital/spousal privilege. These questions related to Ms. Pobereskin's trading of TRG-P shares and Mr. Chishti's involvement in said activity.

> started (at least in part) and the entire case management schedule would have to be reevaluated (or bifurcated, which yields the same result). Moreover, as Claimant correctly notes, any such re-structuring of the schedule for the proceeding is inconsistent with Respondent's oft-stated view – as articulated at multiple points in the proceeding, including at the initial scheduling conference – that the Parties' dispute is narrow and resolution should be expedited.

After the Hearing in this matter was postponed – as agreed between the Parties – Respondent sought reconsideration of the preceding motion. The Tribunal denied the application, as follows:

> The Tribunal is not persuaded that the rescheduling of the Hearing from June until September, 2024 . . . provides a reasonable basis for reconsideration under the circumstances presented. As Claimant points out, that scheduling adjustment was militated by Respondent's (new) Counsel's unavailability to conduct the Hearing in June, 2024, as the Parties and the Tribunal had contemplated. Axiomatically, a scheduling change made necessary by Respondent's Counsel is not a reasonable basis for reconsidering a decision that was not favorable to Respondent.
>
> More importantly, it is not apparent to the Tribunal that the efficiencies that Respondent says allowing the amendment now would promote would indeed be the result. Injecting an entirely new damages theory into this proceeding would require additional discovery (undoubtedly both fact and expert) which could not likely occur prior to the September Hearing, especially since fact discovery is essentially complete. . . .
>
> Finally, Respondent does not articulate any persuasive rationale for reconsidering the first basis upon which the Tribunal's prior decision was made – i.e., that Respondent's initial request was untimely. Indeed, as Claimant correctly notes in its response, the Pakistani judicial injunction that fundamentally gives rise to Respondent's proposed second counterclaim was issued in August, 2023, prior to the initial Scheduling Order that was entered by the Tribunal on September 8, 2023. Nevertheless, Respondent did not seek leave to amend his operative pleading until November 22, 2023 – i.e., approximately 3-months later, by which point – importantly – document discovery had been completed but for certain supplemental responses that the Tribunal required Respondent to produce. . . .

**F. Continuing Discovery Disputes**

This proceeding was characterized by repeated claims by both Parties that the other had not fulfilled it or his obligation to produce all documents that had been requested. Frequently, counsel for the allegedly deficient Party would respond that, indeed, all responsive, non-privileged documents had been produced. This representation turned out not to be true on some occasions.[9]

The Tribunal first addressed this situation on January 18, 2024, noting that "the Tribunal accepts the representations made by Counsel for Respondent that all responsive available information has been provided in prior answers and that all responsive documents have been produced." The Tribunal further noted that "Claimant will have the opportunity to inquire into/test those representations at Mr. Chishti's forthcoming deposition, and . . . if the representations that have been made by Respondent and/or his Counsel prove demonstrably inaccurate, Respondent and/or his Counsel may be subject to sanctions, unless there has been good cause shown for the failure previously to provide such information or produce such documents and/or for any representations that have been made."

**G. Rulings on Cross Motions for Summary Disposition and Related Discovery Issues**

The Parties argued in cross-filed Motions for Summary Disposition ("MSD's") competing textual analyses of the relevant language of the SPA. The Tribunal denied both motions on May 6, 2024, ruling that the relevant language is ambiguous. Specifically, the Tribunal found that:

---

[9] This pattern almost always involved representations made by Respondent's counsel in reliance on what their client had told them regarding his search for responsive documents; these representations turned out to be false or incomplete. To the extent that Claimant was at fault, it was primarily the result of its overly-narrowly construing either a request for production or an order from the Tribunal. Claimant was also at fault for not describing as fully as it should have the interlocking nature of the Boards of TRG-I and TRG-P, creating the impression that these corporations are more distinct than they really are.

