# EXHIBIT 2

**Execution Copy**

# PREFERRED STOCK PURCHASE AGREEMENT

Dated as of

October 4, 2005

BY AND AMONG

THE RESOURCE GROUP INTERNATIONAL LIMITED,

TRG PAKISTAN LIMITED,

THE INDIVIDUALS IDENTIFIED ON THE SIGNATURE PAGES HERETO

and

THE INVESTORS IDENTIFIED ON SCHEDULE I HERETO

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS; INTERPRETATION....................1**
1.1 Definitions....................1
1.2 Interpretation; Usage....................15

**ARTICLE II ISSUANCE AND SALE OF PREFERRED SHARES....................15**
2.1 Authorization of the Preferred Shares....................15
2.2 Issuance and Sale of Preferred Shares. ....................15

**ARTICLE III CLOSING; CLOSING DELIVERIES....................16**
3.1 Initial Closing....................16
3.2 Payment for and Delivery of Preferred Shares....................16
3.3 Subsequent Closings....................17

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND PARENT....................18**
4.1 Existence; Qualification....................18
4.2 Subsidiaries; Investments....................18
4.3 Authorization and Enforceability; Issuance of Preferred Shares. ....................19
4.4 Capitalization of Company....................20
4.5 Capitalization of Parent....................20
4.6 Private Sale; Voting Agreements....................21
4.7 Financial Condition....................21
4.8 Absence of Certain Changes. ....................21
4.9 Litigation....................23
4.10 Licenses, Compliance with Law, Other Agreements, Etc. ....................23
4.11 Third-Party Approvals....................24
4.12 No Undisclosed Liabilities....................24
4.13 Tangible Assets....................24
4.14 Owned Real Property....................24
4.15 Real Property Leases....................25
4.16 Material Contracts....................25
4.17 Intellectual Property....................25
4.18 Employees....................25
4.19 ERISA; Employee Benefits....................26
4.20 Environment, Health and Safety....................27
4.21 Transactions With Affiliates....................27
4.22 Taxes....................28
4.23 Investment Company....................29
4.24 Certain Fees....................29
4.25 Parent Activities....................30
4.26 Registration Rights; Rights of Participation....................30
4.27 Insurance....................30
4.28 Disclosure....................30

**TABLE OF CONTENTS**


**ARTICLE V REPRESENTATIONS AND WARRANTIES OF EACH PURCHASER....................30**

5.1 Authorization and Enforceability....................30
5.2 Government Approvals....................31
5.3 Investment Intent of Purchaser....................31
5.4 Status of Preferred Shares....................31
5.5 No Public Market....................31
5.6 Sophistication and Financial Condition of Purchaser....................31
5.7 Foreign Investors....................32
5.8 No General Solicitation....................32
5.9 Financial Wherewithal....................32

**ARTICLE VI SECURITIES LAWS MATTERS....................32**

6.1 Transfer of Preferred Shares and Conversion Shares....................32

**ARTICLE VII CONDITIONS PRECEDENT....................34**

7.1 Initial Closing Conditions of Each Purchaser....................34
7.2 Subsequent Closing Conditions of Each Purchaser....................36

**ARTICLE VIII COVENANTS OF THE COMPANY AND PARENT....................38**

8.1 Negative Covenants....................38
8.2 Affirmative Covenants....................42
8.3 Information Rights....................44
8.4 Conversion Shares; Exchange Shares....................45
8.5 Board of Directors....................46
8.6 Restrictions on Transfer....................48
8.7 Sale of the Company....................51
8.8 Preemptive Rights....................53
8.9 Exchange Right....................54
8.10 Qualified Public Offering....................55
8.11 Parent Activities....................55
8.12 Diversification of Operations....................55
8.13 Dividend Policy....................55
8.14 Use of Proceeds....................56
8.15 Parent Underwriting Agreement....................56
8.16 Proceeds of Parent Bridge Loan and Rights Offering....................56
8.17 Return of Funds....................56
8.18 U.S. Tax Matters....................56
8.19 Registration Rights Acknowledgement....................58
8.20 Company Exchange Shares....................58

**ARTICLE IX SURVIVAL; INDEMNIFICATION....................58**

9.1 Survival....................58
9.2 Indemnification....................58

**ARTICLE X GENERAL PROVISIONS....................59**

10.1 Successors and Assigns....................59

# TABLE OF CONTENTS


| | | |
|---|---|---|
| 10.2 | Entire Agreement | 60 |
| 10.3 | Notices | 60 |
| 10.4 | Purchaser Fees and Expenses | 61 |
| 10.5 | Publicity | 61 |
| 10.6 | Amendment and Waiver | 62 |
| 10.7 | Counterparts | 62 |
| 10.8 | Headings | 62 |
| 10.9 | Specific Performance | 62 |
| 10.10 | Remedies Cumulative | 62 |
| 10.11 | GOVERNING LAW | 63 |
| 10.12 | No Third Party Beneficiaries | 63 |
| 10.13 | Severability | 63 |
| 10.14 | Submission to Jurisdiction | 63 |
| 10.15 | Waiver of Jury Trial | 63 |
| 10.16 | Arbitration | 64 |
| 10.17 | Time is of Essence; Computation of Time | 64 |

| | |
|---|---|
| Schedule I | Schedule of Purchasers |
| Schedule II | Management Shareholders |
| Schedule 4.2 | Subsidiaries; Investments |
| Schedule 4.3(a) | Authorization and Enforceability |
| Schedule 4.3(b) | Exchange Share Authorization Requirements |
| Schedule 4.4 | Capitalization of Company |
| Schedule 4.5 | Capitalization of Parent |
| Schedule 4.8 | Absence of Certain Changes |
| Schedule 4.9 | Litigation |
| Schedule 4.10 | Licenses, Compliance with Law, Other Agreements, Etc. |
| Schedule 4.11 | Third-Party Approvals |
| Schedule 4.12 | Undisclosed Liabilities |
| Schedule 4.13 | Tangible Assets |
| Schedule 4.14 | Owned Real Property |
| Schedule 4.15 | Real Property Leases |
| Schedule 4.16(a) | Material Contracts |
| Schedule 4.16(b) | Defaults |
| Schedule 4.17 | Intellectual Property |
| Schedule 4.18 | Employees |
| Schedule 4.20 | Environmental, Health and Safety |
| Schedule 4.21 | Transactions with Affiliates |
| Schedule 4.22 | Taxes |
| Schedule 4.26 | Registration Rights, Rights of Participation |
| Schedule 4.27 | Insurance |
| Schedule 6.1 | Competing Businesses |
| Annex A | Estimated Financial Condition |

**TABLE OF CONTENTS**


| | |
|---|---|
| Annex B | Valuations |
| Exhibit A | Parent and Company Governing Documents |
| Exhibit B | Financial Statements |
| Exhibit C | Company Stock Option Plan |
| Exhibit D | Registration Rights Agreement |
| Exhibit E | Joinder to Agreement |
| Exhibit F | Executive Stock Agreement |
| Exhibit G | Employment Agreement (Muhammad Ziaullah Khan Chishti) |
| Exhibit H | Employment Agreement (Mohammed Khaishgi) |
| Exhibit I | Employment Agreement (Hasnain Aslam) |

# PREFERRED STOCK PURCHASE AGREEMENT

This PREFERRED STOCK PURCHASE AGREEMENT (this "Agreement") is dated as of October 4, 2005, and entered into by and among The Resource Group International Limited, a Bermuda company (the "Company"), TRG Pakistan Limited, a Karachi Stock Exchange listed company ("Parent"), the investors listed on Schedule I attached hereto (each a "Purchaser" and collectively the "Purchasers"), and each of Messrs. Muhammad Ziaullah Khan Chishti, Mohammed Khaishgi, Mohammad Ali Jameel and Hasnain Aslam (each a "Management Shareholder").

WHEREAS, the Purchasers desire to purchase from the Company, and the Company desires to sell and issue to the Purchasers, upon the terms and subject to the conditions set forth herein, Series A Preferred Shares; and

WHEREAS, the parties to this Agreement wish to set forth the rights and obligations of the Shareholders.

NOW THEREFORE, in consideration of the mutual promises, representations, warranties, covenants and conditions set forth in this Agreement, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATION

**1.1 Definitions**. For purposes of this Agreement, the following terms have the indicated meanings:

"Acceptable Exchange" means (i) any of the New York Stock Exchange, the NASDAQ National Market, the London Stock Exchange, the "AIM" market operated by the London Stock Exchange plc ("AIM") or the Hong Kong Stock Exchange or (ii) if agreed in writing by the Purchasers and the Company based on their good faith determination, either of the Stock Exchange of Singapore or the Dubai International Financial Exchange.

"Affiliate" of a Person means any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

"Agreement" has the meaning set forth in the preamble.

"AIG Directors" means those individuals from time to time designated by the holders of a majority of the then issued AIG Shares to serve on the Company Boards in accordance with Section 8.5.

"AIG Initial Investor Affiliates" means AIG Annuity Insurance Company, American General Life Insurance Company and Variable Annuity Life Insurance Company.

"AIG Observer" has the meaning set forth in Section 8.5(d).

"AIG Shares" means (i) any Preferred Shares acquired by the Purchasers hereunder, (ii) any Conversion Shares or Exchange Shares issued upon the conversion or exchange of the Preferred Shares, (iii) any additional equity securities of the Company hereafter acquired by the Purchasers pursuant to Section 8.8 or otherwise, and (iv) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clauses (i) - (iii) by way of dividend, bonus issue, sub-division, share split or in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization. Any particular shares constituting AIG Shares that are Transferred in compliance with the provisions of this Agreement shall continue to constitute AIG Shares in the hands of any such transferee; such shares shall cease to be AIG Shares only when they have been sold pursuant to a Public Sale or Approved Sale.

"AIG Supermajority" means as of any time of determination for so long as the Purchasers are entitled to designate at least one AIG Director: (i) in the event there is only one AIG Director at such time, such AIG Director plus either two other members of the Board of Directors if such time is after the first anniversary of the Initial Closing Date or one other member of the Board of Directors if such time is on or prior to the first anniversary of the Initial Closing Date; and (ii) in the event there are two AIG Directors at such time, all AIG Directors plus at least one other member of the Board of Directors.

"Annual Budget" means, for the operations of the Company and its Subsidiaries (on a consolidated but not consolidating basis) in existence as of the relevant Budget Date, an annualized projected income statement (which includes revenues, operating expenses, EBITDA and net income), and an annualized projected cash flow statement (which includes working capital and capital expenditures) forecasted for the following fiscal year, in each case prepared on a consolidated by not consolidating basis. Such Annual Budget will be in the form agreed to by at least one AIG Director, and will be presented on a quarterly basis. The Annual Budget will be prepared and presented to each Purchaser no less than 30 days prior to the beginning of each fiscal year. In no event shall the Annual Budget for any fiscal year incorporate acquisitions planned to be consummated during such fiscal year. As used herein, the term "Budget Date" means, with respect to any Annual Budget, the date on which such Annual Budget is delivered to the Board of Directors.

"Applicable Laws" means, with respect to any matter, each applicable statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, clearance, approval, authorization, grant, concession, franchise, license or written agreement, policy, requirement, and other restriction of any Governmental Authority having jurisdiction over such matter.

"Approved Annual Budget" has the meaning set forth in Section 8.3(c).

"Approved Buildout Plan" means any plan expressly contemplated in the Approved Annual Budget and Approved Business Plan (or amendments thereto effected pursuant to the approval of the Board of Directors and the holders of a majority of the then issued AIG Shares) with respect to the construction or acquisition of real property, improvements, fixtures, equipment or supplies to be used by the Company or its Subsidiaries in any location (other than the United States, Canada or Pakistan) for the conduct of their businesses; provided that

notwithstanding the foregoing, Approved Buildout Plans may include up to $3 million for investment in facilities in Pakistan.

"Approved Business Plan" has the meaning set forth in Section 8.3(c).

"Approved Sale" means a sale of the Company pursuant to Section 8.7(a).

"Bankruptcy Event" has the meaning set forth in Section 8.1(a)(viii).

"Base Business" means, as of any date, the business conducted by the Company and its Subsidiaries on the date hereof.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day other than Saturday, Sunday or a day on which banks in New York City are authorized or obligated by law or executive order to close.

"Business Plan" means, for the Company and its Subsidiaries (prepared on a consolidated but not consolidating basis) as of any fiscal year, a business plan for such year which includes but is not limited to: acquisition strategy; the proposed acquisition pipeline and all forecasted acquisitions, mergers, and alliances, as well as any working capital requirements and capital expenditure requirements associated therewith; and divestitures, forecasted for the following fiscal year. Such Business Plan will be in the form agreed to by at least one AIG Director. The Business Plan shall be prepared and presented to each Purchaser no less than 30 days prior to the beginning of each fiscal year.

"Bye-Laws" means the Amended and Restated Bye-Laws of the Company duly adopted by the members of the Board of Directors and set forth as part of Exhibit A hereto.

"Cause" means (i) the conviction of a felony or (ii) the commission of fraud with respect to the Company or any of its Subsidiaries or the misappropriation of property of the Company or any of its Subsidiaries.

"CERCLA" means the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"Certificate of Designation" means the Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock of the Company attached hereto as part of Exhibit A.

"CFC" means "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change of Control" means (i) the acquisition by any Person or Group of Persons, other than Parent, of beneficial ownership (as such term is used in the Exchange Act) of more than 50% of (x) the then issued Common Shares or a quantity of Common Shares Equivalents entitling such Person or Group of Persons to elect a majority of the members of the Board of Directors, except through the issuance of equity securities by the Company through a private placement, or (y) the then issued Parent Stock or a quantity of Parent Stock Equivalents entitling

such Person or Group of Persons to elect a majority of the members of the Parent's board of directors, (ii) any sale or Transfer of all or substantially all of the assets of Parent and its Subsidiaries on a consolidated basis in any transaction or series of related transactions, (iii) any amalgamation, merger or consolidation to which Parent or the Company is a party, except for an amalgamation, merger or consolidation in which the holders of the issued capital stock of Parent and share capital of the Company possessing the voting power (under ordinary circumstances) to elect a majority of the Company Boards immediately prior to such transaction shall continue to own a sufficient quantity of the surviving entity's issued capital stock or share capital to elect a majority of the members of the surviving entity's board of directors immediately after such transaction, and (iv) the appointment by any Person or a Group of Persons (in each case, other than (A) Parent, the Management Shareholders or the Purchasers, in the case of clause (x) below or (B) the Management Shareholders or the Purchasers, in the case of clause (y) below) of a majority of the members of (x) the Company Board or (y) the Parent Board; provided, that insofar as the events contemplated by clauses (i)(y), (ii), (iii) or (iv)(y) above pertain to Parent or the Parent Board, Parent has beneficial ownership of more than 35% of the Company immediately prior to such event; provided, further, that any change in ownership of the Company pursuant to Section 8.7 hereof shall not constitute a Change of Control.

"Closings" has the meaning set forth in Section 2.2(b).

"Code" means the Internal Revenue Code of 1986.

"Commitment Amount" means $30,000,000.

"Common Stock or Common Shares" means the common shares of the Company.

"Common Shares Deemed Outstanding" means the number of Common Shares, determined on a fully-diluted basis after giving effect to the conversion, exercise or exchange of all issued Common Shares Equivalents into Common Shares in accordance with their respective terms.

"Common Shares Equivalents" means, collectively, (i) securities convertible into or exchangeable for Common Shares and (ii) any options, warrants or other rights to acquire Common Shares or any of the securities described in the foregoing clause (i).

"Companies" means, collectively, Parent, the Company and the Company's Subsidiaries.

"Company" has the meaning set forth in the preamble.

"Company Boards" means the boards of directors of Parent and the Company.

"Company Exchange Shares" means any Common Shares held by Parent as of the date of this Agreement or any Deployment Shares received by Parent hereafter that are transferred by Parent to any shareholder of Parent upon such shareholder's exercise of its right to exchange Parent Shares for Common Shares pursuant to Section 5 of the IRA Amendment and Consent Agreement in connection with the completion of a Qualified Public Offering. For the avoidance of doubt, the Company Exchange Shares shall be limited to Company Shares currently held by

Parent and the Deployment Shares, but shall exclude any other Common Shares issued by the Company to Parent after the date hereof.

"Company Securities" has the meaning set forth in Section 8.1(a)(iii).

"Competing Business" has the meaning set forth in Section 6.1(a).

"Contribution Deadline" has the meaning set forth in Section 2.2(a).

"Control" means, (i) with respect to any Person whose common equity securities are not publicly traded, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of shares or other securities, by contract or otherwise, (ii) with respect to any Person whose common equity securities are publicly traded, the record and beneficial ownership of not less than 51% of the issued voting equity securities of such Person and (iii) with respect to any Group of investors, the power to direct or cause the direction of investment decisions to be made by such Group (including the exercise of any investor or contractual rights to which such Group is entitled).

"Conversion Shares" means the Common Shares resulting from the conversion of the Preferred Shares in accordance with the Bye-Laws and the Certificate of Designation.

"Corrupt Practices Law" means (a) the Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95-213, §§101-104), and (b) all other Applicable Laws of relevant jurisdictions relating to bribery, kick-backs, or similar business practices.

"Deployment Options" has the meaning set forth in Section 2.2(a).

"Deployment Shares" has the meaning set forth in Section 4.4.

"EBITDA" means, with respect to any Person for any period, the earnings before interest, taxes, depreciation and amortization, excluding Extraordinary Gains and Losses, of such Person and its Subsidiaries for such period, determined on a consolidated but not consolidating basis in accordance with GAAP, but excluding any expensing of options that is or may become required by GAAP.

"Election Notice" has the meaning set forth in Section 8.8(a).

"Election Period" shall have the meaning set forth in Section 8.6(b).

"Employment Agreements" has the meaning set forth in Section 7.1(a)(iv).

"Environmental Requirements" means all Applicable Laws, all judicial and administrative orders and determinations, all contractual obligations, all common law and the standards and policies promulgated by the World Bank concerning public health and safety, worker health and safety, and pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes,

chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, odor or radiation, each as amended and as now or hereafter in effect.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Event of Noncompliance" means the failure by the applicable party to fully perform any act or covenant required to be performed by it under the terms of Article VIII, Section 9.2 or Section 10.4 hereto; provided, that in the case of a failure to perform any act or covenant required to be performed in Section 8.2 such failure shall constitute an Event of Noncompliance only after the defaulting party has been notified in writing of such failure and has failed to correct it within (i) in the case of Section 8.2(b), (g) or (h), five (5) Business Days following such notification and (ii) with respect to all other subsections of Section 8.2(b), forty-five (45) days following such notification.

"Exchange Act" means the Securities Exchange Act of 1934.

"Exchange Shares" means the shares of Parent Stock issued or issuable to the holders of Preferred Shares upon exchange of Preferred Shares pursuant to Section 8.9.

"Exchange Share Authorization Requirements" has the meaning set forth in Section 4.3(b).

"Executive Shares" has the meaning ascribed to such term in each of the Executive Stock Agreements.

"Executive Stock Agreements" means the executive stock agreements between the Company, the Purchasers and each of Nasser Lone, Nadeem Elahi, John Armbruster and Tanvir Hussain in substantially the form attached hereto as Exhibit F.

"Extraordinary Gains and Losses" means financial effects on EBITDA resulting from events that are (i) unusual in nature (where the underlying event or transaction is extraordinary given the nature of the relevant Person's business or is of a type unrelated to, or only incidentally related to, the ordinary and typical activities of the Person) or (ii) infrequent in occurrence (where the underlying event or transaction is of a type that would not reasonably be expected to recur in the foreseeable future). For the avoidance of doubt, Extraordinary Gains and Losses include, but are not limited to: (i) write-down or write-off of receivables, inventories, equipment leased to others, or other intangible assets; (ii) gains or losses on disposal of a segment of a business; (iii) gains or losses from sale or abandonment of property, plant, or equipment used in the business; (iv) adjustment of accruals on long-term contracts; (v) expensing of reasonable professional fees (other than professional fees that can be capitalized under GAAP) relating to an acquisition or the raising of capital permitted hereunder but outside the relevant Person's Ordinary Course of Business; and (vi) reasonable costs related to one time events such as new facility build-outs (other than costs that can be capitalized under GAAP) or legal settlements outside the relevant Person's Ordinary Course of Business.

"Family Group" means, with respect to any natural person, such person's spouse, siblings and descendants (whether natural or adopted) and any trust or other entity organized or

established solely for the benefit of such person and/or such person's spouse, their respective ancestors and/or descendants.

"Final Arbitration Award" has the meaning set forth in Section 10.16.

"Financial Statements" means (i) the audited balance sheet of Parent as of June 30, 2004, and (ii) the unaudited balance sheet of Parent dated as of March 31, 2005, and the related unaudited statements of income and cash flow for the twelve and nine-month period then ended, respectively, all of which are attached as Exhibit B hereto.

"French Expansion Funding" means the Company's separate fundraising efforts to capitalize the expansion of the Company's business in French speaking territories throughout the world (e.g., Europe and Africa), whether through equity financings or other financing structures and whether effected by the Company directly or indirectly through its Subsidiaries.

"Funding Notice" has the meaning set forth in Section 3.3(b).

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Authority" means, whether domestic, foreign or international, federal, state, local or tribal, any government or any governmental department, ministry, cabinet, commission, board, bureau, agency, tribunal, regulatory authority or instrumentality or any judicial, legislative, fiscal, or administrative body or entity, having jurisdiction over the matter or matters and Person or Persons in question.

"Group" has the meaning contemplated under the Exchange Act.

"Income Tax Return" means Tax Returns relating to income, franchise or similar Taxes.

"Indebtedness" means at a particular time, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness or other Liability evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the Ordinary Course of Business which are not more than ninety (90) days past due), (iv) any commitment by which a Person assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit), (v) any indebtedness or other Liability guaranteed in any manner by a Person (including, without limitation, guarantees in the form of an agreement to repurchase or reimburse), (vi) any obligations under capitalized leases with respect to which a Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligations a Person assures a creditor against loss, (vii) any indebtedness or other Liability secured by a Lien on a Person's assets, (viii) any unsatisfied obligation for "withdrawal liability" to a "multiemployer plan" as such terms are defined under ERISA, (ix) any obligation under a synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing (but excluding all operating leases), and (x) any guarantee of indebtedness of any other Person of the types described in clauses (i) thru (ix) above.

"Indemnitees" has the meaning set forth in Section 9.2

"Indemnified Liabilities" has the meaning set forth in Section 9.2.

"Initial Closing" has the meaning set forth in Section 3.1.

"Initial Closing Date" has the meaning set forth in Section 3.1.

"Initial Closing Purchase Price" means $1,000,000.

"Intellectual Property" means all patents, patent applications and inventions; all trademarks, service marks, trade dress, trade names and corporate names and all goodwill associated therewith; all copyrights; all registrations, applications and renewals for any of the foregoing; all trade secrets, know-how, technical and computer data, documentation and software, financial, business and marketing plans, customer and supplier lists and all other intellectual property rights; and all copies and tangible embodiments of the foregoing.

"Investment Bank" has the meaning set forth in Section 8.7(a).

"Investor Rights Agreement" means the Investor Rights Agreement by and between Parent, the Company, TRG Holdings LLC, TRG Investment Holdings Limited, Muhammad Ziaullah Khan Chishti, Mohammed Khaishgi, Mohammad Ali Jameel and International Finance Corporation dated June 2004, as amended by the IRA Amendment and Consent Agreement.

"IRA Amendment and Consent Agreement" means the Amendment and Consent Agreement dated as of October 3, 2005 between Parent and International Finance Corporation, pursuant to which Parent and International Finance Corporation have agreed to certain amendments to the Investor Rights Agreement and granted certain consents in connection with the transactions contemplated by this Agreement.

"IRS" means the U.S. Internal Revenue Service.

"Issuance Notice" has the meaning set forth in Section 8.8(a).

"issued" means, in reference to equity securities of any Person, the number of shares issued and/or outstanding as of the stated reference date.

"knowledge" or "know" when used with respect to the Company or its Subsidiaries means the knowledge of the Management Shareholders after due inquiry and investigation.

"Liability" means any liability or obligation of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise.

"Lien" means any lien, mortgage, pledge, security interest, restriction, charge or other encumbrance.

"Management Shareholders" shall have the meaning set forth in the preamble.

"Material Adverse Change" or "Material Adverse Effect" means any material adverse change or effect in the assets, properties, Liabilities, business, condition (financial or otherwise) or results of operations of the Company and its Subsidiaries taken as a whole.

"Minimum Price" means, as of any date of determination, the amount determined by dividing (x) the product obtained by multiplying the Company's Pro Forma EBITDA for the 12-month period ending on the last day of the most recent monthly period for which the Company has provided financial statements to the Purchaser pursuant to Section 8.3(a) (the "Reference Date") by 4.0, minus the Company's Net Debt as of the Reference Date, by (y) the aggregate number of issued shares of Common Shares as of the date of determination.

"Most Recent Balance Sheet" means the unaudited balance sheet of Parent as of March 31, 2005.

"Mr. Chishti" means Muhammad Ziaullah Khan Chishti.

"Net Debt" means, with respect to any Person as of any date of determination, the aggregate amount of Indebtedness of such Person and its Subsidiaries as of such date minus the aggregate amount of cash, cash equivalents and marketable securities of such Person and its Subsidiaries as of such date, in each case determined on a consolidated basis in accordance with GAAP.

"Offer Date" has the meaning set forth in Section 8.7(b).

"Offer Period" has the meaning set forth in Section 8.7(b).

"Offer Price" has the meaning set forth in Section 8.7(b).

"Offered Shares" has the meaning set forth in Section 8.8(a).

"Option Plan" means the Company's Stock Option Plan as initially adopted by the Board of Directors on March 20, 2003, as amended to date (as attached hereto as Exhibit C), together with the Company's obligation to issue thereunder the Management Options (as defined and provided for in Section 3(d) of the Bye-Laws), as such option plan and Bye-Laws may be amended, restated or modified from time to time in accordance with this Agreement.

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or arbitrator.

"Ordinary Course of Business" means, with respect to any Person, the ordinary course of business of such Person consistent with past practice (including with respect to quantity, quality and frequency).

"Original Issue Price" has the meaning set forth in Section 2.2(a).

"Other Shareholder Shares" means (i) any Common Shares or other equity securities of the Company that are owned or acquired, in each case directly or indirectly and beneficially or of record, by any of Parent, the Management Shareholders or their Affiliates, (ii) any shares of Parent Stock or other equity securities of Parent that are owned or acquired, in each case directly or indirectly and beneficially or of record by Mr. Chishti, and (iii) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clauses (i) and (ii) in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization. Any particular shares constituting Other Shareholder Shares that are Transferred in compliance with the provisions of this Agreement shall continue to constitute Other Shareholder Shares in the hands of any such transferee; such shares shall cease to be Other Shareholder Shares only when they have been sold pursuant to a Public Sale or Approved Sale.

"Owned Real Property" has the meaning set forth in Section 4.14(a).

"Ownership Ratio" means, as to any Shareholder as of any time of determination, the percentage obtained by dividing the number of Shareholder Shares owned by such Shareholder at such time (determined on an as-if-converted or -exchanged basis and as if the entire Commitment Amount was funded and all of the Preferred Shares that Purchasers are entitled to acquire hereunder were acquired by Purchasers at the Initial Closing) by the aggregate number of shares of Common Shares Deemed Outstanding at such time.

"Parent" has the meaning set forth in the preamble.

"Parent Bridge Loan" means that certain Syndicated Term Financing Agreement between Parent, United Bank Limited and Habib Bank Limited dated May 2, 2005 for PKR 1,400 million pursuant to which the lenders party thereto agreed to loan Parent up to approximately $24 million (based on prevailing exchange rates) pending consummation of the Rights Offering.

"Parent Stock Ownership Ratio" means, as to a holder of Parent Stock at the time of determination, the percentage obtained by dividing the number of shares of Parent Stock owned by such holder at such time by the aggregate number of shares of Parent Stock Deemed Outstanding at such time.

"Parent Stock" or "Parent Shares" means (i) the ordinary shares of Parent and (ii) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clause (i) in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization.

"Parent Stock Deemed Outstanding" means the number of shares of Parent Stock, determined on a fully diluted basis giving effect to all issued Parent Stock Equivalents.

"Parent Stock Equivalents" means, collectively, (i) securities convertible into or exchangeable for Parent Stock and (ii) any options, warrants or other rights to acquire Parent Stock or any of the securities described in the foregoing clause (i).

"Parent Underwriting Agreement" means the Underwriting Agreement for Right Shares by and between Parent and Janhangir Siddiqui & Company Ltd. dated April 18, 2005, as in effect on the date hereof.

"Pending Acquisition Shares" has the meaning set forth in Section 8.8(b).

"Permitted Assignees" means, with respect to the assignment of rights of first refusal of holders of Preferred Shares set forth in clause (3)(B) of Section 8.1(a)(iii) hereof, any investors in any private equity fund or other investment vehicle sponsored or managed (directly or indirectly) by American International Group, Inc., other than Persons that directly or indirectly own or operate a Competing Business and Persons identified on Schedule 6.1 hereto as strategic competitors or financial competitors of the Company (unless, in the case of financial competitors identified on Schedule 6.1 hereto, such Persons provide the Company reasonable assurances in writing that no confidential information of the Company will be shared with such Persons' existing or potential portfolio companies that are either strategic competitors listed on Schedule 6.1 or otherwise engaged in a Competing Business); provided, that each such assignee agrees in writing, pursuant to the execution and delivery of a joinder to this Agreement, that all Company Securities received in connection with the exercise of such assigned rights will be considered AIG Shares for all purposes hereunder, including without limitation the transfer restrictions set forth in Article VI hereof.

"Permitted Liens" means (i) Liens for taxes not yet due and taxes for which adequate provision is made in the Most Recent Balance Sheet, (ii) purchase money security interests in supplies and equipment, (iii) precautionary Liens filed by lessors with respect to leased equipment, and (iv) encumbrances which are not substantial in amount, do not materially detract from the value of the property subject thereto and do not materially impair the use of the property subject thereto or the operation of the Company's business.

"Permitted Transferees" has the meaning set forth in Section 8.6(d).

"Person" means any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization or other entity.

"PFIC" means "passive foreign investment company" within the meaning of Section 1297 of the Code.

"Plan" means any employee benefit plan (as defined in Section 3(3) of ERISA), subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code, maintained or contributed to by the Company, or any predecessor or Subsidiary at any time during the five calendar years immediately preceding the date of this Agreement.

"Preferred Shares" has the meaning set forth in Section 2.1.

"pre-money valuation" has the meaning set forth in Annex B.

"Pro Forma EBITDA" means, with respect to any Person for any relevant period, the EBITDA of such Person for such period plus the actual EBITDA of any Person or business

acquired by such Person during such period as if such Person was acquired on the first day of such period.

"Pro Rata Share" means, with respect to any Purchaser, the percentage obtained by dividing the aggregate purchase price paid by such Purchaser for Preferred Shares at the Initial Closing by the Initial Closing Purchase Price.

"Public Sale" means (i) with respect to sales of Shareholder Shares that are subject to U.S. securities laws, any sale to the public pursuant to an offering registered under the Securities Act or to the public effected through a broker, dealer or market maker pursuant to the provisions of Rule 144 or Rule 144A (if such rule is available) under the Securities Act (or any similar rule or rules then in effect), and (ii) with respect to all other sales of Shareholder Shares, sales on the public market pursuant to an offering or transaction that is conducted in accordance with Applicable Laws and the rules of any applicable securities exchange or trading system.

"Purchasers" has the meaning set forth in the preamble.

"Qualified Acquisition" means an acquisition by the Company or any of its Subsidiaries of (a): (x) all or substantially all of the assets of any Person, or (y) assets that constitute all or substantially all of the assets of a product line, division or operating unit of such Person or (z) a material operating contract of such Person with respect to business in the same lines of business as the Company and its Subsidiaries, or (b) all or any portion of the capital stock or share capital of any Person pursuant to a transaction immediately following which the Company (or a "Group" of Persons with respect to which the Company is in Control) shall, directly or indirectly, Control such Person, whether by amalgamation, merger, consolidation, recapitalization or otherwise, or (c) other assets (including equity securities) approved in advance in writing by the holders of a majority of the then issued AIG Shares, and in each case with respect to which:

(i) the Purchasers shall have received at least twenty (20) Business Days' prior written notice of such acquisition, which notice shall include (A) a reasonably detailed description of such acquisition and the business to be acquired, which may be subject to further negotiation, (B) a copy of an executed letter of intent relating thereto, (C) management's forecast of the target company or business' financial performance for the next three fiscal years, which forecasts shall show not less than a 25% annual cash-on-cash return on cash deployed in such acquisition as of the second anniversary of such acquisition, and (D) three fiscal years (if available, but in any case no less than one fiscal year) historical financial statements (or if not available such *pro forma* financial statements as are provided to the Board of Directors);

(ii) (A) approval by the "target" company's board of directors has been provided or will be provided prior to the closing of the Qualified Acquisition and approval by the "target" company's shareholders, to the extent required by its organizational documents or applicable law, has been provided or will be provided prior to such closing, or (B) in the case where the target company is in bankruptcy, approval of a bankruptcy court of competent jurisdiction has been duly provided or will be provided at or prior to such closing; and

(iii) the Board of Directors has provided the requisite approval for the acquisition.

"Qualified Public Offering" shall mean a firm commitment underwritten initial public offering of the Common Shares pursuant to an effective registration statement under the Securities Act (or otherwise conducted in accordance with Applicable Law) providing for the listing of the Common Shares on an Acceptable Exchange and resulting in net proceeds to the Company of at least $15 million.

"RCRA" shall mean the Federal Resource Conservation and Recovery Act, as amended.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the Initial Closing Date, by and among the Company and the Purchasers in the form of Exhibit D hereto, as amended, restated or modified from time to time.

"Related Documents" means all documents and instruments to be executed or adopted by the Company in connection herewith, including, without limitation, the Bye-Laws, Certificate of Designation, the Company's Memorandum of Association, the amended and restated Memorandum of Association and Articles of Association of Parent, the Registration Rights Agreement, the Option Plan, the Employment Agreements and the Executive Stock Agreements.

"Release" has the meaning provided in CERCLA.

"Rights Offering" means the offering of Parent Stock contemplated under the Parent Underwriting Agreement that will result in the Parent receiving aggregate cash proceeds of PKR 1,445 million (approximately $24 million based on prevailing exchange rates).

"Rules" has the meaning set forth in Section 10.16.

"Sale Percentage" has the meaning set forth in Section 8.6(a)(i).

"SEC" means the Securities and Exchange Commission.

"Securities" has the meaning set forth in Section 4.3(a).

"Securities Act" means the Securities Act of 1933.

"Series A Preferred Shares" means the Series A Convertible Preferred Shares, par value $0.01 per share, of the Company, having the rights and preferences set forth in or established pursuant to the Bye-Laws and the Certificate of Designation.

"Shareholder Shares" means, collectively, the AIG Shares and the Other Shareholder Shares.

"Shareholders" means, collectively, Parent, the Purchasers, the Management Shareholders and their respective Permitted Transferees.

"Significant Line of Business" means, as of the date of any proposed Transfer of Preferred Shares, a line of business operated by the Company or its Subsidiary as of such date that generates not less than 20% of the Company's and its Subsidiaries' annual revenue, determined on a consolidated basis in accordance with GAAP.

"Solvent" means, with respect to any Person on a particular date, that on such date (i) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation contingent liabilities, of such Person, (ii) the present fair salable value of the assets of such Person is not less than the amount that shall be required to pay the probable liability of such Person on its debts as they become absolute and matured, and (iii) such person does not intend to, and does not believe that it will, incur debts and liabilities beyond such person's ability to pay as such debts and liabilities mature. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subsequent Closing Amount" means, with respect to each Subsequent Closing, the aggregate purchase price to be paid by the Purchasers at such Subsequent Closing as described in clause (ii) of Section 3.3(b) or Section 3.3(c), as the case may be.

"Subsequent Closing" has the meaning set forth in Section 2.2(b).

"Subsequent Closing Date" has the meaning set forth in Section 3.3(d).

"Subsequent Closing Shares" has the meaning set forth in Section 3.3(d).

"Subsidiary" means any corporation, partnership, limited liability company, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by the Company or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by the Company. For purposes hereof, (i) the Company shall be deemed to have a majority ownership interest in a partnership, association or other business entity if the Company, directly or indirectly, is allocated a majority of partnership, association or other business entity gains or losses, or is or controls the managing director or general partner of such partnership, association or other business entity and (ii) Blasair, Inc. (d/b/a Alert Communications) shall be deemed a Subsidiary.

"Tag Along Candidates" has the meaning set forth in Section 8.6(c).

"Tax" means any U.S. or non-U.S. federal, state, local or national income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer" has the meaning set forth in Section 8.6(b).

"Transfer Notice" has the meaning set forth in Section 8.6(b).

"Transferring Holder" has the meaning set forth in Section 8.6(c).

"Transferring Shareholder" has the meaning set forth in Section 8.6(b).