> . . . [T]he Tribunal cannot conclude – as New York law requires – that Section 8.6(a) is unambiguous and can otherwise be construed as a matter of law and without reference to extrinsic evidence. . . .
>
> For example, the Tribunal is not persuaded (at least without possible reference to extrinsic evidence) that Claimant's interpretation of Section 8.6(a) – that the only exceptions to the broad prohibitions of Section 8.6(a) exist in Section 8.6(a)(i), (ii) and (iii) – satisfies the applicable New York law standards because it would arguably render Section 8.6(a)(iv) substantively meaningless – or, at least, raises significant questions regarding the substantive meaning of that provision. And as Claimant itself argues, an interpretation that renders a contractual provision actually or "effectively" meaningless should be avoided under New York law.
>
> . . .
>
> Similarly, the Tribunal is not persuaded (also, at least without possible reference to extrinsic evidence) that Respondent's proffered interpretation of Section 8.6(a)(iv) can clearly be harmonized with the balance of Section 8.6(a), including and especially the first clause of Section 8.6(a)(iv). In addition, Respondent has not adequately justified why Section 8.6(a)(iv)(B) is necessary if Section 8.6(a)(iv)(A) can be construed as broadly as Respondent suggests.
>
> Moreover, both Parties have tacitly (if not expressly) argued that parol and/or extrinsic evidence may be helpful, and the [Tribunal] is persuaded that the introduction and testing of any such evidence at the hearing (e.g., via cross-examination and impeachment) is clearly appropriate under the circumstances presented and may assist the Tribunal in determining the correct interpretation of the relevant provisions.

In its ruling on the cross-MSD's, the Tribunal also ruled that "[b]ecause the Tribunal has not concluded that Section 8.6(a) is unambiguous, parol and/or extrinsic evidence will be relevant to the Tribunal's ultimate construction of that provision. Accordingly, the Tribunal is persuaded that non-privileged correspondence related to the negotiation, drafting, and course-of-dealing under the SPA is relevant and therefore falls under the aegis of JAMS Rule 17."

Subsequently, the Parties disputed before the Tribunal various issues regarding the production of extrinsic evidence.[10] In the first such instance, the Tribunal found good cause to order both Parties to seek from outside counsel – Orrick Herrington for Claimant and Pakistani counsel for Respondent – in Claimant's situation, "any non-privileged correspondence (e.g., external correspondence with AIG/Kirkland & Ellis) related to the negotiation and drafting of the SPA" and, in Respondent's situation, "any non-privileged correspondence (e.g., external correspondence with the Pakistani securities regulatory authority) related to Respondent's alleged course-of-dealing under the SPA, and specifically, his hypothecation and/or sale of TRG-I/TRG-P securities on his own behalf or on behalf of Ms. Pobereskin."[11]

The Tribunal notes herein two other aspects of its discovery-related rulings following the ruling on the cross-MSD's, both of which were referenced in a ruling dated May 24, 2024. First, the Tribunal ordered limited discovery from Claimant from TRG-P's files, as follows:

> . . . [W]hile the Tribunal appreciates Claimant's position that the categories of course-of-dealing documents that Respondent has identified relate to TRG-P (versus TRG-I), and therefore "do not exist in Claimant's files," the Tribunal is nevertheless persuaded that given the now-clear relevance of at least certain of the documents that Respondent has requested, and given that Respondent has been required to produce similar course-of-dealing documents via request to its outside counsel, it is appropriate for Claimant to make a reasonable effort to request, obtain and produce the following from TRG-P: all TRG-P annual reports in which the Management

[10] Given the multiplicity of discovery disputes, the Parties had agreed to the appointment of Patrick J. Murphy III, Esq. of JAMS to monitor and try to resolve, in the first instance, discovery disputes. Accordingly, some of the discovery disputes referenced in the text came, in the first instance, before Mr. Murphy for resolution, and some were resolved by him without Tribunal involvement.

[11] In this ruling, the Tribunal noted that "at this point in the proceeding Respondent need not seek additional course-of-dealing materials from those financial institutions from which he did not previously seek such materials. As of now, the burden appears to outweigh the benefit in that Respondent has admitted that he has both sold TRG-P shares and has hypothecated TRG-I and TRG-P shares, so no additional proof is necessary to show those elements of the liability case. Were Claimant to prevail, it will be able to renew during any discussions regarding relief its efforts to seek additional documents necessary to fashioning such relief."