**1.2 Interpretation; Usage**. In this Agreement, unless a clear contrary intention appears: (i) the singular number includes the plural number and vice versa; (ii) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually; (iii) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (iv) reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Applicable Law means that provision of such Applicable Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (v) "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof; (vi) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (vii) references to "$" shall be references to United States dollars; and (viii) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

## ARTICLE II
## ISSUANCE AND SALE OF PREFERRED SHARES

**2.1 Authorization of the Preferred Shares**. The Company has authorized the issuance and sale to the Purchasers of up to 26,785,714 Series A Preferred Shares at one or more Closings to be held hereunder in accordance with the terms hereof (the "Preferred Shares") (subject to adjustment to reflect any sub-division, share split, dividend, bonus issue, reclassification, recapitalization or other transactions having a similar effect). The Preferred Shares have the rights and restrictions set out in the Bye-Laws and Certificate of Designation, are convertible into Common Shares in accordance with the Certificate of Designation and are exchangeable into shares of Parent Stock in accordance with Section 8.9.

**2.2 Issuance and Sale of Preferred Shares**.

(a) **Initial Closing**. At the Initial Closing, on the terms and subject to the conditions of this Agreement, the Company shall sell and issue to each Purchaser and each Purchaser shall subscribe for and purchase from the Company the number of Preferred Shares set forth opposite such Purchaser's name on Schedule I hereto at a purchase price of $1.12 per share (the "Original Issue Price") for the aggregate purchase price set forth opposite such Purchaser's name on Schedule I hereto; provided that if the Rights Offering is not consummated on or prior to April

30, 2006 (the "Contribution Deadline") or the proceeds thereof contributed to the Company on or prior to such date is either less than or more than $24,000,000, then: (i) with respect to all Preferred Shares to be acquired at Subsequent Closings from and after such date, the Original Issue Price shall be adjusted automatically, and without further action of the Parties, to the amount computed by dividing (x) the sum of $50,000,000 plus the actual aggregate cash proceeds from the Rights Offering or Parent Bridge Loan (without duplication) contributed to the Company on or prior to the Contribution Deadline plus $16,400,000 plus the product of $1.00 times the number of options to purchase Common Shares to be issued pursuant to the Option Plan based on the actual aggregate contribution of proceeds from the Rights Offering or Parent Bridge Loan (without duplication) to the Company on or prior to the Contribution Deadline (such options the "Deployment Options") by (y) the total number of Common Shares issued as of the Initial Closing Date plus the total number of Deployment Shares to be issued after the date hereof based on the actual aggregate contribution of proceeds from the Rights Offering or Parent Bridge Loan (without duplication) to the Company on or prior to the Contribution Deadline plus the total number of options to purchase Common Shares issued as of the Initial Closing Date plus the total number of Deployment Options; and (ii) with respect to all Preferred Shares acquired prior to such date, the "Conversion Price" of such shares shall be adjusted automatically, and without further action of the Parties, pursuant to Section 5B(v) of the Certificate of Designation. The proceeds of the Rights Offering or Parent Bridge Loan (without duplication) shall be contributed to the Company as common equity without any issuance of Common Shares or Common Shares Equivalents in consideration therefor other than the number of Deployment Shares and Deployment Options corresponding to such contribution.

(b) **Subsequent Closings**. As provided in Section 3.3 and subject to the other terms and conditions set forth herein, at one or more subsequent closings (each, a "Subsequent Closing" and collectively, together with the Initial Closing, the "Closings") the Company shall give effect to additional sales of Preferred Shares to the Purchasers. At each Subsequent Closing, on the terms and subject to the conditions of this Agreement, the Company shall sell and issue to each Purchaser and each Purchaser shall subscribe for and purchase from the Company, at a purchase price equal to the Original Issue Price, such Purchaser's Pro Rata Share of the number of Preferred Shares being sold at such Subsequent Closing.

## ARTICLE III
## CLOSING; CLOSING DELIVERIES

**3.1 Initial Closing**. Subject to the terms and conditions contained herein, the initial closing of the transactions contemplated hereby (the "Initial Closing") shall take place at or about 10:00 a.m. on October 4, 2005, at the offices of Kirkland & Ellis LLP, New York, New York or at such other time, place and/or date as shall be agreed upon by the Company and the Purchasers (the "Initial Closing Date").

**3.2 Payment for and Delivery of Preferred Shares**. At the Initial Closing, the Company shall (i) issue the Preferred Shares to be purchased at the Initial Closing, free and clear of all Taxes, Liens, Charges, restrictions on Transfer (other than those contained herein) and pre-emptive rights and duly registered in the name of each Purchaser in the Company's Register of Members and (ii) deliver to each Purchaser certificates for the Preferred Shares to be acquired by such Purchaser at such Closing, against payment by such Purchaser, by wire transfer of

immediately available funds to the account designated by the Company, of the purchase price therefor set forth on Schedule I.

**3.3 Subsequent Closings.**

(a) Subject to the terms and conditions set forth herein, Subsequent Closings shall be held (i) upon the request of the Company to provide financing for a Qualified Acquisition or Approved Buildout Plan in accordance with Section 3.3(b), (ii) at the election of the Purchasers in accordance with Section 3.3(c), or (iii) upon the request of the Company to provide working capital in accordance with the Approved Business Plan and the Approved Annual Budget (or otherwise required pursuant to a new contract or the expansion of business in the Ordinary Course of Business) to the extent that all other available sources of funds, including borrowings permitted hereunder, have been exhausted. No Subsequent Closing shall be held after the second (2nd) anniversary of the date hereof. The maximum purchase price to be paid by the Purchasers for Preferred Shares at all Closings, in the aggregate, shall not exceed the Commitment Amount.

(b) If the Company wishes to hold a Subsequent Closing in order to consummate a Qualified Acquisition, make a payment to a third party pursuant to an Approved Buildout Plan, or to provide working capital in accordance with the Approved Business Plan and the Approved Annual Budget in accordance with Section 3.3(a), then the Company shall send written notice to the Purchasers of such fact. Any such notice (a "Funding Notice") shall contain a reasonably detailed description of (i) the key terms of the Qualified Acquisition or the Approved Buildout Plan or working capital requirements, (ii) the amount of funds required to be provided by the Purchasers (which amount (A) shall not exceed the amount required to fund such Qualified Acquisition or Approved Buildout Plan payment or the working capital requirements set forth in the Approved Business Plan and the Approved Annual Budget and (B) when added to the total purchase price paid for Preferred Shares at all prior Closings, shall not exceed the Commitment Amount) and an itemized description of the intended uses of such funds and a detailed demonstration of how the use of such funds is consistent with the Approved Business Plan and Approved Annual Budget, and (iii) a proposed date for such Subsequent Closing (which date shall be at least twelve (12) Business Days following Purchasers' receipt for any reason of such notice and shall not occur after the second (2nd) anniversary of the date hereof, it being understood that such advance notice period shall run concurrently with any other advance notice requirement hereunder in connection with a Qualified Acquisition).

(c) If the Purchasers wish to hold a Subsequent Closing pursuant to Section 3.3(a)(ii) (whether or not in connection with a Qualified Acquisition, Approved Business Plan or to provide working capital in accordance with the Approved Business Plan and the Approved Annual Budget), then they may do so at any time and from time to time by providing not less than three (3) Business Days' written notice to the Company. Any such notice shall set forth (i) the date of such Subsequent Closing (which date shall not be after the second (2nd) anniversary of the date hereof) and (ii) the aggregate purchase price to be paid by the Purchasers at such Subsequent Closing (which amount, when added to the total purchase price paid for Preferred Shares at all prior Closings, shall not exceed the Commitment Amount).

(d) At each Subsequent Closing, the Company shall issue and sell, and the Purchasers shall purchase, in the aggregate, a number of Preferred Shares equal to the applicable Subsequent

Closing Amount divided by the Original Issue Price (such shares being referred to as the "Subsequent Closing Shares"), at a per share purchase price equal to the Original Issue Price. All such sales shall be made subject to the terms and conditions set forth in this Agreement, in reliance on the representations and warranties set forth in this Agreement. Each Subsequent Closing, if any, shall take place at the offices of Kirkland & Ellis LLP, New York, New York as follows: (i) in the case of a Subsequent Closing to be held pursuant to Section 3.3(b), at such time and on such date as shall be agreed upon by the Company and the Purchasers and (ii) in the case of a Subsequent Closing to be held pursuant to Section 3.3(c), at such time and on such date as shall be designated by the Purchasers (in each case a "Subsequent Closing Date"). At any Subsequent Closing, the Company shall issue and sell to each Purchaser, and each Purchaser, severally and not jointly, shall subscribe for and purchase from the Company its Pro Rata Share of the Subsequent Closing Shares. At the Subsequent Closing, the Company shall issue and deliver to each Purchaser its Pro Rata Share of the Subsequent Closing Shares and shall deliver to each Purchaser, stock certificates for such Subsequent Closing Shares, free and clear of all Taxes, Liens, Charges, restrictions on Transfer (other than those contained herein) and pre-emptive rights and duly registered in the name of such Purchaser in the Company's Register of Members, against payment by such Purchaser, by wire transfer of immediately available funds to the account designated by the Company, of the applicable purchase price for such Subsequent Closing Shares.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND PARENT

The Company and Parent hereby represent and warrant to each Purchaser that, except as set forth in the Schedules attached hereto, which exceptions shall be deemed to be representations and warranties as if made hereunder, the following representations are true and complete as of the date of the Initial Closing, except as otherwise indicated.

**4.1 Existence; Qualification**. Each of Parent and the Company is a company with limited liability, validly existing and in good standing under the laws of its jurisdiction of organization and has full corporate power and authority to conduct its business and own and operate its properties as now conducted, owned and operated. The copies of the Certificate of Incorporation, Bye-laws, Memorandum of Association, Certificate of Deposit of Memorandum of Increased Share Capital and Certificate of Designation of the Company and the Certificate of Incorporation, Memorandum of Association and Articles of Association of Parent and all amendments thereto attached hereto as Exhibit A are true, correct and complete copies of such documents. The Company is licensed or qualified as a foreign entity and is in good standing in each jurisdiction in which the failure so to qualify would have a Material Adverse Effect.

**4.2 Subsidiaries; Investments**. Parent does not have any direct Subsidiaries other than the Company. Schedule 4.2 correctly sets forth the name of each Subsidiary of the Company, the jurisdiction of its incorporation, the capital stock authorized and issued and the Persons owning the issued capital stock of such Subsidiary. Each such Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, possesses all requisite corporate power and authority and all material licenses, permits and authorizations necessary to own its properties and to carry on its businesses as now being conducted and as presently proposed to be conducted and is qualified to do business in every

jurisdiction in which the failure so to qualify would reasonably be expected to have a Material Adverse Effect. All of the issued shares of capital stock of each such Subsidiary are validly issued and, if applicable, are fully paid and free and clear of all Taxes, Liens and charges, and except as set forth on Schedule 4.2 all such shares are owned by the Company or another Subsidiary free and clear of any Lien and not subject to any option or right of any character to purchase any such shares. Except as set forth on Schedule 4.2, no Subsidiary has granted or issued any options, convertible securities, warrants, phantom stock, stock appreciation rights, calls, pledges, transfer restrictions (except restrictions imposed by federal and state securities laws), liens, rights of first offer, rights of first refusal, antidilution provisions or commitments of any character relating to any issued or unissued shares of capital stock of such Subsidiary. There are no preemptive or other preferential rights applicable to the issuance and sale of securities of any Subsidiary. Except as set forth on Schedule 4.2, neither Parent, the Company nor any Subsidiary of the Company owns or holds the right to acquire any shares of stock or any other security or interest in any other Person.

**4.3 Authorization and Enforceability; Issuance of Preferred Shares.**

(a) Except as set forth on Schedule 4.3(a), each of the Company and Parent have full power and authority and have taken all required corporate and other action necessary to permit it to execute and deliver this Agreement and the Related Documents and to carry out the terms hereof and thereof and to issue and deliver each of the Preferred Shares, the Conversion Shares and, subject to satisfaction of the Exchange Share Authorization Requirements, the Exchange Shares (collectively, the "Securities") and none of such actions will violate any provision of the Memorandum of Association, the Bye-laws of the Company or the similar governing documents of Parent or of any Applicable Law, regulation, order, judgment or decree or rule of any stock exchange where the Common Shares or Parent Stock is listed, or result in the breach of or constitute a default (or an event which, with notice or lapse of time or both would constitute a default) under any material agreement, instrument or understanding to which the Company or Parent is a party or by which it is bound or by which it will become bound as a result of the transactions contemplated by this Agreement. This Agreement and each of the Related Documents to which the Company and/or Parent are parties constitutes a legal, valid and binding obligation of the Company and/or Parent, enforceable against the Company and/or Parent in accordance with its terms, except to the extent limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws of general application related to the enforcement of creditor's rights generally and (ii) general principles of equity.

(b) (i) The Preferred Shares have been duly authorized and, when issued, sold and when certificates representing such Preferred Shares are delivered in accordance with this Agreement, will be validly issued, fully paid and free and clear of all Taxes, Liens and charges, and (ii) the Conversion Shares have been duly reserved for issuance upon conversion of the Preferred Shares, and, when so issued, will be duly authorized, validly issued, fully paid and free and clear of all Taxes, Liens and charges. The due authorization and reservation for issuance of the Exchange Shares upon exchange of the Preferred Shares in accordance with Section 8.9, will not require any action by the Company or Parent, except for the actions identified in Schedule 4.3(b) (the "Exchange Share Authorization Requirements"). Upon satisfaction of the Exchange Share Authorization Requirements, the Exchange Shares issued upon exchange of the Preferred Shares in accordance with Section 8.9 will be duly authorized, validly issued and outstanding, fully paid

and free and clear of all Taxes, Liens and charges. Neither the issuance of the Preferred Shares nor the issuance of any Conversion Shares or Exchange Shares upon conversion or exchange of any Preferred Shares, as the case may be, is subject to any preemptive right of any stockholder of the Company or Parent or to any right of first refusal or other similar right in favor of any Person which has not been waived.

**4.4 Capitalization of Company**. Immediately following the Initial Closing, the authorized share capital of the Company shall consist of $1,500,000 divided into shares of $0.01 par value each, comprising: (a) 150,000,000 Common Shares, of which 49,200,000 shares are issued, up to 15,000,000 shares are reserved for issuance upon the deployment to the Company of proceeds from the Rights Offering or Parent Bridge Loan (the "Deployment Shares"), 26,785,714 shares are reserved for issuance upon conversion of the Series A Preferred Shares, up to 30,661,905 shares are reserved for issuance upon exercise of options granted (and to be granted in connection with share issuances related to the Rights Offering and current agreements) pursuant to the Option Plan, and up to 1,000,000 shares are reserved for issuance in connection with the acquisitions pending as of the date hereof set forth in Schedule 4.8(a)(xiii); and (b) 26,785,714 Series A Preferred Shares, of which 892,857 shares are issued as of the Initial Closing Date and 25,892,857 shares are reserved for issuance at the Subsequent Closing(s). Immediately following the consummation of the transactions to be effected at each Closing, (i) all of the issued share capital of the Company will be validly issued, fully paid and free and clear of all Taxes, Liens and charges, and will have been issued in compliance with all Applicable Laws (including the provisions of the Securities Act and the rules and regulations promulgated thereunder) and (ii) except as otherwise permitted in accordance with Section 8.1, no issued share capital or other equity securities of the Company will rank *pari passu* or senior in right of payment of dividends or redemption to the Series A Preferred Shares. Except as set forth on Schedule 4.4, the Company has not granted or issued any options, convertible securities, warrants, phantom stock, stock appreciation rights, calls, pledges, transfer restrictions (except restrictions imposed by federal and state securities laws), liens, rights of first offer, rights of first refusal, antidilution provisions or commitments of any character relating to any issued or unissued shares of the Company other than as contemplated in the Related Documents. Except as contemplated by this Agreement and the Related Documents or as set forth in Schedule 4.4, there are no preemptive or other preferential rights applicable to the issuance and sale of securities of the Company, including the Preferred Shares. Set forth on Schedule 4.4 is a list of all shareholders of the Company who immediately following the Initial Closing, own equity securities of the Company and the percentage ownership of such shareholders on a fully-diluted basis.

**4.5 Capitalization of Parent**. Immediately following the Initial Closing, the authorized capital stock of Parent shall consist of 456,250,000 shares of Common Stock, par value of approximately $0.167 per share (based on prevailing exchange rates), of which 240,869,166 shares are outstanding. Immediately following the consummation of the transactions to be effected at each Closing, all of the issued capital stock of Parent will be validly issued, fully paid and free and clear of all Taxes, Liens and charges, and will have been issued in compliance with all applicable securities laws (including the provisions of the Securities Act and the rules and regulations promulgated thereunder). Except as set forth on Schedule 4.5, Parent has not granted or issued any options, convertible securities, warrants, phantom stock, stock appreciation rights, calls, pledges, transfer restrictions (except restrictions imposed by federal and state securities

laws), liens, rights of first offer, rights of first refusal, antidilution provisions or commitments of any character relating to any issued or unissued shares of capital stock of Parent other than as contemplated in the Related Documents. Except as contemplated by this Agreement and the Related Documents or as set forth in Schedule 4.5, there are no preemptive or other preferential rights applicable to the issuance and sale of securities of Parent. Set forth on Schedule 4.5 is a list of all shareholders of Parent who as of June 30, 2005 own more than 100,000 shares of the equity securities of Parent and the percentage ownership of such shareholders.

**4.6 Private Sale; Voting Agreements**. Assuming the accuracy of the representations and warranties made by recipients of the Company's share capital made in connection with the acquisition of such share capital, to the Company's knowledge, the Company has not violated any applicable Bermuda, U.S. or non-U.S. federal or state securities laws in connection with the offer, sale and issuance of any of its share capital. Subject to the accuracy of the Purchasers' representations contained herein, neither the offer, sale and issuance of the Preferred Shares hereunder nor the issuance and delivery of any Conversion Shares requires, or in the case of the Exchange Share will, upon completion of the Exchange Share Authorization Requirements, require registration under the Securities Act or any state securities laws or the preparation and filing of a prospectus pursuant to the Companies Act of 1981 of Bermuda. There are no agreements between the Company's shareholders with respect to the voting or Transfer of the Company's share capital or, except as set forth on Schedule 4.6, with respect to any other aspect of the Company's affairs, in each case, other than as set forth in the Related Documents.

**4.7 Financial Condition**. The Financial Statements (together with the notes thereto, as applicable), (i) are true, correct and complete in all material respects, (ii) are in accordance with the books and records of Parent on a consolidated basis and (iii) fairly present the financial condition and results of operations of Parent on a consolidated basis as of the dates and for the periods indicated, in accordance with GAAP or International Accounting Standards as notified by the Securities Exchange Commission of Pakistan, except that the unaudited balance sheets and related financial statements do not contain an auditors' opinion and do not contain footnotes and are subject to normal year-end audit adjustments. The line items from the audited balance sheet of Parent as of June 30, 2005, and the related audited statements of income and cash flow for the twelve-month period then ended will not deviate adversely from those line items presented in Annex A hereto by more than 5%. Parent, the Company and the Purchasers have jointly prepared the pro forma model of the financial performance of Parent in good faith based on the best information available to the Company and Parent as of the date hereof. The parties acknowledge that such pro forma model contains forward looking statements and there is no guarantee that such results will be achieved.

**4.8 Absence of Certain Changes**.

(a) As of the date hereof and the Initial Closing Date, except as set forth on Schedule 4.8 since the date of the Most Recent Balance Sheet, neither the Company nor, to the Company's knowledge, any of its Subsidiaries has:

(i) incurred any Liabilities other than current Liabilities incurred, or obligations under contracts entered into, in the Ordinary Course of Business and for individual amounts not greater than $3 million; provided, that total Indebtedness of the Company and its

Subsidiaries determined on a consolidated basis do not in any event exceed $12 million (which amount excludes the Company's estimate of earnout payments under the Stock Purchase Agreement by and among the Company and Barry Reese, Chris Ungarino, Ralph Reese and Charles O'Hanlon (the Shareholders of Reese Teleservices, Inc.), dated April 6, 2005 of $5,000,000);

(ii) paid, discharged or satisfied any claim, Lien or Liability, other than any claim, Lien or Liability (A) reflected or reserved against on the Most Recent Balance Sheet and paid, discharged or satisfied in the Ordinary Course of Business since the date of the Most Recent Balance Sheet or (B) incurred and paid, discharged or satisfied since the date of the Most Recent Balance Sheet, in each case in the Ordinary Course of Business;

(iii) sold, leased, assigned or otherwise transferred any of its assets, tangible or intangible (other than sales of inventory in the Ordinary Course of Business and use of supplies in the Ordinary Course of Business);

(iv) permitted any of its assets, tangible or intangible, to become subject to any Lien (other than any Permitted Lien);

(v) written off as uncollectible, canceled, waived or released any accounts receivable, right, claim or other amount owed to it other than (A) in the Ordinary Course of Business or (B) having a value not greater than $2 million;

(vi) terminated or amended or suffered the termination or amendment of, other than in the Ordinary Course of Business, failed to perform in all material respects all of its obligations or suffered or permitted any material default to exist under, any material agreement, license or permit;

(vii) suffered any damage, destruction or loss of tangible property (whether or not covered by insurance) which in the aggregate exceeds $1 million;

(viii) made any loans to any Person which exceed $0.5 million in the aggregate;

(ix) paid any amount to or entered into any agreement, arrangement or transaction with any Affiliate (including its officers, directors and employees) outside the Ordinary Course of Business and which was not approved by a majority of the Company's disinterested directors;

(x) declared, set aside, or paid any dividend or distribution with respect to its capital stock or redeemed, purchased or otherwise acquired any of its capital stock;

(xi) other than in the Ordinary Course of Business, except as expressly contemplated herein or in the Related Documents, granted any increase in the compensation of any officer, employee, director or consultant or made any other change in employment terms of any officer, employee, director or consultant;

(xii) made any material change in accounting, cash management, sales incentive or tax reporting practices;

(xiii) except as expressly contemplated herein or in the Related Documents, issued any notes, bonds or other debt securities or any capital stock or other equity securities or any securities convertible, exchangeable or exercisable into any capital stock or other equity securities;

(xiv) made capital expenditures or commitments therefor that aggregate in excess of $2 million;

(xv) made any charitable contributions or pledges in excess of $50,000;

(xvi) acquired or agreed to acquire any business, or business unit or assets of any Person;

(xvii) made any investment in any Person or taken steps to incorporate any Subsidiary;

(xviii) suffered or caused any other occurrence, event or transaction outside the Ordinary Course of Business which would have a Material Adverse Effect; or

(xix) agreed, in writing or otherwise, to any of the foregoing.

(b) Since the date of the Most Recent Balance Sheet there has been no Material Adverse Change.

**4.9 Litigation**. Except as set forth on Schedule 4.9, as of the date hereof, no claim, suit, proceeding or investigation is pending or, to the knowledge of the Company, threatened against or affecting the Companies or any officer or director thereof relating to their activities with the Companies or which could reasonably be expected to have an adverse effect on the Company or its Subsidiaries. None of the matters identified on Schedule 4.9 are reasonably expected to have a Material Adverse Effect.

**4.10 Licenses, Compliance with Law, Other Agreements, Etc.** Except as set forth on Schedule 4.10, the Companies have all material franchises, permits, licenses and other rights to allow them to conduct their businesses and are not subject to or in violation, in any material respects, of any injunction, order or decree of any court, or of any law, order or regulation of any Governmental Authority, or of the provisions of any material contract or agreement to which it is a party or by which it is bound, and neither this Agreement nor the Related Documents nor the transactions contemplated hereby or thereby will result in any such violation. The Companies' businesses have been conducted in all material respects in compliance with all Applicable Laws (including all Environmental Requirements and Corrupt Practices Laws). Without limiting the generality of the foregoing, each of the Companies and their respective officers, directors, employees and agents have complied (and will continue to comply) with all applicable Corrupt Practices Laws in connection with the conduct of the Companies' respective businesses, including with respect to any Qualified Acquisition or Approved Buildout Plan. The internal management and accounting practices and controls of each of the Companies are adequate to ensure compliance with applicable Corrupt Practices Laws.

**4.11 Third-Party Approvals**. Assuming the accuracy of the representations and warranties of the Purchasers contained in this Agreement and except as set forth on Schedule 4.11, none of the Companies is required to obtain any order, consent, approval or authorization of, or to make any declaration or filing with, any Governmental Authority or other third party (other than under any state securities or "blue sky" laws or Pakistan or Bermuda Monetary Authority approval for issuing additional shares or for accepting new shareholders) in connection with the execution and delivery of this Agreement or the Related Documents, or the consummation of the transactions contemplated hereby or thereby to occur on the Initial Closing Date or any Subsequent Closing Date.

**4.12 No Undisclosed Liabilities**. Except as set forth on Schedule 4.12, none of the Companies has any material Liabilities except (a) as and to the extent of the amounts reflected or reserved against on the Most Recent Balance Sheet (excluding the footnotes thereto) and (b) liabilities and obligations incurred in the Ordinary Course of Business since the date thereof (none of which is the result of tort, breach of contract or negligence and none of which, individually or in the aggregate, is material).

**4.13 Tangible Assets**. The Company and its Subsidiaries have good and marketable title to, or a valid leasehold interest in, all tangible assets used or reasonably necessary in connection with the conduct of their respective businesses. Except as set forth on Schedule 4.13, all material tangible assets are free from any Liens (other than Permitted Liens), are free from any material defects, have been maintained in accordance with normal industry practice and any regulatory standard or procedure to which such assets are subject, are in good operating condition and repair (subject to normal wear and tear) and are suitable for the purposes for which such assets are used or proposed to be used other than Liens, defects and wear and tear which in the aggregate could not materially impair their use.

**4.14 Owned Real Property**.

(a) Schedule 4.14 sets forth a list of all owned real property (collectively, the "Owned Real Property") used by the Company and each of its Subsidiaries in the operation of the Company's and each of its Subsidiaries' business. With respect to each such parcel of Owned Real Property: (i) such parcel is free and clear of all Liens, except Permitted Liens; (ii) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any person the right of use or occupancy of any portion of such parcel; and (iii) there are no outstanding actions or rights of first refusal to purchase such parcel, or any portion thereof or interest therein.

(b) The current use of the Owned Real Property does not violate any instrument of record or agreement affecting such Owned Real Property. There is no violation of any covenant, condition, restriction, easement, agreement or order of any governmental authority having jurisdiction over any of the Owned Real Property that affects such real property or the use or occupancy thereof.

(c) All certificates of occupancy, permits, licenses, franchises, approvals and authorizations of all governmental authorities having jurisdiction over the Owned Real Property, required or appropriate to have been issued to the Company and each of its Subsidiaries to enable

the Owned Real Property to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are, as of the date hereof, in full force and effect.

(d) The Owned Real Property is in full compliance with all applicable building, zoning, subdivision and other land use and similar laws affecting the Owned Real Property, and neither the Company nor any of its Subsidiaries has received any notice of violation or claimed violation of any such law.

**4.15 Real Property Leases**. Schedule 4.15 sets forth the agreements pursuant to which the Company and its Subsidiaries is the lessee or lessor of any real property. There exists no event of default (nor any event which with notice or lapse of time would constitute an event of default), including any Liability for past due rent, with respect to the Company or any of its Subsidiaries, and, to the Company's or its Subsidiaries' knowledge, with respect to any other party thereto under any such lease agreement, except for such defaults and defects in enforceability as would not in the aggregate be expected to materially affect the use of such property and all such agreements are in full force and effect and enforceable against the lessor or lessee in accordance with their terms, and will be in full force and effect and enforceable against such parties immediately following the Initial Closing Date.

**4.16 Material Contracts**. Schedule 4.16(a) sets forth each agreement, arrangement or understanding to which the Company and its Subsidiaries is a party which is material to the conduct of its business. Except as set forth on Schedule 4.16(b), neither the Company nor any of its Subsidiaries is in default, nor to the knowledge of the Company or any of its Subsidiaries is there any basis for a valid claim of default, and to the Company's or its Subsidiaries' knowledge no event has occurred which, with notice or lapse of time, would constitute a default, under any such agreement, arrangement or understanding to which the Company or any of its Subsidiaries is a party, and to the knowledge of the Company or its Subsidiaries no other Person is in default under any such agreement.

**4.17 Intellectual Property**. Schedule 4.17 sets forth a complete list of (a) all patented, registered or applied for Intellectual Property owned or filed by the Company or any of its Subsidiaries; and (b) all trade names and material unregistered trademarks used by the Company or any of its Subsidiaries in connection with its business. The Company or its Subsidiaries owns and possesses all right, title and interest in and to, or has a valid and enforceable license to use, the Intellectual Property necessary for the operation of its business as currently conducted and as currently proposed to be conducted, and no claim by any third party contesting the validity, enforceability, use or ownership of such Intellectual Property has been made or, to the knowledge of the Company or its Subsidiaries, is threatened except as set forth on Schedule 4.17. To the best of the Company's knowledge or its Subsidiaries, neither the Company nor any of its Subsidiaries has infringed or misappropriated the Intellectual Property of any third party.

**4.18 Employees**. Except as set forth on Schedule 4.18, since the date of the Most Recent Balance Sheet, no key employees and no group of employees has terminated, or to the knowledge of the Company or its Subsidiaries plans to terminate, employment with the Company or its Subsidiaries. Except as set forth on Schedule 4.18, neither the Company nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, nor has it

experienced any strike, material grievance, material claim of unfair labor practice or other collective bargaining dispute. Except as set forth on Schedule 4.18, to the knowledge of the Company or its Subsidiaries there is no organizational effort being made or threatened by or on behalf of any labor union with respect to its employees. Neither the Company nor any of its Subsidiaries has committed any unfair labor practice or materially violated any federal, state, foreign or local law or regulation regulating employers or the terms and conditions of its employees' employment, including laws regulating employee wages and hours, employment discrimination, employee civil rights, equal employment opportunity and employment of foreign nationals. The Company has provided to the Purchasers a schedule, dated the date of this Agreement, setting forth as of the date hereof (a) the name and total compensation of each employee of the Company and any of its Subsidiaries whose total annual or annualized compensation for the twelve months ended December 31, 2004 exceeded $150,000, (b) all wage or salary increases or bonuses received by such persons since December 31, 2004 with respect to periods beginning after December 31, 2004 (c) all commitments or agreements by the Company or any of its Subsidiaries to increase the wages or modify the conditions or terms of employment of any of their respective employees other than in the Ordinary Course of Business and (d) the name and estimated total compensation of any employee hired since December 31, 2004 whose annual compensation is likely to exceed $150,000. For the avoidance of doubt, references to "compensation" in this Section 4.18 shall exclude Management Options (as defined and provided for in Section 3(d) of the Bye-Laws).

**4.19 ERISA; Employee Benefits.** Each Plan (other than a Plan which is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA) that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service or has timely filed for a favorable determination letter from the Internal Revenue Service and no event has occurred since the date of the last determination letter that would reasonably be expected to materially adversely affect the qualified status of such Plan. Each Plan (other than a Plan which is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA) is in full force and effect and has been administered in all material respects in accordance with its terms and is and has been, and each plan administrator and fiduciary of a Plan is acting and has been acting, in compliance in all material respects with all applicable requirements of the Code and ERISA (including the funding, reporting and disclosure and prohibited transaction provisions thereof) and other applicable laws, regulations and rulings in connection with each such Plan. No Plan has been terminated or partially terminated. With respect to each Plan which is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA, no complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) has occurred, no such Plan is in reorganization or insolvency (within the meaning of Title IV of ERISA) and no material withdrawal liability has been assessed against the Company. The Company and its Subsidiaries has made, accrued or provided for all contributions required under each Plan. To the knowledge of the Company or its Subsidiaries, no event has occurred or is reasonably expected to occur with respect to any employee pension benefit plan of the Company, its Subsidiaries or any member of the Company's or its Subsidiaries' controlled group (within the meaning of Section 414 of the Code), which would reasonably be expected to directly or indirectly result in any material liability (other than liability arising in the ordinary course) to the Company, its Subsidiaries or any member of its or its Subsidiaries' controlled group pursuant to Title IV of ERISA or Section 412 of the Code. No Plan (other than a Plan which is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA) has incurred an

"accumulated funding deficiency" within the meaning of Section 412 of the Code or Section 302 of ERISA.

**4.20 Environment, Health and Safety**.

(a) The Company and its Subsidiaries (as used in this Section 4.20, Company and its Subsidiaries shall include any predecessor; provided, however, the representations and warranties in this Section insofar as they relate to any predecessor shall be limited in each case to the Company's knowledge) has complied and is in compliance in all material respects with all Environmental Requirements that are applicable to the Company's and its Subsidiaries' businesses.

(b) The Company and its Subsidiaries has obtained and complied with, and is in compliance with in all material respects, all permits, licenses and other authorizations that are required pursuant to Environmental Requirements for the occupation of its facilities and the operation of its businesses.

(c) Neither the Company nor its Subsidiaries has received any written or oral notice, report or other information regarding any actual or alleged violation of Environmental Requirements, or any liabilities or potential liabilities (whether accrued, absolute, contingent, unliquidated or otherwise), including any investigatory, remedial or corrective obligations, relating to it or its operations arising under Environmental Requirements.

(d) The Company and its Subsidiaries have provided to the Purchasers copies of all of the following: (i) environmental compliance audits or any so-called "Phase I" or "Phase II" environmental assessments; (ii) notices of violation, complaints, CERCLA information requests and responses, compliance orders, consent decrees and similar documents, relating to violations of or liabilities arising under Environmental Requirements; (iii) correspondence alleging nuisance, injury or property damage arising from odors, noise, pollution or contamination associated with the Company's or its Subsidiaries' business; (iv) reports prepared in connection with RCRA corrective actions, remedial investigations and feasibility studies, or other site investigations or cleanups required or undertaken pursuant to Environmental Requirements and associated with properties owned, leased, used or operated by the Company or its Subsidiaries; (v) documents describing or explaining cost estimates for closure and post-closure care of the Company's or its Subsidiaries' facilities involved in the treatment, storage or disposal of hazardous wastes; and (vi) documents alleging, describing or explaining the Company's or its Subsidiaries' liability or potential liability pursuant to CERCLA or similar Environmental Requirements. To the Company's knowledge, no material expenditures are or will be required in order to continue to comply in all material respects with all Environmental Requirements that are applicable to the Company's and its Subsidiaries' businesses.

**4.21 Transactions With Affiliates**. Except as set forth on Schedule 4.21, none of Parent, the Company or, to the Company's knowledge, any of its Subsidiaries is a party to any agreement (whether written or oral), arrangement or transaction with any Affiliate, equity holder, officer or director of the Companies or any Affiliate or Family Group member of the foregoing. Neither Parent nor any Management Shareholder nor any of their respective Affiliates (other than the Company and its Subsidiaries) or Family Group members (i) has any interest in any

material property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to the business of the Company and its Subsidiaries, or (ii) is the record or beneficial owner of any equity, financial or profit interest in any Person that has (a) had business dealings or a material financial interest in any transaction with the Company and its Subsidiaries, or (b) engaged in competition with the Company and its Subsidiaries with respect to any of their lines of businesses, except for ownership of less than five percent (5%) of the issued capital stock of any such business that is publicly traded on any Acceptable Exchange.

**4.22 Taxes**. Except as provided on Schedule 4.22:

(a) each of the Companies has filed all Tax Returns that it was required to file under applicable laws and regulations. All such Tax Returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations. All Taxes due and owing by each of the Companies (whether or not shown on any Tax Return) have been paid. Neither the Company nor any of its Subsidiaries is the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction. There are no Liens for Taxes (other than Taxes not yet due and payable for which adequate provision is made in the Most Recent Balance Sheet) upon any of the assets of the Company or any of its Subsidiaries;

(b) neither the Company nor any of its Subsidiaries (A) has been a member of an affiliated group filing a consolidated U.S. federal Tax Return or (B) has any Liability for the Taxes of any Person (other than the Company and its Subsidiaries) under U.S. Treasury Regulations §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise;

(c) the Company and each of its Subsidiaries has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party;

(d) there is no dispute or claim concerning any Tax Liability of the Company or any of its Subsidiaries either (i) claimed or raised by any authority in writing or (ii) as to which any of the directors and officers (and employees responsible for Tax matters) of the Parent, the Company or any of its Subsidiaries has knowledge based upon personal contact with any agent or representative of such authority;

(e) Schedule 4.22(e) lists all U.S. federal, state and local, and non-U.S., Income Tax Returns filed with respect to the Company and its Subsidiaries for taxable periods ended after December 31, 2000, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. The Company has delivered to the Purchasers correct and complete copies of all U.S. federal, state and local and non-U.S. Income Tax Returns, and all examination reports and statements of deficiencies assessed against or agreed to by any Company, filed or received since December 31, 2000. Neither the Company nor any of its Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency;

(f) neither the Company nor any of its Subsidiaries is a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local or non-U.S Tax law);

(g) neither the Company nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii);

(h) neither the Company nor any of its Subsidiaries is a party to or bound by any Tax allocation or sharing agreement;

(i) the unpaid Taxes of the Company and its Subsidiaries (A) did not, as of March 31, 2005, exceed the reserve for Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (B) do not exceed that reserve as adjusted for the passage of time through the Initial Closing Date in accordance with the past custom and practice of the Companies in filing their Tax Returns. Since the date of the Most Recent Balance Sheet, no Company has incurred any liability for Taxes arising from extraordinary gains or losses, as that term is used in GAAP, outside the Ordinary Course of Business consistent with past custom and practice;

(j) neither the Company nor any of its Subsidiaries that are organized under the laws of a jurisdiction other than the United States has a permanent establishment in the United States or is engaged in a "trade or business within the United States" within the meaning of Code §864(b);

(k) neither the Company nor any of its Subsidiaries is or has ever been a CFC or PFIC. No Person is a "United States shareholder" (within the meaning of Code §951(b), and taking into account the attribution rules of Code §958) of the Company or any of its Subsidiaries; and

(l) the Company at all times has been a corporation for U.S. federal income tax purposes, and no election has been made or other action taken to change or revoke such status. The U.S. federal Tax classification of each Subsidiary is specified on Schedule 4.22(l), and the Company has provided Purchasers with a copy of each IRS Form 8832 that has been filed with the Company or any of its Subsidiaries.