> Shareholders' purchases, sales, or encumbrances of TRG-P shares are disclosed; and all non-privileged documents exchanged with the Pakistani Stock Exchange, the Securities & Exchange Commission of Pakistan, auditors or other regulatory counterparties concerning Management Shareholders' purchases, sale, or encumbrances of TRG-P shares.

The Tribunal did not, in this order, require the production of Board Minutes from TRG-P because Respondent did not specifically request same.

Secondly, as referenced above, the Tribunal again relied on representations from Respondent counsel that all responsive documents relating to "course of dealing" had been produced or, if not produced, would be produced shortly thereafter:

> More specifically, with respect to Claimant's request related to Mr. Chishti's so-called "Open Letter", the Tribunal credits the representation made by Respondent's Counsel in its May 21 letter brief that "a search for the Open Letter and any related drafts and communications and has no further documents to produce." . . . Based upon that representation, the Tribunal is not persuaded that additional relief is currently warranted.

Finally, on July 19, 2024, the Tribunal ruled again on an accusation that Respondent had not produced that which it had previously represented that it had produced. Specifically, Respondent had on July 12 produced 674 additional documents. Claimant sought sanctions against Respondent and a forensic investigation as to whether other relevant documents had not been produced.

The Tribunal rejected the relief requested by Claimant, ruling as follows:

> . . . [T]he Tribunal notes that based upon the present record, it appears either undisputed or has been reasonably established that: (1) many or all of the additional documents produced on July 12 are responsive to document requests previously made by Claimant and therefore should have been produced in the ordinary course of discovery; (2) Respondent has offered no persuasive explanation why any otherwise responsive documents were not previously produced; and (3) Respondent previously represented that its document production was complete. In view of those facts, Claimant's objection is generally well founded.

> Nevertheless, the respective descriptions of the additional documents in Claimant's July 14 letter and Respondent's July 15 response appear to indicate that many or all of the additional documents involve counterparties at TRG and have therefore been accessible to Claimant throughout the pendency of this proceeding. . . .
>
> Thus, the Tribunal is persuaded that while Respondent's July 12 production was untimely, any prejudice suffered by Claimant is substantively minimal and can be remedied . . . The Tribunal will also consider the appropriateness of sanctions for Respondent's conduct, but not until an Award has been issued and cost shifting is being litigated by the Parties.

Finally, the Tribunal noted the following, in its denial of the motion for reconsideration filed by Claimant of the preceding:

> [T]he "limited measures" that Claimant describes in its [motion for reconsideration] are significantly different from the relief that Claimant previously sought in both its [initial motion] and during the July 17 hearing – where, among other things, Claimant requested that the Tribunal "adjourn all present deadlines", ultimately including the Arbitration Hearing, and when pressed by the Tribunal during the July 17 hearing, was unable to provide a timing estimate for completing the bilateral investigation that Claimant then urged. Any argument by Claimant to the contrary in its July 24 letter, reflects a new argument – or at least substantively revised argument – that is not appropriate grounds for reconsideration under the "strict" standard that Claimant itself previously urged.

### H. Rulings on Motions In Limine

On September 3, 2024,[12] the Tribunal orally ruled on various motions in limine ("MIL") brought by the Parties.[13] These rulings were as follows: a) denial of Claimant's MIL to exclude

---

[12] This in-person meeting also served as a final, pre-Hearing conference where the Tribunal ruled on other disputes regarding procedural issues and Hearing logistics – such as when motions for reimbursement of costs should be brought and whether exhibits on a Party's exhibit list need to referred to at the Hearing in order to be considered as part of the record – as well as regarding various issues relating to the nature of relief sought by each Party, depending on which Party prevails on liability. These rulings will be referred to as necessary throughout this Interim Award.