**4.23 Investment Company**. The Company is not, and is not controlled by or under common control with an affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

**4.24 Certain Fees**. No fees or commissions will be payable by the Companies to any broker, financial advisor, finder, investment banker, bank or employee with respect to the sale of the Preferred Shares to the Purchasers pursuant to this Agreement. The Purchasers shall have no obligation with respect to any such fees or with respect to any claims made by or on behalf of any Persons for such fees payable by the Companies of a type contemplated in this section that may be due in connection with the transactions contemplated by this Agreement. Each of the Companies shall indemnify and hold harmless each Purchaser, its employees, officers, directors, agents and partners, and their respective affiliates (as such term is defined under Rule 405

promulgated under the Securities Act), from and against all claims, losses, damages, costs (including the costs of preparation and attorney's fees) and expenses suffered in respect to any such claimed or existing fees.

**4.25 Parent Activities**. Parent does not (a) conduct any activity or business other than the business of owning Common Shares, maintaining its listing of Parent Stock on the Karachi Stock Exchange and taking such administrative or other actions incidental thereto, raising debt capital, short-term investing of undeployed capital, and any administrative or other matters incidental thereto or (b) own any material assets other than the Common Shares or incidental to its short-term investing activities.

**4.26 Registration Rights; Rights of Participation**. Except as set forth in the Registration Rights Agreement or on Schedule 4.26, (a) neither Parent nor the Company has granted or agreed to grant to any Person any rights (including "piggy-back" registration rights) to have any securities of Parent or the Company registered with the SEC or any other governmental authority which has not been satisfied and (b) no Person, including, but not limited to, current or former shareholders of Parent or the Company, underwriters, brokers or agents, has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by this Agreement or any Related Document which has not been waived.

**4.27 Insurance**. Schedule 4.27 contains a description of each material insurance policy maintained by the Company or any of its Subsidiaries with respect to its properties, assets and businesses, and each such policy is in full force and effect. Neither the Company nor any of its Subsidiaries is in material default with respect to its obligations under any insurance policy maintained by it and neither the Company nor any of its Subsidiaries has been denied insurance coverage. Except as set forth on Schedule 4.27, neither the Company nor any of its Subsidiaries has any self-insurance or co-insurance programs, and the reserves set forth on the Most Recent Balance Sheet are adequate to cover all anticipated liabilities with respect to any such self-insurance or co-insurance programs.

**4.28 Disclosure**. None of the representations and warranties contained in this Article IV contain any untrue statement of material fact or, to the Company's knowledge, omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF EACH PURCHASER

Each Purchaser, severally and not jointly, hereby represents and warrants to the Company as follows:

**5.1 Authorization and Enforceability**. The Purchaser has taken all action necessary to permit it to execute and deliver this Agreement and the other documents and instruments to be executed by it pursuant hereto and to carry out the terms hereof and thereof. This Agreement and each such other document and instrument, when duly executed and delivered by the

Purchaser, will constitute a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

**5.2 Government Approvals**. The Purchaser is not required to obtain any order, consent, approval or authorization of, or to make any declaration or filing with, any Governmental Authority in connection with the execution and delivery of this Agreement and the other documents and instruments to be executed by it pursuant hereto or the consummation of the transactions contemplated hereby and thereby, except for such order, consent, approval, authorization, declaration or filing as which has been or will be obtained or made.

**5.3 Investment Intent of Purchaser**. The Purchaser is acquiring the Preferred Shares for its own account, with no present intention of selling or otherwise distributing the same to the public. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Securities to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities.

**5.4 Status of Preferred Shares**. The Purchaser understands that the Securities will be characterized as "restricted securities" under the federal securities laws, inasmuch as they are being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations such Securities may not be resold in a public offering subject to U.S. securities laws without registration under the Securities Act, except in certain limited circumstances. In this connection, the Purchaser represents that it is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale, except as set forth in the Registration Rights Agreement. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company that are outside the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

**5.5 No Public Market**. The Purchaser understands that no public market now exists for any of the securities issued by the Company, and that, without affecting any of the rights or obligations arising under or related to Article VIII or Article X, the Company has made no assurances that a public market will ever exist for the Preferred Shares or the Conversion Shares.

**5.6 Sophistication and Financial Condition of Purchaser**. The Purchaser represents and warrants to the Company that it is an "Accredited Investor" as defined in Regulation D under the Securities Act and that it considers itself to be an experienced and sophisticated investor and to have such knowledge and experience in financial and business matters as are necessary to

evaluate the merits and risks of an investment in the Preferred Shares and is able to bear the economic risk of its investment in the Company for an indefinite period of time.

**5.7 Foreign Investors**. If the Purchaser is not a United States person (as defined in Section 7701(a)(30) of the Code), such Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Preferred Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Preferred Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or Transfer of the Preferred Shares. Such Purchaser's subscription and payment for and continued beneficial ownership of the Securities, will not violate any applicable securities or other laws of the Purchaser's jurisdiction. The funds used to purchase the Preferred Shares do not violate the anti-money laundering provisions of the Money Laundering Control Act of 1986 or the Bank Secrecy Act of 1970, as amended by the USA Patriot Act of 2001.

**5.8 No General Solicitation**. Neither the Purchaser, nor any of its officers, employees, agents, directors, shareholders or partners has engaged the services of a broker, investment banker or finder to contact any potential investor nor has the Purchaser or any of the Purchaser's officers, employees, agents, directors, shareholders or partners, agreed to any commission, fee or other remuneration to any third party to solicit or contact any potential investor. Neither the Purchaser, nor any of its officers, directors, employees, agents, shareholders or partners has (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Preferred Shares.

**5.9 Financial Wherewithal**. The Purchaser represents and warrants to the Company that it has sufficient funds to meet its obligations hereunder, including without limitation, the payment of its full portion of the Commitment Amount as set forth on Schedule I attached hereto.

## ARTICLE VI
## SECURITIES LAWS MATTERS

**6.1 Transfer of Preferred Shares and Conversion Shares**.

(a) Subject to Section 8.6, the Preferred Shares and Conversion Shares may only be Transferred pursuant to (i) a Public Sale, (ii) a Transfer conducted in accordance with Applicable Law and Section 6.1(b) below, (iii) a sale conducted in accordance with Section 8.6(c), if applicable, (iv) a Transfer to a Permitted Transferee in accordance with Section 8.6(d), (v) a Transfer in accordance with Section 8.7, or (vi) a Transfer of up to one-sixth of the AIG Shares issued at any Closing to any investors in any private equity fund or other investment vehicle sponsored or managed (directly or indirectly) by American International Group, Inc., other than Persons that directly or indirectly own or operate a Competing Business and Persons identified on Schedule 6.1 hereto as strategic competitors or financial competitors of the Company (unless, in the case of financial competitors identified on Schedule 6.1 hereto, such Persons provide the Company reasonable assurances in writing that no confidential information of the Company will

be shared with such Persons' existing or potential portfolio companies that are either strategic competitors listed on Schedule 6.1 or otherwise engaged in a Competing Business); provided that Transfers pursuant to this clause (vi) shall be limited to 4,464,286 shares in the aggregate and subject to compliance with Section 6.1(b) below. Notwithstanding the foregoing, without the prior written consent of the Company, (a) the Preferred Shares may not be Transferred to any Person prior to the second (2nd) anniversary of the date hereof (other than pursuant to clauses (i), (iii), (iv), (v) or (vi) of the foregoing sentence) and (b) after such date the Preferred Shares may not be Transferred to (A) any Person identified on Schedule 6.1 hereto, which schedule may from time to time be updated with the prior written consent of the holders of a majority of the then issued shares of Preferred Stock (which consent shall not be unreasonably withheld), or (B) to any Person that directly or indirectly owns or operates a business (a "Competing Business") that competes with a Significant Line of Business and generates annual revenue from such business that is not less than 20% of the annual revenue generated by such Significant Line of Business, and any such purported Transfer shall be void. The parties agree to act in good faith with respect to the proposal or approval of any updates to Schedule 6.1 hereto.

(b) In connection with any Transfer of any Preferred Shares or Conversion Shares (other than a Transfer described in Section 6.1(a)(i)), the holder of such shares shall deliver written notice to the Company describing in reasonable detail the proposed Transfer, together with an opinion of counsel reasonably satisfactory to the Company, to the effect that such Transfer may be effected without registration of such shares under the Securities Act or other Applicable Law. The holder of the shares being Transferred shall not consummate the Transfer until (i) the prospective transferee has confirmed to the Company in writing its agreement to be bound by the provisions of this Section 6.1, and Section 8.5 through 8.8 or (ii) such holder shall have delivered to the Company an opinion of such counsel that such Transfer will not require registration under the Securities Act or other Applicable Law. Promptly upon receipt of any opinion described in the first sentence of this Section 6.1(b), a duly executed instrument of transfer, Bermuda Monetary Authority Approval and approval of the Board of Directors the Company shall register the transfer in its register of members and shall prepare and deliver in connection with the consummation of the proposed Transfer, new certificates for the Preferred Shares and Conversion Shares being Transferred which shall not bear the legend set forth in Section 6.1(c)(i) so long as such opinion states that no such subsequent Transfer of such shares will require registration under the Securities Act or other Applicable Law.

(c) Except as provided in Section 6.1(b), until Transferred pursuant to clauses (a)(i) above, each certificate for Preferred Shares and Conversion Shares shall be imprinted with the following legends:

(i) "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [__________], 2005, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

(ii) "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE RESTRICTIONS CONTAINED IN A PREFERRED STOCK PURCHASE

AGREEMENT DATED AS OF [__________], 2005, BY AND AMONG THE COMPANY, THE PARENT OF THE COMPANY AND CERTAIN PURCHASERS AND MANAGEMENT SHAREHOLDERS AS DEFINED THEREIN, AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME. THE COMPANY RESERVES THE RIGHT TO REFUSE ANY TRANSFER OF SUCH SECURITIES UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED WITH RESPECT TO SUCH TRANSFER. A COPY OF SUCH PURCHASE AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

**ARTICLE VII**
**CONDITIONS PRECEDENT**

**7.1 Initial Closing Conditions of Each Purchaser.** The obligations of each Purchaser to be performed under this Agreement on the Initial Closing Date are subject to the fulfillment by the Company and Parent, at or before the Initial Closing, of the following conditions, unless otherwise waived in writing by each Purchaser:

(a) each Purchaser shall have received:

(i) a certificate of a duly authorized officer of the Company and Parent acting on behalf of the Company and Parent dated as of the Initial Closing Date:

(A) stating that the conditions set forth in clauses (b) through (j) of this Section 7.1 have been satisfied as of the Initial Closing Date; and

(B) setting forth the resolutions of the Board of Directors and shareholders, as applicable, of the Company and Parent authorizing (1) the execution and delivery of this Agreement and the Related Documents and the consummation of the transactions contemplated hereby and thereby, (2) the creation, authorization and issuance of the Series A Preferred Shares having the ability to be converted into Conversion Shares and also having the ability, upon completion of the Exchange Shares Authorization, to be exchanged into Exchange Shares and (3) the reservation of a sufficient number of Common Shares for issuance upon the conversion of the Preferred Shares into Conversion Shares and certifying that such resolutions were duly adopted and have not been rescinded or amended;

(ii) a certified copy of the Memorandum of Association and Bye-laws of the Company and the similar governing documents of Parent;

(iii) a duly executed and delivered counterpart by the Company of each of this Agreement, the Registration Rights Agreement and each Executive Stock Agreement;

(iv) fully executed and delivered amendments to the employment agreements between the Company or TRG Holdings LLC, on the one hand, and each of Muhammad Ziaullah Khan Chishti, Mohammed Khaishgi and Hasnain Aslam, on the other hand, in the form of Exhibit G, Exhibit H and Exhibit I hereto, respectively (the "Employment Agreements");

(v) copies of all third party and governmental consents, waivers, approvals, and filings required in connection with the consummation of the transactions contemplated

hereby in form and substance and in a manner reasonably acceptable to the Purchasers (other than any filings required pursuant to state securities or "blue sky" laws, which such filings shall be promptly made in a timely manner);

(vi) the written opinions of U.S., Bermuda and Pakistan legal counsel for Parent and the Company in form and substance satisfactory to the Purchasers; and

(vii) such other documents or evidence relating to the transactions contemplated hereby or the conditions set forth in this Section 7.1 as the Purchasers may reasonably request and such documents shall be in form and substance reasonably satisfactory to such Purchaser;

(b) the Company shall have provided Purchasers with satisfactory evidence that Parent and the Company have obtained director's and officer's insurance policies at commercially reasonable rates with coverage in an amount reasonably satisfactory to Purchasers for each director and executive officer of the Company;

(c) no action, suit, investigation or proceeding is pending or, to the knowledge of the Company, threatened before any court or Governmental Authority that seeks to restrain, prohibit, collect damages as a result of or otherwise challenge this Agreement or any Related Document or any transaction contemplated hereby or thereby or that would have a Material Adverse Effect;

(d) no Material Adverse Change has occurred between the date of the Most Recent Balance Sheet and the Initial Closing Date;

(e) no claim, suit, proceeding or investigation is pending or threatened against or affecting the Company or any officer or director thereof or the Company's business which if decided adversely to any such Person would or would reasonably be expected to have a Material Adverse Effect;

(f) Parent shall have provided satisfactory evidence that it has contributed to the Company as contributed surplus (without any issuance of shares other than the number of Deployment Shares and Deployment Options corresponding to such contribution) all of the drawn proceeds of the Parent Bridge Loan, net of interest expenses, underwriting fees and fundraising expenses, administrative expenses, and other reasonable and customary expenses not to exceed 10% of such drawn proceeds in the aggregate;

(g) There shall not be on the Initial Closing Date any Order or any condition imposed under any Applicable Law which would prohibit the transactions contemplated at the Initial Closing under this Agreement and the Related Documents, or subject any of the parties hereto to any material penalty or other onerous condition or claim for damages or other remedy under or pursuant to any Applicable Law as a result of giving effect to such transactions;

(h) the initial AIG Director shall have been elected to the Board of Directors and the board of directors of Parent;

(i) the organizational documents of the Company and Parent and the Investor Rights Agreement shall have been amended to the extent required to effectuate the transactions contemplated by this Agreement and the Related Documents; and

(j) the Company shall have paid the fees and expenses then due set forth in Section 10.4.

**7.2 Subsequent Closing Conditions of Each Purchaser**. The obligations of each Purchaser to be performed under this Agreement on each Subsequent Closing Date are subject to the fulfillment by the Company, at or before each Subsequent Closing Date, of the following conditions, unless otherwise waived in writing by each Purchaser:

(a) the Company shall have (i) entered into a written agreement with the target Person that contemplates a Qualified Acquisition or the Company shall have notified the Purchasers that the Company is proceeding with the buildout activities set forth in an Approved Buildout Plan which in each case will require the commencement of expenditure of funds within 30 days after the applicable Subsequent Closing and expenditure of all such funds within 180 days, or (ii) allocated as of the Subsequent Closing the proceeds received by the Company at such Closing to working capital of the Company in accordance with the Approved Business Plan, Approved Annual Budget and the requirements of Section 3.3(a), and in each case:

(i) (x) the Rights Offering shall have been consummated prior to or contemporaneously with such Closing and the net cash proceeds thereof shall have been contributed to the Company or used to repay indebtedness outstanding under the Parent Bridge Loan or (y) the Parent Bridge Loan has been fully drawn and all the drawn proceeds thereof net of interest expenses, underwriting fees and fundraising expenses, administrative expenses and other reasonable and customary expenses not to exceed 10% of such drawn proceeds in the aggregate, contributed by Parent as contributed surplus to the Company (without any issuance of additional shares other than the number of Deployment Shares and Deployment Options corresponding to such contribution);

(ii) the Company and its Subsidiaries shall have theretofore spent or concurrently with the applicable Subsequent Closing spent (or allocated for expenditure within 30 days of any applicable prior Closing) substantially all of the net proceeds received by the Company in connection with the Parent Bridge Loan, the Rights Offering and all prior Closings;

(iii) the applicable Subsequent Closing Amount, when added together with the aggregate purchase price paid by Purchasers at all prior Closings, does not exceed the Commitment Amount; and

(iv) such Subsequent Closing Date occurs on or prior to the second (2nd) anniversary of the date hereof.

(b) the Company and each of its Subsidiaries is Solvent as of such Subsequent Closing Date;

(c) each Purchaser shall have received such other documents or evidence relating to the transactions contemplated hereby or the conditions set forth in this Section 7.2 as the Purchasers

may reasonably request and such documents shall be in form and substance reasonably satisfactory to such Purchaser;

(d) no Bankruptcy Event shall have occurred as of such Subsequent Closing Date;

(e) either:

(i) (A) the EBITDA (after deduction of minority interests) of the Base Business for the quarterly period ended most recently prior to such Subsequent Closing Date, determined on a consolidated basis in accordance with GAAP, shall be no less than the target amount set forth in the following table with respect to the period in which such Subsequent Closing Date occurs, and (B) the Company's Chief Financial Officer shall have delivered a certificate to the Purchasers to the effect that, based on information reasonably available as of such Subsequent Closing Date, he or she does not expect the EBITDA (after deduction of minority interests) of the Base Business for the next successive quarterly period to be less than such target amount:

| PERIOD DURING WHICH SUBSEQUENT CLOSING DATE OCCURS: | TARGET EBITDA (AFTER DEDUCTION OF THE MINORITY INTERESTS) |
|---|---|
| From Initial Closing Date through and including December 31, 2005 | $650,000 |
| From January 1, 2006 through and including June 30, 2006 | $1,100,000 |
| From July 1, 2006 through and including December 31, 2006 | $1,200,000 |
| Thereafter | $1,300,000 |

or;

(ii) (A) the Pro Forma EBITDA (after deduction of minority interests) of the Company and its Subsidiaries for the quarterly period ended most recently prior to such Subsequent Closing Date, determined on a consolidated basis in accordance with GAAP, shall be no less than the target amount set forth in the following table with respect to the period in which such Subsequent Closing Date occurs, and (B) the Company's Chief Financial Officer shall have delivered a certificate to the Purchasers to the effect that, based on information reasonably available as of such Subsequent Closing Date, he or she does not expect the Pro Forma EBITDA (after deduction of minority interests) of the Company and its Subsidiaries for the next successive quarterly period to be less than such target amount:

| PERIOD DURING WHICH SUBSEQUENT CLOSING DATE OCCURS: | TARGET PRO FORMA EBITDA (AFTER DEDUCTION OF THE MINORITY INTERESTS) |
|---|---|
| From Initial Closing Date through and including December 31, 2005 | $900,000 |
| From January 1, 2006 through and including June 30, 2006 | $1,500,000 |
| From July 1, 2006 through and including December 31, 2006 | $1,800,000 |
| Thereafter | $1,950,000 |

(f) the line items from the audited balance sheet of Parent as of June 30, 2005, and the related audited statements of income and cash flow for the twelve month period then ended, if

available, do not deviate adversely from those line items presented in Annex A hereto by more than 5%;

(g) there shall be no Event of Noncompliance (or event which would become an Event of Noncompliance upon the passage of time and/or giving of notice) in existence as of such Subsequent Closing Date;

(h) no action, suit, investigation or proceeding that is non-frivolous (as determined by the Purchasers in good faith) is pending or, to the knowledge of the Company, threatened before any court or Governmental Authority to restrain, prohibit, collect damages as a result of or otherwise challenge this Agreement or any Related Document or any transaction contemplated hereby or thereby;

(i) there shall not be on the applicable Subsequent Closing Date any Order or any condition imposed under any Applicable Law which would prohibit the transactions contemplated at the applicable Subsequent Closing under this Agreement and the Related Documents, or subject any of the parties hereto to any material penalty or other onerous condition or claim for damages or other remedy under or pursuant to any Applicable Law as a result of giving effect to such transactions;

(j) the Company shall have paid the fees and expenses then due set forth in Section 8.5(b);

(k) Parent and the Company shall have obtained all consents and authorizations necessary in order to give effect to the rights of the Purchasers to effect an Approved Sale in accordance with Section 8.7; and

(l) each Purchaser shall have received a certificate of a duly authorized officer of the Company dated as of the applicable Subsequent Closing Date stating that the conditions set forth in this Section 7.2 shall have been satisfied as of such Subsequent Closing Date.

## ARTICLE VIII
## COVENANTS OF THE COMPANY AND PARENT

**8.1 Negative Covenants.** Until the earlier of (i) a Qualified Public Offering or (ii) such time as the Purchasers or their Permitted Transferees cease to be entitled to designate at least one AIG Director pursuant to Section 8.5, the following actions will be subject to the restrictions set forth below:

(a) The Company shall not, and shall not cause or allow any of its Subsidiaries to, take any of the following actions (nor shall Parent cause or allow the Company to take any of such actions) without the prior written consent of the holders of a majority of the then issued AIG Shares:

(i) amend the organizational documents of Parent or the Company, except, in the case of the Bye-Laws, amendments in connection with any financing subsequent to the Initial Closing Date effected in compliance with the terms and conditions of this Agreement;

(ii) amend or modify the dividend policy of Parent as in effect on the date hereof;

(iii) offer, issue or sell any equity or debt securities of the Company or any of the Company's Subsidiaries, or any securities convertible into or exchangeable for such securities, or for warrants, options or other rights to acquire such securities (collectively, "Company Securities"), unless: (1) such Company Securities are issued at a pre-money valuation not less than the amount set forth in Annex B hereto with respect to the date on which the Company issues such Company Securities; provided that if such Company Securities are sold pursuant to an agreement in which multiple closings are contemplated or permitted, then the date of issuance for purposes of this Section 8.1(a)(iii) shall be deemed to be the date of the initial closing so long as (i) not less than 3% of the total funds committed by the investors pursuant to such agreement is funded at the initial closing, (ii) any subsequent closing occurs on or prior to the second anniversary of such initial closing, and (iii) in the case of the issuance of Company Securities for any purpose other than French Expansion Funding, the issuer of such Company Securities (and not the applicable investors) has the sole right and ability, subject to reasonable conditions precedent as mutually agreed by the issuer and the applicable investors (it being understood, by way of example and not limitation, that conditions precedent substantially similar to those set forth in Section 7.2 hereof shall be deemed reasonable), to cause a subsequent closing or otherwise require the funding of any unfunded portion of any such commitments; (2) such Company Securities do not provide for a liquidation preference payable upon a Change of Control or Qualified Public Offering in excess of the actual original issue price paid therefor (it being agreed, however, that any such liquidation preference may, subject to note (b) of Annex B hereto, be senior in right of payment to the Series A Preferred Shares); (3) either (A) such Company Securities are issued after such time as the Company has, or concurrently with the closing of the sale of such Company Securities shall have, funded and used for the purposes permitted under this Agreement at least $24 million of the funds committed by the Purchasers under this Agreement or (B) the Company, by sending written notice to the holders of the Preferred Shares, has offered to sell all (except in the case where such Company Securities are issued on or prior to the eighth-month anniversary of the date hereof, in which case the Company has offered to sell 50%) of such Company Securities to such holders on the same terms as proposed to be sold to the relevant third party and such holders have either affirmatively declined such offer in writing or failed to affirmatively accept or decline such offer in writing within 30 days after receiving the offer notice described above, whichever occurs earlier (it being agreed that, only in connection with issuances of Company Securities on or prior to the eight-month anniversary of the Initial Closing, such holders may assign their rights of first refusal under this clause (3)(B) to the Permitted Assignees); (4) such sale shall not have been opposed by an AIG Supermajority; and (5) the issuance of such Company Securities does not alter, change or materially impair the rights, preferences or privileges of the Series A Preferred Shares set forth in this Agreement and the Related Documents; provided, however, that notwithstanding the foregoing, the Company may offer, issue or sell Common Stock for non-cash consideration in connection with an acquisition of any securities, interests or assets of any Person, so long as such acquisition is otherwise permitted hereunder and (a) such offer, issuance and sale reflects an equity value of the Company immediately prior to such issuance of at least $109 million (which amount shall be deemed to be increased to equal the equity value of the Company immediately after the most recent prior issuance of Company Securities) and otherwise complies with the requirements of clauses (2) and (5) above, (b) the amount of Common Stock issued pursuant to

any such offer, issuance and sale does not exceed 12.1% of the Common Shares Deemed Outstanding on the day before the Initial Closing Date (subject to adjustment to reflect any stock split, stock dividend, reclassification, recapitalization or other transaction having a similar effect), and (c) the aggregate amount of Common Stock issued pursuant to all such offers, issuances and sales does not exceed 25% of the Common Shares Deemed Outstanding on the day before the Initial Closing Date (subject to adjustment to reflect any stock split, stock dividend, reclassification, recapitalization or other transaction having a similar effect); provided, further, that the Company may issue up to 928,572 Common Shares in connection with the acquisitions pending as of the date hereof set forth in Schedule 4.8(a)(xiii); and provided, further, that, notwithstanding anything to the contrary set forth in this Agreement, this Section 8.1(a)(iii) shall not apply to the Company Exchange Shares. Notwithstanding anything to the contrary set forth herein, so long as Section 8.7 remains in effect, the Company shall not issue any Company Securities, other than the Pending Acquisition Shares, unless the purchaser thereof has agreed in writing to be bound by the terms of Section 8.7;

(iv) list or apply for the listing of any Company Securities on any security exchange or other securities trading system;

(v) redeem, repurchase or acquire any Company Securities, unless, in the case of equity Company Securities, the Series A Preferred Shares participates on an as-converted (or "as-exchanged") basis with the holders of the applicable Company Securities;

(vi) with respect to any fiscal year, operate or act under any business plan or annual budget other than the Approved Business Plan and the Approved Annual Budget (subject to reasonable, non-material, non-recurring deviation therefrom) or amendments thereto effected pursuant to approval of the Board of Directors and the holders of a majority of the then issued AIG Shares;

(vii) select, remove or replace the chief executive officer or the chief financial officer (or any individual possessing any of the responsibilities typically held by any of the foregoing) of the Company and compensation arrangements with respect to such individuals;

(viii) (1) file a petition, answer or consent seeking relief under Title 11 of the United States Code, or seeking liquidation under the Companies Act of 1981 of Bermuda or any other applicable bankruptcy law or other similar law, or (2) consent to (or fail to diligently contest) the institution of proceedings thereunder or to the filing of any such petition or to the appointment or taking of possession of a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Companies or of any substantial part of their respective properties, or (3) fail generally to pay its debts as they become due in the Ordinary Course of Business, except to the extent consistent with the Company's past working capital management practices, or (4) be adjudicated insolvent, or (5) suspend or discontinue its business (any of the foregoing events a "Bankruptcy Event");

(ix) sell, transfer, convey, lease or otherwise dispose of (whether by amalgamation, merger, consolidation, recapitalization, stock or asset sale or otherwise), in one or a series of related transactions, (A) any assets, equity or business of the Company or its Subsidiary, that generate more than 15% of the annual revenue of the Company and its

Subsidiaries or (B) real estate or other assets that do not generate revenue and represent greater than 10% of the Company's and its Subsidiaries' total assets, in each case determined on a consolidated basis in accordance with GAAP;

(x) enter into or agree to enter into any transaction that would result in a Change of Control;

(xi) (A) before the entire Commitment Amount has been paid to the Company by the Purchasers in accordance herewith, acquire or agree to acquire, in one or a series of related transactions, any securities, interests or assets of any Person involving capital deployed or to be deployed by the Company or its Subsidiaries in the aggregate amount in excess of $15 million, or (B) after the entire Commitment Amount has been paid to the Company by the Purchasers in accordance herewith, acquire or agree to acquire, in one or a series of related transactions, any securities, interests or assets of any Person involving capital deployed or to be deployed by the Company or its Subsidiaries in the aggregate amount in excess of $25 million;

(xii) incur any Indebtedness which alone or together with all other outstanding Indebtedness of the Company and its Subsidiaries exceeds three (3) times the annualized Pro Forma EBITDA of the Company and its Subsidiaries for the most recently ended three consecutive-month period determined on a consolidated but not consolidating basis in accordance with GAAP;

(xiii) loan, advance or extend credit to any Person(s) in an aggregate amount in excess of $2 million, no more than $500,000 of which shall be to officers, directors, employees or consultants of the Companies, in each case except for (A) loans extended under the Option Plan in connection with the exercise of options granted thereunder and (B) loans extended to members of management of the Company, its Subsidiaries or a target company to finance the purchase of capital stock of the Company or its Subsidiaries in connection with Qualified Acquisitions or acquisitions consummated on or prior to the date hereof;

(xiv) amend, modify or restate the Option Plan or adopt, enter into or amend any other option plan, equity-related compensation plan or substantially similar plan;

(xv) enter into or amend the terms of any agreement, arrangement or transaction with any Affiliate, equity holder, officer or director of the Companies or any Affiliate or Family Group member of the foregoing (excluding any employment agreements and inter-company agreements) that creates new commitments of the Company in excess of $500,000 in the aggregate;

(xvi) agree to settle any litigation or proceeding having a cost or value (or potential cost or value) in excess of $3 million;

(xvii) appoint, select or replace the auditors of the Company or any Subsidiary with annual revenues in excess of $20 million, determined in accordance with GAAP;

(xviii) make any change in the nature of the business of the Company which results in the Company or any Subsidiary engaging in any business other than the current business of the Company and its Subsidiaries or any reasonable extension thereof as described in

any pre-existing research report published by a top-tier Investment Bank, which in any case must be within the scope of offshore migration of call center and business services;

(xix) make or change any election that would alter the classification of the Company or any of its Subsidiaries for United States tax purposes from its classification specified in Section 4.22(k) and Schedule 4.22(k);

(xx) or make any material change to the accounting methods, practices, or policies of the Company or its Subsidiaries, other than as otherwise required by Applicable Law or to be consistent with GAAP; or

(xxi) amend, restate or modify (or waive, release or compromise any material rights or claims under) any of the noncompete or confidentiality provisions set forth in the Employment Agreements during the 18-month period following the termination of any employee party thereto.

(b) The Company shall not, and shall not cause or allow any of its Subsidiaries to, take any of the following actions (nor shall Parent cause or allow the Company to take any of such actions) over the objection of an AIG Supermajority:

(i) sell, transfer, convey, lease or otherwise dispose of (whether by amalgamation, merger, consolidation, recapitalization, stock or asset sale or otherwise), in one or a series of related transactions, (A) any assets, equity or business of the Company or its Subsidiary, that generate more than 10% of the annual revenue of the Company and its Subsidiaries or (B) real estate or other assets that do not generate revenue and represent greater than 5% of the Company's and its Subsidiaries' total assets, in each case determined on a consolidated basis in accordance with GAAP;

(ii) incur any Indebtedness which alone or together with all other outstanding Indebtedness of the Company and its Subsidiaries exceeds two (2) times the annualized Pro Forma EBITDA of the Company and its Subsidiaries for the most recently ended three consecutive-month period, determined on a consolidated but not consolidating basis in accordance with GAAP;

(iii) enter into, modify or terminate any partnership, joint venture or strategic alliance with any other Person, unless such partnership, joint venture or strategic alliance is entered into in the Ordinary Course of Business or does not result in the creation of a commitment or incurrence of any liability of the Company or its Subsidiaries in excess of $5 million; or

(iv) acquire or agree to acquire, in one or a series of related transactions, any securities, interests or assets of any Person involving aggregate consideration (including the assumption of any liabilities or the payment of any "earn-out" consideration) in excess of $5 million.

**8.2 Affirmative Covenants.** Until the earlier of (i) a Qualified Public Offering or (ii) such time as the Purchasers (or their Permitted Transferees) cease to own any Preferred Shares (including as a result of the conversion of exchange of Preferred Shares into Conversion Shares

or Parent Shares as applicable), representing on an as-if-converted or as-if-exchanged basis less than 5% of the issued Common Shares or Parent Stock, Parent and/or the Company, as applicable, shall and shall cause its Subsidiaries to:

(a) maintain the books, accounts and records of the Company and its Subsidiaries in accordance with past custom and practice as used in the preparation of the Financial Statements to the extent permitted or required by GAAP;

(b) permit representatives of holders of the AIG Shares and their respective agents (including their counsel, accountants and consultants) to have reasonable access during business hours to (i) the Company's books, records, facilities, its Chief Executive Officer, Chief Operating Officer and Chief Financial Officer, and its independent accountants and legal counsel and (ii) upon reasonable notice, the books, records, facilities and senior-most employee of each Subsidiary (provided that a representative of the Company may participate in any facility visit or teleconference undertaken pursuant to this clause (ii) so long as such participation does not unreasonably delay such visit or teleconference);

(c) (i) comply in all material respects with Applicable Laws (and in all respects with Corrupt Practices Laws) and with the written directions of each Governmental Authority having jurisdiction over them or their business or properties, and (ii) obtain and maintain all approvals and licenses from, and all filings and registrations with, any Governmental Authority to the extent material to the ordinary course operation of the Company's and its Subsidiaries' businesses;

(d) use reasonable efforts to preserve and maintain its existence in the state of their respective organizations and goodwill;

(e) discharge in all material respects their obligations arising under their respective governing documents and other material agreements, unless, in the case of such agreements, the same are being contested in good faith by the Company or its Subsidiary;

(f) maintain or cause to be maintained with financially sound and reputable insurers approved by the Board of Directors, the director's and officer's insurance policies referred to in Section 7.1(b) and such other public liability and other insurance on the Company and its Subsidiaries' property, assets and business in such amounts and against such risks as is customarily carried or maintained by companies of established reputation engaged in similar businesses and operating in similar jurisdictions as the Company and its Subsidiaries (including political risk policies to the extent required under Section 8.12);

(g) amend its register of members to reflect any conversion of Preferred Shares into Conversion Shares and to deliver replacement certificates representing the Conversion Shares in accordance with the terms, conditions and time periods set forth in the Certificate of Designation;

(h) deliver certificates representing the Exchange Shares in accordance with the terms and conditions and time periods set forth in Section 8.9;

(i) cause the non-competition provisions contained in the Employment Agreements to remain in force until at least twelve months following the termination of employment of the applicable employees and use best efforts to enforce such provisions during such period; and

(j) comply with Sections 4.03, 4.04, 4.05, 4.06 and 7.01 of the Investor Rights Agreement, all of the terms of which are hereby incorporated by reference in their entirety and made a part of this Agreement (it being agreed that to the extent any of such provisions relate specifically to the board of directors of Parent or to meetings of Parent's shareholders, such provisions as incorporated herein shall also apply to the Board of Directors and meetings of the Company's shareholders), it being agreed that any waiver or amendment to any such provisions shall not be effective against the holder of a majority of the then issued Preferred Shares without the written approval of such holders.

**8.3 Information Rights**. Until such time as the Purchasers (or their Permitted Transferees) cease to own, collectively, less than 5% of the issued Common Shares or Parent Stock (determined on an as-if-converted or -exchanged basis and as if the entire Commitment Amount was funded and all of the Preferred Shares that Purchasers are entitled to acquire hereunder were acquired by Purchasers at the Initial Closing), the Company shall deliver to each Purchaser:

(a) The following financial statements:

(i) as soon as available but in any event within forty-five (45) days after the end of each of the first three fiscal quarters each year, internally prepared statements of income and cash flows of the Company and its Subsidiaries on a consolidated basis for such fiscal quarter and for the period from the beginning of the fiscal year to the end of such fiscal quarter, and the related balance sheets of the Company and its Subsidiaries on a consolidated basis as of the end of such fiscal quarter, setting forth in each case comparisons to the Approved Annual Budget (including any variances from such budget duly noted), and all such statements shall be signed by the Company's chief executive officer attesting on behalf of the Company that such statements are true and correct in all material respects, subject to normal year end adjustments for recurring accruals and have been prepared in accordance with GAAP;

(ii) within ninety (90) days after the end of each fiscal year, statements of income and cash flows of the Company and its Subsidiaries on a consolidated basis for such fiscal year, and balance sheets of the Company and its Subsidiaries on a consolidated basis as of the end of such fiscal year, setting forth in each case comparisons to the Approved Annual Budget, all prepared in accordance with GAAP certified by an independent certified public accountant firm and accompanied by a copy of such firm's annual management letter to the Board of Directors;

(iii) each of the financial statements referred to in Sections 8.3(a)(i) and Section 8.3(a)(ii) shall be true and correct in all material respects as of the dates and for the periods stated therein, subject in the case of the unaudited financial statements to changes resulting from normal year-end adjustments for recurring accruals. In the event the Company fails to provide the financial information set forth in Section 8.3(a)(i) or Section 8.3(a)(ii), as the case may be, the holders of a majority of the then issued Preferred Shares shall have the

authority, at the Company's expense, to retain an accounting firm to audit the books and records of the Company. The Company agrees to provide all reasonable cooperation necessary to assist such accounting firm in the audit.

(b) promptly upon receipt thereof, any additional reports, management letters or other detailed information concerning significant aspects of the Company's and its Subsidiaries' operations or financial affairs given to them by their independent accountants (and not otherwise contained in other materials provided hereunder);

(c) prior to the beginning of each fiscal year, but in any case no later than thirty (30) days prior thereto, a Business Plan and Annual Budget. Such Business Plan and Annual Budget shall, so long as the Purchasers continue to hold Preferred Shares representing on an as-if-converted or as-if-exchanged basis at least 5% of the issued Common Shares or Parent Stock, be approved in writing by the Board of Directors and the holders of a majority of the then issued AIG Shares (the "Approved Business Plan" and the "Approved Annual Budget", respectively).