[13] The Tribunal had, by email dated August 15, 2024, denied Claimant's MIL to exclude Respondent's "course of dealing" evidence without the need for Respondent to file a response.

Exhibit R-91 (whereby the Tribunal allowed Respondent to introduce the document into evidence, subject to a later determination by the Tribunal as to how much weight, if any, to give the document; b) an articulation of the appropriate scope of the testimony – both on direct and cross – of Claimant's witnesses Mr. Costello and Mr. Leone (allowing the latter's testimony "both as to course of conduct and as to the inter-actions between AIG and either TRG or Mr. Chishti"); c) granted the MIL to exclude the testimony of Claimant's expert, Professor Rock, to the extent of not allowing his report into evidence and articulating the proper scope of his testimony as "industry practice and what's usually done in the context of these types of deals"; and d) granting in part and denying in part Respondent's MIL to exclude evidence of unrelated allegations and legal proceedings, which motion had focused on the prior arbitration proceeding brought against Mr. Chishti, alleging that he had sexually harassed an employee (known as the "Spottiswoode Arbitration").

Specifically, as relates to (d), the Tribunal allowed the admission of Exhibit C – 24 (the so-called "Financial Statement") and allowed Claimant to introduce the ruling of the Spottiswoode Arbitrator "to the extent that it is part of the effort to lay a groundwork for the judicial estoppel claim [relating to the legal significance of certain statements made in the Financial Statement], and to the extent it may be necessary to question Mr. Chishti's credibility relating to C – 24." The Tribunal further ruled that Claimant can challenge Mr. Chishti's credibility, but "not on the basis of [any] finding from the [Spottiswoode] arbitrator" or the "details of the other arbitration."

Finally, also as relates to (d), the Tribunal stated:

> I'm going to leave open, however, the use of the articles that were challenged to the [H]earing to see what reason [C]laimant wants to use them and whether or not [R]espondent has opened the door on those reasons. And to the extent the door has been opened, you may be able to use them not for the truth of the matter asserted, but for the fact of and some of the other purposes discussed, [e.g., how the

> relevant market was reacting to the allegations against Mr. Chishti]
> so that I'm reserving on and we'll see what happens.

### I. Hearing and Post-Hearing Proceedings

The five-day Hearing took place between September 9 and September 13, 2024. Claimant called four fact witnesses, including Mr. Chishti as an adverse witness, and one expert witness. Respondent called one fact witness – Mr. Chishti. In conjunction with the Hearing, more than 500 exhibits were considered as admitted into the record.

There were a limited number of post-Hearing issues that arose and/or brought to the attention of either the Tribunal or Mr. Murphy, but none are material to the ultimate resolution of the proceeding.

The Parties concurrently submitted post-Hearing briefs on October 24, 2024 and the Parties conducted final, oral argument on November 13, 2024. During the oral argument, there was some discussion as to whether the Tribunal might, sua sponte, seek from Claimant TRG-P Board minutes. As part of a colloquy of the significance to the "course of dealing" argument that Respondent only offered a limited number of TRG-P Board minutes, the Tribunal was concerned that, given the initial record presented to it, it had not previously fully appreciated – at the time it limited discovery of TRG-P – the interlocking nature of the Boards of TRG-I and TRG-P. The Tribunal reserved on this possible step.

On December 12, 2024, the Tribunal communicated to the Parties that "having thoroughly considered the substantial evidentiary record developed by the Parties and the many legal arguments that have been made," the Tribunal was satisfied that the record with respect to all issues except a potential award of attorneys' fees and costs is complete – i.e., with respect to liability and the requested remedies – and can formally be deemed closed." Accordingly, the Tribunal set the date of issuance of what it "anticipate[d] to be a Partial Final or Interim Award" – given the need

to consider, once liability was determined, a request for reimbursement of costs – to be, pursuant to the JAMS Rules, thirty days thereafter, January 13, 2025. At the Tribunal's request, the Parties subsequently agreed to extend the issuance date for this Interim Award until January 27, 2025.

[REMAINDER OF PAGE LEFT BLANK BY TRIBUNAL]