(d) promptly (but in any event no later than five (5) Business Days) after discovery of any failure to comply with the terms of this Agreement or the Related Documents written notice of such event which shall include a reasonable description thereof and of the Company's proposed response or cause of action to be taken with respect thereto;

(e) promptly (but in no event later than five (5) Business Days) after discovering that (i) a Material Adverse Effect or Bankruptcy Event has occurred, or (ii) a claim, suit, proceeding or investigation is pending or threatened against or affecting the Companies or any officer or director thereof which if decided adversely to any such Person would reasonably be expected to have a Material Adverse Effect or seek to restrain, prohibit, collect damages as a result of or otherwise challenge this Agreement or any Related Document or any transaction contemplated hereby or thereby, written notice of such event which shall include a reasonable description thereof and the Company's proposed response or course of action to be taken with respect thereto; and

(f) promptly (but in no event later than five (5) Business Days) after entering into or becoming subject to an agreement, transaction or arrangement that would reasonably be expected to result in a Change of Control or other Liquidity Event (as defined in the Certificate of Designation), written notice of such event which shall include a reasonable description thereof and, if applicable, of the Company's proposed response or course of action to be taken with respect thereto.

**8.4 Conversion Shares; Exchange Shares.**

(a) The Company shall at all times reserve and keep available out of its authorized but unissued Common share capital, solely for the purposes of issuance upon conversion of the Preferred Shares in accordance with the terms set forth in the Certificate of Designation, the maximum number of Common Shares as are or may become issuable to the Purchasers upon the conversion of all issued Preferred Shares (assuming the entire Commitment Amount is funded). All Common Shares which are so issuable shall, when issued, be duly and validly issued, fully paid and free from all Taxes, Liens, charges, restrictions on Transfer (other than those contained

herein) and pre-emptive rights. The Company shall take all such actions as may be necessary to assure that all such Common Shares shall be so issued without violation of any Applicable Law or any requirements of any securities exchange upon which Common Shares may be listed (except for official notice of issuance which shall be immediately transmitted by the Company upon issuance).

(b) At all times from and after the date Parent satisfies the Exchange Share Authorization Requirements in accordance with Section 8.9(a) hereof, Parent shall reserve and keep available out of its authorized but unissued shares of Parent Stock, solely for the purposes of issuance of exchange of the Preferred Shares accordance with Section 8.9, the maximum number of shares of Parent Stock as are or may become issuable to the Purchasers upon the conversion of all issued Preferred Shares (assuming the entire Commitment Amount is funded). All such shares which are so issuable shall, when issued, be duly and validly issued and outstanding, fully paid and free from all Taxes, Liens, charges, restrictions on Transfer and pre-emptive rights. Parent shall take all such actions as may be necessary to assure that all such shares shall be so issued without violation of any Applicable Law or any requirements of any securities exchange upon which such shares are listed (except for official notice of issuance which shall be immediately transmitted by Parent upon issuance, and that all of such shares shall be freely tradeable upon issuance to the Purchasers).

**8.5 Board of Directors.**

(a) Each Shareholder shall vote all Company Securities over which such Shareholder has voting control, and shall take all other necessary or desirable actions within such Shareholder's control (whether in such Shareholder's capacity as a stockholder, director, member of a board committee or officer of the Company or Parent or otherwise, and including, without limitation, attendance at meetings in Person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company and Parent shall take all necessary and desirable actions within its control, subject to Applicable Law (including, without limitation, calling special board and general meetings), such that:

(i) the Company Boards shall be comprised of ten (10) directors and except to the extent required by (a) Applicable Law or (b) documentation governing any investment in the Company made after the date hereof (and otherwise permitted hereunder) by a Person that is not an Affiliate of the Parent, the Company or the Purchasers, the composition of such boards shall be identical;

(ii) subject to Section 8.5(c) below, for so long as the Purchasers own in the aggregate, Preferred Shares representing on an as-if-converted or as-if-exchanged basis at least 10% of the issued Common Shares or issued Parent Stock, two (2) individuals designated by the holders of a majority of the then issued AIG Shares shall be appointed or elected to each of the Company Boards, one of whom shall initially be Paolo Zapparoli;

(iii) subject to Section 8.5(c) below, for so long as the Purchasers own in the aggregate, Preferred Shares representing on an as-if-converted or as-if-exchanged basis more than 5% but less than 10% of the issued Common Shares or Parent Stock, one (1) individual

designated by the holders of a majority of the then issued AIG Shares shall be appointed or elected to each of the Company Boards;

(iv) for so long as an AIG Director serves on the Board of Directors in accordance with this Section 8.5(a), the Board of Directors shall establish an audit committee and a compensation committee, each of which shall have three (3) members. The audit committee and compensation committee shall include at least one (1) AIG Director. No committee of the Board of Directors may take any action that would not be permitted to be taken by the full Board of Directors under the terms of this Agreement over the objection of an AIG Supermajority or without first obtaining the requisite consent of holders of a majority of the then issued AIG Shares, as the case may be;

(v) any AIG Director shall be removed from the Company Boards or any committee thereof only (i) except where such removal is for Cause, at the written request of the holders of a majority of the then issued AIG Shares and (ii) where such removal is for Cause, by action of the Company Boards; and

(vi) in the event that an AIG Director for any reason ceases to serve as a member of the Company Boards or any committee thereof during such representative's term of office, the resulting vacancy on the Company Boards shall be filled by a representative designated by the holders of a majority of the then issued AIG Shares promptly upon notice to the Company by such holders.

(b) The Company shall pay the reasonable travel and out-of-pocket expenses incurred by the AIG Directors or the AIG Observer in connection with attending the meetings of the Company Boards or any committee thereof or any other activities which are required or requested by the Company and that involve expenses. If Parent or the Company decides to pay its directors any fees or other compensation for their service on the Company Boards or any committees thereof, then any such compensation that would otherwise be payable to an AIG Director shall be paid to AIG Capital Partners, Inc. (or such other Person from time to time designated by the holders of a majority of the then issued AIG Shares) and not reported as income of such AIG Director.

(c) Notwithstanding anything set forth in this Agreement to the contrary, the Purchasers shall be entitled to designate one (1) AIG Director pursuant to Section 8.5(a) during the period beginning on the Initial Closing Date and ending on the earlier to occur of (i) the 12-month anniversary of the Initial Closing Date and (ii) the date on which the Purchasers acquire (or deliver notice to the Company pursuant to Section 3.3(c) with respect to the acquisition of) a quantity of Preferred Shares that would otherwise entitle the Purchasers to designate at least one (1) AIG Director pursuant to Section 8.5(a). Following such period, the Purchasers' rights to designate AIG Directors shall be determined without reference to this Section 8.5(c).

(d) Notwithstanding anything to the foregoing to the contrary, if at any time one or more AIG Directors have not been appointed to the board of directors of Parent as otherwise required pursuant to this Section 8.5 solely because of the Parent's failure to obtain any consent or approval required under applicable law or stock exchange rule, then until such consent or approval is obtained the holders of a majority of the AIG Shares then issued shall be entitled to

designate one individual to serve as a board observer (the "AIG Observer") and attend all meetings of Parent's board of directors and receive all documentation (including actions to be taken by written consent in lieu of a board meeting) provided to members of such board as if the AIG Observer was in fact a duly nominated and elected member of such board. The Company and Parent shall provide the AIG Observer with all materials and notices provided to the members of the Parent's board of directors as and when provided to board members. In addition, so long as an AIG Observer is designated hereunder, such AIG Observer shall be deemed to be an "AIG Director" for all purposes hereof, including for purposes of determining any objection of an AIG Supermajority.

(e) The rights set forth in this Section 8.5 shall terminate upon the consummation of a Qualified Public Offering.

**8.6 Restrictions on Transfer**. As a material inducement for the parties to enter into this Agreement and consummate the transactions contemplated hereunder, the parties have agreed to be bound by the following restrictions on Transfer of Shareholder Shares.

(a) No Transfers by Parent or Management Shareholders. Until the Purchasers or their Permitted Transferees cease to own AIG Shares, neither Parent nor any Management Shareholder (nor any of their Permitted Transferees) shall directly or indirectly Transfer any of the Other Shareholder Shares held by them without the prior written consent of holders of at least a majority of the then issued AIG Shares, except for (i) Transfers expressly permitted by this Section 8.6(a), (ii) Transfers pursuant to an Approved Sale or pursuant to a sale conducted in accordance with Section 8.6(b) or (c), and (iii) Transfers permitted by Section 8.6(d). Any attempted or purported Transfer of Other Shareholder Shares which does not comply with the provisions of this Section 8.6(a) shall be void and the Company shall not recognize or give effect to any such Transfer.

(i) If the Purchasers sell all or a lesser percentage of the AIG Shares pursuant to a Public Sale (such percentage, the "Sale Percentage"), then Mr. Chishti shall be permitted to sell, in a separate and independent transaction or series of separate and independent transactions conducted on the public market, a number of Parent Shares he owns as of the date hereof determined by multiplying (x) Mr. Chishti's Parent Stock Ownership Ratio as of the Initial Closing Date by (y) the Sale Percentage. Any such sales by Mr. Chishti shall not be tied, linked or otherwise related to the sales of Exchange Shares conducted by the Purchasers and, for the avoidance of doubt, the provisions of Section 8.6(c) shall not apply to any such sales of Exchange Shares.

(ii) If the Company consummates a Qualified Public Offering, each Management Shareholder and Parent shall be subject to any "lock-up" arrangement required by the managing underwriters, including with respect to any Parent Shares. Upon the termination of such "lock-up", the restriction contained in Section 8.6(a)(i) shall terminate and Management Shareholders shall be permitted to sell their Parent Stock or Company Stock on the public markets, subject to Applicable Law and the Company's trading policies; provided that prior to the earlier of (x) the fifth anniversary of the Initial Closing Date and (y) such time as the Purchasers, collectively, own less than 5% of the issued shares of Common Shares of the Company, Mr. Chishti may not sell more than 60% of the Other Shareholder Shares he owns as

of the date hereof (or which are issued with respect to such shares in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization).

(iii) If the Purchasers sell all or a lesser percentage of their Preferred Shares or Conversion Shares pursuant to a Public Sale, then Parent and each Management Shareholder shall be subject to any "lock-up" arrangement required by the managing underwriters. Following the expiration of any such "lock-up", Parent and Management Shareholders shall be permitted to sell their shares of Common Shares on the public markets, subject to Applicable Law and the Company's trading policies.

(iv) Except as specifically prohibited in this Section 8.6(a), there shall be no restriction on (A) the Transfer of Other Shareholder Shares by the Management Shareholders, or (B) the sale by Mr. Chishti of Parent Shares he acquires after the date hereof (other than shares issued with respect to Parent Shares he owns on the date hereof in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization). For the avoidance of doubt, the Parent Shares now held or subsequently acquired by any Management Shareholder other than Mr. Chishti shall neither constitute Other Shareholder Shares for purposes of this Agreement nor be subject to any restrictions on Transfer notwithstanding any provision of this Agreement to the contrary.

(b) Right of First Refusal. Subject to the other provisions of this Section 8.6, at least thirty (30) days prior to any sale, assignment, transfer, pledge, hypothecation, give away, or any other disposition of or encumbrance upon, whether voluntarily or by operation of law, whether for consideration or for no consideration (but not including a conversion or exchange of Preferred Shares into Conversion Shares or Parent Shares, as applicable) (a "Transfer") of any Other Shareholder Shares held by Parent or any Management Shareholder or any of his, her or its Permitted Transferees (other than an Approved Sale or a sale permitted under Section 8.6(a) or a transfer of shares of Parent held by a Management Shareholder in compliance with this Agreement), the Person making such Transfer (the "Transferring Shareholder") shall deliver a written notice (the "Transfer Notice") to the Company and the Purchasers specifying in reasonable detail the identity of the prospective transferee(s), the type and number of Other Shareholder Shares proposed to be Transferred, the proposed purchase price (which shall be payable solely in cash) and the other material terms and conditions of the Transfer. The Purchasers may elect to purchase any of the Other Shareholder Shares to be Transferred, upon the same terms and conditions as those set forth in the Transfer Notice, by giving written notice of such election to the Transferring Shareholder within twenty (20) days after the Transfer Notice has been given (the "Election Period"). If the Purchasers have not elected to purchase all of the Other Shareholder Shares to be Transferred within the Election Period and if the terms and conditions of this Section 8.6(b) have been met, then the Transferring Shareholder may Transfer the Other Shareholder Shares specified in the Transfer Notice at a price and on terms no more favorable to the transferee(s) thereof than specified in the Transfer Notice during the thirty-day period immediately following the expiration of the Election Period. Any Other Shareholder Shares not Transferred within such thirty-day period shall continue to be subject to the provisions of this Section 8.6(b).

(c) Tag Along Rights. Subject to the other provisions of this Section 8.6, at least fifteen (15) days prior to any Transfer (other than with respect to an Approved Sale or a sale permitted under Section 8.6(a) or a transfer of shares of Parent held by a Management Shareholder in compliance with this Agreement) of (i) all or any lesser portion of the Other Shareholder Shares held by Parent or any Management Shareholder or any of their respective Permitted Transferees or (ii) all (but not less than all) of the AIG Shares held by the Purchasers or their Permitted Transferees (any such transferring Person described in clause (i) or (ii), a "Transferring Holder"), the Transferring Holder shall deliver a Transfer Notice to the Company, each other holder of Shareholder Shares and each holder of Executive Shares (the "Tag Along Candidates") specifying in reasonable detail the identity of the prospective transferee(s), the type and number of Shareholder Shares proposed to be Transferred, the proposed purchase price (which shall be payable solely in cash) and the other material terms and conditions of the Transfer (which Transfer Notice may be the same notice and given at the same time as the Transfer Notice under Section 8.6(b) above). The Tag Along Candidates may elect to participate in the contemplated Transfer by delivering written notice to the Transferring Holder within ten (10) days after delivery of the Transfer Notice. If any of the Tag Along Candidates has elected to participate in such Transfer, each of the Transferring Holder and such Tag Along Candidates shall be entitled to sell in the contemplated Transfer, at the same price and on the same terms, a number of Shareholder Shares or Executive Shares of the same type proposed to be sold by the Transferring Holder equal to the product of (i) the quotient determined by dividing (A) the percentage of such Shareholder Shares or Executive Shares owned by such Shareholder by (B) the aggregate percentage of such Shareholder Shares or Executive Shares owned by the Transferring Holder and such Tag Along Candidates participating in such Transfer, and (ii) the aggregate number of such Shareholder Shares to be sold in the proposed Transfer.

(d) Permitted Transfers. The restrictions contained in this Section 8.6 shall not apply with respect to any Transfer of Shareholder Shares by any Shareholder (i) in the case of an individual Shareholder, pursuant to applicable laws of descent and distribution, to any member of such Shareholder's Family Group, (ii) in the case of all other Shareholders and their respective Permitted Transferees, among their Affiliates, partners, members, employees and consultants, (iii) in the case of any holder of AIG Shares, pursuant to a Transfer permitted under Section 6.1(a)(vi); provided, that the restrictions contained in this Section 8.6 shall continue to be applicable to such Shareholder Shares after any such Transfer; and (iv) in the case of Parent, the Transfer of the Company Exchange Shares in accordance with Section 5 of the IRA Amendment and Consent Agreement; provided further, that the transferees of such Shareholder Shares shall have agreed in writing to be bound by the provisions of this Agreement which affect the Shareholder Shares so Transferred by executing a joinder in substantially the form attached hereto as Exhibit E. All transferees permitted under this Section 8.6(d) are collectively referred to herein as "Permitted Transferees."

(e) Termination of Restrictions. The restrictions set forth in Section 8.6(c) and (d) shall continue with respect to each Shareholder Share until the earlier of (i) the Transfer of such Shareholder Share in a Public Sale or an Approved Sale, or (ii) the consummation of a Qualified Public Offering. In addition, the restrictions set forth in Section 8.6(b) shall continue with respect to each Shareholder Share until the earlier of (i) the Transfer of such Shareholder Share in a Public Sale or an Approved Sale, (ii) the consummation of a Qualified Public Offering or (iii) such time as the Purchasers cease to own (determined on an as-if-converted or -exchanged

basis and as if the entire Commitment Amount was funded and all of the Preferred Shares that Purchasers are entitled to acquire hereunder were acquired by Purchasers at the Initial Closing) at least 5% of the issued Common Stock or Parent Stock.

(f) Limited Restriction on Sale of Conversion Shares. If the Conversion Price of the Preferred Shares (as defined in the Certificate of Designation) is adjusted pursuant to Section 5B(iii) of the Certificate of Designation as a result of a Qualified Public Offering consummated on or prior to the 18-month anniversary of the Initial Closing Date, then as part of such Qualified Public Offering the Purchasers shall not be entitled to sell more than 50% of the Conversion Shares (as may be adjusted to reflect any share split, share dividend, reverse stock split, sub-division, consolidation, reclassification or other transaction having a similar effect) that the Purchasers would have been entitled to acquire immediately after the Initial Closing Date had the entire Commitment Amount been funded at the Initial Closing.

**8.7 Sale of the Company**.

(a) In the event that the Company has not consummated a Qualified Public Offering on or prior to the third anniversary of the Initial Closing Date, then the Purchasers shall have the right to cause the Company and all other Shareholders (including the Management Shareholders) to sell to a third party all or a lesser portion (but in no event less than 50%) of (i) the Company's issued capital stock (including those shares owned by Parent and the Management Shareholders) or (ii) the consolidated assets of the Company and its Subsidiaries (whether by amalgamation, merger, consolidation, recapitalization, stock or asset sale or otherwise). Any such sale (an "Approved Sale") shall be conducted on the terms and subject to the conditions set forth in this Section 8.7. The Purchasers may exercise their rights under this Section 8.7 at any time after the third anniversary of the Initial Closing Date by delivering a written notice to the Company to such effect and identifying a top-tier U.S. investment bank (the "Investment Bank"), which Investment Bank shall be reasonably acceptable to the Board of Directors, to conduct such sale.

(b) If the Purchasers exercise their right to cause an Approved Sale pursuant to Section 8.7(a), then the Company (or with the consent of the Company, Parent or any other Shareholder) may submit a written offer to the Purchasers to buy all (but not less than all) of the then issued AIG Shares for per share cash consideration that is not less than the Original Issue Price; provided, however, that no action taken by the Company pursuant to the foregoing shall excuse, impede, delay or otherwise prejudice any of the actions required to be taken by the Company, Parent or the Management Shareholders pursuant to Section 8.7(c). Any such offer must be made on or prior to the 60th day after delivery by the Purchasers of the written notice referred to in Section 8.7(a). If the Company (or with the consent of the Company, Parent or any other Shareholder) does not submit an actual offer within such 60 day period, then the Company shall nonetheless be deemed to have submitted an offer as of the last day of such period at a per share cash purchase price equal to the Original Issue Price. As used below, the term "Offer Date" shall mean the earlier to occur of (i) the last day of such 60-day period and (ii) the date on which the Company (or with the consent of the Company, Parent or any other Shareholder) delivers a written offer to the Purchasers as described above. Any offer made (or deemed to have been made) by the Company (or with the consent of the Company, Parent or any other Shareholder) to acquire the AIG Shares shall remain open until the 10-month anniversary of the Offer Date (such period, the "Offer Period"). At any time prior to the expiration of the Offer Period, the

Purchasers may, in their sole and absolute discretion, by written notice delivered to the Company and Parent or any other Shareholder that submits the offer to the Purchasers: (A) accept the Company's, Parent's or other Shareholder's offer (or deemed offer), as the case may be; (B) cause the Company to pursue and effectuate an Approved Sale in accordance with Section 8.7(c); or (C) reject the Company's offer and rescind the Purchaser's election to cause an Approved Sale at such time (in which case the Purchaser may later elect to cause an Approved Sale in accordance with this Section 8.7; provided that the Purchasers shall not be entitled to make such election more than once during any twelve month period). If the Purchasers elect to accept the Company's, Parent's or other Shareholder's offer (or deemed offer), as the case may be, as provided in the preceding clause (A), then the Company and the Purchasers shall close the purchase and sale contemplated thereunder at a mutually convenient time and place, which shall not be sooner than the 4-month anniversary of the Purchasers' acceptance of the Company's, Parent's or other Shareholder's offer (or deemed offer) or later than 30 days following such 4-month anniversary.

(c) If the Purchasers elect to cause an Approved Sale pursuant to Section 8.7(a), subject to the Purchasers compliance with Section 8.7(b), each of Parent, the Company and the Management Shareholders shall take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to authorize, obtain all third-party and governmental consents required as a result of, and otherwise give effect to the sale of the Company in accordance with the following provisions:

(i) The Investment Bank shall establish procedures reasonably acceptable to the Purchasers to effect an orderly sale of the Company with the objective of achieving the highest practicable value for the Shareholders of the Company within a reasonable period of time; provided, however, that in no event shall the consummation of an Approved Sale be permitted or required if the per share cash consideration available for payment or distribution to the holders of Common Shares as a result of such transaction would be less than the greater of (x) the Minimum Price and (y) the Original Issue Price, in each case subject to reduction to the extent of any fees and expenses of the Company and the funding of any applicable holdbacks or escrows required by the buyer. The Company and Parent shall cooperate with the Investment Bank in accordance with such procedures, and (subject to the foregoing) shall use their best efforts to reach agreement on the optimum structure and the terms and conditions for the Approved Sale (including whether such sale shall be by amalgamation, merger or sale of assets or capital stock) and shall retain independent legal counsel of appropriate expertise, reasonably acceptable to the Purchasers, to advise the Company on such sale. The Company shall pay all fees and expenses of the Investment Bank and such legal counsel, as well as the fees and expenses of one law firm retained by the Purchasers in connection with such sale.

(ii) If the Approved Sale is structured as a sale of assets, the Company agrees to execute and deliver or cause to be executed and delivered all documents, certificates, agreements and other writings and to take, or cause to be taken, all such actions as may be necessary or desirable to vest in the purchaser(s) thereof good and marketable title to such assets.

(iii) If the Approved Sale is structured as a sale of shares, each of Parent, the Company, and the Management Shareholders shall execute and deliver or cause to be executed and delivered all documents, certificates, agreements and other writings and to take, or cause to

be taken, all such actions as may be necessary or desirable to vest in the purchaser(s) thereof good and marketable title to the shares being acquired; provided that: (A) all holders of Common Shares of the Company shall be entitled to receive the same form and amount of consideration per share of Common Shares or if any such holder is given an option as to the form of consideration to be received, then all holders participating therein will be given the same option; (B) if the Approved Sale will involve the sale of less than 100% of the Company's issued Common Shares, then each holder of Common Shares shall be entitled to sell a *pro rata* portion of such shares determined by multiplying (x) the total number of shares to be sold in such Approved Sale by (y) a fraction, the numerator of which is the number of shares of Common Shares held by such holder immediately prior to the time of the Approved Sale and the denominator of which is the total number of shares of Common Shares held by all holders immediately prior to the time of the Approved Sale; and (C) the liability of any such holder for misrepresentation or indemnity will not exceed an amount equal to the proceeds received by such holder in such sale. If such Approved Sale is structured as an amalgamation, merger or consolidation, each holder of Shareholder Shares shall waive any dissenters rights, appraisal rights or similar rights in connection with such amalgamation, merger or consolidation.

**8.8 Preemptive Rights.**

(a) Subject to Section 8.8(b) below, if the Company issues any equity or debt securities after the date hereof, the Company shall offer to sell to each holder of AIG Shares a number of such securities ("Offered Shares") so that the Ownership Ratio for such holder immediately after the issuance of such securities (and assuming the purchase of such Offered Shares) would be equal to the Ownership Ratio for such holder immediately prior to such issuance of securities. The Company shall give each holder of AIG Shares at least thirty (30) days prior written notice of any proposed issuance, which notice shall disclose in reasonable detail the proposed terms and conditions of such issuance (the "Issuance Notice"). Each such holder shall be entitled to purchase such securities at the same price, on the same terms (including, if more than one type of security is issued, the same proportionate mix of such securities), and at the same time as the securities are issued by delivery of irrevocable written notice to the Company of such election within thirty (30) days after delivery of the Issuance Notice (the "Election Notice"). If any such holder has elected to purchase any Offered Shares, the sale of such shares shall be consummated as soon as practical (but in any event within fifteen (15) days) after the delivery of the Election Notice.

(b) The provisions of Section 8.8(a) shall not apply to: (i) the issuance of securities in connection with subdivisions of Company Securities, bonus issues of shares by the Company, share splits or dividends; (ii) the issuance of securities to employees, officers, consultants, members of management or directors of the Company as compensation pursuant to the Option Plan or any other stock option or stock purchase plans or agreements approved by the Board of Directors for the primary purpose of soliciting or retaining their services, (iii) the issuances of Preferred Shares or Conversion Shares contemplated by this Agreement; (iv) the issuance of securities pursuant to the conversion or exercise of the Deployment Options and convertible or exercisable securities issued as of the date of this Agreement and disclosed to the Purchasers; (v) the issuance of securities in connection with bona fide acquisition, amalgamation, merger, joint venture or similar transactions, the terms of which have been approved pursuant to this Agreement by the requisite vote of the Board of Directors; (vi) the issuance of Common Shares

in a Qualified Public Offering; (vii) the issuance of the Deployment Shares and the Deployment Options; or (viii) the issuance of up to 928,572 shares of Common Stock in connection with the Company's pending acquisitions described on Schedule 4.8(a)(xiii) (the "Pending Acquisition Shares").

(c) This Section 8.8 shall automatically terminate upon the consummation of a Qualified Public Offering.

**8.9 Exchange Right**.

(a) With respect to each issuance of Exchange Shares, the Company and Parent shall take all actions necessary to complete the applicable Exchange Share Authorization Requirements (including obtaining any required consent or approval) as soon as practicable, but in no event later than the 90th day after the date on which the relevant Purchaser irrevocably exercises its exchange rights pursuant to Section 8.9(b) below.

(b) The Purchasers shall have the right at any time and from time to time to exchange all or any lesser portion of the then issued Preferred Shares into a number of freely tradable shares of Parent Stock determined by multiplying (x) the number of Conversion Shares into which the Preferred Shares proposed to be exchanged are then convertible in accordance with the terms of the Certificate of Designation (without actually requiring such Preferred Shares to be so converted) by (y) a fraction, the numerator of which is the sum of the Original Issue Price plus any unpaid dividends (on a per share basis) thereon, and the denominator of which is the quotient obtained by dividing (i) $74,000,000 (which amount shall be reduced, in the event the actual amount invested in the Company pursuant to the Rights Offering or the Parent Bridge Loan, without duplication, is less than $24,000,000, by the amount of such shortfall) by (ii) the total number of shares of Parent Stock issued on a fully diluted basis, as of the Initial Closing Date (to be adjusted as appropriate to give effect to any stock split, stock dividend, reverse stock split, reclassification or other transaction having a similar effect on Parent Stock). The failure of the Company or Parent to have satisfied the Exchange Share Authorization Requirements on or prior to the date on which the Purchasers elect to exchange Preferred Shares pursuant to this Section 8.9 shall not effect Purchasers rights hereunder, however, the Parent shall not be required to issue the Exchange Shares unless and until the Exchange Share Authorization Requirements are satisfied, it being expressly agreed that Parent shall use its best efforts to satisfy such requirements in accordance with Section 8.9(a). As soon as possible after an exchange has been effected pursuant to this Section 8.9, (i) Parent shall deliver to the exchanging holder a certificate or certificates representing the number of shares of Parent Stock issuable by reason of such exchange in such name or names and such denomination or denominations as the exchanging holder has specified and (ii) the Company shall deliver to the exchanging holder a certificate representing any Preferred Shares which were represented by the certificate or certificates delivered to the Company in connection with such exchange but which were not exchanged. The issuance of certificates for shares of Parent Stock upon exchange of the Preferred Shares shall be made free and clear of all Taxes, Liens, charges, restrictions on Transfer or pre-emptive rights. Parent or the Company shall provide each Purchaser with thirty (30) days prior notice of any Change of Control of Parent or any other recapitalization, reorganization, reclassification, consolidation, amalgamation, merger, sale of all or substantially all of Parent's assets or other transaction, in each case which is effected in such a manner that the holders of Parent Stock are

entitled to receive (either directly or upon subsequent liquidation) stock, securities or assets with respect to or in exchange for Parent Stock. If the Purchasers, after receiving any such notice from Parent or the Company, elect to exchange Preferred Shares for Exchange Shares pursuant to this Section 8.9, then Parent shall not give effect to the applicable transaction unless and until the Exchange Shares are duly authorized and issued to the Purchasers.

**8.10 Qualified Public Offering**. The Company, Parent and the Management Shareholders shall use their best efforts to consummate a Qualified Public Offering as soon as possible after the date hereof, and in any event no later than 24 months following the Initial Closing Date. The Purchasers shall have the right to approve the managing underwriter for any such offering.

**8.11 Parent Activities**. Parent shall continue to pursue its activities in the business process outsourcing sector and other related sectors only through the Company. In addition, Parent shall not engage in any other business other than business process outsourcing and its related sectors except that Parent may engage in the incidental businesses of owning Common Shares, maintaining its listing of Parent Stock on the Karachi Stock Exchange and taking such administrative or other actions incidental thereto, raising equity or debt capital for the business process outsourcing and other related activities of the Company, short-term investing of undeployed capital, and any administrative or other matters incidental thereto.

**8.12 Diversification of Operations**. On or prior to the 12-month anniversary of the Initial Closing Date, at least 25% of all call center operators operated by the Company or its Subsidiaries (excluding call center operators located in the United States) shall be located in one or more non-U.S. locations (other than Pakistan) to be mutually agreed by the parties to this Agreement. On or prior to the 18-month anniversary of the Initial Closing Date, at least 33% of all call center operators operated by the Company or its Subsidiaries (excluding call center operators located in the United States) shall be located in one or more non-U.S. locations (other than Pakistan) to be mutually agreed by the parties to this Agreement. If the Company fails to meet either of the foregoing requirements, then the Company shall purchase (at its sole expense) political risk insurance insuring the full amount of the Purchasers' investment in Preferred Shares pursuant to this Agreement to date, naming the Purchasers as sole beneficiaries of such policy and including such other terms and conditions reasonably satisfactory to the Purchasers.

**8.13 Dividend Policy**. From the date hereof until the consummation of a Qualified Public Offering, any income generated directly or indirectly by the Company shall be retained and used by the Company only for purposes consistent with the Approved Business Plan or otherwise approved by the Board of Directors and, if the then issued AIG Shares represent 5% or more of the Common Shares Deemed Outstanding as of such time, the holders of a majority of the then issued AIG Shares in accordance with Section 8.1(a)(ii) of this Agreement. Until such time as the requirements of the preceding sentence are no longer required, any income that exceeds the amount required by the Approved Budget and Approved Business Plan not immediately required or reasonably anticipated to be required within the foreseeable future for the aforesaid purposes and available for payment of dividends by the Company under the Bermuda Companies Act of 1981, Section 54 shall be promptly paid to the shareholders of the Company by way of dividend as promptly as practicable after the end of the relevant Annual Budget period.

**8.14 Use of Proceeds**. The Company shall not, and shall not cause or allow any of its Subsidiaries to, use any proceeds from the sale of the Preferred Shares hereunder except to finance the purchase price payable with respect to one or more Qualified Acquisitions, to make payments to third parties in accordance with an Approved Buildout Plan, to pay reasonable fees and expenses incurred in connection with Qualified Acquisitions or Approved Buildout Plans or for working capital of the Company in accordance with the Approved Business Plan, Approved Annual Budget and the requirements of Section 3.3(a). Without limiting the foregoing, the funds delivered by the Purchasers at the Initial Closing or any Subsequent Closing shall not be used to pay any dividend or distribution to Shareholders of the Company or to repay any Indebtedness of Parent, the Company or any of its Subsidiaries other than the repayment of third-party bridge loans made in order to finance the relevant Qualified Acquisition.

**8.15 Parent Underwriting Agreement**. Parent and each of the Management Shareholders shall use their best efforts to cause each of the conditions precedent set forth in Section 1.05 of the Parent Underwriting Agreement to be satisfied on or prior to April 30, 2006. In addition, Parent covenants that all of the conditions precedent set forth in Section 1.05 of the Parent Underwriting Agreement will be satisfied on or prior to April 30, 2006.

**8.16 Proceeds of Parent Bridge Loan and Rights Offering**. Parent shall contribute all cash proceeds received from borrowings under the Parent Bridge Loan or upon the consummation of the Rights Offering to be contributed to the Company as contributed surplus (without any issuance of shares other than the number of Deployment Shares or Deployment Options corresponding to such contribution), other than (a) in the case of proceeds from the Parent Bridge Loan, an amount equal to interest expenses, underwriting fees and fundraising expenses, administrative expenses, and other reasonable and customary expenses not to exceed 10% of such cash proceeds in the aggregate and (b) in the case of proceeds from the Rights Offering, such amount as is necessary to pay transaction expenses, administrative expenses, and other reasonable and customary expenses not to exceed 10% of such cash proceeds in the aggregate (without duplication) and repay Indebtedness outstanding under the Parent Bridge Loan.

**8.17 Return of Funds**. If the Company or its Subsidiary does not use proceeds received from the Purchasers pursuant to Section 3.3(d) at any Subsequent Closing for the purposes stated in the relevant Funding Notice on or prior to (x) in the case where funding is required for a Qualified Acquisition, the 30th day after the date of such Subsequent Closing, or (y) in all other cases, the 180th day after the date of such Subsequent Closing, then the Company shall promptly (but in no event later than two (2) Business Days after such day) return all of such proceeds to the Purchasers by wire transfer of immediately available funds to the accounts designated by the Purchasers.

**8.18 U.S. Tax Matters**.

(a) Tax Returns. The Company and each of its Subsidiaries shall (and the Parent shall cause such Persons to) (i) prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns that are required to be filed after the Initial Closing Date and (ii) timely pay all Taxes required to be paid by them or with respect to their operations. Such Tax Returns shall be prepared in accordance with applicable law and on a basis consistent with the preparation of

Tax Returns with respect to prior periods except to the extent otherwise required by law. The Company shall deliver to Purchasers a copy of each such Income Tax Return within 15 Business Days after such Tax Return is filed. The Company and each of its Subsidiaries shall timely withhold and pay all Taxes required to be withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(b) Cooperation on Tax Matters.

(i) The Purchasers and each of the Companies shall cooperate fully, as and to the extent reasonably requested by any other party, in connection with the filing of Tax Returns (and any audit, litigation or other proceeding with respect to Taxes). Such cooperation shall include the retention and (upon any party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Each of the Companies shall (and the Parent shall cause each such member to) retain all books and records with respect to Tax matters pertinent to each of the Companies relating to any taxable period until the expiration of the statute of limitations (including any extension thereof) for the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority.

(ii) The Company will (and Parent will cause the Company to) furnish to each Purchaser reasonably promptly upon request such information as such Purchaser may reasonably request to enable it or its direct or indirect investors to complete their U.S. federal, state and local and non-U.S. Tax Returns and otherwise comply with applicable Tax laws. Without limiting the generality of the foregoing, not later than 45 days after the end of each fiscal year of the Company and its Subsidiaries, the Company will (and Parent shall cause the Company to) provide written notice to the Purchasers if any of the Companies was either a PFIC or a CFC for such fiscal year. For each fiscal year of the Companies, commencing with the first fiscal year for which any of the Companies is determined to be a PFIC or a CFC, the Company shall (and Parent shall cause the Company to), not later than 85 days after the end of such fiscal year, furnish each Purchaser with (i) all information necessary to permit such Purchaser (and its direct or indirect investors) to complete IRS Forms 5471 and 8621 with respect to such Purchaser's direct and indirect interest in each of the Companies, and (ii) a "PFIC Annual Information Statement", satisfying the requirements of U.S. Treasury Regulations §1.1295-1(g)(1), with respect to each of the Companies determined to be a PFIC. The Company will obtain professional assistance experienced in U.S. federal income tax matters to the extent necessary to make the determinations and to provide the information, forms and statements described in this paragraph.

(iii) The Company shall promptly (i) notify the Purchasers of the commencement of any material Tax audit, controversy or proceeding relating to the Company or any of its Subsidiaries, (ii) furnish to the Purchaser a copy of all written correspondence relating thereto, and (iii) provide to the Purchasers reasonably detailed accounts of all stages of each administrative or judicial proceeding relating thereto.

(iv) Each of the Companies and the Purchasers agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated by this Agreement).

(v) Neither the Company nor any of its Subsidiaries that are organized under the laws of a jurisdiction other than the United States shall (and the Parent shall cause such Persons not to) take any action that would cause it to have a permanent establishment in the United States or to be treated as engaged in a "trade or business within the United States" within the meaning of Code §864(b).

(c) Tax Sharing Agreements. All tax-sharing agreements or similar agreements with respect to or involving a Company shall be terminated as of the Initial Closing Date and, after the Initial Closing Date, the Companies shall not be bound thereby or have any liability thereunder.

**8.19 Registration Rights Acknowledgement**. Parent has reviewed the Registration Rights Agreement and is familiar with its terms, including Section 6 thereof. Parent acknowledges and agrees to the rights, preferences and priorities granted to the holders of AIG Shares in the Registration Rights Agreement.

**8.20 Company Exchange Shares**. For the avoidance of doubt, Parent and the Company agree that, notwithstanding any provision of this Agreement to the contrary, the Purchasers shall not suffer any dilution in their ownership of the Company as a result of any shareholder's exercise of the Exchange Right (as defined in the IRA Amendment and Consent Agreement).

## ARTICLE IX
## SURVIVAL; INDEMNIFICATION

**9.1 Survival**. The representations and warranties of the parties hereto contained herein, or in any writing delivered pursuant hereto, shall survive the execution and delivery of this Agreement and the Initial Closing for a period of two (2) years following each date on which such representations and warranties of the parties have been made or were deemed to have been made, regardless of any investigation made by any Purchaser or on its behalf. Notwithstanding the above, the representations made in Sections 4.1, 4.3, 4.4, 4.5, 4.21 and 4.24 shall survive indefinitely. All covenants of the Parties contained in the Agreement shall survive the Closing according to their respective terms.

**9.2 Indemnification**.

(a) In consideration of the Purchasers' execution and delivery of this Agreement and acquiring the Preferred Shares hereunder and in addition to all of Parent's and the Company's other obligations under this Agreement, each of Parent and the Company shall defend, protect, indemnify and hold harmless the Purchasers and all of their respective Affiliates, officers, managers, advisors, directors, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs,

penalties, fees, Liabilities and damages, and expenses (including, without limitation, costs of suit and all reasonable attorneys' fees and expenses) in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought) (the "Indemnified Liabilities"), incurred by the Indemnitees or any of them as a result of, or arising out of, or relating to (i) the breach of any representation or warranty contained in this Agreement or in any Related Document, (ii) the breach of any promise, agreement or covenant contained in this Agreement or in any Related Document, or (iii) the execution, delivery, performance or enforcement of this Agreement and any other instrument, document or agreement executed pursuant hereto by any of the Indemnitees. Parent and the Company shall reimburse the Indemnitees for the Indemnified Liabilities as such Indemnified Liabilities are incurred. To the extent that the foregoing indemnification obligations may be unenforceable for any reason, each of the Company and Parent shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under Applicable Law. The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnitee or any officer, director or controlling Person of such Indemnitee and shall survive the Transfer of securities.

(b) Notwithstanding anything in this Section 9.2 to the contrary:

(i) except in the case of fraud or willful misconduct, no Indemnified Liabilities shall be recoverable by the Indemnitees pursuant to the provisions of Section 9.2(a) unless and until the total of all Indemnified Liabilities exceeds 2.5% of the aggregate purchase price paid by the Purchasers for Preferred Shares hereunder as of the relevant date of determination, in which case the Indemnitees shall, subject to Section 9.2(b)(ii) below, be entitled to seek indemnification for all Indemnified Liabilities from the first dollar, provided, that the foregoing limitation shall not apply with respect to claims for Indemnified Liabilities arising from or related to breaches of any covenants contained herein or breaches of the representations and warranties set forth in Sections 4.1, 4.3, 4.4, 4.5 or 4.6; and

(ii) except in the case of fraud, the indemnification obligations of Parent and the Company pursuant to this Section 9.2 shall not exceed the aggregate purchase price actually delivered to the Company pursuant to this Agreement in consideration of the purchase of Preferred Shares at the Initial Closing and any Subsequent Closings, provided, that the foregoing limitation shall not apply with respect to claims for Indemnified Liabilities arising from or related to breaches of any covenants contained herein or breaches of the representations and warranties set forth in Sections 4.1, 4.3, 4.4, 4.5 or 4.6.

## ARTICLE X
## GENERAL PROVISIONS

**10.1 Successors and Assigns**. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, including each subsequent holder of Shareholder Shares. Except as otherwise specifically provided herein, this Agreement shall not be assignable by any party without the prior written consent of the other parties hereto; provided that each Purchaser shall be entitled to assign its rights and obligations under this Agreement to any transferee of AIG Shares without the consent of any other party hereto, so long as (a) the Transfer of such AIG Shares is a Permitted Transferee or is otherwise made in

accordance with Section 6.1 hereof and (b) such transferee agrees in writing to be bound by the terms of this Agreement.

**10.2 Entire Agreement**. This Agreement and the other writings referred to herein or delivered pursuant hereto constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior arrangements or understandings (including, without limitation, the Term Sheet and Minority Shareholder Rights and the Exclusivity and Reimbursement Agreement, each executed by Parent, the Company and the Purchasers and dated as of May 5, 2005).

**10.3 Notices**. All notices, requests, consents and other communications provided for herein shall be in writing and shall be (a) delivered in person, (b) transmitted by telecopy, (c) sent by first-class, registered or certified mail, postage prepaid, or (d) sent by reputable overnight courier service, fees prepaid, to the recipient at the address or telecopy number set forth below, or such other address or telecopy number as may hereafter be designated in writing by such recipient. Notices shall be deemed given upon personal delivery, seven (7) days following deposit in the mail as set forth above, upon acknowledgment by the receiving telecopier or one day following deposit with an overnight courier service.

If to the Company:

The Resources Group International Limited
Milner House, 18 Parliament Street
Hamilton, HM FX, Bermuda
Telephone: (441) 294-1523
Telecopy: (441) 292-7880
Attention: Don S. Laurenceo, Esq.

with a copy to (which shall not constitute notice to the Company):

TRG Holdings, LLC
1700 Pennsylvania Avenue, NW
Suite 560
Washington, DC 20006
Telephone: (202) 289-9898
Telecopy: (202) 289-8088
Attention: Hasnain Aslam

and with a copy to (which shall not constitute notice to the Company):

Orrick Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street NW
Washington, DC 20007-5135
Telephone: (202) 339-8400
Telecopy: (202) 339-8500
Attention: Mark W. Seneca, Esq.

If to Parent:

TRG Pakistan Limited
7th Floor, Block B
Finance And Trade Centre, Shahrah-e-Faisal
Karachi, Pakistan
Telephone: +92-21-111874874
Telecopy: +92-21-5661508-9
Attention: Muhammad Ali Jameel

If to any Purchaser:

AIG Capital Partners, Inc.
599 Lexington Avenue, 24th Floor
New York, NY 10022
Telephone: (212) 458-2194
Telecopy: (212) 458-2275
Attention: Paolo Zapparoli

with a copy to (which shall not constitute notice to such Purchaser):

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4775
Telecopy: (212) 446-4900
Attention: Armand Della Monica, Esq.

If to a Management Shareholder, to the address listed adjacent his name on Schedule II attached hereto.

**10.4 Purchaser Fees and Expenses**. The Company shall, up to a maximum amount of $100,000, reimburse the Purchasers for their reasonable legal, accounting and out-of-pocket fees and expenses (including travel and other due diligence expenses) incurred in connection with the documentation, negotiation and consummation of the transactions contemplated by this Agreement and the Related Documents at the Initial Closing and, to the extent incurred following the Initial Closing, at each Subsequent Closing, and any other such fees and expenses of the Purchasers incurred in connection with any future amendment or waiver to this Agreement or any of the Related Documents.

**10.5 Publicity**. Except as may be required by applicable law, none of the parties hereto shall issue a publicity release or announcement or otherwise make any public disclosure concerning this Agreement, the Related Documents or the transactions contemplated hereby, without prior approval of the Company and the Purchasers (which approval shall not be unreasonably withheld or delayed). If any announcement is required by law to be made by any party hereto, prior to making such announcement such party shall deliver a draft of such

announcement to the other parties and shall give the other parties an opportunity to comment thereon. Notwithstanding the foregoing, following the Initial Closing, (a) the Purchasers and their Affiliates may list the Company's name and logo, and describe the Company's business in their marketing materials and may post such information on their website, and (b) Parent and the Company may issue press releases regarding the transactions contemplated hereby in such form as is reasonably acceptable to the Purchasers and may post such releases on their websites.

**10.6 Amendment and Waiver**. No amendment of any provision of this Agreement shall be effective, unless the same shall be in writing and signed by the Company and the holders of at least a majority of the then issued AIG Shares. No amendment to any provision affecting the rights and obligations of the Management Shareholders shall be effective unless the same shall also signed by the holders of a majority of the then issued Other Shareholder Shares held by the Management Shareholders. Except as otherwise expressly set forth herein, any failure of the Company or any Management Shareholder to comply with any provision hereof may only be waived in writing by the holders of at least a majority of the then issued AIG Shares, and any failure of any holder of AIG Shares to comply with any provision hereof may only be waived in writing by the Company. No such waiver shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure by any party to take any action against any breach of this Agreement or default by any other party shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action. For all purposes hereof, any action required of the Purchasers, collectively, shall be deemed to have been taken if approved by the holders of a majority of the then issued AIG Shares held by all Purchasers.

**10.7 Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. This Agreement may be executed and delivered in counterpart signature pages executed and delivered via facsimile transmission, and any such counterpart executed and delivered via facsimile transmission shall be deemed an original for all intents and purposes. After each Closing the Parties shall reasonably promptly exchange original versions of this Agreement and all other agreements, certificates, instruments and other documents contemplated by this Agreement that were executed and exchanged by facsimile transmission pursuant to this Section 10.7.

**10.8 Headings**. The headings of the various sections of this Agreement have been inserted for reference only and shall not be deemed to be a part of this Agreement.

**10.9 Specific Performance**. Each of Parent, the Company, the Purchasers and the Management Shareholders acknowledge that money damages would not be a sufficient remedy for any breach of this Agreement. It is accordingly agreed that the parties shall be entitled to specific performance and injunctive relief as remedies for any such breach, these remedies being in addition to any of the remedies to which they may be entitled at law or equity.

**10.10 Remedies Cumulative**. Except as otherwise provided herein, the remedies provided herein shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against any other party hereto.

**10.11 GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

**10.12 No Third Party Beneficiaries.** Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

**10.13 Severability.** If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**10.14 Submission to Jurisdiction.** SUBJECT TO SECTION 10.16, ANY AND ALL SUITS, LEGAL ACTIONS OR PROCEEDINGS ARISING OUT OF THIS AGREEMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND EACH PARTY HEREBY SUBMITS TO AND ACCEPTS THE EXCLUSIVE JURISDICTION OF SUCH COURTS FOR THE PURPOSE OF SUCH SUITS, LEGAL ACTIONS OR PROCEEDINGS. IN ANY SUCH SUIT, LEGAL ACTION OR PROCEEDING, EACH PARTY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO IT IN ACCORDANCE WITH SECTION 10.3. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OR ANY SUCH SUIT, LEGAL ACTION OR PROCEEDING IN ANY SUCH COURT AND HEREBY FURTHER WAIVES ANY CLAIM THAT ANY SUIT, LEGAL ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**10.15 Waiver of Jury Trial.** EACH PARTY TO THIS AGREEMENT HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. SUBJECT TO SECTION 10.16, EACH PARTY TO THIS AGREEMENT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE

AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**10.16 Arbitration**. All disputes and controversies arising under or in connection with this Agreement shall be settled by arbitration conducted in accordance with the arbitration procedures described in this Section 10.16. Except as otherwise provided in the JAMS' Comprehensive Arbitration Rules and Procedures as in effect from time to time (the "Rules"), the arbitration procedures described in this Section 10.16 and any Final Arbitration Award (as defined below) shall be governed by, and shall be enforceable pursuant to, the Uniform Arbitration Act as in effect in the State of New York from time to time. Arbitral proceeding initiated hereunder shall take place in New York, NY or another place agreeable to the parties to the dispute, before a single arbitrator who is agreeable to such parties. If the parties are unable to agree on an arbitrator within a reasonable period of time, an arbitrator shall be selected in accordance with the Rules. The arbitration (including discovery) shall be conducted under the Rules, as the same may be modified by any written agreement between the parties to the dispute. The arbitrator shall conduct the arbitration in a manner so that the final result, determination, finding, judgment or award determined by the arbitrator (each, a "Final Arbitration Award") is made or rendered as soon as practicable, and the parties to the dispute shall use reasonable efforts to cause a Final Arbitration Award to occur within ninety (90) days after the arbitrator is selected. Any Final Arbitration Award shall be final and binding upon each party to this Agreement, and there shall be no appeal from or reexamination of any Final Arbitration Award, except in the case of fraud or perjury or misconduct by the arbitrator prejudicing the rights of any party to the dispute or to correct manifest clerical errors. A Final Arbitration Award may be enforced in any state or federal court having jurisdiction over the subject matter of the dispute. In order to encourage the amicable and rapid resolution of all issues that may arise hereunder without resort to arbitration, and to prevent frivolous and unreasonable claims and actions by any Party, in every case in which a matter is submitted to arbitration pursuant to this Section 10.16, the non-prevailing party in such arbitration shall pay to the prevailing party the full costs of the arbitration, the full and reasonable costs incurred by the prevailing party in preparing for and participating in the arbitration (including reasonable attorney's fees and expert fees).

**10.17 Time is of Essence; Computation of Time**. Time is of the essence for each and every provision of this Agreement. Whenever the last day for the exercise of any privilege or the discharge or any duty hereunder shall fall upon a day that is not a Business Day, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a Business Day.

* * * * *

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

**THE RESOURCE GROUP INTERNATIONAL LIMITED**

By: Z. Chisht
Name: MUHAMMAD ZIAULLAH KHAN CHISTI
Title: CHIEF EXECUTIVE OFFICER

**Witnesses:**

1. [signature]
Name: EMAD AHMED KHAN
Address: D-226 NHS ~~ZA~~ CLIFTON KARACHI PAKISTAN

2. [signature]
Name: HABIB MAMSA
Address: A-51 B/13 GULSHAN-E-IQBAL KARACHI PAKISTAN

**TRG PAKISTAN LIMITED**

By: Z. Chisht
Name: MUHAMMAD ZIAULLAH KHAN CHISTI
Title: CHIEF EXECUTIVE OFFICER

**Witnesses:**

1. [signature]
Name: EMAD AHMED KHAN
Address: D-226 NHS CLIFTON KARACHI PAKISTAN

2. [signature]
Name: HABIB MAMSA
Address: A-51 B/13 GULSHAN-E-IQBAL KARACHI PAKISTAN

IN WITNESS WHEREOF, each of the individuals listed below has executed this Agreement as of the date first above written.

**MANAGEMENT SHAREHOLDER**

Muhammad Ziaullah Khan Chishti

**Witnesses:**

1. ________________

Name: EMAD AAMED KHAN
Address: D-226 NHS CLIFTON KARACHI

2. ________________

Name: HABIB MAMSA
Address: A-51 B/13 GULSHAN-E-IQBAL KARACHI PAKISTAN

IN WITNESS WHEREOF, each of the individuals listed below has executed this Agreement as of the date first above written.

**MANAGEMENT SHAREHOLDER**

Mohammed Khaishgi

**Witnesses:**

1. ____________________

Name: EMAD AHMED KITAN
Address: 7th Floor Block B FTC
SH-E-FAISAL
KARACHI
PAKISTAN

2. ____________________

Name: MUSTAFA CHAGLA
Address: 7TH FLOOR, BLOCK B,
FINANCE AND TRADE
CENTRE,
SH-E-FAISAL
KARACHI
PAKISTAN

IN WITNESS WHEREOF, each of the individuals listed below has executed this Agreement as of the date first above written.

**MANAGEMENT SHAREHOLDER**

______________________________
Mohammad Ali Jameel

**Witnesses:**

1. ______________________________
Name: SAFWAT KHALID
Address: E7-3, 8/14 MAYMAR SQUARE, GULSHAN-E-IQBAL
KARACHI.

2. ______________________________
Name: MUSTAFA ALI
Address: B-4, 141-Q, BLOCK II,
PECHS, KARACHI.

IN WITNESS WHEREOF, each of the individuals listed below has executed this Agreement as of the date first above written.

**MANAGEMENT SHAREHOLDER**

[signature]
Hasnain Aslam

**Witnesses:**

1. [signature]
Name: ASAD NAQVI
Address: 1600 Q St NW Apt 1
Washington DC 20009

2. [signature]
Name: RAHIM LALANI
Address: 1111 11th Street NW, Apt 102
Washington DC 20001

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

**AIG GLOBAL EMERGING MARKETS FUND II, L.P.**

By: AIG GEM II G.P., L.P.
Its: General Partner

By: AIG GEM II G.P., Co.
Its: General Partner

By: ______________________
Name: PAOLO ZAPPAROLI
Title: ATTORNEY IN FACT

**AIG ANNUITY INSURANCE COMPANY**

By: AIG Global Investment Corp.
Its: Investment Advisor

By: ______________________
Name: David Pinkerton
Title: Managing Director

**AMERICAN GENERAL LIFE INSURANCE COMPANY**

By: AIG Global Investment Corp.
Its: Investment Advisor

By: ______________________
Name: David Pinkerton
Title: Managing Director

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

**VARIABLE ANNUITY LIFE INSURANCE COMPANY**

By: AIG Global Investment Corp.
Its: Investment Advisor

By: ______________________
Name: David Pinkerton
Title: Managing Director

# SCHEDULE I

## Schedule of Purchasers

| PURCHASER | TOTAL COMMITMENT AMOUNT | INITIAL CLOSING PURCHASE PRICE | INITIAL CLOSING NUMBER OF SHARES |
|---|---|---|---|
| AIG Global Emerging Markets Fund II, L.P. | $25,000,000.00 | $ 833,333.00 | $ 744,048 |
| AIG Annuity Insurance Company | $ 1,666,666.67 | $ 55,556.00 | $ 49,603 |
| American General Life Insurance Company | $ 1,666,666.67 | $ 55,556.00 | $ 49,603 |
| Variable Annuity Life Insurance Company | $ 1,666,666.67 | $ 55,556.00 | $ 49,603 |

# SCHEDULE II

## Schedule of Management Shareholders

| Name | Address |
|---|---|
| Muhammad Ziaullah Khan Chishti | c/o TRG Private Limited<br>7th Floor, Aiwan-e-Iqbal<br>Egerton Road, Lahore<br>Pakistan |
| Mohammed Khaishgi | 1515 Church Street NW<br>Washington, DC 20005 |
| Mohammad Ali Jameel | Trakker Pvt Ltd<br>Head Office,<br>Mr. Ali Jameel<br>39-K, Block 6, P.E.C.H.S.<br>Karachi, Pakistan |
| Hasnain Aslam | c/o TRG Holdings, LLC<br>1700 Pennsylvania Avenue NW<br>Suite 560<br>Washington, DC 20006 |

## ANNEX A

## ESTIMATED FINANCIAL CONDITION

(see attached hereto)

# Annex A

**TRG Pakistan Income Statement format**

| | **TRG Pakistan Income Statement** (consolidation excludes Alert **US$** |
|---|---|
| Revenues | 100,613,214 |
| Operating Expenses including Corporate Overhead & Certain Extraordinary Costs | 98,187,827 |
| Depreciation and Amortization | 3,546,665 |
| Finance Charges | 1,124,813 |
| Taxation | 600,000 |
| Minority Interest + Share of Income | (227,134) |
| **Net Income** | (3,073,225) |
| | **US$** |
| **Capex** | 4,235,374 |

**Balance Sheet**

| ***As of June 30, 2005.*** | **TRG Pakistan US$** |
|---|---|
| Debt | **22,452,923** |
| plus Capitalized Leases | **1,842,892** |
| less Cash | **10,420,497** |
| Net Debt | **13,875,318** |
| Accounts Payable | **5,434,232** |
| less Accounts Receivable | **23,857,258** |
| | **(18,423,026)** |
| Accrued and Other Liabilities | **12,103,719** |
| Equity | **42,177,501** |
| Total Assets | **74,056,411** |

# ANNEX B

| Date of Issuance of Company Securities | Pre-Money Valuation (a) |
|---|---|
| From the Initial Closing Date through and including the 8-month anniversary of the Initial Closing Date | $ 109 Million (b) |
| From the 8-month anniversary of the Initial Closing Date through and including the 12-month anniversary of the Initial Closing Date | $112 Million |
| From the 12-month anniversary of the Initial Closing Date through and including the 18-month anniversary of Initial Closing Date | $117 Million |
| From the 18-month anniversary of the Initial Closing Date through and including the 24-month anniversary of Initial Closing Date | $121 Million |
| From the 24-month anniversary of the Initial Closing Date through and including the 30-month anniversary of Initial Closing Date | $126 Million |
| From the 30-month anniversary of the Initial Closing Date through and including the 36-month anniversary of Initial Closing Date | $131 Million |
| From the 36-month anniversary of the Initial Closing Date through and including the 42-month anniversary of Initial Closing Date | $136 Million |
| From the 42-month anniversary of the Initial Closing Date through and including the 48-month anniversary of Initial Closing Date | $141 Million |
| From the 48-month anniversary of the Initial Closing Date through and including the 54-month anniversary of Initial Closing Date | $147 Million |
| Thereafter | $153 Million |

Notes

(a) For the purposes of this Annex B and Section 8.1(a)(iii), with respect to any issuance of Company Securities, the term "pre-money valuation" shall mean the equity value of the issuer immediately prior to such issuance, and each pre-money valuation specified in the table above shall be (i) deemed to be increased to equal the equity value of the issuer immediately after the most recent prior issuance of Company Securities or (ii) deemed to be reduced, in the event the actual amount invested in the Company pursuant to the Rights Offering or the Parent Bridge Loan ,without duplication, is less than $24,000,000, by the amount of such shortfall.

(b) In the event any Company Securities having a liquidation preference senior to the Preferred Shares are issued on or prior to the eight-month anniversary of the Initial Closing Date for any purpose other than French Expansion Funding, the pre-money valuation applicable to such issuance shall be $112 Million rather than $109 Million.

# EXHIBIT C

## COMPANY STOCK OPTION PLAN

# AMENDED 2003 SHARE OPTION PLAN

# OF

# <u>THE RESOURCE GROUP INTERNATIONAL LTD.</u>

# TABLE OF CONTENTS

**Page**


**1. PURPOSE OF THIS PLAN ..... 1**

**2. DEFINITIONS AND RULES OF INTERPRETATION ..... 1**

DEFINITIONS. ..... 1
RULES OF INTERPRETATION. ..... 4

**3. SHARES SUBJECT TO THIS PLAN; TERM OF THIS PLAN ..... 4**

NUMBER OF SHARES. ..... 4
SOURCE OF SHARES. ..... 4
TERM OF THIS PLAN ..... 4
ISSUE OF OPTIONS. ..... 4

**4. ADMINISTRATION ..... 5**

GENERAL. ..... 5
AUTHORITY OF ADMINISTRATOR. ..... 5
SCOPE OF DISCRETION ..... 6

**5. PERSONS ELIGIBLE TO RECEIVE OPTIONS ..... 6**

ELIGIBLE INDIVIDUALS. ..... 6

**6. TERMS AND CONDITIONS OF OPTIONS ..... 6**

PRICE. ..... 7
TERM. ..... 7
VESTING. ..... 7
FORM OF PAYMENT ..... 7
NONASSIGNABILITY OF OPTIONS. ..... 8
SUBSTITUTE OPTIONS. ..... 8
DELAWARE OPTION PLAN. ..... 8

**7. INCENTIVE SHARE OPTIONS ..... 9**

**8. CONSULTING OR EMPLOYMENT RELATIONSHIP ..... 10**

**9. EXERCISE OF OPTIONS ..... 10**

IN GENERAL. ..... 10
TIME OF EXERCISE. ..... 10
ISSUANCE OF OPTION SHARES. ..... 10
TERMINATION ..... 10

**10. CERTAIN TRANSACTIONS AND EVENTS ..... 11**

IN GENERAL. ..... 11
CHANGES IN CAPITAL STRUCTURE. ..... 12
FUNDAMENTAL TRANSACTIONS. ..... 12

Changes of Control. ..... 12
Divestiture. ..... 12
Dissolution. ..... 13
Cut-Back to Preserve Benefits. ..... 13

**11. WITHHOLDING AND TAX REPORTING ..... 13**

Tax Withholding Option ..... 13
Reporting of Dispositions. ..... 14

**12. COMPLIANCE WITH LAW ..... 14**

Applicable Law. ..... 14
Financial Information. ..... 14

**13. AMENDMENT OR TERMINATION OF THIS PLAN OR OUTSTANDING OPTIONS ..... 15**

Amendment and Termination. ..... 15
Shareholder Approval. ..... 15
Effect. ..... 15

**14. RESERVED RIGHTS ..... 15**

Nonexclusivity of this Plan. ..... 15
Unfunded Plan. ..... 15

**15. ESCROWS AND PLEDGES. ..... 16**

**16. BENEFICIARIES ..... 16**

**17. MISCELLANEOUS ..... 16**

Governing Law. ..... 16
Determination of Value. ..... 16
Reservation of Shares. ..... 17
Electronic Communications. ..... 17
Notices. ..... 18

# 2003 SHARE OPTION PLAN
# OF
# THE RESOURCE GROUP INTERNATIONAL LIMITED

# ("TRG INTERNATIONAL").

1. **Purpose of this Plan**

The purpose of this 2003 Share Option Plan of TRG International. is to enhance the long-term Shareholder value of TRG International by offering opportunities to eligible individuals to participate in the growth in value of the equity of TRG International. This Plan replaces any prior such plans, in particular the 2002 Share Option Plan of TRG Holdings Corp.

2. **Definitions and Rules of Interpretation**

2.1 **Definitions.** This Plan uses the following defined terms:

(a) ***"Administrator"*** means the Board, or any officer or employee of the Company to whom the Board delegates authority to administer this Plan.

(b) ***"Affiliate"*** means a "holding company" or "subsidiary" (as each is defined in the Companies Act) of the Company and any other entity that the Board or Administrator designates as an "Affiliate" for purposes of this Plan.

(c) ***"Applicable Law"*** means any and all laws of whatever jurisdiction, within or without Bermuda, and the rules of any exchange or quotation system on which Shares are listed or quoted, applicable to the taking or refraining from taking of any action under this Plan, including the administration of this Plan and the issuance or transfer of Options or Option Shares.

(d) ***"Board"*** means the board of directors of the Company.

(e) ***"Change of Control"*** means any transaction or event that the Administrator specifies as a Change of Control under Section 10.4.

(f) ***"Company"*** means The Resource Group International Ltd, a Bermuda exempted company.

(g) ***"Companies Act"*** means the Companies Act, 1981 of Bermuda as amended or replaced.

(h) ***"Company Director"*** means a member of the Board.

(i) ***"Consultant"*** means an individual who, or an employee of any entity that, provides bona fide services to the Company or an Affiliate not in connection with the offer or sale of securities in a capital-raising transaction, but who is not an Employee.

(j) ***"Delaware Option Plan"*** means Options granted under the 2002 Share Option Plan of TRG Holdings Corporation.

(k) ***"Director"*** means a member of the board of directors of the Company or an Affiliate

(l) ***"Divestiture"*** means any transaction or event that the Board specifies as a Divestiture under Section 10.5.

(m) ***"Employee"*** means a regular employee of the Company or an Affiliate, including an officer or Director, who is treated as an employee in the personnel records of the Company or an Affiliate, but not individuals who are classified by the Company or an Affiliate as: (i) leased from or otherwise employed by a third party, (ii) independent contractors, or (iii) intermittent or temporary workers. The Company's or an Affiliate's classification of an individual as an "Employee" (or as not an "Employee") for purposes of this Plan shall not be altered retroactively even if that classification is changed retroactively for another purpose as a result of an audit, litigation or otherwise. An Optionee shall not cease to be an Employee due to transfers between locations of the Company, or between the Company and an Affiliate, or to any successor to the Company or an Affiliate that assumes the Optionee's Options under Section 10. Neither service as a Director nor receipt of a director's fee shall be sufficient to make a Director an "Employee."

(n) ***"Executive"*** means any (i) Director, (ii) officer elected or appointed by the Board, or (iii) beneficial owner of more than 10% of any class of the Company's equity securities.

(o) ***"Expiration Date"*** means, with respect to an Option, the date stated in the Option Agreement as the expiration date of the Option or, if no such date is stated in the Option Agreement, then the last day of the maximum exercise period for the Option, disregarding the effect of an Optionee's Termination or any other event that would shorten that period.

(p) ***"Fair Market Value"*** means the value of Shares as determined under Section 17.2.

(q) ***"Fundamental Transaction"*** means any transaction or event described in Section 10.3.

(r) ***"Grant Date"*** means the date the Administrator approves the grant of an Option. However, if the Administrator specifies that an Option's Grant Date is a future

date or the date on which a condition is satisfied, the Grant Date for such Option is that future date or the date that the condition is satisfied.

(s) ***"Incentive Share Option"*** means an Option intended to qualify as an incentive stock option under Section 422 of the United States Tax Code and designated as an Incentive Share Option in the Option Agreement for that Option.

(t) ***"Listed Security"*** means any Share listed or approved for listing upon notice of issuance on a national securities exchange or other market system.

(u) ***"Nonstatutory Option"*** means any Option other than an Incentive Share Option.

(v) ***"Option"*** means a right to purchase Shares of the Company granted under this Plan.

(w) ***"Option Agreement"*** means the document evidencing the grant of an Option.

(x) ***"Option Price"*** means the price payable under an Option for Shares, not including any amount payable in respect of withholding or other taxes.

(y) ***"Option Shares"*** means Shares covered by an outstanding Option or purchased under an Option.

(z) ***"Optionee"*** means: (i) a person to whom an Option has been granted, including a holder of a Substitute Option, and (ii) a person to whom an Option has been transferred in accordance with all applicable requirements of Sections 6.5, 7(e), and 16.

(aa) ***"Plan"*** means this 2003 Share Option Plan of TRG International.

(bb) ***"Share"*** "Share" means common or convertible Share of the Company or any other Security substituted for the common or convertible Share including options, instruments, securities or rights exercisable or exchangeable for or convertible into the same under Section 10.

(cc) ***"Substitute Option"*** means an Option granted in substitution for, or upon the conversion of, an option granted by another entity to purchase equity securities in the granting entity.

(dd) ***"Termination"*** means that the Optionee has ceased to be, with or without any cause or reason, an Employee, Director or Consultant. However, unless so determined by the Administrator, "Termination" shall not include a change in status from an Employee, Consultant or Director to another such status. An event that causes an

Affiliate to cease being an Affiliate shall be treated as the "Termination" of that Affiliate's Employees, Directors, and Consultants.

2.2 **Rules of Interpretation.** Any reference to a "Section," without more, is to a Section of this Plan. Captions and titles are used for convenience in this Plan and shall not, by themselves, determine the meaning of this Plan. Except when otherwise indicated by the context, the singular includes the plural and vice versa. Any reference to a statute is also a reference to the applicable rules and regulations adopted under that statute. Any reference to a statute, rule or regulation, or to a section of a statute, rule or regulation, is a reference to that statute, rule, regulation, or section as amended from time to time, both before and after the effective date of this Plan and including any successor provisions.

## 3. Shares Subject to this Plan; Term of this Plan

3.1 **Number of Shares**. Subject to adjustment under Section 10, the maximum number of Shares that may be issued under this Plan is 25,000,000. When an Option is granted, the maximum number of Shares that may be issued under this Plan shall be reduced by the number of Shares covered by that Option. However, if an Option later terminates or expires without having been exercised in full, the maximum number of shares that may be issued under this Plan shall be increased by the number of Shares that were covered by, but not purchased under that Option. By contrast, the repurchase of Option Shares by the Company shall not increase the maximum number of Shares that may be issued under this Plan.

3.2 **Source of Shares.** Option Shares may be: (a) Shares that have never been issued, or (b) Shares that are outstanding and are acquired to discharge the Company's obligation to deliver Option Shares.

3.3 **Term of this Plan**

(a) This Plan shall be effective on, and Options may be granted under this Plan, after the date it is approved by the Board.

(b) Subject to Section 13, Options may be granted under this Plan for a period of ten years from the date on which the Board approves this Share Plan.

3.4 **Issue of Options**. Each new issue of shares by the Company (other than an issue of shares pursuant to the exercise of Options) will require the Company to issue Options under this Plan in an aggregate amount such that the fully diluted amount of such issued Options after each such new issue of shares will represent 25% of the total number of shares issued (assuming full exercise of the issued Options).

4. **Administration**

4.1 **General.** The Board shall have ultimate responsibility for administering this Plan. The Board may delegate certain of its responsibilities to an Administrator, whose appointment or removal shall require the unanimous approval of the Board members. All actions and determinations by any Administrator are subject to the provisions of this Plan. The Chief Executive Officer of the Company will act as the initial Administrator of the Plan.

4.2 **Authority of Administrator**. Subject to the other provisions of this Plan, the Administrator shall have the authority to:

(a) grant Options, including Substitute Options;

(b) determine the Fair Market Value of Shares;

(c) determine the Option Price of Options;

(d) to select the Optionees;

(e) determine the times Options are granted;

(f) determine the number of Shares subject to each Option;

(g) determine the types of payment that may be used to purchase Option Shares;

(h) determine the types of payment that may be used to satisfy withholding tax obligations;

(i) determine the other terms of each Option, including but not limited to the time or times at which Options may be exercised, whether and under what conditions an Option is assignable, and whether an Option is a Nonstatutory Option or an Incentive Share Option;

(j) modify or amend any Option;

(k) authorize any person to sign any Option Agreement or other document related to this Plan on behalf of the Company;

(l) determine the form of any Option Agreement or other document related to this Plan, and whether that document, including signatures, may be in electronic form;

(m) interpret this Plan and any Option Agreement or document related to this Plan;

(n) correct any defect, remedy any omission, or reconcile any inconsistency in this Plan, any Option Agreement or any other document related to this Plan;

(o) adopt, amend, and revoke rules and regulations under this Plan, including rules and regulations relating to sub-plans and Plan addenda;

(p) adopt, amend and revoke special rules and procedures, which may be inconsistent with the terms of this Plan, set forth (if the Administrator so chooses) in sub-plans regarding (for example) the operation and administration of this Plan and the terms of Options, if and to the extent necessary or useful to accommodate Applicable Laws and practices as they apply to Options and Option Shares held by, or granted or issued to, persons working or resident outside Bermuda.

(q) determine whether a transaction or event should be treated as a Change of Control, a Divestiture or neither;

(r) determine the effect of a Fundamental Transaction and, if the Board determines that a transaction or event should be treated as a Change of Control or a Divestiture, then the effect of that Change of Control or Divestiture; and

(s) make all other determinations the Administrator deems necessary or advisable for the administration of this Plan.

4.3 **Scope of Discretion**. Subject to the last sentence of this Section 4.3, on all matters for which this Plan confers the authority, right or power on the Board, that body may make those decisions in its sole and absolute discretion. Those decisions will be final, binding and conclusive. Moreover, but again subject to the last sentence of this Section 4.3, in making those decisions the Board need not treat all persons eligible to receive Options, all Optionees, all Options or all Option Shares the same way. However, except as provided in Section 13.3, the discretion of the Board is subject to the specific provisions and specific limitations of this Plan, as well as all rights conferred on specific Optionees by Option Agreements and other agreements.

## 5. Persons Eligible to Receive Options

5.1 **Eligible Individuals.** Options (including Substitute Options) may be granted to, and only to, Employees, Directors and Consultants, including to prospective Employees, Directors and Consultants conditioned on the beginning of their service for the Company or an Affiliate. However, Incentive Share Options may only be granted to Employees as provided in Section 7(d).

## 6. Terms and Conditions of Options

The following rules apply to all Options:

6.1 **Price**. In no event will the Option Price of any Option be less than the par value of the Shares issuable under the Option if that is required by Applicable Law. The Option Price of an Incentive Share Option shall be subject to Section 7(d).

6.2 **Term**. No Option shall be exercisable after its Expiration Date. Additional provisions regarding the term of Incentive Share Options are provided in Section 7(a).

6.3 **Vesting**. Options shall be exercisable in accordance with a three (3) year vesting schedule related to the Grant Date, the date the Optionee's directorship, employment or consultancy begins, or a different date specified in the Option Agreement.

6.4 **Form of Payment**

(a) The Administrator shall determine the acceptable form and method of payment for exercising an Option.

(b) Acceptable forms of payment for all Option Shares are cash, check or wire transfer, denominated in U.S. dollars except as specified by the Administrator.

(c) In addition, the Administrator may permit payment to be made by any of the following methods:

(i) other Shares, or the designation of other Shares, which (A) are "mature" shares for purposes of avoiding variable accounting treatment under generally accepted accounting principles (generally mature shares are those that have been owned by the Optionee for more than six months on the date of surrender), and (B) have a Fair Market Value on the date of surrender equal to the Option Price of the Shares as to which the Option is being exercised;

(ii) provided that a public market exists for the Shares, consideration received by the Company under a procedure under which a broker-dealer that is a member of the National Association of Securities Dealers advances funds on behalf of an Optionee or sells Option Shares on behalf of an Optionee (a ***"Cashless Exercise Procedure"***), provided that if the Company extends or arranges for the extension of credit to an Optionee under any Cashless Exercise Procedure, no Officer or Director may participate in that Cashless Exercise Procedure;

(iii) one or more promissory notes meeting the requirements of Section 6.4(e);

(iv) cancellation of any debt owed by the Company or any Affiliate to the Optionee by the Company including without limitation

waiver of compensation due or accrued for services previously rendered to the Company; and

(v) any combination of the methods of payment permitted by any paragraph of this Section 6.4.

(d) The Administrator may also permit any other form or method of payment for Option Shares permitted by Applicable Law.

(e) The promissory notes referred to in Section 6.4(c)(iii) will be collateralized by the Option Shares. Unless the Administrator specifies otherwise after taking into account any relevant accounting issues, the notes shall bear interest at the minimum possible level sufficient to avoid imputation of interest under Sections 483, 1274, and 7872 of the US Income Tax Code. Consultants may not purchase Option Shares with a note unless the note is adequately secured by collateral other than the Option Shares. All other terms of the notes shall be specified by the Administrator.

6.5 **Nonassignability of Options**. Except as set forth in any Option Agreement or determined by the Administrator, no Option shall be assignable or otherwise transferable by the Optionee except by will or by the laws of descent and distribution. However, Options may exercised by a guardian or conservator appointed to act for the Optionee. Incentive Share Options may only be assigned in compliance with Section 7(e).

6.6 **Substitute Options.** The Board may cause the Company to grant Substitute Options in connection with the acquisition by the Company or an Affiliate of equity securities of any entity (including by merger, tender offer, or other similar transaction) or of all or a portion of the assets of any entity. Any such substitution shall be effective when the acquisition closes. Substitute Options may be Nonstatutory Options or Incentive Share Options. Unless and to the extent specified otherwise by the Board, Substitute Options shall have the same terms and conditions as the options they replace, except that (subject to Section 10) Substitute Options shall be Options to purchase Shares rather than equity securities of the granting entity and shall have an Option Price determined by the Board.

6.7 **Delaware Option Plan.** All options issued under the Delaware Option Plan shall, pursuant to the Amalgamation Agreement of March 20, 2003 entered into between TRG Holdings Corporation and the Company, cease to represent the right to acquire shares of TRG Holdings Corporation and shall, instead, without any action on the part of any holder of such options thereof, be converted into Options of the Company. They will, as a result, represent the right to acquire an equal number of Shares of the Company, upon the same terms and conditions as the options issued under the Delaware Option Plan.

7. **Incentive Share Options**

The following rules apply only to Incentive Share Options and only to the extent these rules are more restrictive than the rules that would otherwise apply under this Plan. With the consent of the Optionee, or where this Plan provides that an action may be taken notwithstanding any other provision of this Plan, the Administrator may deviate from the requirements of this Section, notwithstanding that any Incentive Share Option modified by the Administrator will thereafter be treated as a Nonstatutory Option.

(a) The Expiration Date of an Incentive Share Option shall not be later than ten years from its Grant Date, with the result that no Incentive Share Option may be exercised after the expiration of ten years from its Grant Date.

(b) No Incentive Share Option may be granted more than ten years from the date this Plan was approved by the Board.

(c) In order for an Incentive Share Option to be exercised for any form of payment other than those described in Section 6.4(b) and Section 6.4(c), that right must be stated at the time of grant in the Option Agreement relating to that Incentive Share Option.

(d) Incentive Share Options may be granted only to Employees. If an Optionee changes status from an Employee to a Consultant, that Optionee's Incentive Share Options become Nonstatutory Options if not exercised within the time period described in Section 7(f).

(e) No rights under an Incentive Share Option may be transferred by the Optionee, other than by will or the laws of descent and distribution. During the life of the Optionee, an Incentive Share Option may be exercised only by the Optionee. The Company's compliance with a Domestic Relations Order, or the exercise of an Incentive Share Option by a guardian or conservator appointed to act for the Optionee, shall not violate this Section 7(e).

(f) An Incentive Share Option shall be treated as a Nonstatutory Option if it remains exercisable after, and is not exercised within, the three-month period beginning with the Optionee's Termination for any reason other than the Optionee's death or disability (as defined in Section 22(c) of the Code). In the case of Termination due to death, an Incentive Share Option shall continue to be treated as an Incentive Share Option if it remains exercisable after, and is not exercised within, the three-month period after the Optionee's Termination provided it is exercised before the Expiration Date. In the case of Termination due to disability, an Incentive Share Option shall be treated as a Nonstatutory Option if it remains exercisable after, and is not exercised within, one year after the Optionee's Termination.

8. **Consulting or Employment Relationship**

Nothing in this Plan or in any Option Agreement, and no Option or the fact that Option Shares remain subject to repurchase rights, shall: (a) interfere with or limit the right of the Company or any Affiliate to terminate the employment or consultancy of any Optionee at any time, whether with or without cause or reason, and with or without the payment of severance or any other compensation or payment, or (b) interfere with the application of any provision in any of the Company's or any Affiliate's charter documents or Applicable Law relating to the election, appointment, term of office, or removal of a Director.

9. **Exercise of Options**

9.1 **In General**. An Option shall be exercisable in accordance with this Plan and the Option Agreement under which it is granted.

9.2 **Time of Exercise.** An Option shall be considered exercised when the Company receives: (a) written notice of exercise from the person entitled to exercise the Option, (b) full payment, or provision for payment, in a form and method approved by the Administrator, for the Shares for which the Option is being exercised, and (c) with respect to Nonstatutory Options, payment, or provision for payment, in a form approved by the Administrator, of all applicable withholding taxes due upon exercise. An Option may not be exercised for a fraction of a Share.

9.3 **Issuance of Option Shares.** The Company shall issue Option Shares in the name of the person properly exercising the Option. If the Optionee is that person and so requests, the Option Shares shall be issued in the name of the Optionee, Optionee's spouse, or Optionee's trust. The Company shall endeavor to issue Option Shares promptly after an Option is exercised. However, until Option Shares are actually issued, as evidenced by the appropriate entry on the Share books of the Company or its transfer agent, the Optionee will not have the rights of a Shareholder with respect to those Option Shares, even though the Optionee has completed all the steps necessary to exercise the Option. No adjustment shall be made for any dividend, distribution, or other right for which the record date precedes the date the Option Shares are issued, except as provided in Section 10.

9.4 **Termination**

(a) ***In General***. Except as provided in an Option Agreement or in writing by the Administrator, and as otherwise provided in Sections 9.4(b), (c), (d), (e) and after an Optionee's Termination the Optionee's Options shall be exercisable to the extent (but only to the extent) they are vested on the date of that Termination and only during the period ending three months after the Termination; provided that in no event shall the Optionee's Options be exercisable after the Expiration Date. To the extent the Optionee

does not exercise an Option within the time specified for exercise, the Option shall automatically terminate.

(b) ***Leaves of Absence***. Unless otherwise provided in the Option Agreement, no Option may be exercised more than three months after the beginning of a leave of absence, other than a personal or medical leave approved by an authorized representative of the Company with employment guaranteed upon return. Options shall not continue to vest during a leave of absence, unless otherwise determined by the Administrator.

(c) ***Death or Disability***. Unless otherwise provided by the Administrator or in the Option Agreement, if an Optionee's Termination is due to death or disability (as determined by the Administrator with respect to Nonstatutory Options and as defined by Section 22(e) of the Code with respect to Incentive Share Options), all Options of that Optionee to the extent exercisable at the date of that Termination may be exercised for one year after that Termination; provided that in no event shall the Optionee's Options be exercisable after the Expiration Date. In the case of Termination due to death, an Option may be exercised as provided in Section 16. In the case of Termination due to disability, if a guardian or conservator has been appointed to act for the Optionee and been granted this authority as part of that appointment, that guardian or conservator may exercise the Option on behalf of the Optionee. To the extent an Option is not so exercised within the time specified for its exercise, the Option shall automatically terminate.

(d) ***Divestiture***. If an Optionee's Termination is due to a Divestiture, the Administrator may take any one or more of the actions described in Section 10.5 with respect to the Optionee's Options.

(e) ***Termination for Cause***. If an Optionee's Termination is due to Cause, all of the Optionee's un-exercised Options shall automatically terminate and cease to be exercisable at the time of Termination. "Cause" means employment-related dishonesty, fraud, misconduct or disclosure or misuse of confidential information, or other employment-related conduct that is likely to cause significant injury to the Company, an Affiliate, or any of their respective employees, officers or directors (including, without limitation, commission of a felony or similar offense).

## 10. Certain Transactions and Events

10.1 **In General**. Except as provided in this Section 10, no change in the capital structure of the Company, merger, sale or other disposition of assets or a subsidiary, change of control, issuance by the Company of shares of any class of securities convertible into shares of any class, conversion of securities, or other transaction or event shall require or be the occasion for any adjustments of the type described in this Section 10. Additional provisions with respect to the foregoing transactions are set forth in Section 13.3.

10.2 **Changes in Capital Structure**. In the event of any Share split, reverse Share split, recapitalization, combination or reclassification of Share, Share dividend, spin-off, or similar change to the capital structure of the Company (not including a Fundamental Transaction or Change of Control), an automatic adjustment reflecting the change in capital structure shall be made by the Administrator as to: (a) the number and type of Options that may be granted under this Plan, (b) the number and type of Options that may be granted to any individual under this Plan, (c) the Option Price and number and class of securities issuable under each outstanding Option, and (d) the repurchase price of any securities substituted for Option Shares that are subject to repurchase rights. The specific adjustments shall be determined by the Administrator. Unless the Administrator specifies otherwise, any securities issuable as a result of any such adjustment shall be rounded to the next lower whole security.

10.3 **Fundamental Transactions**. If the Company merges with another entity in a transaction in which the Company is not the surviving entity or if, as a result of any other transaction or event, other securities are substituted for the Shares or Shares may no longer be issued (each a "***Fundamental Transaction***"), then, notwithstanding any other provision of this Plan, all outstanding Options, in whole or in part, shall be exercisable immediately before or otherwise in connection with the closing or completion of the Fundamental Transaction or event.

10.4 **Changes of Control**. The Administrator may also, but need not, specify that other transactions or events constitute a "***Change of Control***." In particular, the following events shall constitute a Change of Control: (a) the Company or an Affiliate is a party to a merger, consolidation, amalgamation, or other transaction in which the beneficial Shareholders of the Company, immediately before the transaction, beneficially own securities representing 30% or less of the total combined voting power or value of the Company immediately after the transaction, (b) any new person or entity, including a "group" as contemplated by Section 13(d)(3) of the Exchange Act, acquires securities holding 30% or more of the total combined voting power or value of the Company, or (c) as a result of or in connection with a contested election of Company Directors, the persons who were Company Directors immediately before the election cease to constitute a majority of the Board. In connection with a Change of Control, notwithstanding any other provision of this Plan, all outstanding Options, in whole or in part, shall be exercisable immediately before or otherwise in connection with the closing or completion of the Change of Control.

10.5 **Divestiture**. If the Company or an Affiliate sells or otherwise transfers equity securities of an Affiliate to a person or entity other than the Company or an Affiliate, or leases, exchanges or transfers all or any portion of its assets to such a person or entity, then the Board may specify that such transaction or event constitutes a "***Divestiture***." In connection with a Divestiture, notwithstanding any other provision of

this Plan, all outstanding Options, in whole or in part, shall be exercisable immediately before or otherwise in connection with the closing or completion of the Divesture.

10.6 **Dissolution**. If the Company adopts a plan of dissolution, the Administrator may cause Options to be fully vested and exercisable (but not after their Expiration Date) before the dissolution is completed but contingent on its completion and may cause the Company's repurchase rights on Option Shares to lapse upon completion of the dissolution.

10.7 **Cut-Back to Preserve Benefits**. If the Administrator determines that the net after-tax amount to be realized by any Optionee, taking into account any accelerated vesting, termination of repurchase rights, or cash payments to that Optionee in connection with any transaction or event addressed in this Section 10 would be greater if one or more of those steps were not taken or payments were not made with respect to that Optionee's Options or Option Shares, then and to that extent one or more of those steps shall not be taken and payments shall not be made.

10.8 **Distributions to shareholders**. If the Company distributes a cash dividend, all outstanding Options shall participate in the dividend distribution on a fully diluted pro-rata basis (the pro-rate Options proceeds being "Dividend Option Proceeds") and such Dividend Option Proceeds shall be used to exercise and convert all or part of the fully vested Options into Shares based on the Option Price. Any portion of the Dividend Option Proceeds left over after the exercise of the fully vested Options shall be applied towards the exercise price of unvested Options upon the vesting of such Options. Further, if the Company effects a share buyback, all outstanding Options shall participate in the share buyback on a fully diluted pro-rata basis (the pro-rate Options proceeds being "Share Buyback Option Proceeds) and such Share Buyback Option Proceed shall be used to exercise and convert the fully vested Options into Shares based on the Share Buyback Price, provided that the Company will only effect share buybacks such that (i) the Share Buyback Price shall always be greater than the Option Price; and (ii) that the number of Options to be exercised shall always be less the number of fully vested Options.

## 11. Withholding and Tax Reporting

### 11.1 Tax Withholding Option

(a) ***General***. Whenever Option Shares are issued or become free of restrictions, the Company may require the Optionee to remit to the Company an amount sufficient to satisfy any applicable tax withholding requirement, whether the related tax is imposed on the Optionee or the Company. The Company shall have no obligation to deliver Option Shares or release Option Shares from an escrow or permit a transfer of Option Shares until the Optionee has satisfied those tax withholding obligations. Whenever payment in satisfaction of Options is made in cash, the payment will be reduced by an amount sufficient to satisfy all tax withholding requirements.

(b) ***Method of Payment***. The Optionee shall pay any required withholding using the forms of consideration described in Section 6.4(b), except that, in the discretion of the Administrator, the Company may also permit the Optionee to use any of the forms of payment described in Section 6.4(c). The Administrator may also permit Option Shares to be withheld to pay required withholding. If the Administrator permits Option Shares to be withheld, the Fair Market Value of the Option Shares withheld, as determined as of the date of withholding, shall not exceed the amount determined by the applicable minimum statutory withholding rates.

11.2 **Reporting of Dispositions.** Any holder of Option Shares acquired under an Incentive Share Option shall promptly notify the Administrator, following such procedures as the Administrator may require, of the sale or other disposition of any of those Option Shares if the disposition occurs during: (a) the longer of two years after the Grant Date of the Incentive Share Option and one year after the date the Incentive Share Option was exercised, or (b) such other period as the Administrator has established.

## 12. Compliance with Law

12.1 **Applicable Law.** The grant of Options and the issuance and subsequent transfer of Option Shares shall be subject to compliance with all Applicable Law, including all applicable securities laws. Options may not be exercised, and Option Shares may not be transferred, in violation of Applicable Law. Thus, for example, Options may not be exercised unless: (a) a registration statement under the Securities Act is then in effect with respect to the related Option Shares, or (b) in the opinion of legal counsel to the Company, those Option Shares may be issued in accordance with an applicable exemption from the registration requirements of the Securities Act and any other applicable securities laws. The failure or inability of the Company to obtain from any regulatory body the authority considered by the Company's legal counsel to be necessary or useful for the lawful issuance of any Option Shares or their subsequent transfer shall relieve the Company of any liability for failing to issue those Option Shares or permitting their transfer. As a condition to the exercise of any Option or the transfer of any Option Shares, the Company may require the Optionee to satisfy any requirements or qualifications that may be necessary or appropriate to comply with or evidence compliance with any Applicable Law.

12.2 **Financial Information.** The Company shall furnish its annual financial statements to each Optionee during the period the Optionee holds any Option or Option Shares. Those statements shall include a balance sheet and income statement, and shall be delivered as soon as is practical after the end of the Company's fiscal year. This section does not apply to Optionees who are key Employees and whose duties afford them access to those financial statements.

## 13. Amendment or Termination of this Plan or Outstanding Options

13.1 **Amendment and Termination**. The Board may at any time amend, suspend, or terminate this Plan with the unanimous approval of its members.

13.2 **Shareholder Approval**. The Company shall obtain the approval of the Company's Shareholders for any amendment to this Plan if Shareholder approval is necessary or desirable to comply with any Applicable Law or with the requirements applicable to the grant of Options intended to be Incentive Share Options.

13.3 **Effect.** No amendment, suspension, or termination of this Plan, and no modification of any Option even in the absence of an amendment, suspension, or termination of this Plan, shall impair any existing contractual rights of any Optionee unless the affected Optionee consents to the amendment, suspension, termination, or modification. However, no such consent shall be required if the Board determines, in its sole and absolute discretion, that the amendment, suspension, termination, or modification: (a) is required or advisable in order for the Company, the Plan or the Option to satisfy Applicable Law, to meet the requirements of any accounting standard or to avoid any adverse accounting treatment, or (b) in connection with any transaction or event described in Section 10, is in the best interests of the Company or its Shareholders. The Board may, but need not, take the tax consequences to affected Optionees into consideration in acting under the preceding sentence. Those decisions will be final, binding and conclusive. Termination of this Plan shall not affect the Administrator's ability to exercise the powers granted to it under this Plan with respect to Options granted before the termination or Option Shares issued under such Options even if those Option Shares are issued after the termination.

## 14. Reserved Rights

14.1 **Nonexclusivity of this Plan.** This Plan shall not limit the power of the Company or any Affiliate to adopt other incentive arrangements including, for example, the grant or issuance of Share options, Share, or other equity-based rights under other plans or independently of any plan.

14.2 **Unfunded Plan.** This Plan shall be unfunded. Although bookkeeping accounts may be established with respect to Optionees, any such accounts will be used merely as a convenience. The Company shall not be required to segregate any assets on account of this Plan, the grant of Options, or the issuance of Option Shares. The Company and the Administrator shall not be deemed to be a trustee of Share or cash to be awarded under this Plan. Any obligations of the Company to any Optionee shall be based solely upon contracts entered into under this Plan, such as Option Agreements. No such obligations shall be deemed to be secured by any pledge or other encumbrance on any assets of the Company. Neither the Company nor the Administrator shall be required to give any security or bond for the performance of any such obligations.

15. **Escrows and Pledges.**

To enforce any restrictions on Option Shares, the Administrator may require their holder to deposit the certificates representing Option Shares, with Share powers or other transfer instruments approved by the Administrator endorsed in blank, with the Company or an agent of the Company to hold in escrow until the restrictions have lapsed or terminated. The Administrator may also cause a legend or legends referencing the restrictions to be placed on the certificates. Any Optionee who delivers a promissory note as partial or full consideration for the purchase of Option Shares will be required to pledge and deposit with the Company some or all of the Option Shares as collateral to secure the payment of the note. However, the Administrator may require or accept other or additional forms of collateral to secure the note and, in any event, the Company will have full recourse against the maker of the note, notwithstanding any pledge or other collateral.

16. **Beneficiaries**

An Optionee may file a written designation of one or more beneficiaries who are to receive the Optionee's rights under the Optionee's Options after the Optionee's death. An Optionee may change such a designation at any time by written notice. If an Optionee designates a beneficiary, the beneficiary may exercise the Optionee's Options after the Optionee's death. If an Optionee dies when the Optionee has no living beneficiary designated under this Plan, the Company shall allow the executor or administrator of the Optionee's estate to exercise the Option or, if there is none, the person entitled to exercise the Option under the Optionee's will or the laws of descent and distribution. In any case, no Option may be exercised after its Expiration Date.

17. **Miscellaneous**

17.1 **Governing Law.** This Plan, the Option Agreements, and all other agreements entered into under this Plan, and all actions taken under this Plan or in connection with Options or Option Shares shall be governed by the substantive laws, but not the choice of law rules, of Bermuda.

17.2 **Determination of Value**. Fair Market Value shall be determined as follows:

(a) ***No Established Market***. If Shares are not traded on any established Share exchange or quoted on a national market system and are not quoted by a recognized securities dealer, the Administrator (following guidelines established by the Board or Administrator) will determine Fair Market Value in good faith. The Administrator will consider the following factors, and any others it considers significant, in determining Fair Market Value: (i) the price at which other securities of the Company have been issued to purchasers other than Employees, Directors, or Consultants, (ii) the Company's net worth, prospective earning power, dividend-paying capacity, and non-

operating assets, if any, and (iii) any other relevant factors, including the economic outlook for the Company and the Company's industry, the Company's position in that industry, the Company's goodwill and other intellectual property, and the values of securities of other businesses in the same industry.

(b) ***Listed Share***. If the Shares are traded on any established Share exchange or quoted on a national market system, Fair Market Value shall be the closing sales price for the Shares as quoted on that Share exchange or system for the date the value is to be determined (the "***Value Date***") as reported in *The Wall Street Journal* or a similar publication. If no sales are reported as having occurred on the Value Date, Fair Market Value shall be that closing sales price for the last preceding trading day on which sales of Shares are reported as having occurred. If no sales are reported as having occurred during the five trading days before the Value Date, Fair Market Value shall be the closing bid for Shares on the Value Date. If Shares are listed on multiple exchanges or systems, Fair Market Value shall be based on sales or bids on the primary exchange or system on which Shares are traded or quoted.

(c) ***Share Quoted by Securities Dealer***. If Shares are regularly quoted by a recognized securities dealer but selling prices are not reported on any established Share exchange or quoted on a national market system, Fair Market Value shall be the mean between the high bid and low asked prices on the Value Date. If no prices are quoted for the Value Date, Fair Market Value shall be the mean between the high bid and low asked prices on the last preceding trading day on which any bid and asked prices were quoted.

(d) ***Initial Public Offering***. The Fair Market Value of Shares on the date, if any, that the Company makes an initial public offering of Shares shall be the price at which Shares are first offered to the public.

17.3 **Reservation of Shares.** During the term of this Plan, the Company will at all times reserve and keep available such number of Shares as are still issuable under this Plan.

17.4 **Electronic Communications.** Any Option Agreement, notice of exercise of an Option, or other document required or permitted by this Plan may be delivered in writing or, to the extent determined by the Administrator, electronically. Signatures may also be electronic if permitted by the Administrator.

17.5 **Notices.** Unless the Administrator specifies otherwise, any notice to the Company under any Option Agreement or with respect to any Options or Option Shares shall be in writing (or, if so authorized by Section 17.4, communicated electronically), shall be addressed to the Secretary of the Company, and shall only be effective when received by the Secretary of the Company.

Adopted by the Board on: April 25, 2003

Approved by the Shareholders on: April 25, 2003

Effective date of this Plan: April 25, 2003

# EXHIBIT D

## REGISTRATION RIGHTS AGREEMENT

**EXECUTION VERSION**

# REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (this "Agreement") is made as of October 4, 2005, by and among The Resource Group International Limited, a Bermuda company (together with its successors and assigns, the "Company"), and each of the investors listed on the signature pages attached hereto (each, an "Investor"). Capitalized terms used but not concurrently or previously defined herein are defined in Section 9 hereof.

## RECITALS:

WHEREAS, the Investors have acquired shares of the Company's Series A Convertible Preferred Stock (the "Preferred Shares"), which are convertible into Common Shares, pursuant to a Preferred Stock Purchase Agreement dated as of the date hereof (as in effect, the "Purchase Agreement"); and

WHEREAS, in order to induce the Investors to enter into the Purchase Agreement, the Company has agreed to grant the Investors the registration rights (which apply to public offers and sales of Common Shares within and outside the United States) as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1. Demand Registrations.

(a) Requests for Registration.

(i) Subject to the terms and conditions of this Agreement, at any time and from time to time after the 21-month anniversary of the date hereof, the holders of a majority of the Registrable Securities (the "Initiating Holders"), may request registration under the Securities Act of all or any portion of their respective Registrable Securities (A) on Form S-1 or any similar long-form registration ("Long-Form Registrations"), or (B) on Form S-2 or S-3 or any similar short-form registration ("Short-Form Registrations"), if available.

(ii) All registrations requested as described in this Section 1 are referred to herein as "Demand Registrations." Each request for a Demand Registration shall specify the approximate number of Registrable Securities requested to be registered. Within ten (10) days after receipt of any such request, the Company shall give written notice of such requested registration to all other holders of Registrable Securities and, subject to paragraph (d) below, shall include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within twenty (20) days after the mailing of such notice by the Company in accordance with Section 10(h).

(b) Long-Form Registrations. The holders of a majority of the Registrable Securities shall be entitled to request up to two (2) Long-Form Registrations in which the Company shall pay all Registration Expenses. A registration will not count as one of the permitted Long-Form Registrations until (i) it has become effective, (ii) if the Initiating Holders requesting such registration are not able to register and sell at least 75% of the Registrable

Securities requested by such Initiating Holders to be included in such registration, or (iii) in the case of a Long-Form Registration that would be the last permitted Long-Form Registration requested hereunder, if the Initiating Holders requesting such registration are not able to register and sell all of the Registrable Securities requested by such Initiating Holders to be included in such registration. For purposes of clarity, a Long-Form Registration can be used to cause the Company to consummate the Qualified Public Offering.

(c) Short-Form Registrations. In addition to the Long-Form Registrations provided pursuant to Section 1(b), the holders of a majority of the Registrable Securities shall be entitled to request unlimited Short-Form Registrations in which the Company shall pay all Registration Expenses; provided, however, the Company shall not be obligated to effect any Short-Form Registration pursuant to this Section 1(c): (i) if Form S-3 is not available for such offering by the holders of Registrable Securities; (ii) if the holders of Registrable Securities propose to sell Registrable Securities at an aggregate gross offering price of less than $1,000,000; (iii) if the Board of Directors, in an action approved by 66% of the members thereof, of the Company determines, in its good faith judgment, that it would be materially detrimental to the Company and its stockholders for such Short-Form Registration to be effected at such time, in which event the Company shall have the right to defer the filing of the Short-Form Registration for a period of not more than 90 days after receipt of the request of holders of Registrable Securities under this paragraph (c); provided, however, that the Company shall not utilize this right more than once in any twelve month period; (iv) if the Company has, within the twelve (12) month period preceding the date of such request, already effected two Short-Form Registrations for the holders of Registrable Securities pursuant to this paragraph (c); or (v) during the period ending 180 days after the effective date of a registration statement subject to Section 2. Demand Registrations shall be Short-Form Registrations whenever the Company is permitted to use any applicable short form. After the Company has become subject to the reporting requirements of the Securities Exchange Act, the Company shall use commercially reasonable efforts to make Short-Form Registrations on Form S-3 available for the sale of Registrable Securities upon a demand for registration pursuant to this Agreement. If the holders of a majority of the Registrable Securities to which such registration relates (or, if such registration involves an underwritten public offering, the managing underwriter) or the Company's counsel shall notify the Company in writing that, in the judgment of such holders (or, if applicable, such managing underwriter), the inclusion of additional information not required by Form S-3 as specified in such notice is of material importance to the success of the public offering of such Registrable Securities, such information shall be so included.

(d) Priority on Demand Registrations. The Company will not include in any Demand Registration any securities which are not Registrable Securities without the prior written consent of the holders of at least a majority of the Registrable Securities included in such registration. If a Demand Registration is an underwritten offering and the managing underwriters advise the Company in writing that in their opinion the number of Registrable Securities and other securities requested to be included in such offering exceeds the number of Registrable Securities, and other securities, if any, which can be sold therein without adversely affecting the Company or the marketability of the offering, the Company shall include in such registration only the number of shares of Registrable Securities which in the opinion of such managing underwriters can be sold. If the number of shares which can be sold is less than the number of shares of Registrable Securities proposed to be registered, the amount of Registrable

Securities to be so sold shall be allocated pro rata among the Initiating Holders and other securities requested to be included in such registration, on the basis of the number of shares requested to be registered by such holders or as such holders may otherwise agree. If the number of shares which can be sold exceeds the number of shares of Registrable Securities proposed to be sold, such excess shall be allocated pro rata among the other holders of securities, if any, desiring to participate in such registration based on the amount of such securities initially requested to be registered by such holders or as such holders may otherwise agree. Any Persons other than holders of Registrable Securities who participate in Demand Registrations which are not at the Company's expense must pay their share of the Registration Expenses as provided in Section 5 hereof.

(e) Restrictions on Demand Registrations. The Company shall not be obligated to effect any Demand Registration within one hundred eighty (180) days after the effective date of a previous Demand Registration or a previous registration in which the holders of Registrable Securities were given piggyback rights pursuant to Section 2 hereof; provided, that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to remain effective. The Company may postpone for up to one hundred twenty (120) days the filing or the effectiveness of a Registration Statement for a Demand Registration if, based on the good faith judgment of the Company's board of directors, such postponement or withdrawal is necessary in order to avoid premature disclosure of a matter the board of directors has determined would not be in the best interest of the Company to be disclosed at such time; provided, however, that (i) in no event shall the Company withdraw a Registration Statement under this Section 1(e) after such Registration Statement has been declared effective, and provided, further, however, that the Initiating Holders requesting such Demand Registration shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as one of the permitted Demand Registrations hereunder and the Company will pay all Registration Expenses in connection with such registration. The Company shall provide written notice to the Initiating Holders requesting such Demand Registration of (x) any postponement or withdrawal of the filing or effectiveness of a Registration Statement pursuant to this Section 1(e), (y) the Company's decision to file or seek effectiveness of such Registration Statement following such withdrawal or postponement and (z) the effectiveness of such Registration Statement. The Company may defer the filing of a particular Registration Statement pursuant to this Section 1(e) only once every 12 months.

(f) Limited Restrictions on Sales of Shares in IPO. Notwithstanding anything set forth herein to the contrary, the number of Registrable Securities that may be sold in any Demand Registration shall be subject to the limitation set forth in Section 8.6(f) of the Purchase Agreement.

(g) Selection of Underwriters. If any Demand Registration is an underwritten offering, the selection of investment banker(s) and manager(s) for such offering, which investment banker(s) and manager(s) shall be nationally recognized, shall be made by the holders of a majority of the Registrable Securities initiating such Demand Registration subject to the approval of the Company, which approval shall not be unreasonably withheld or delayed.

(h) Other Registration Rights. The Company shall not grant to any Persons the right, other than as set forth herein and except to employees of the Company with respect to

registrations on Form S-8 (or any successor forms thereto), to request the Company to register any equity securities of the Company, or any securities convertible or exchangeable into or exercisable for such securities, without the prior written consent of the holders of a majority of the Registrable Securities.

2. Piggyback Registrations.

(a) Right to Piggyback. If the Company proposes to register (including for this purpose a registration effected by the Company for stockholders other than the holders of Registrable Securities) any of its securities under the Securities Act in connection with the public offering of such securities solely for cash (other than pursuant to (i) a registration on Form S-4, or any successor forms thereto, of shares issued by the Company in connection with a Qualified Acquisition or other transaction covered by Rule 145 under the Securities Act, (ii) a registration on Form S-8, or any successor forms thereto, solely of shares that have been issued pursuant to the Company's employee benefit plans approved by the Company's board of directors, or (iii) a registration in which the only stock being registered is Common Stock issuable upon conversion of debt securities which are also being registered (a "Piggyback Registration"), the Company shall give prompt written notice to all holders of Registrable Securities of its intention to effect such a registration and, subject to paragraphs (c) and (d) below, shall include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within twenty (20) days after mailing of such notice by the Company in accordance with Section 10(h). The Company may postpone or withdraw the filing or the effectiveness of a Piggyback Registration at any time, in its sole discretion, whether or not any holder of Registrable Securities has elected to include securities in such registration.

(b) Piggyback Expenses. The Registration Expenses of the holders of Registrable Securities plus the expenses referred to in Section 5(b) shall be paid by the Company in all Piggyback Registrations.

(c) Priority on Primary Registrations. If a Piggyback Registration is an underwritten primary registration on behalf of the Company, and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such registration exceeds the number which can be sold without adversely affecting the marketability of the offering, the Company shall include in such registration (i) first, the securities the Company proposes to sell, (ii) second, the number of Registrable Securities requested to be included by the holders thereof in such registration which in the opinion of such underwriters can be sold without adversely affecting the Company or the marketability of the offering, (iii) third, the other securities of the Company requested by the holders thereof to be included in such registration which in the opinion of such underwriters can be sold without adversely affecting the Company or the marketability of the offering, in each case *pro rata* among the respective holders thereof on the basis of the number of shares requested to be included by the holders thereof in such registration.

(d) Priority on Secondary Registrations. If a Piggyback Registration is an underwritten secondary registration on behalf of holders of the Company's securities other than Registrable Securities and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such registration exceeds the

number which can be sold in an orderly manner within a price range acceptable to such initiating holders in such offering without adversely affecting the Company or the marketability of the offering, the Company shall include in such registration the Registrable Securities requested to be included therein by the Initiating Holders and other securities requested to be included in such registration pro rata among all the holders of such securities on the basis of the number of shares requested to be registered by such holders or as such holders may otherwise agree.

(e) Selection of Underwriters. If any Piggyback Registration is an underwritten primary offering, the Company shall have the right to select the managing underwriter or underwriters to administer any such offering subject to the approval of the holders of a majority of the then outstanding Registrable Securities, which consent shall not be unreasonably withheld or delayed.

(f) Other Registrations. If the Company has previously filed a registration statement with respect to Registrable Securities pursuant to Section 1 hereof or pursuant to this Section 2, and if such previous registration has not been withdrawn or abandoned, the Company shall not be obligated to file or cause to be effected any other registration of any of its securities under the Securities Act, whether on its own behalf or at the request of any holder or holders of such securities, until a period of at least one hundred eighty (180) days has elapsed from the date such previous registration became effective.

3. Holdback Agreements.

(a) Each holder of Registrable Securities agrees not to effect any public sale or distribution (including sales pursuant to Rule 144) of Common Shares of the Company during the seven days prior to and the one hundred eighty (180)-day period beginning on the effective date of any underwritten Demand Registration (other than a 415 Registration) or any underwritten Piggyback Registration (except as part of such underwritten registration) in which Registrable Securities are included, unless the underwriter(s) managing the registered public offering otherwise agree to a shorter period.

(b) The Company agrees (i) not to effect any public sale or distribution of shares of its Common Shares during the seven days prior to and during the one hundred eighty (180)-day period beginning on the effective date of any underwritten Demand Registration or any underwritten Piggyback Registration (except as part of such underwritten registration or pursuant to registrations on Form S-8 or S-4 or any successor forms thereto), unless the underwriter(s) managing such underwritten registration otherwise agree, and (ii) to (A) use commercially reasonable efforts to cause each holder of at least 5% (on a fully-diluted basis) of shares of its Common Shares, or any securities convertible into or exchangeable or exercisable for shares of its Common Shares, purchased from the Company at any time after the date of this Agreement (other than in a registered public offering), and (B) cause each director and officer of the Company, to agree not to effect any public sale or distribution (including sales pursuant to Rule 144) of any such securities during such period (except as part of such underwritten registration, if otherwise permitted), unless the underwriter(s) managing the registered public offering otherwise agree to a shorter period.

(c) In order to enforce the foregoing covenants, the Company may impose stop-transfer instructions with respect to the Registrable Securities until the end of the applicable holdback period.

4. Registration Procedures. Whenever the holders of Registrable Securities have requested that any Registrable Securities be registered pursuant to this Agreement, the Company shall use commercially reasonable efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a) prepare and file with the SEC a registration statement with respect to such Registrable Securities and use commercially reasonable efforts to cause such registration statement to become effective (provided, that the holders of such Registrable Securities provide the Company all information necessary to prepare such registration statement in compliance with applicable laws, rules and regulations, and provided further, that as far in advance as practicable before filing a registration statement or prospectus or any amendments or supplements thereto, the Company will furnish to the counsel selected by the holders of a majority of the Registrable Securities covered by such registration statement copies of all such documents proposed to be filed, which documents will be subject to the review of such counsel);

(b) notify each holder of Registrable Securities of the effectiveness of each registration statement filed hereunder and prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (excluding any period when effectiveness lapses), or such shorter period as is necessary to complete the distribution of the securities covered by such registration statement, and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such registration statement;

(c) furnish to each seller of Registrable Securities such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(d) use commercially reasonable efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (provided, that the Company shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction);

(e) notify each seller of such Registrable Securities, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening

of any event as a result of which the prospectus included in such registration statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading, and, at the request of any such seller, the Company shall promptly prepare a supplement or amendment to such prospectus and/or registration statement so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading;

(f) cause all such Registrable Securities to be listed on a national securities exchange or trading system and each securities exchange and trading system on which similar securities issued by the Company are then listed and, if not so listed, to be listed on the NASD automated quotation system and, if listed on the NASD automated quotation system, use its best efforts to secure designation of all such Registrable Securities covered by such registration statement as a NASDAQ "national market system security" within the meaning of Rule 11Aa2-1 of the Securities and Exchange Commission or, failing that, to secure NASDAQ authorization for such Registrable Securities and, without limiting the generality of the foregoing, to arrange for at least two market makers to register as such with respect to such Registrable Securities with the NASD;

(g) provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of the first registration statement relating to Registrable Securities or securities of any class of the Company and cooperate to make certificates promptly available;

(h) enter into such customary agreements (including underwriting agreements in customary form) and take all such other actions as the holders of a majority of the Registrable Securities being sold or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including, without limitation, effecting a share split, a combination of shares or obtaining a "cold comfort" letter from the Company's independent public accountants in customary form and covering customary matters);

(i) make available for inspection by any seller of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement and any attorney, accountant or other agent retained by any such seller or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with such registration statement;

(j) permit any holder of Registrable Securities which holder, in its sole and exclusive judgment, might be deemed to be an underwriter or a controlling person of the Company, to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Company in writing, which in the reasonable judgment of such holder and its counsel should be included; provided, that such holder shall notify the Company of the happening of any event as a result of which the information so furnished contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading, and, at the request of the Company,

such holder shall promptly prepare a written supplement or amendment to such furnished information so that, as thereafter delivered to the Company, such furnished information shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading;

(k) in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any shares of Common Shares included in such registration statement for sale in any jurisdiction, the Company shall notify the holders of Registrable Securities participating in such registration thereof and use commercially reasonable efforts promptly to obtain the withdrawal of such order;

(l) use commercially reasonable efforts to cause such Registrable Securities covered by such registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of such Registrable Securities; and

(m) in connection with an underwritten public offering, (i) cooperate with the selling holders of Registrable Securities, the underwriters participating in the offering and their counsel in any due diligence investigation reasonably requested by the selling holders or the underwriters in connection therewith and (ii) participate fully, and use commercially reasonable efforts to cause its management to participate fully, in efforts to sell the Registrable Securities under the offering (including, without limitation, participating in "roadshow" meetings with prospective investors) that would be customary for underwritten primary offerings of a comparable amount of equity securities by the Company.

The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish to the Company any other information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

Each seller of Registrable Securities agrees by having its stock treated as Registrable Securities hereunder that, upon receipt of notice from the Company of the happening of any event as a result of which the prospectus included in such registration statement contains an untrue statement of a material fact or omits any material fact necessary to make the statements therein not misleading (a "Suspension Notice"), such seller shall forthwith discontinue disposition of Registrable Securities until such seller is advised in writing by the Company that the use of the prospectus may be resumed and is furnished with a supplemented or amended prospectus as contemplated by Section 4(e) hereof, and, if so directed by the Company, such seller will deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such seller's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice; provided, however, that such postponement of sales of Registrable Securities by the holders shall not exceed thirty (30) days in the aggregate in any one year. If the Company shall give any notice to suspend the disposition of Registrable Securities pursuant to a prospectus, the Company shall extend the period of time during which the Company is required to maintain the registration statement effective pursuant to this Agreement by the number of days during the period from and including the date of the

giving of such notice to and including the date such seller either is advised by the Company that the use of the prospectus may be resumed or receives the copies of the supplemented or amended prospectus contemplated by Section 4(e). In any event, the Company shall not be entitled to deliver more than one (1) Suspension Notices in any one year.

5. Registration Expenses.

(a) All Registration Expenses shall be borne by the Company, and the Company shall pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by the Company are then listed or on the NASD automated quotation system; provided, however, that unless (A) the Company postponed or delayed the registration pursuant to Section 1(c) or 1(e) or (B) the Initiating Holders withdrew the registration pursuant to Section 1(e), the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Section 1 if the registration request is subsequently withdrawn at the request of the holders of a majority of the Registrable Securities to be registered (in which case all participating holders of Registrable Securities shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless the holders of a majority of the Registrable Securities agree to forfeit their right to one Long-Form Registration pursuant to Section 1. The Company shall not be required to pay an underwriting discount with respect to any shares being sold by any party other than the Company in connection with an underwritten public offering of any of the Company's securities pursuant to this Agreement.

(b) In connection with each Demand Registration and each Piggyback Registration, the Company shall reimburse the holders of Registrable Securities included in such registration for the reasonable fees and disbursements of one counsel chosen by the holders of a majority of the Registrable Securities requested to be included in such registration.

6. Applicability to Non-U.S. Offerings. The parties acknowledge and agree that the purpose and intent of this Agreement is to permit the holders of Registrable Securities to sell Registrable Securities in an offering conducted in any jurisdiction in the world without any limitations, with the full support and cooperation of the Company and its senior management team in accordance with the priorities described herein and at the sole cost and expense of the Company. It is understood and agreed by the parties that this Agreement merely, by way of example, contemplates the offer and sale of Registrable Securities in a registered public offering that is conducted in accordance with U.S. securities laws and pursuant to registration procedures customary for such transactions. In the event Registrable Securities are proposed to be offered or sold in any other transaction anywhere in the world, the parties shall give full effect to the purpose and intent of this Agreement. The parties shall give full effect to this Agreement (including, without limitation, Sections 5, 6, 7 and 10) to the maximum extent permitted by applicable law regardless of the jurisdiction(s) in which an offering or sale of Registrable Securities is actually conducted.

7. Indemnification. In the event any Registrable Securities are included in a registration statement under this Agreement:

(a) The Company agrees to indemnify, to the extent permitted by law, each holder of Registrable Securities, such holder's officers and directors, and each Person who controls such holder (within the meaning of the Securities Act) (the "Holder Indemnified Persons") against all losses, claims, damages, liabilities and expenses ("Losses") caused by or arising out of any untrue or alleged untrue statement of material fact contained in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to the Company by any Holder Indemnified Person expressly for use therein or by such holder's failure to deliver a copy of the registration statement or prospectus or any amendments or supplements thereto after the Company has furnished such holder with a sufficient number of copies of the same. In connection with an underwritten offering, the Company shall indemnify such underwriters, their officers and directors and each Person who controls such underwriters (within the meaning of the Securities Act) as and to the extent normal and customary.

(b) In connection with any registration statement in which a holder of Registrable Securities is participating, each such holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such registration statement or prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and each Person who controls the Company (within the meaning of the Securities Act) against any Losses caused by or arising out of any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by such holder; provided, that the obligation to indemnify shall be individual, not joint and several, for each holder and shall be

limited to the net amount of proceeds received by such holder from the sale of Registrable Securities pursuant to such registration statement.

(c) Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided, that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party), and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, (x) the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent, and (y) the indemnified party shall not be subject to any liability for any settlement made by the indemnifying party without its consent; provided, that in each case such consent shall not be unreasonably withheld. An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest exists between such indemnified party and any other of such indemnified parties with respect to such claim in which event the indemnifying party shall be obligated to pay the fees and expenses of such additional counsel.

(d) The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and shall survive the transfer of securities.

(e) Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim referred to in the preceding paragraph (a) or (b) of this Section 7, such indemnified party shall, if a claim in respect thereof is to be made against an indemnifying party pursuant to such paragraphs, give written notice to the latter of the commencement of such action, provided, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding paragraphs of this Section 7, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and, unless, in the reasonable judgment of any indemnified party a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, to assume the defense thereof, jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation; provided, that the indemnified party may participate in such defense at the indemnified party's expense; provided further, that the indemnified party or indemnified parties shall have the right to employ at it or their expense one counsel to represent it or them if, in the reasonable judgment of the indemnified party or indemnified parties, it is advisable for it or them

to be represented by separate counsel by reason of having legal defenses which are different from or in addition to those available to the indemnifying party. No indemnifying party shall consent to entry of any judgment or enter into any settlement without the consent of the indemnified party (i) which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of an unconditional release from all liability in respect to such claim or litigation or (ii) which includes a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(f) If the indemnity and reimbursement obligation provided for in any paragraph of this Section 7 is unavailable or insufficient to hold harmless an indemnified party in respect of any Losses (or actions or proceedings in respect thereof) referred to therein, then the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Losses (or actions or proceedings in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified party on the other hand in connection with statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The parties hereto agree that it would not be just and equitable if contributions pursuant to this paragraph were to be determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the first sentence of this paragraph. The amount paid by an indemnified party as a result of the Losses referred to in the first sentence of this paragraph shall be deemed to include any legal and other expenses reasonably incurred by such indemnified party in connection with investigation or defending any Loss which is the subject of this paragraph. No indemnified party guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from the indemnifying party if the indemnifying party was not guilty of such fraudulent misrepresentation.

(g) Indemnification similar to that specified in the preceding paragraphs of this Section 7 (with appropriate modifications) shall be given by the Company and each seller of Registrable Securities with respect to any required registration or other qualification of securities under any federal or state law or regulation of any governmental authority other than the Securities Act. The provisions of this Section 7 shall be in addition to any other rights to indemnification or contribution which an indemnified party may have pursuant to law, equity, contract or otherwise.

8. Participation in Underwritten Registrations. No Person may participate in any registration hereunder which is underwritten unless such Person (a) agrees to sell such Person's securities on the basis provided in any underwriting arrangements reasonably approved by the Person or Persons entitled hereunder to approve such arrangements (which will include the making of representations and warranties and the granting of indemnification rights customary for a selling member in the circumstances of such Person), and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents that are standard and customary for similarly situated Persons and are reasonably

required under the terms of such underwriting arrangements; provided, that no holder of Registrable Securities included in any underwritten registration shall be required to make any representations or warranties to the Company or the underwriters other than representations and warranties regarding such holder, such holder's Registrable Securities and such holder's intended method of distribution or to undertake any indemnification obligations to the Company or the underwriters with respect thereto, except as otherwise provided in Section 7 hereof or as required by applicable securities laws, rules or regulations.

9. Definitions.

"Acceptable Exchange" means (i) any of the New York Stock Exchange, the NASDAQ National Market, the London Stock Exchange, the "AIM" market operated by the London Stock Exchange plc or the Hong Kong Stock Exchange or (ii) if agreed in writing by the Investors and the Company based on their good faith determination, either of the Stock Exchange of Singapore or the Dubai International Financial Exchange.

"Certificate of Designation" means the Company's Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock.

"Common Shares" means the ordinary shares of the Company.

"Person" means an individual, a partnership, a joint venture, a corporation, a trust, a limited liability company, an unincorporated organization or a government or any department or agency thereof.

"Qualified Public Offering" means a firm commitment underwritten initial public offering of Common Shares pursuant to an effective registration statement under the Securities Act (or otherwise conducted in accordance with applicable law) providing for the listing of the Common Shares on an Acceptable Exchange and resulting in net proceeds to the Company of at least $15 million.

"Registrable Securities" means, irrespective of which Person actually holds such securities, (i) any Common Shares issued upon conversion of any Preferred Shares initially acquired pursuant to the Purchase Agreement, (ii) any Common Shares otherwise acquired by any Purchaser (or its successors or assigns) or any of its affiliates after the date hereof, and (iii) any Common Shares issued or issuable with respect to the securities referred to in clauses (i) and (ii) above by way of a distribution, share dividend, share split, sub-division, consolidation, conversion or in connection with a combination of shares, recapitalization, amalgamation, merger, consolidation or other reorganization. As to any particular Registrable Securities, such securities will cease to be Registrable Securities when they have been distributed to the public pursuant to an offering registered under the Securities Act or sold to the public through a broker, dealer or market maker in compliance with Rule 144 (or any similar rule then in force) under the Securities Act. For purposes of this Agreement, a Person will be deemed to be a holder of Registrable Securities, and the Registrable Securities shall be deemed to be in existence, whenever such Person has the right to acquire directly or indirectly such Registrable Securities (upon conversion, or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such

acquisition has actually been effected, and such Person shall be entitled to exercise the rights of a holder of Registrable Securities hereunder. For avoidance of doubt, a holder of Preferred Shares will be deemed to be a holder of Registrable Securities. For purposes of calculating the number of Registrable Securities held by a holder of Preferred Shares, at any time, the Preferred Shares held by such holder shall be deemed to have been converted at the then applicable conversion price.

"Registration Expenses" means all expenses incidental to the Company's performance of or compliance with this Agreement, including without limitation all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, stock exchange listing fees, printing expenses, messenger and delivery expenses, fees and disbursements of custodians, and fees and disbursements of counsel for the holders of Registrable Securities and all independent certified public accountants, underwriters (excluding discounts and commissions) and other Persons retained by the Company.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

10. Miscellaneous.

(a) No Inconsistent Agreements. The Company has not entered and shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the holders of Registrable Securities in this Agreement.

(b) Remedies. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Remedies available specifically hereunder are cumulative with each other and with all other remedies available at law and not specifically precluded hereby. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that, in addition to any other rights and remedies existing in its favor, any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(c) Amendments and Waivers. Except as otherwise provided herein, the provisions of this Agreement may be amended or waived only upon the prior written consent of the Company, the holders of a majority of the Preferred Shares and the holders of a majority of the Registrable Securities; provided, that any such modification, amendment or waiver which adversely affects any holder of Registrable Securities and is prejudicial to such holder relative to all of the other holders of Registrable Securities that hold the same class or series of security cannot be effected without the consent of such holder; provided further that, any such modification, amendment or waiver which adversely affects any class or series of Registrable Securities relative to the rights of all classes or series of the Company's share capital cannot be

effected without the consent of the holders of a majority of the affected class or series of Registrable Securities.

(d) Successors and Assigns. All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not. In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent holder of Registrable Securities; provided that such successors or assigns execute the form of joinder attached hereto as Exhibit A.

(e) Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law and in a manner consistent with each other so as to carry out the purposes and intent of the parties hereto, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

(f) Counterparts. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(g) Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(h) Notices. All notices, requests, consents and other communications provided for herein shall be in writing and shall be (i) delivered in person, (ii) transmitted by telecopy, (iii) sent by first-class, registered or certified mail, postage prepaid, or (iv) sent by reputable overnight courier service, fees prepaid, to the recipient at the address or telecopy number set forth below, or such other address or telecopy number as may hereafter be designated in writing by such recipient. Notices shall be deemed given upon personal delivery, five (5) days following deposit in the mail as set forth above, upon acknowledgment by the receiving telecopier or one (1) day following deposit with an overnight courier service.

If to the Company:

The Resource Group International Limited
Milner House, 18 Parliament Street
Hamilton, HM FX, Bermuda
Telecopy: (441) 292-7880
Attention: Don S. Lawrenceo, Esq.

with a copy to (which shall not constitute notice to the Company):

Orrick Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, NW
Washington, DC 20007
Telecopy: (202) 339-8500
Attention: Mark W. Seneca, Esq.

If to any Investor:

AIG Capital Partners, Inc.
599 Lexington Ave., 24th Floor
New York, NY 10022
Telecopy: 212-458-2275
Attention: Paolo Zapparoli

with a copy to (which shall not constitute notice to Investors):

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telecopy: (212) 446-4900
Attention: Armand A. Della Monica, Esq.

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the Company.

**(i) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

(j) No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(k) Transfer. Prior to transferring any Registrable Securities (other than a transfer pursuant to which such Registrable Securities cease to be Registrable Securities) to any Person, the Person transferring such Registrable Securities will cause the prospective transferee to execute and deliver to the Company (for itself and as the agent of the other members), a joinder to this Agreement substantially in the form of Exhibit A hereto pursuant to which the

prospective transferee agrees to be bound by this Agreement to the same extent as the Person transferring such Registrable Securities with respect to the Registrable Securities so transferred.

(l) Entire Agreement. Except as otherwise expressly set forth herein, this Agreement, the Purchase Agreement, the Related Documents (as defined in the Purchase Agreement) and the other agreements referred to herein and therein embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(m) Covenants Relating to Rule 144. If at any time the Company is required to file reports in compliance with either Section 13 or Section 15(d) of the Securities Exchange Act, as amended, the Company will file reports in compliance with the Securities Exchange Act, will comply with all rules and regulations of the SEC applicable in connection with the use of Rule 144 under the Securities Act and take such other actions and furnish such holder with such other information as such holder may request in order to avail itself of such rule or any other rule or regulation of the SEC allowing such holder to sell any Registrable Securities without registration, and will, at its expense, forthwith upon the request of any holder of Registrable Securities, deliver to such holder a certificate, signed by the Company's principal financial officer, stating (i) the Company's name, address and telephone number (including area code), (ii) the Company's Internal Revenue Service identification number, (iii) the Company's Commission file number, (iv) the number of shares of each class of share capital outstanding as shown by the most recent report or statement published by the Company, and (v) whether the Company has filed the reports required to be filed under the Securities Exchange Act for a period of at least ninety (90) days prior to the date of such certificate and in addition has filed the most recent annual report required to be filed thereunder. If at any time the Company is not required to file reports in compliance with either Section 13 or Section 15(d) of the Securities Exchange Act, the Company at its expense will, forthwith upon the written request of the holder of any Registrable Securities, make available adequate current public information with respect to the Company within the meaning of paragraph (c)(2) of Rule 144 under the Securities Act.

(n) Time of the Essence; Computation of Time. Time is of the essence for each and every provision of this Agreement. Whenever the last day for the exercise of any privilege or the discharge or any duty hereunder shall fall upon a day which is not a business day, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

**(o) WAIVER OF JURY TRIAL. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES**

**AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

(p) Submission to Jurisdiction. The parties hereby expressly submit to the exclusive jurisdiction of the courts of the State of New York and U.S. Federal Courts located in New York County for the resolution of disputes arising hereunder and each party hereby waives any defense of improper venue or inconvenient forum as to any action brought within New York County.

* * * * *

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**THE RESOURCE GROUP INTERNATIONAL LIMITED**

By:_______________________________________
Name:
Title:

**Witnesses:**

1. __________________________
Name:
Address:

2. __________________________
Name:
Address:

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**AIG GLOBAL EMERGING MARKETS FUND II, L.P.**

By: AIG GEM II G.P., L.P.
Its: General Partner

By: AIG GEM II G.P., Co.
Its: General Partner

By: ______________________________
Name:
Title:

**AIG ANNUITY INSURANCE COMPANY**

By: ______________________________
Its: ______________________________

By: ______________________________
Name:
Title:

**AMERICAN GENERAL LIFE INSURANCE COMPANY**

By: ______________________________
Its: ______________________________

By: ______________________________
Name:
Title:

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**VARIABLE ANNUITY LIFE INSURANCE COMPANY**

By: ______________________________
Its: ______________________________

By: ______________________________
Name:
Title:

**EXHIBIT E**

**JOINDER TO AGREEMENT**

EXHIBIT E

FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT (this "Joinder") is made as of ______________, by and among __________________________ ("Transferee"), AIG Global Emerging Markets Fund II, L.P. ("AIG") and The Resource Group International Limited (the "Company"). This Joinder is delivered pursuant to the Preferred Stock Purchase Agreement dated as of October 4, 2005 among the Company, TRG Pakistan Limited, a Karachi Stock Exchange listed company ("Parent"), the investors identified on the signature pages thereto, and the individuals identified on the signatures pages thereto (the "Purchase Agreement"). Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

FOR VALUE RECEIVED, Transferor hereby sells, assigns and transfers to the Transferee __________ shares of [Common][Preferred] Stock of the Company (the "Transferred Shares").

Transferee hereby acknowledges, agrees and confirms that Transferee has received a copy of the Purchase Agreement and the exhibits thereto and that, by its execution of this Joinder, Transferee will be deemed to be a party to the Purchase Agreement and any other Related Documents to which Transferor is a party for all purposes of the Purchase Agreement and such other Related Documents, and shall have all of the rights and obligations of a Purchaser thereunder as fully as if it had executed the Purchase Agreement and such other Related Documents. Transferee hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement and in such other Related Documents, including without limitation the restrictions on subsequent transfers of the Transferred Shares pursuant to Section 6.1 of the Purchase Agreement.

Without limiting the generality of the foregoing, Transferee hereby acknowledges that it has reviewed the representations and warranties set forth in Section 5 of the Purchase Agreement and agrees with the Company that such representations and warranties, which are incorporated herein by this reference and made a part hereof, are true and correct as of the date hereof as they relate to Transferee's acquisition of the Transferred Shares hereunder.

[IF TRANSFEROR IS AIG: Transferee hereby represents to Transferor and the Company that it does not directly or indirectly own or operate a Competing Business (as defined in Section 6.1(a) of the Purchase Agreement).]

[IF TRANSFEROR IS THE COMPANY: Transferee hereby represents to Transferor and AIG that it agrees to be bound by the Restrictions on Transfer of Shareholder Shares in Section 8.6 of the Purchase Agreement.]

From and after the date hereof, Transferee covenants and agrees to perform or cause to be performed all covenants, agreements and conditions to be performed by

Transferor under the Purchase Agreement and the other Related Documents to which Transferor is a party.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute this Joinder as of the date first above written.

[NAME OF TRANSFEREE]

By:
Name:
Title:

AIG GLOBAL EMERGING MARKETS FUND II, L.P.

By: AIG GEM II G.P., L.P.
Its: General Partner

By: AIG GEM II G.P., Co.
Its: General Partner

By: ______________________________
Name:
Title:

THE RESOURCE GROUP INTERNATIONAL LIMITED

By:
Name:
Title:

# EXHIBIT F

## EXECUTIVE STOCK AGREEMENT

# EXECUTIVE STOCK AGREEMENT

This EXECUTIVE STOCK AGREEMENT (this "Agreement") is dated as of October 4, 2005, and entered into by and among The Resource Group International Limited, a Bermuda limited company (the "Company"), the purchasers identified on the signature pages hereto (the "Purchasers") and «Executive», ("Executive").

WHEREAS, Executive is the holder of record of an option or options to acquire ordinary shares of the Company ("Common Shares") listed on Annex A attached hereto (together with any other options or rights to acquire Common Shares held by Executive, the "Options");

WHEREAS, the Company, TRG Pakistan Limited, a Karachi Share Exchange listed company ("Parent"), Purchasers and certain other parties signatory thereto have entered into that certain Preferred Stock Purchase Agreement of even date herewith (the "Purchase Agreement");

WHEREAS, in order to induce Purchasers to enter into the Purchase Agreement, and as a condition precedent to the transactions contemplated thereunder, the Company has agreed to enter into this Agreement with Executive in order to (i) establish limited restrictions on the transfer of all Common Shares issuable upon exercise of the Options (such Common Shares, the "Option Shares") and (ii) obtain an agreement by Executive to vote the Option Shares as required to support certain rights of Purchasers provided in the Purchase Agreement.

NOW THEREFORE, in consideration of the mutual promises, representations, warranties, covenants and conditions set forth in this Agreement, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATION

**1.1 Definitions**. For purposes of this Agreement, the following terms have the indicated meanings:

"Affiliate" of a Person means any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

"Agreement" has the meaning set forth in the preamble.

"AIG Shares" means (i) any Preferred Shares acquired by Purchasers under the terms of the Purchase Agreement, (ii) any Common Shares or Parent Shares issued to the holder of Preferred Shares upon the conversion or exchange of the Preferred Shares in accordance with their terms, (iii) any additional equity securities of the Company hereafter acquired by Purchasers, and (iv) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clauses (i) - (iii) by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. Any particular shares constituting AIG Shares that are Transferred in compliance with the provisions of this Agreement shall continue to constitute AIG Shares in the hands of any such transferee; such shares shall cease to be AIG Shares only when they have been sold pursuant to a Public Sale or Approved Sale.

"Applicable Law" means, with respect to any matter, each applicable statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, clearance, approval, authorization, grant, concession, franchise, license or written agreement, policy, requirement, and other restriction of any Governmental Authority having jurisdiction over such matter.

"Approved Sale" means a sale of the Company pursuant to Section 2.3(a).

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day other than Saturday, Sunday or a day on which banks in New York City are authorized or obligated by law or executive order to close.

"Bye-Laws" means the Amended and Restated Bye-Laws of the Company designating the rights and preferences of the Common Shares and the Series A Preferred Share adopted by the Board of Directors and set forth as Exhibit A to the Purchase Agreement.

"Certificate of Designation" means the Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock of the Company as attached as part of Exhibit A to the Purchase Agreement.

"Closing" has the meaning ascribed to such term in the Purchase Agreement.

"Commitment Amount" has the meaning ascribed to such term in the Purchase Agreement.

"Common Shares" has the meaning set forth in the recitals hereof.

"Company" has the meaning set forth in the preamble.

"Exchange Act" means the Securities Exchange Act of 1934.

"Executive" has the meaning set forth in the preamble.

"Executive Shares" means (i) the Options and (ii) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clause (i) in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. Any particular shares constituting Executive Shares that are Transferred in compliance with the provisions of this Agreement shall continue to constitute Executive Shares in the hands of any such transferee; such shares shall cease to be Executive Shares only when they have been sold pursuant to a Public Sale or Approved Sale.

"Family Group" means, with respect to any natural person, such person's spouse, siblings and descendants (whether natural or adopted) and any trust or other entity organized or established solely for the benefit of such person and/or such person's spouse, their respective ancestors and/or descendants.

"Initial Closing Date" has the meaning ascribed to such term in the Purchase Agreement.

"Options" has the meaning set forth in the recitals.

"Option Shares" has the meaning set forth in the recitals.

"Other Shareholder Shares" has the meaning ascribed to such term in the Purchase Agreement.

"Parent" has the meaning set forth in the preamble.

"Parent Shares" means (i) the ordinary shares of Parent and (ii) any equity securities issued or issuable directly or indirectly with respect to the securities described in the preceding clause (i) in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization.

"Permitted Transferees" has the meaning set forth in Section 2.2(d).

"Person" means any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization or other entity.

"Preferred Shares" means Series A Preferred Shares of the Company issued under the terms of the Purchase Agreement.

"Public Sale" means (i) with respect to sales of Shareholder Shares that are subject to U.S. securities laws, any sale to the public pursuant to an offering registered under the Securities Act or to the public effected through a broker, dealer or market maker pursuant to the provisions of Rule 144 or Rule 144A (if such rule is available) under the Securities Act (or any similar rule or rules then in effect), and (ii) with respect to all other sales of Shareholder Shares, sales on the public market pursuant to an offering or transaction that is conducted in accordance with Applicable Laws and the rules of any applicable securities exchange or trading system.

"Purchase Agreement" has the meaning set forth in the recitals.

"Purchasers" has the meaning set forth in the preamble.

"Qualified Public Offering" shall mean a firm commitment underwritten initial public offering of shares of the Common Shares pursuant to an effective registration statement under the Securities Act (or otherwise conducted in accordance with Applicable Law) providing for the listing of the Common Shares on an internationally recognized stock exchange and resulting in net proceeds to the Company of at least $15 million.

"Rules" has the meaning set forth in Section 3.14.

"Securities Act" means the Securities Act of 1933.

"Series A Preferred Shares" means the Series A Convertible Preferred Shares, par value $0.01 per share, of the Company, having the rights and preferences set forth in or established pursuant to the Bye-Laws and the Certificate of Designation.

"Shareholders" means, Purchasers, Executive and their respective Permitted Transferees.

"Shareholder Shares" means, collectively, the AIG Shares and the Executive Shares.

"Tag Along Candidates" has the meaning set forth in Section 2.2(c).

"Transfer" has the meaning set forth in Section 2.2(b).

"Transfer Notice" has the meaning set forth in Section 2.2(b).

"Transferring Holder" has the meaning set forth in Section 2.2(c).

"Transferring Shareholder" has the meaning set forth in Section 2.2(b).

**1.2 Interpretation; Usage**. In this Agreement, unless a clear contrary intention appears: (i) the singular number includes the plural number and vice versa; (ii) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually; (iii) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (iv) reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Applicable Law means that provision of such Applicable Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (v) "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof; (vi) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (vii) references to "$" shall be references to United States dollars; and (viii) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

## ARTICLE II
## AFFIRMATIVE COVENANTS

**2.1 Board of Directors**.

(a) Executive shall vote all Shareholder Shares over which such Shareholder has voting control, and shall take all other necessary or desirable actions within his or her control (whether in his or her capacity as a stockholder, director, member of a board committee or officer of the Company or Parent or otherwise, and including, without limitation, attendance at meetings in Person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings) such that:

(i) the Board of Directors shall be comprised of ten (10) directors; and

(ii) for so long as the holders of Preferred Shares are entitled to designate representatives to serve as members of the Board of Directors, individuals so designated by such holders shall be elected to the Board of Directors.

(b) The voting obligations of Executive set forth in this Section 2.1 shall terminate upon the consummation of a Qualified Public Offering.

**2.2 Restrictions on Transfer**. The parties have agreed to be bound by the following restrictions on Transfer of Shareholder Shares.

(a) No Transfers by Executive. Until Purchasers or any of their Permitted Transferees cease to own AIG Shares, neither Executive nor any of his or her Permitted Transferees shall directly or indirectly Transfer any of the Executive Shares held by them without the prior written consent of holders of at least a majority of the then outstanding AIG Shares, except for (i) Transfers expressly permitted by this Section 2.2(a), (ii) Transfers pursuant to an Approved Sale or pursuant to a sale conducted in accordance with Section 2.2(b) or (c), and (iii) Transfers permitted by Section 2.2(d). Any attempted or purported Transfer of Executive Shares which does not comply with the provisions of this Section 2.2(a) shall be void and the Company shall not recognize or give effect to any such Transfer.

(i) If the Company consummates a Qualified Public Offering, Executive shall be subject to any "lock-up" arrangement required by the managing underwriters, including with respect to any Parent Shares. Upon the termination of such "lock-up", Executive shall be permitted to sell his or her Parent Shares or Company Shares on the public markets, subject to Applicable Law and the Company's trading policies.

(ii) If any Purchaser sells all or a lesser percentage of its Preferred Shares or Conversion Shares pursuant to a Public Sale, Executive shall be subject to any "lock-up" arrangement required by the managing underwriters. Following the expiration of any such "lock-up", Executive shall be permitted to sell his or her Common Shares on the public markets, subject to Applicable Law and the Company's trading policies.

(iii) Except as specifically prohibited in this Section 2.2(a), there shall be no restriction on the Transfer of Executive Shares by Executive.

(b) Right of First Refusal. Subject to the other provisions of this Section 2.2, at least thirty (30) days prior to any sale, assignment, transfer, pledge, hypothecation, give away, or any other disposition of or encumbrance upon, whether voluntarily or by operation of law, whether for consideration or for no consideration (a "Transfer") of any Executive Shares held by Executive or any of his or her Permitted Transferees (other than an Approved Sale or a sale permitted under Section 2.2(a)), the Person making such Transfer (the "Transferring Shareholder") shall deliver a written notice (the "Transfer Notice") to the Company and Purchasers specifying in reasonable detail the identity of the prospective transferee(s), the type and number of Executive Shares proposed to be Transferred, the proposed purchase price (which shall be payable solely in cash) and the other material terms and conditions of the Transfer. Purchasers may elect to purchase any of the Executive Shares to be Transferred, upon the same terms and conditions as those set forth in the Transfer Notice, by giving written notice of such

election to the Transferring Shareholder within twenty (20) days after the Transfer Notice has been given (the "Election Period"). If Purchasers has not elected to purchase all of the Executive Shares to be Transferred within the Election Period and if the terms and conditions of this Section 2.2(b) have been met, then the Transferring Shareholder may Transfer the Executive Shares specified in the Transfer Notice at a price and on terms no more favorable to the transferee(s) thereof than specified in the Transfer Notice during the thirty-day period immediately following the expiration of the Election Period. Any Executive Shares not Transferred within such thirty-day period shall continue to be subject to the provisions of this Section 2.2(b).

(c) Tag Along Rights. Subject to the other provisions of this Section 2.2, at least fifteen (15) days prior to any Transfer (other than with respect to an Approved Sale or a sale permitted under Section 2.2(a)) of (i) all or any lesser portion of the Executive Shares held by Executive or any of his or her respective Permitted Transferees or (ii) all (but not less than all) of the AIG Shares held by the Purchasers or its Permitted Transferees (any such transferring Person described in clause (i) or (ii), a "Transferring Holder"), the Transferring Holder shall deliver a Transfer Notice to the Company, each other holder of Shareholder Shares and each holder of Other Shareholder Shares (the "Tag Along Candidates") specifying in reasonable detail the identity of the prospective transferee(s), the type and number of Shareholder Shares proposed to be Transferred, the proposed purchase price (which shall be payable solely in cash) and the other material terms and conditions of the Transfer (which Transfer Notice may be the same notice and given at the same time as the Transfer Notice under Section 2.2(b) above). The Tag Along Candidates may elect to participate in the contemplated Transfer by delivering written notice to the Transferring Holder within ten (10) days after delivery of the Transfer Notice. If any of the Tag Along Candidates has elected to participate in such Transfer, each of the Transferring Holder and such Tag Along Candidates shall be entitled to sell in the contemplated Transfer, at the same price and on the same terms, a number of Shareholder Shares or Other Shareholder Shares of the same type proposed to be sold by the Transferring Holder equal to the product of (i) the quotient determined by dividing (A) the percentage of such Shareholder Shares or Other Shareholder Shares owned by such shareholder by (B) the aggregate percentage of such Shareholder Shares or Other Shareholder Shares owned by the Transferring Holder and such Tag Along Candidates participating in such Transfer, and (ii) the aggregate number of such Shareholder Shares to be sold in the proposed Transfer.

(d) Permitted Transfers. The restrictions contained in this Section 2.2 shall not apply (i) with respect to any Transfer of Executive Shares by Executive to any member of Executive's Family Group, (ii) in the case of all other Shareholders and their respective Permitted Transferees, to any Transfer among their Affiliates, partners, members, employees and consultants, and (iii) to any Transfer of AIG Shares permitted under Section 8.6(d)(iii) of the Purchase Agreement; provided that the transferees of any Transfer described in this Section 2.2(d) shall agree in writing to be bound by the provisions of this Agreement. In addition, the restrictions contained in this Section 2.2 shall continue to be applicable to such Shareholder Shares after any such Transfer. All transferees permitted under this Section 2.2(d) are collectively referred to herein as "Permitted Transferees."

(e) Termination of Restrictions. The restrictions set forth in Section 2.2(c) and (d) shall continue with respect to each Shareholder Share until the earlier of (i) the Transfer of such

Shareholder Share in a Public Sale or an Approved Sale, or (ii) the consummation of a Qualified Public Offering. In addition, the restrictions set forth in Section 2.2(b) shall continue with respect to each Shareholder Share until the earlier of (i) the Transfer of such Shareholder Share in a Public Sale or an Approved Sale, (ii) the consummation of a Qualified Public Offering or (iii) such time as the Purchasers cease to own (determined on an as-if-converted or –exchanged basis and as if the entire Commitment Amount was funded and all of the Preferred Shares that Purchasers are entitled to acquire under the Purchase Agreement were acquired by Purchasers on the Initial Closing Date) at least 5% of the outstanding Common Shares or Parent Shares.

**2.3 Sale of the Company**.

(a) Executive acknowledges that, in the event the Company has not consummated a Qualified Public Offering on or prior to the third anniversary of the Initial Closing Date, the Purchasers shall have the right under the Purchase Agreement to cause the Company (and in the case of clause (i) below, all other shareholders of the Company) to sell to a third party all or a lesser portion (but in no event less than 50%) of (i) the Company's outstanding capital stock (including those shares owned by Executive) or (ii) the consolidated assets of the Company and its Subsidiaries (whether by amalgamation, merger, consolidation, recapitalization, stock or asset sale or otherwise), in each case on the terms and subject to the conditions set forth in Section 8.7 of the Purchase Agreement (any such sale, an "Approved Sale").

(b) If Purchasers elect to cause an Approved Sale, and such sale is structured as a sale of shares, Executive shall execute and deliver or cause to be executed and delivered all documents, certificates, agreements and other writings and to take, or cause to be taken, all such actions as may be necessary or desirable to vest in the Purchasers(s) thereof good and marketable title to the shares being acquired; provided that: (A) all holders of Common Shares of the Company shall be entitled to receive the same form and amount of consideration per Common Share or if any such holder is given an option as to the form of consideration to be received, then all holders participating therein will be given the same option; (B) if the Approved Sale will involve the sale of less than 100% of the Company's outstanding Common Shares, then each holder of Common Shares shall be entitled to sell a *pro rata* portion of such shares determined by multiplying (x) the total number of shares to be sold in such Approved Sale by (y) a fraction, the numerator of which is the number of Common Shares held by such holder immediately prior to the time of the Approved Sale and the denominator of which is the total number of Common Shares held by all holders immediately prior to the time of the Approved Sale; and (C) the liability of any such holder for misrepresentation or indemnity will not exceed an amount equal to the proceeds received by such holder in such sale. If such Approved Sale is structured as an amalgamation, merger or consolidation, each holder of Common Shares of the Company shall waive any dissenters rights, appraisal rights or similar rights in connection with such amalgamation, merger or consolidation.

## ARTICLE III
## GENERAL PROVISIONS

**3.1 Successors and Assigns**. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, including each subsequent holder of Shareholder Shares. Except as otherwise specifically provided herein, this Agreement shall

not be assignable by any party without the prior written consent of the other parties hereto; provided that any Purchaser shall be entitled to assign its rights and obligations under this Agreement to any transferee of AIG Shares without the consent of any other party hereto, so long as the Transfer of such AIG Shares is permitted under the Purchase Agreement.

**3.2 Entire Agreement**. This Agreement and the other writings referred to herein or delivered pursuant hereto constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior arrangements or understandings.

**3.3 Notices**. All notices, requests, consents and other communications provided for herein shall be in writing and shall be (a) delivered in person, (b) transmitted by telecopy, (c) sent by first-class, registered or certified mail, postage prepaid, or (d) sent by reputable overnight courier service, fees prepaid, to the recipient at the address or telecopy number set forth below, or such other address or telecopy number as may hereafter be designated in writing by such recipient. Notices shall be deemed given upon personal delivery, seven (7) days following deposit in the mail as set forth above, upon acknowledgment by the receiving telecopier or one day following deposit with an overnight courier service.

If to the Company:

The Resources Group International Limited.
Milner House, 18 Parliament Street
Hamilton, HM FX, Bermuda
Telephone: (441) 294-1523
Telecopy: (441) 292-7880
Attention: Don S. Laurenceo, Esq.

with a copy to (which shall not constitute notice to the Company):

Orrick Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street NW
Washington, DC 20007-5135
Telephone: (202) 339-8400
Telecopy: (202) 339-8500
Attention: Mark W. Seneca, Esq.

If to any Purchasers:

AIG Capital Partners, Inc.
599 Lexington Avenue, 24th Floor
New York, NY 10022
Telephone: (212) 458-2194
Telecopy: (212) 458-2275
Attention: Paolo Zapparoli

with a copy to (which shall not constitute notice to such Purchasers):

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4775
Telecopy: (212) 446-4900
Attention: Armand Della Monica, Esq.

If to Executive, to the address listed on the signature page attached hereto or such other address as may be from time to time provided to the parties hereto by Executive.

3.4 **Amendment and Waiver**. No amendment or waiver of any provision of this Agreement shall be effective, unless the same shall be in writing and signed by each of the parties hereto. No waiver shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure by any party to take any action against any breach of this Agreement or default by any other party shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action. For all purposes hereof, any action required of the Purchasers, collectively, shall be deemed to have been approved by all the Purchasers if approved by the holders of a majority of the then outstanding AIG Shares held by all Purchasers.

3.5 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. This Agreement may be executed and delivered in counterpart signature pages executed and delivered via facsimile transmission, and any such counterpart executed and delivered via facsimile transmission shall be deemed an original for all intents and purposes.

3.6 **Headings**. The headings of the various sections of this Agreement have been inserted for reference only and shall not be deemed to be a part of this Agreement.

3.7 **Specific Performance**. Each of the Company, Purchasers and Executive acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. It is accordingly agreed that the parties shall be entitled to specific performance and injunctive relief as remedies for any such breach, these remedies being in addition to any of the remedies to which they may be entitled at law or equity.

3.8 **Remedies Cumulative**. Except as otherwise provided herein, the remedies provided herein shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against any other party hereto.

**3.9 GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

**3.10 No Third Party Beneficiaries**. Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

**3.11 Severability**. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**3.12 Submission to Jurisdiction**. SUBJECT TO SECTION 3.14 ANY AND ALL SUITS, LEGAL ACTIONS OR PROCEEDINGS ARISING OUT OF THIS AGREEMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND EACH MEMBER HEREBY SUBMITS TO AND ACCEPTS THE JURISDICTION OF SUCH COURTS FOR THE PURPOSE OF SUCH SUITS, LEGAL ACTIONS OR PROCEEDINGS. IN ANY SUCH SUIT, LEGAL ACTION OR PROCEEDING, EACH MEMBER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO IT IN ACCORDANCE WITH SECTION 3.3. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OR ANY SUCH SUIT, LEGAL ACTION OR PROCEEDING IN ANY SUCH COURT AND HEREBY FURTHER WAIVES ANY CLAIM THAT ANY SUIT, LEGAL ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**3.13 Waiver of Jury Trial**. EACH PARTY TO THIS AGREEMENT HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. SUBJECT TO SECTION 3.14, EACH PARTY TO THIS AGREEMENT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**3.14 Arbitration**. All disputes and controversies arising under or in connection with this Agreement shall be settled by arbitration conducted in accordance with the arbitration procedures described in this Section 3.14. Except as otherwise provided in the JAMS' Comprehensive Arbitration Rules and Procedures as in effect from time to time (the "Rules"),

the arbitration procedures described in this Section 3.14 and any Final Arbitration Award (as defined below) shall be governed by, and shall be enforceable pursuant to, the Uniform Arbitration Act as in effect in the State of New York from time to time. Arbitral proceeding initiated hereunder shall take place in New York, NY or another place agreeable to the parties to the dispute, before a single arbitrator who is agreeable to such parties. If the parties are unable to agree on an arbitrator within a reasonable period of time, an arbitrator shall be selected in accordance with the Rules. The arbitration (including discovery) shall be conducted under the Rules, as the same may be modified by any written agreement between the parties to the dispute. The arbitrator shall conduct the arbitration in a manner so that the final result, determination, finding, judgment or award determined by the arbitrator (each, a "Final Arbitration Award") is made or rendered as soon as practicable, and the parties to the dispute shall use reasonable efforts to cause a Final Arbitration Award to occur within ninety (90) days after the arbitrator is selected. Any Final Arbitration Award shall be final and binding upon each party to this Agreement, and there shall be no appeal from or reexamination of any Final Arbitration Award, except in the case of fraud or perjury or misconduct by the arbitrator prejudicing the rights of any party to the dispute or to correct manifest clerical errors. A Final Arbitration Award may be enforced in any state or federal court having jurisdiction over the subject matter of the dispute. In order to encourage the amicable and rapid resolution of all issues that may arise hereunder without resort to arbitration, and to prevent frivolous and unreasonable claims and actions by any Party, in every case in which a matter is submitted to arbitration pursuant to this Section 3.14, the non-prevailing party in such arbitration shall pay to the prevailing party the full costs of the arbitration, the full and reasonable costs incurred by the prevailing party in preparing for and participating in the arbitration (including reasonable attorney's fees and expert fees).

**3.15 Time is of Essence; Computation of Time**. Time is of the essence for each and every provision of this Agreement. Whenever the last day for the exercise of any privilege or the discharge or any duty hereunder shall fall upon a day that is not a Business Day, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a Business Day.

* * * * *

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

**THE RESOURCE GROUP INTERNATIONAL LIMITED**

By: ______________________________

Name:
Title:

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

**AIG GLOBAL EMERGING MARKETS FUND II, L.P.**

By: AIG GEM II G.P., L.P.
Its: General Partner

By: AIG GEM II G.P., Co.
Its: General Partner

By: ______________________________
Name:
Title:

**AIG ANNUITY INSURANCE COMPANY**

By: AIG Global Investment Corp.
Its: Investment Advisor

By: ______________________________
Name: David Pinkerton
Title: Managing Director

**AMERICAN GENERAL LIFE INSURANCE COMPANY**

By: AIG Global Investment Corp.
Its: Investment Advisor

By: ______________________________
Name: David Pinkerton
Title: Managing Director

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

**VARIABLE ANNUITY LIFE INSURANCE COMPANY**

By: AIG Global Investment Corp.
Its: Investment Advisor

By: ______________________________
Name: David Pinkerton
Title: Managing Director

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date first above written.

By: ______________________________
«Executive»

Address for Notice:

«Address»

# ANNEX A

| NAME | NAME OF SECURITY | NUMBER OF SECURITIES | EXERCISE PRICE |
|---|---|---|---|
| «Executive» | Options for Common Shares | «Options» | $1.00 |

**EXHIBIT G**

**EMPLOYMENT AGREEMENT**
(Muhammad Ziaullah Khan Chishti)

**AMENDMENT TO EMPLOYMENT LETTER**
**(Zia Chishti)**

This Amendment to Employment Letter (this "Amendment") is executed as of October 4, 2005 by and between Zia Chishti ("you" or "Executive") and The Resource Group International Limited (the "Company or "TRG"), and amends that certain employment letter dated December 1, 2004 by and between Executive and the Company (the "Employment Letter"). All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Employment Letter.

The parties hereto hereby agree as follows:

1. Position and Duties. The last sentence of Section 1 of the Employment Letter shall be amended in its entirety to read as follows:

"You agree to devote 90% of your business time, attention and energies to the performance of your duties for the Company."

2. Termination. The third sentence of Section 4 of the Employment Letter shall be amended in its entirety to read as follows:

"In the event of termination without Cause or for Good Reason, you will be entitled to a severance payment equivalent to 12 months of compensation and your outstanding stock options shall immediately vest in accordance with the following schedule:"

3. Non-Compete and Non-Solicitation of Employees. Section 5 of the Employment Letter shall be amended in its entirety to read as follows:

"(a) You represent that you are not actively engaged in the management of any other business or organization, whether as an employee, board member, consultant or otherwise, other than Orthoclear, Inc., TopCrop Technologies (Pvt.) Limited and Audimed. You agree that you will promptly notify the Board of Directors of any litigation or adverse developments that may adversely impact the Company or its subsidiaries involving any business venture that you are associated with.

(b) You agree that during a period of one year following termination of your employment with TRG (the "Restricted Period"), you will not, except with the prior consent of TRG's Board of Directors, engage in Competition. Further, you also agree that during the Restricted Period, you will not solicit any employee of the Company to leave the employ of the Company. In addition, during the Restricted Period, you will not induce or attempt to induce any customer, supplier, licensee or other business relation of the Company Group to cease doing business with the Company Group. For purposes of this Section 5, the following terms shall have the following meanings:

(i) "Business of the Company" means the business in which the Company Group engages as of the date your employment with TRG terminates, anywhere in the world in which the Company Group's products or services are currently marketed or sold by the Company Group.

(ii) "Company Group" means the Company, TRG Pakistan Limited, TRG Holdings, LLC and their respective subsidiaries.

(iii) "Competing Business" means any entity or person that directly or indirectly owns or operates a business that competes with a Significant Line of Business and generates annual revenue from such business that is not less than 20% of the annual revenue generated by such Significant Line of Business.

(iv) "Competition" means to, directly or indirectly, own any interest in, manage, control, participate in, consult with, render services for, operate or in any manner engage with any of the entities listed on Exhibit A hereto or any Competing Business; provided, however, that you shall not be prohibited from owning, directly or indirectly, up to 5% of the outstanding stock of entities listed on Exhibit A hereto or any Competing Business, whether publicly traded or privately held, so long as you have no active participation in the business of such entities or Competing Business; provided, further, that your employment with any investment bank, private equity firm, hedge fund or similar financial services firm or other participation in the field of mergers and acquisitions or employment with any of the entities listed on Exhibit A that are designated as financial competitors of the Company during the Restricted Period shall not be deemed Competition so long as you do not accept any engagement on behalf of entities listed on Exhibit A that are designated as strategic competitors of the Company or any Competing Business during the Restricted Period.

(v) "Significant Line of Business" means, as of any date during the Restricted Period, a line of business operated by the Company or any of its subsidiaries as of such date that generates not less than 20% of the Company's and its subsidiaries' annual revenue, determined on a consolidated basis in accordance with United States generally accepted accounting principles as in effect from time to time, consistently applied.

4. Ratification. Except as modified hereby, all of the terms and conditions of the Employment Letter are hereby ratified and confirmed.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first written above.

The Resource Group International Limited

By: ______________________________

Name: ____________________________

Title: ____________________________

**Witnesses:**

1. ______________________________
Name:
Address:

2. ______________________________
Name:
Address:

______________________________
Zia Chishti

**Witnesses:**

1. ______________________________
Name:
Address:

2. ______________________________
Name:
Address:

# EXHIBIT A

## LIST OF COMPETITORS

The strategic competitors and financial competitors of The Resource Group International Limited ("TRGI") as of the Initial Closing Date (as defined in that certain Preferred Stock Purchase Agreement dated as of October 4, 2005 by and among TRGI, TRG Pakistan Limited, the investors specified therein and the individuals specified therein (the "Purchase Agreement") include the entities listed below, together with their respective parent entities, subsidiaries, affiliates and succesors. This Exhibit A shall be amended from time to time to conform at all times to Schedule 6.1 of the Purchase Agreement.

**Strategic Competitors**
24/7 Customer Inc.
Accenture
Adea Solutions, Inc.
Aditi Technologies
Access Direct
ACI Telecentrics, Inc.
Actis
Adaptis
ADP Medical Claims Services
Aegis Communications Group, Inc.
Affiliated Computer Services, Inc. (ACS)
AICOM Solutions Corp.
Aisys Synertech, Inc.
Ajuba International, Inc.
Akela, LLC
Alden Business Solutions
AllianceOne Receivables Management Inc.
Allsech Tech
AllServe Systems
Alorica Inc.
Ambergris Solutions, Inc.
Americall Group, Inc.
Amdocs Ltd.
ANTAR Eslabon Systems, S.A. de C.V.
Antares Management Solutions
APAC Customer Service, Inc.
Appteck
Apollo Health Street
Arrow Financial Services
ASCI
Asset Acceptance
AsiaInfo Holdings, Inc.
Asta Funding

Astron BPO
Aztec Software Inc.
Bearingpoint
Bleum, Inc.
Blue Star Infotech Limited
BPL Telecom (P) Ltd
Brigade Management Services
Brokerage Concepts, Inc.
Caliber Point Business Solutions
Capgemini
Capture Resource
Capvent AG
Carretek, LLC
Cavalry Investments
CCC Interactive Corporation
Certified Services, Inc.
Center Partners, Inc.
CGI
Cherukuri BPO
ClientLogic
Cognizant Technology Solution Corp.
Colwell & Salmon Communications
Collins Financial Services, Inc.
Computer Sciences Corp. (CSC)
Convasys Corp.
Convergent Resources
Convergys Corp.
Core3, Inc.
CRAIG/is Ltd.
CRP Technologies
The Cross Country Group, LLC
CTGroup
Daksh
Datamatics Technologies
DCS BPO
Delta Services
Deloitte
^DevelopAll Inc.
DialAmerica Marketing, Inc.
Diversified Collection Services
DPS Technologies
E2E Serwiz Solutions Ltd.
e4e, Inc.
EDS
eFunds Corporation
EMCC

eMR Technology
Encore Capital Group
EPAM Systems, Inc.
Epicenter Technology Pvt Ltd.
ePERFORMAX Contact Centers Corporation
Epixtar, Inc.
Espire Infolabs
eTelecare Global Solutions, Inc.
EUR Systems
EValueServe
Equinox Corporation
Excell Agent Services, LLC
Excell Services
ExlService Holdings, Inc.
The Faneuil Group
First City Financial
Fortune InfoTech USA, Inc.
Friendly Advanced Software Technology Pvt Ltd.
GECIS
GC Services, Houston
Goldstone Technologies
GTL Ltd.
Harte Hanks, Inc.
HCL Technologies
Headstrong
HealthPlan Holdings
Help Desk NOW, Inc.
Hewitt Associates
Hexaware Technologies
Hinduja TMT Limited
HTC Global Services, Inc.
i2iEnterpise Ltd.
ICT Group, Inc.
ICICI OneSource
IDS Comercial
iEnergizer, Inc.
i-flex solutions limited
iGate Global Solutions
Immaculate Intractions
Indecomm Global Services
Infinite Computer Solutions Pvt. Ltd.
InfoCision Management Corporation
Informatica Integral Empresarial
Infosys Technologies, Ltd.
Infowavz International Pvt. Ltd.
Integreon

Intelenet Global Services Limited
IntelliRisk Management Corporation
International Business Alliance
iSeva, Inc.
ITC Infotech
I.T. United
IT&T Limited
Kanbay International Inc.
Kankei Relationship Marketing Services
King Teleservices, LLC
KMG Infotech Pvt. Ltd.
Larsen and Toubro Infotech Limited
Lester Incorporated
Liberata
Lightbridge, Inc
Luxoft
Manjushree Infotech
Maritz Inc.
Marlin Integrated Capital Holding
Mastek Ltd.
Medical Matrix, L.P.
MedsoftUSA
Metro One Communications, Inc.
Millennium Teleservices, LLC
Minacs Worldwide Inc.
MindTree Consulting
Motif, Inc.
Mphasis BFL Ltd.
Nationwide Credit
NCO Group, Inc.
Ness Technologies, Inc.
Neusoft Group Ltd.
NIIT Ltd.
Nipuna Services Ltd.
North American Software
Ocwen Financial Solutions
OfficeTiger
OKS Group
Outsource Partners International
Outsourcing Solutions, Inc.
Patni Computer Systems Limited
PeopleSupport, Inc.
Perot Systems Corporation
Pinkerton Computer Consultants, Inc.
Plaza Associates
Portfolio Recovery Associates

Precision Response Corp.
Prefexa Solutions
ProAdept
Progeon
Promantra Synergy Solutions Ltd.
Protocol Communications Inc.
Pumasource Ltd.
Qinteraction Philippines Inc.
RCG Information Technology
Risk Management Alternatives, Inc.
Royal Health Care
RT Outsourcing Services Ltd.
Satyam Computer Services, Inc.
Scandent Group
Secova eServices, Inc.
Service1ne Global Solutions
Sherman Financial
Sichuan Yinhai Software
Sierra Atlantic, Inc.
Singapore Computer Systems
SITEL Corp.
Slash Support
Softtek
SourceNet Solutions
SPI Technologies Inc.
SR. Teleperformance S.A.
StarTek, Inc.
STI Knowledge, Inc.
Stream International, Inc.
Sykes Enterprises, Inc.
Syntel, Inc.
The Sutherland Group, Ltd.
Talk2rep Inc.
TATA Consultancy Services
TCIM Services, Inc.
Technion Communications Corporation
TeleMarketing Concepts, Inc.
Telerx Marketing Inc.
TeleTech Holdings, Inc.
TELUS International Inc.
TMG Health, Inc.
Tracmail
TransWorks Information Service Ltd.
Trident Capital
United Recovery Systems
Unicall International, Inc.

U-soft Co., Ltd
vCustomer
vMoksha Technologies Pvt. Ltd.
Vision-X, Inc.
Vortex Technologies
Vsource Asia Berhad
West Corp.
Wipro Ltd.
WNS Global Services
Worldwide Asset Management, LLC
Xchanging
ZenSar Technologies Ltd.
Zenta Group

**Financial Competitors**
3i Group plc
Blackstone Group
The Carlyle Group
CD Ventures
CDC Capital Partners
Francisco Partners
Frontenac Company
General Atlantic, LLC
H.I.G. Capital
Nautic Partners, LLC
Oak Hill Capital Partners
Oaktree Capital Management, LLC
Newbridge Capital
Platinum Equity
Terra Firma Capital Partners
TH Lee Putnam Ventures
Warburg Pincus LLC
Willis Stein & Partners

# EXHIBIT H

## EMPLOYMENT AGREEMENT
(Mohammed Khaishgi)

# AMENDMENT TO EMPLOYMENT LETTER
## (Mohammed Khaishgi)

This Amendment to Employment Letter (this "Amendment") is executed as of October 4, 2005 by and between Mohammed Khaishgi ("you" or "Executive") and TRG Holdings, LLC (the "Company or "TRG"), and amends that certain employment letter dated December 1, 2004 by and between Executive and The Resource Group International Limited (the "Employment Letter"). All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Employment Letter.

The parties hereto hereby agree as follows:

1. Termination.

(a) The first sentence of Section 4 of the Employment Letter shall be amended in its entirety to read as follows:

"The Company may terminate this agreement, with or without cause, upon the vote of 75% of the Board of Directors of The Resource Group International Limited."

(b) The third sentence of Section 4 of the Employment Letter shall be amended in its entirety to read as follows:

"In the event of termination without Cause or for Good Reason, you will be entitled to a severance payment equivalent to 12 months of compensation and your outstanding stock options shall immediately vest in accordance with the following schedule:"

2. Non-Compete and Non-Solicitation of Employees. Section 5 of the Employment Letter shall be amended in its entirety to read as follows:

"You agree that during a period of one year following termination of your employment with TRG (the "Restricted Period"), you will not, except with the prior consent of TRG's Board of Directors, engage in Competition. Further, you also agree that during the Restricted Period, you will not solicit any employee of the Company to leave the employ of the Company. In addition, during the Restricted Period, you will not induce or attempt to induce any customer, supplier, licensee or other business relation of the Company Group to cease doing business with the Company Group. For purposes of this Section 5, the following terms shall have the following meanings:

(a) "Business of the Company" means the business in which the Company Group engages as of the date your employment with TRG terminates, anywhere in the world in which the Company Group's products or services are currently marketed or sold by the Company Group.

(b) "Company Group" means the Company, The Resource Group International Limited and their respective subsidiaries.

(c) "Competing Business" means any entity or person that directly or indirectly owns or operates a business that competes with a Significant Line of Business and generates annual revenue from such business that is not less than 20% of the annual revenue generated by such Significant Line of Business.

(d) "Competition" means to, directly or indirectly, own any interest in, manage, control, participate in, consult with, render services for, operate or in any manner engage with any of the entities listed on Exhibit A hereto or any Competing Business; provided, however, that you shall not be prohibited from owning, directly or indirectly, up to 5% of the outstanding stock of entities listed on Exhibit A hereto or any Competing Business, whether publicly traded or privately held, so long as you have no active participation in the business of such entities or Competing Business; provided, further, that your employment with any investment bank, private equity firm, hedge fund or similar financial services firm or other participation in the field of mergers and acquisitions or employment with any of the entities listed on Exhibit A that are designated as financial competitors of the Company during the Restricted Period shall not be deemed Competition so long as you do not accept any engagement on behalf of entities listed on Exhibit A that are designated as strategic competitors of the Company or any Competing Business during the Restricted Period.

(e) "Significant Line of Business" means, as of any date during the Restricted Period, a line of business operated by the Company or any of its subsidiaries as of such date that generates not less than 20% of the Company's and its subsidiaries' annual revenue, determined on a consolidated basis in accordance with United States generally accepted accounting principles as in effect from time to time, consistently applied.

3. Ratification. Except as modified hereby, all of the terms and conditions of the Employment Letter are hereby ratified and confirmed. Without limiting the generality of the foregoing, each of the undersigned hereby agrees that the Employment Letter, as amended hereby, is binding on the Company and Executive notwithstanding its original execution by The Resource Group International Limited.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first written above.

TRG Holdings, LLC

By:______________________________

Name: ____________________________

Title: _____________________________

_________________________________
Mohammed Khaishgi

# EXHIBIT A

## LIST OF COMPETITORS

The strategic competitors and financial competitors of The Resource Group International Limited ("TRGI") as of the Initial Closing Date (as defined in that certain Preferred Stock Purchase Agreement dated as of October 4, 2005 by and among TRGI, TRG Pakistan Limited, the investors specified therein and the individuals specified therein (the "Purchase Agreement") include the entities listed below, together with their respective parent entities, subsidiaries, affiliates and succesors. This Exhibit A shall be amended from time to time to conform at all times to Schedule 6.1 of the Purchase Agreement.

**Strategic Competitors**
24/7 Customer Inc.
Accenture
Adea Solutions, Inc.
Aditi Technologies
Access Direct
ACI Telecentrics, Inc.
Actis
Adaptis
ADP Medical Claims Services
Aegis Communications Group, Inc.
Affiliated Computer Services, Inc. (ACS)
AICOM Solutions Corp.
Aisys Synertech, Inc.
Ajuba International, Inc.
Akela, LLC
Alden Business Solutions
AllianceOne Receivables Management Inc.
Allsech Tech
AllServe Systems
Alorica Inc.
Ambergris Solutions, Inc.
Americall Group, Inc.
Amdocs Ltd.
ANTAR Eslabon Systems, S.A. de C.V.
Antares Management Solutions
APAC Customer Service, Inc.
Appteck
Apollo Health Street
Arrow Financial Services
ASCI
Asset Acceptance
AsiaInfo Holdings, Inc.
Asta Funding

Astron BPO
Aztec Software Inc.
Bearingpoint
Bleum, Inc.
Blue Star Infotech Limited
BPL Telecom (P) Ltd
Brigade Management Services
Brokerage Concepts, Inc.
Caliber Point Business Solutions
Capgemini
Capture Resource
Capvent AG
Carretek, LLC
Cavalry Investments
CCC Interactive Corporation
Certified Services, Inc.
Center Partners, Inc.
CGI
Cherukuri BPO
ClientLogic
Cognizant Technology Solution Corp.
Colwell & Salmon Communications
Collins Financial Services, Inc.
Computer Sciences Corp. (CSC)
Convasys Corp.
Convergent Resources
Convergys Corp.
Core3, Inc.
CRAIG/is Ltd.
CRP Technologies
The Cross Country Group, LLC
CTGroup
Daksh
Datamatics Technologies
DCS BPO
Delta Services
Deloitte
^DevelopAll Inc.
DialAmerica Marketing, Inc.
Diversified Collection Services
DPS Technologies
E2E Serwiz Solutions Ltd.
e4e, Inc.
EDS
eFunds Corporation
EMCC

eMR Technology
Encore Capital Group
EPAM Systems, Inc.
Epicenter Technology Pvt Ltd.
ePERFORMAX Contact Centers Corporation
Epixtar, Inc.
Espire Infolabs
eTelecare Global Solutions, Inc.
EUR Systems
EValueServe
Equinox Corporation
Excell Agent Services, LLC
Excell Services
ExlService Holdings, Inc.
The Faneuil Group
First City Financial
Fortune InfoTech USA, Inc.
Friendly Advanced Software Technology Pvt Ltd.
GECIS
GC Services, Houston
Goldstone Technologies
GTL Ltd.
Harte Hanks, Inc.
HCL Technologies
Headstrong
HealthPlan Holdings
Help Desk NOW, Inc.
Hewitt Associates
Hexaware Technologies
Hinduja TMT Limited
HTC Global Services, Inc.
i2iEnterpise Ltd.
ICT Group, Inc.
ICICI OneSource
IDS Comercial
iEnergizer, Inc.
i-flex solutions limited
iGate Global Solutions
Immaculate Intractions
Indecomm Global Services
Infinite Computer Solutions Pvt. Ltd.
InfoCision Management Corporation
Informatica Integral Empresarial
Infosys Technologies, Ltd.
Infowavz International Pvt. Ltd.
Integreon

Intelenet Global Services Limited
IntelliRisk Management Corporation
International Business Alliance
iSeva, Inc.
ITC Infotech
I.T. United
IT&T Limited
Kanbay International Inc.
Kankei Relationship Marketing Services
King Teleservices, LLC
KMG Infotech Pvt. Ltd.
Larsen and Toubro Infotech Limited
Lester Incorporated
Liberata
Lightbridge, Inc
Luxoft
Manjushree Infotech
Maritz Inc.
Marlin Integrated Capital Holding
Mastek Ltd.
Medical Matrix, L.P.
MedsoftUSA
Metro One Communications, Inc.
Millennium Teleservices, LLC
Minacs Worldwide Inc.
MindTree Consulting
Motif, Inc.
Mphasis BFL Ltd.
Nationwide Credit
NCO Group, Inc.
Ness Technologies, Inc.
Neusoft Group Ltd.
NIIT Ltd.
Nipuna Services Ltd.
North American Software
Ocwen Financial Solutions
OfficeTiger
OKS Group
Outsource Partners International
Outsourcing Solutions, Inc.
Patni Computer Systems Limited
PeopleSupport, Inc.
Perot Systems Corporation
Pinkerton Computer Consultants, Inc.
Plaza Associates
Portfolio Recovery Associates

Precision Response Corp.
Prefexa Solutions
ProAdept
Progeon
Promantra Synergy Solutions Ltd.
Protocol Communications Inc.
Pumasource Ltd.
Qinteraction Philippines Inc.
RCG Information Technology
Risk Management Alternatives, Inc.
Royal Health Care
RT Outsourcing Services Ltd.
Satyam Computer Services, Inc.
Scandent Group
Secova eServices, Inc.
Service1ne Global Solutions
Sherman Financial
Sichuan Yinhai Software
Sierra Atlantic, Inc.
Singapore Computer Systems
SITEL Corp.
Slash Support
Softtek
SourceNet Solutions
SPI Technologies Inc.
SR. Teleperformance S.A.
StarTek, Inc.
STI Knowledge, Inc.
Stream International, Inc.
Sykes Enterprises, Inc.
Syntel, Inc.
The Sutherland Group, Ltd.
Talk2rep Inc.
TATA Consultancy Services
TCIM Services, Inc.
Technion Communications Corporation
TeleMarketing Concepts, Inc.
Telerx Marketing Inc.
TeleTech Holdings, Inc.
TELUS International Inc.
TMG Health, Inc.
Tracmail
TransWorks Information Service Ltd.
Trident Capital
United Recovery Systems
Unicall International, Inc.

U-soft Co., Ltd
vCustomer
vMoksha Technologies Pvt. Ltd.
Vision-X, Inc.
Vortex Technologies
Vsource Asia Berhad
West Corp.
Wipro Ltd.
WNS Global Services
Worldwide Asset Management, LLC
Xchanging
ZenSar Technologies Ltd.
Zenta Group

**Financial Competitors**
3i Group plc
Blackstone Group
The Carlyle Group
CD Ventures
CDC Capital Partners
Francisco Partners
Frontenac Company
General Atlantic, LLC
H.I.G. Capital
Nautic Partners, LLC
Oak Hill Capital Partners
Oaktree Capital Management, LLC
Newbridge Capital
Platinum Equity
Terra Firma Capital Partners
TH Lee Putnam Ventures
Warburg Pincus LLC
Willis Stein & Partners

# EXHIBIT I

## EMPLOYMENT AGREEMENT

(Hasnain Aslam)

**AMENDMENT TO EMPLOYMENT LETTER**
**(Hasnain Aslam)**

This Amendment to Employment Letter (this "Amendment") is executed as of October 4, 2005 by and between Hasnain Aslam ("you" or "Executive") and TRG Holdings, LLC (the "Company or "TRG"), and amends that certain employment letter dated May 1, 2003 by and between Executive and the Company (the "Employment Letter"). All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Employment Letter.

The parties hereto hereby agree as follows:

1. Termination. The third sentence of Section 4 of the Employment Letter shall be amended in its entirety to read as follows:

"In the event of termination without Cause or for Good Reason, you will be entitled to a severance payment equivalent to 12 months of your total compensation and your outstanding Management Options shall immediately vest in accordance with the following schedule:"

2. Non-Compete and Non-Solicitation of Employees. Section 5 of the Employment Letter shall be amended in its entirety to read as follows:

"You agree that during a period of one year following termination of your employment with TRG (the "Restricted Period"), you will not, except with the prior consent of TRG's Board of Directors, engage in Competition. Further, you also agree that during the Restricted Period, you will not solicit any employee of the Company to leave the employ of the Company. In addition, during the Restricted Period, you will not induce or attempt to induce any customer, supplier, licensee or other business relation of the Company Group to cease doing business with the Company Group. For purposes of this Section 5, the following terms shall have the following meanings:

(a) "Business of the Company" means the business in which the Company Group engages as of the date your employment with TRG terminates, anywhere in the world in which the Company Group's products or services are currently marketed or sold by the Company Group.

(b) "Company Group" means the Company, TRGI and their respective subsidiaries.

(c) "Competing Business" means any entity or person that directly or indirectly owns or operates a business that competes with a Significant Line of Business and generates annual revenue from such business that is not less than 20% of the annual revenue generated by such Significant Line of Business.

(d) "Competition" means to, directly or indirectly, own any interest in, manage, control, participate in, consult with, render services for, operate or in any manner engage with any of the entities listed on Exhibit A hereto or any Competing Business; provided, however, that you shall not be prohibited from owning, directly or indirectly, up to 5% of the outstanding stock of entities listed on Exhibit A hereto or any Competing Business, whether publicly traded or privately held, so long as you have no active participation in the business of such entities or Competing Business; provided, further, that your employment with any investment bank, private equity firm, hedge fund or similar financial services firm or other participation in the field of mergers and acquisitions or employment with any of the entities listed on Exhibit A that are designated as financial competitors of the Company during the Restricted Period shall not be deemed Competition so long as you do not accept any engagement on behalf of entities listed on Exhibit A that are designated as strategic competitors of the Company or any Competing Business during the Restricted Period.

(e) "Significant Line of Business" means, as of any date during the Restricted Period, a line of business operated by the Company or any of its subsidiaries as of such date that generates not less than 20% of the Company's and its subsidiaries' annual revenue, determined on a consolidated basis in accordance with United States generally accepted accounting principles as in effect from time to time, consistently applied.

3. Ratification. Except as modified hereby, all of the terms and conditions of the Employment Letter are hereby ratified and confirmed.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first written above.

TRG Holdings, LLC

By:______________________________

Name: ____________________________

Title: ____________________________

_________________________________
Hasnain Aslam

# EXHIBIT A

## LIST OF COMPETITORS

The strategic competitors and financial competitors of The Resource Group International Limited ("TRGI") as of the Initial Closing Date (as defined in that certain Preferred Stock Purchase Agreement dated as of October 4, 2005 by and among TRGI, TRG Pakistan Limited, the investors specified therein and the individuals specified therein (the "Purchase Agreement") include the entities listed below, together with their respective parent entities, subsidiaries, affiliates and succesors. This Exhibit A shall be amended from time to time to conform at all times to Schedule 6.1 of the Purchase Agreement.

**Strategic Competitors**

24/7 Customer Inc.
Accenture
Adea Solutions, Inc.
Aditi Technologies
Access Direct
ACI Telecentrics, Inc.
Actis
Adaptis
ADP Medical Claims Services
Aegis Communications Group, Inc.
Affiliated Computer Services, Inc. (ACS)
AICOM Solutions Corp.
Aisys Synertech, Inc.
Ajuba International, Inc.
Akela, LLC
Alden Business Solutions
AllianceOne Receivables Management Inc.
Allsech Tech
AllServe Systems
Alorica Inc.
Ambergris Solutions, Inc.
Americall Group, Inc.
Amdocs Ltd.
ANTAR Eslabon Systems, S.A. de C.V.
Antares Management Solutions
APAC Customer Service, Inc.
Appteck
Apollo Health Street
Arrow Financial Services
ASCI
Asset Acceptance
AsiaInfo Holdings, Inc.
Asta Funding

Astron BPO
Aztec Software Inc.
Bearingpoint
Bleum, Inc.
Blue Star Infotech Limited
BPL Telecom (P) Ltd
Brigade Management Services
Brokerage Concepts, Inc.
Caliber Point Business Solutions
Capgemini
Capture Resource
Capvent AG
Carretek, LLC
Cavalry Investments
CCC Interactive Corporation
Certified Services, Inc.
Center Partners, Inc.
CGI
Cherukuri BPO
ClientLogic
Cognizant Technology Solution Corp.
Colwell & Salmon Communications
Collins Financial Services, Inc.
Computer Sciences Corp. (CSC)
Convasys Corp.
Convergent Resources
Convergys Corp.
Core3, Inc.
CRAIG/is Ltd.
CRP Technologies
The Cross Country Group, LLC
CTGroup
Daksh
Datamatics Technologies
DCS BPO
Delta Services
Deloitte
^DevelopAll Inc.
DialAmerica Marketing, Inc.
Diversified Collection Services
DPS Technologies
E2E Serwiz Solutions Ltd.
e4e, Inc.
EDS
eFunds Corporation
EMCC

eMR Technology
Encore Capital Group
EPAM Systems, Inc.
Epicenter Technology Pvt Ltd.
ePERFORMAX Contact Centers Corporation
Epixtar, Inc.
Espire Infolabs
eTelecare Global Solutions, Inc.
EUR Systems
EValueServe
Equinox Corporation
Excell Agent Services, LLC
Excell Services
ExlService Holdings, Inc.
The Faneuil Group
First City Financial
Fortune InfoTech USA, Inc.
Friendly Advanced Software Technology Pvt Ltd.
GECIS
GC Services, Houston
Goldstone Technologies
GTL Ltd.
Harte Hanks, Inc.
HCL Technologies
Headstrong
HealthPlan Holdings
Help Desk NOW, Inc.
Hewitt Associates
Hexaware Technologies
Hinduja TMT Limited
HTC Global Services, Inc.
i2iEnterpise Ltd.
ICT Group, Inc.
ICICI OneSource
IDS Comercial
iEnergizer, Inc.
i-flex solutions limited
iGate Global Solutions
Immaculate Intractions
Indecomm Global Services
Infinite Computer Solutions Pvt. Ltd.
InfoCision Management Corporation
Informatica Integral Empresarial
Infosys Technologies, Ltd.
Infowavz International Pvt. Ltd.
Integreon

Intelenet Global Services Limited
IntelliRisk Management Corporation
International Business Alliance
iSeva, Inc.
ITC Infotech
I.T. United
IT&T Limited
Kanbay International Inc.
Kankei Relationship Marketing Services
King Teleservices, LLC
KMG Infotech Pvt. Ltd.
Larsen and Toubro Infotech Limited
Lester Incorporated
Liberata
Lightbridge, Inc
Luxoft
Manjushree Infotech
Maritz Inc.
Marlin Integrated Capital Holding
Mastek Ltd.
Medical Matrix, L.P.
MedsoftUSA
Metro One Communications, Inc.
Millennium Teleservices, LLC
Minacs Worldwide Inc.
MindTree Consulting
Motif, Inc.
Mphasis BFL Ltd.
Nationwide Credit
NCO Group, Inc.
Ness Technologies, Inc.
Neusoft Group Ltd.
NIIT Ltd.
Nipuna Services Ltd.
North American Software
Ocwen Financial Solutions
OfficeTiger
OKS Group
Outsource Partners International
Outsourcing Solutions, Inc.
Patni Computer Systems Limited
PeopleSupport, Inc.
Perot Systems Corporation
Pinkerton Computer Consultants, Inc.
Plaza Associates
Portfolio Recovery Associates

Precision Response Corp.
Prefexa Solutions
ProAdept
Progeon
Promantra Synergy Solutions Ltd.
Protocol Communications Inc.
Pumasource Ltd.
Qinteraction Philippines Inc.
RCG Information Technology
Risk Management Alternatives, Inc.
Royal Health Care
RT Outsourcing Services Ltd.
Satyam Computer Services, Inc.
Scandent Group
Secova eServices, Inc.
Service1ne Global Solutions
Sherman Financial
Sichuan Yinhai Software
Sierra Atlantic, Inc.
Singapore Computer Systems
SITEL Corp.
Slash Support
Softtek
SourceNet Solutions
SPI Technologies Inc.
SR. Teleperformance S.A.
StarTek, Inc.
STI Knowledge, Inc.
Stream International, Inc.
Sykes Enterprises, Inc.
Syntel, Inc.
The Sutherland Group, Ltd.
Talk2rep Inc.
TATA Consultancy Services
TCIM Services, Inc.
Technion Communications Corporation
TeleMarketing Concepts, Inc.
Telerx Marketing Inc.
TeleTech Holdings, Inc.
TELUS International Inc.
TMG Health, Inc.
Tracmail
TransWorks Information Service Ltd.
Trident Capital
United Recovery Systems
Unicall International, Inc.

U-soft Co., Ltd
vCustomer
vMoksha Technologies Pvt. Ltd.
Vision-X, Inc.
Vortex Technologies
Vsource Asia Berhad
West Corp.
Wipro Ltd.
WNS Global Services
Worldwide Asset Management, LLC
Xchanging
ZenSar Technologies Ltd.
Zenta Group

**Financial Competitors**
3i Group plc
Blackstone Group
The Carlyle Group
CD Ventures
CDC Capital Partners
Francisco Partners
Frontenac Company
General Atlantic, LLC
H.I.G. Capital
Nautic Partners, LLC
Oak Hill Capital Partners
Oaktree Capital Management, LLC
Newbridge Capital
Platinum Equity
Terra Firma Capital Partners
TH Lee Putnam Ventures
Warburg Pincus LLC
Willis Stein & Partners