UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
THE RESOURCE GROUP INTERNATIONAL
LIMITED,

          Petitioner,

     -v-

MUHAMMAD ZIAULLAH KHAN CHISHTI,

          Respondent.
```

25-cv-1021 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

On December 24, 2025, the Court granted in part and denied in part the motion of petitioner The Resource Group International Ltd. ("TRG-I") for a preliminary injunction prohibiting respondent Muhammad Ziaullah Khan Chishti, his spouse Sarah Jennifer Pobereskin, and persons acting on their behalf or in concert with them from transferring or otherwise disposing of funds held in a savings account at Bank of America, N.A., that is titled in Pobereskin's name. See ECF No. 113. Specifically, after a full evidentiary hearing and briefing, the Court preliminarily enjoined Chishti and Pobereskin, along with their respective agents, designees, representatives, servants, officers, employees, members, managers, attorneys, or anyone else acting on their behalf or in concert with them, from transferring, selling, pledging, assigning, encumbering, or otherwise disposing, or causing any other person to transfer, sell, pledge, assign, encumber, or otherwise dispose of, $1,200,000 of the funds contained in Pobereskin's savings account at Bank of America, but otherwise did not

1

restrict the transfers of funds in the account above $1,200,000. Id. This preliminary injunction took immediate effect and will remain in effect until such time as the Court has disposed of TRG-I's forthcoming motion for turnover of the funds in the aforementioned account. This Opinion sets forth the reasons for the Court's determination.

I.    Background and Procedural History

These proceedings arise out of TRG-I's efforts to enforce a judgment of this Court, dated June 20, 2025, that confirmed an arbitration award entered against Chishti on April 22, 2025. See ECF No. 41 (judgment), ECF No. 36-1 (final arbitration award).[1] As relevant here, the arbitrator awarded TRG-I attorneys' fees and costs in the amount of $9,053,606.34. ECF No. 36-1 at 72. In seeking to enforce the Court's judgment, TRG-I served numerous asset discovery subpoenas on banks and law firms presently or formerly affiliated with Chishti, as well as on Pobereskin. See ECF No. 63. The Court has, on several occasions, resolved disputes concerning the propriety and scope of those subpoenas. See id. (granting in part and denying in part Chishti's motion to quash subpoenas); ECF No. 72 (granting in part and denying in part TRG-I's motion to compel compliance with subpoenas); see also In re Subpoena to Non-Party Sarah J. Pobereskin, No. 25-369 (D.P.R.) (separate action by Pobereskin to quash subpoena).

---

[1] On July 18, 2025, Chishti moved to set aside the Court's judgment or, in the alternative, to stay enforcement proceedings on the basis of, among other things, alleged fraud, misrepresentation, and misconduct by TRG-I in obtaining the underlying arbitration award and its confirmation. See ECF Nos. 42, 44. The Court denied Chishti's motion on August 11, 2025. ECF No. 52.

On October 30, 2025, TRG-I applied to the Court for an ex parte Temporary Restraining Order ("TRO") concerning an account held in Pobereskin's name at Bank of America. ECF No. 73. TRG-I sought the TRO after obtaining, via subpoena, bank records showing that Chishti had transferred millions of dollars into Pobereskin's account and that millions of dollars more had been transferred from Pobereskin's account to accounts in Chishti's name and to Chishti's creditors. Id. ¶ 8. TRG-I asserted that it intended to move, under Federal Rule of Civil Procedure 69, for an order requiring Bank of America to turn the funds in the account over to TRG-I in partial satisfaction of the Court's judgment. Id. ¶ 17. TRG-I contended that immediate injunctive relief was necessary because Chishti and Pobereskin would otherwise dissipate the funds in the account. Id. ¶ 18. The Court entered the TRO, granting the interim relief requested by TRG-I, on October 30, 2025. See generally id.

Upon the consent of TRG-I, Chishti, and Pobereskin, the Court modified the TRO on November 6, 2025, by, among other things, correctly identifying the bank account at issue and extending the TRO's effect until such time as the Court could conduct an evidentiary hearing and rule on TRG-I's motion for a preliminary injunction. See ECF No. 84. TRG-I's motion was fully briefed on December 12, 2025. See ECF Nos. 88, 89, 104. Beginning on December 17, 2025, and concluding on December 22, 2025, the Court held an evidentiary hearing at which Chishti and Pobereskin each testified at length. The Court received supplemental briefing from the parties and Pobereskin on December 23, 2025. See ECF

3

Nos. 110, 112. On December 24, 2025, the Court entered the aforesaid preliminary injunction barring Chishti, Pobereskin, and those acting in concert with them from disposing of $1,200,000 of the funds contained in the bank account at issue. ECF No. 113.

II.  Factual Findings

The Court presumes familiarity with the dispute between TRG-I and Chishti that resulted in the arbitration award underlying these proceedings. See ECF No. 40 (summarizing factual background). Here, the Court makes such factual findings as are necessary to decide TRG-I's motion for a preliminary injunction.

These proceedings primarily concern funds that are held in two accounts that are titled in Pobereskin's name at Bank of America. The proceedings also concern the nature of the financial, commercial, and marital relationships between Chishti and Pobereskin.

Pobereskin, a native of the United Kingdom, is a graduate of Cambridge University and Harvard Business School. Tr. 8:17-20, 10:16-11:10, 12:2-6.[2] While studying at Harvard in 2010, Pobereskin opened two accounts at Bank of America: a checking account whose account number ends in -9748 and a savings account whose account number ends in -5826. See id. 12:3-4. Bank statements for the past five years indicate that the accounts are and have been solely titled in

---

[2] Citations to "Tr." are to the transcript of the evidentiary hearing held from December 17, 2025, to December 22, 2025.

Pobereskin's name. See generally RX 1.[3] Those statements also indicate that, in addition to the disputed transactions at issue in these proceedings, the checking account has received regular deposits representing compensation payments and expense reimbursements from Pobereskin's employer and has made regular payments for Pobereskin's household and credit card expenses. See Tr. 83:23-84:5; RX 1. Until October 14, 2025, when Pobereskin transferred $4 million from her checking account to her savings account, she consistently maintained a savings account balance of less than $30,000. See RX 1, RX 5.[4]

Pobereskin has worked primarily as a management consultant. See Tr. 12:7-13:13. Since 2019, she has been employed by the firm of ghSMART, where she specializes in talent development and leadership training. Tr. 13:1-4. She receives an annual salary from ghSMART, as well as substantial commissions and bonuses that have often exceeded her salary. Tr. 13:15-22. Although Pobereskin has earned as much as $1 million in total annual compensation from ghSMART, her compensation

---

[3] Citations to "RX" and "PX" refer to exhibits that were introduced into evidence at the evidentiary hearing by respondent Chishti and/or Pobereskin ("RX") and by petitioner TRG-I ("PX"). See ECF No. 111 (collecting exhibits).

[4] The TRO that the Court initially entered in this matter restrained the use of Pobereskin's checking account, but, upon stipulation of the parties, the Court amended the TRO to restrain the use of Pobereskin's savings account instead. See ECF Nos. 73, 84. For convenience, the Court employs the shorthand term "Bank of America Account" to refer to Pobereskin's two Bank of America accounts collectively, except where it is necessary to specify the checking or savings account individually. However, the amended TRO and the operative preliminary injunction pertain only to Pobereskin's savings account. The funds in Pobereskin's checking account were not subject to the amended TRO and are not subject to the preliminary injunction.

in calendar year 2024 was in the range of $500,000 to $650,000 because she spent a portion of that year on parental leave. Tr. 13:23-14:8. On several occasions, ghSMART has granted Pobereskin (and other employees) the opportunity to purchase equity in the firm. As relevant here, in 2022 ghSMART offered Pobereskin the option to purchase $2.77 million in shares, which she exercised. Tr. 48:3-16; RX 8. In 2025, as a result of a mandatory redemption, Pobereskin was required to sell approximately two-fifths of the ghSMART shares that she then owned. Tr. 51:6-12, 187:14-16. From that sale, Pobereskin realized some $4.658 million, which was deposited at Bank of America on July 14, 2025. See RX 1 (statement of June 13, 2025, to July 16, 2025); Tr. 51:6-12. Pobereskin continues to hold the balance of her shares in ghSMART, an investment that she characterizes as a safe and valuable one. Tr. 48:7-9, 51:4-12, 187:5-7, 224:20-225:16, 228:10-25.[5]

Pobereskin initially met Chishti, who grew up in Pakistan, in 2016, and they began seriously dating in 2018. See Tr. 14:21-16:2. In 2019, Pobereskin discovered that a former employee of Afiniti Ltd., a company at which Chishti was then serving as chairman and chief executive officer, had accused Chishti of sexual assault and harassment and that a confidential arbitration concerning these accusations was pending. Tr. 25:22-26:3. Although the accusations were not public at

---

[5] Pobereskin testified that she has long valued financial independence, a trait that she attributes, at least in part, to the divorce of her parents when she was younger. Tr. 9:6-19. Apart from the funds and transactions at issue in these proceedings, Pobereskin maintains personal investment accounts in the United States and United Kingdom with a collective balance of less than $1 million. Tr. 9:20-10:15.

that time, Pobereskin testified, they changed her relationship with Chishti. Tr. 26:22-27:23. While Pobereskin elected to continue their relationship, she and Chishti decided to enter into a prenuptial agreement before getting married. Tr. 21:12-13, 29:10-22; RX 3. That agreement contained several provisions that, Pobereskin testified, were designed for her protection. See Tr. 24:1-11. As relevant here, the agreement provided that gifts between Chishti and Pobereskin would be deemed the property of the recipient, that only income that each spouse would contribute to a joint account would be treated as marital property, that Chishti would be required to contribute up to $1 million per year to the joint account, and that Pobereskin would be entitled to a lump-sum payment of up to $10 million should the couple divorce. RX 3 ¶¶ 1(a), 2(a), 10. After executing the prenuptial agreement on December 18, 2020, Chishti and Pobereskin married the following day in Bermuda, where they were then living. See Tr. 21:19-20. During calendar year 2021, and pursuant to the prenuptial agreement, Pobereskin sometimes transferred substantial portions of her compensation into the couple's joint account at Butterfield Standard Retail Bank in Bermuda. See Tr. 31:22-33:4; RX 6. However, Pobereskin testified, Chishti did not contribute to the couple's joint account as required, allegedly because he instead prioritized repaying a loan that he had taken out so that he could pay his accuser the portion he owed of an award that the arbitrator had entered against him and

Afiniti. Tr. 33:4-34:2. No evidence before the Court indicates that Chishti ever contributed to the couple's joint account.[6]

In November 2021, Chishti's accuser testified before a committee of the United States Congress that was considering legislation to restrict mandatory arbitration of allegations of sexual assault and harassment. See Tr. 35:20-36:14. Within days of his accuser's testimony, Chishti resigned from his leadership roles with Afiniti, TRG-I, and TRG-I's publicly traded parent company, The Resource Group Pakistan ("TRG-P"). See Tr. 37:15-38:7, 42:14-16, 43:5-20. Bitter recriminations followed, and Chishti has continued to vie for control of TRG-P and TRG-I through litigation that remains pending in Pakistan. See, e.g., RX 11-12; PX 41 (pleadings filed in courts of Pakistan).

In January 2022, Chishti represented to Pobereskin that, around the time of (but not as a result of) his resignation from his roles at TRG-P, TRG-I, and Afiniti, he was about to receive a net payment of approximately $2 million in cash and approximately $16 million in stock in Ibex Global, a subsidiary of TRG-P that is publicly traded in the United States. Tr. 43:24-44:22, 46:13-20; RX 7. Chishti further represented to Pobereskin that he held approximately $50 million in

---

[6] Pobereskin's contributions were themselves irregular. Between November 2021 and July 2024, she only made two transfers to the couple's joint account. See generally RX 9. She resumed making such contributions on an approximately monthly basis in July 2024, even though, as the Court discusses below, the couple's postnuptial agreement no longer required her to do so. See generally id. Hence, neither Chishti nor Pobereskin has consistently contributed to their joint account during their more than five-year marriage.

TRG-P stock, but he cautioned her that "[w]hile this is real money, it is hard to get it out of Pakistan into dollars." RX 7.[7]

Beginning in 2022, Chishti began converting substantial assets to Pobereskin's at least nominal control.[8] On April 14, 2022, Chishti wired $2,770,000 to ghSMART to fund the purchase of the aforementioned shares that the firm had offered to Pobereskin. Tr. 49:20-23. From May 2022 through at least July 2023, Chishti spent at least $10 million to purchase, again in Pobereskin's name, shares in Isbei Ltd., a Chinese corporation in which Pobereskin was the sole initial investor and of which she remains the primary shareholder. Tr. 54:22-55:11, 60:9-61:8, 226:13-15. Chishti then loaned substantial sums to Isbei, once more in Pobereskin's name, beginning in August 2023 and continuing through at least March 2025. Tr. 61:1-8, 153:18-21.[9] Separately, from

_____

[7] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other alterations in source material.

[8] In November 2025, Chishti executed an affidavit in connection with litigation taking place in Bermuda regarding the winding up of Afiniti. RX 4. In that affidavit, as to the veracity of which the Court makes no findings, Chishti represented that his net worth as of December 2022 was "approximately $213 million." Id. at 5. He represented that his assets at that time consisted principally of some $145 million of stock in Afiniti, some $44 million of stock in TRG-P, some $44 million of stock in Ibex, and some $7 million in cash, minus liabilities of some $17 million in loans and some $10 million in United States income tax payments that would be due in April 2023. Id. at 5-6. Pobereskin testified, and TRG-I does not dispute, that Chishti's interest in Afiniti was "completely wiped out" as a result of a corporate restructuring in fall 2024. Tr. 93:14-16.

[9] There is ample evidence before the Court that Isbei, although nominally governed by Pobereskin, is in reality Chishti's venture. Pobereskin conceded that her "understanding" of the "opportunity" that Isbei represented "came from [Chishti]." Tr. 115:23-116:4; cf. id. at 55:15-56:24 (Pobereskin characterizing Isbei as a "joint plan" and

9

September 2022 through at least September 2023, Chishti spent at least another $20 million to purchase shares in TRG-P, most of which yet again were in Pobereskin's name. Tr. 77:4-7. As both Chishti and Pobereskin testified, their plan was for Pobereskin to acquire a sufficient stake in TRG-P that would entitle her, under Pakistani law, to call for the election of new directors who, Chishti and Pobereskin hoped, would be more favorable to Chishti than the current directors and management. Tr. 65:6-12, 67:9-14, 143:17-145:15 (Pobereskin); 282:4-283:14 (Chishti). Their plan did not come to fruition, however, because Pobereskin did not acquire the necessary stake. Tr. 73:3-18.[10]

On September 1, 2023, toward the end of the period when Chishti was engaged in the transactions the Court has just described, he and Pobereskin entered into a postnuptial agreement under the law of Puerto Rico, where they had relocated in the spring of 2022. Tr. 47:4-9, 194:3-4; RX 2. That agreement provides, in relevant part, that it was Chishti's and Pobereskin's "sole purpose" in executing it to "completely amend[] their current marital economic regime to an

─────────────

acknowledging that Chishti's reputation was "severely damaged globally" at time of Isbei's founding), 157:20-25 (similar). She also acknowledged that Chishti has at least occasionally conducted Isbei business from her email address. Tr. 159:14-160:19. The Court takes notice that Afiniti has brought contract and trade secrets claims against Isbei, Chishti, Pobereskin, and others in the United States District Court for the District of Columbia. See PX 14. The Court expresses no view on the merits of these claims.

[10] Because it is not necessary to the resolution of TRG-I's motion for a preliminary injunction, the Court omits discussion of ongoing litigation in Pakistan concerning the governance of TRG-P. Suffice to say that there appears to be an ongoing and bitter war of litigation between Chishti and the current leadership of TRG-I.

10

economic regime of total separation of property." RX 2 at 3. The agreement further provides that each spouse is liable only for his or her individual debts and obligations, as well as that each spouse holds individual title to all assets that that spouse held prior to the date of the agreement. Id. at 8-9. Pobereskin testified that she and Chishti executed the postnuptial agreement in order to ensure that they could reap the maximum tax benefits available to them as residents of Puerto Rico. Tr. 80:16-81:19, 191:2-21. Her testimony as to the circumstances in which she and Chishti decided to execute the agreement was, however, somewhat inconsistent with Chishti's testimony. Compare Tr. 189:22-192:3 (Pobereskin) with Tr. 273:15-25 (Chishti). More generally, the Court draws the inference that at least part of the motivation for the postnuptial agreement was a reaction to the claims being made against Chishti.

Until 2024, few transactions involving Chishti passed through the Bank of America Account.[11] In May 2021, Pobereskin transferred $70,000 from the account to Chishti; he returned that sum in July 2021. See RX 1 (statements of May 14, 2021, to June 15, 2021, and July 16, 2021, to August 16, 2021). Pobereskin testified that these transfers represented a promptly repaid personal loan. Tr. 86:9-12. In May 2022,

---

[11] Because the sole issue before the Court is whether TRG-I is likely to succeed in obtaining an order for Bank of America to turn over to TRG-I some or all of the funds in Pobereskin's savings account, the Court omits discussion of the extensive evidence concerning transactions by or on behalf of Chishti and Pobereskin that do not bear on the Bank of America Account. See RX 10, PX 8, PX 10-11 (Pobereskin foreign account statements); PX 28-29, 32 (Chishti correspondence concerning foreign accounts).

11

Chishti transferred $2.5 million into the account, which Pobereskin returned in a few weeks' time. Tr. 86:20-87:4. She testified that these transfers represented Chishti's attempt to provide Pobereskin with funds that she could directly invest in Isbei, but she was unable to make that investment because Bank of America could not wire funds to Isbei's account in Bahrain. Id. In November 2022, Chishti transferred $400 into the account, which Pobereskin did not return. Tr. 85:10-15. In March 2023, Pobereskin wired $600,000 from the account to Chishti so that he could purchase further shares of Isbei in her name. Tr. 87:14-21. That same month, Pobereskin attempted to use the account to transfer a further $1 million to Chishti for him to invest in Isbei, but Pobereskin's wire failed and was returned, minus a nominal fee. See RX 1 (statement of March 17, 2023, to April 13, 2023).

Beginning in 2024, Pobereskin began using the Bank of America Account to make substantial transfers that were unquestionably for Chishti's personal benefit. On occasion, she transferred funds directly into Chishti's personal accounts. See generally RX 1. More often, Pobereskin paid Chishti's creditors -- such as his lawyers and tax advisors -- directly. In 2025, she paid a total of more than $1.5 million in Chishti's legal and other professional fees. Tr. 110:18-21. She did so while also making regular contributions to the couple's

12

joint checking account, which they maintained at Banco Popular in Puerto Rico. See generally RX 1.[12]

During calendar year 2025, Pobereskin used the Bank of America Account to conduct a series of transactions that figure prominently in these proceedings. First, beginning on February 28, 2025, Pobereskin began using the Bank of America Account to make loans to, and receive loan repayments and stock sales from, Isbei. These transactions, the last of which occurred on May 15, 2025, produced net proceeds of approximately $1 million. See Tr. 111:25-115:15. Second, on May 30, 2025, which fell some six weeks after the arbitrator entered against Chishti the award of approximately $9 million in attorney's fees that underlies these proceedings, Chishti transferred $695,311 into the Bank of America Account. RX 1 (statement of May 15, 2025, to June 12, 2025); Tr. 88:7-16. Pobereskin testified that this sum represented substantially all of Chishti's liquid United States assets at the time. Tr. 89:1-7. She characterized this transfer as a repayment of certain amounts that she had paid on Chishti's behalf to his lawyers and other professionals. Id. As discussed below, however, the Court does not find that explanation credible. Third, on July 14, 2025, ghSMART deposited approximately $4.658 million into the Bank of America Account, representing the proceeds of Pobereskin's sale of ghSMART's

---

[12] Pobereskin was no longer required to make such contributions because the relevant provisions of the couple's prenuptial agreement were not incorporated into their postnuptial agreement. See Tr. 192:9-16.

stock. RX 1 (statement of June 13, 2025, to July 16, 2025); Tr. 51:6-12.

As a result of these and other transactions, on September 15, 2025, Pobereskin maintained balances of approximately $5.17 million in her checking account and approximately $8,600 in her savings account. RX 1 (statement of August 15, 2025, to September 15, 2025). On October 14, 2025, she transferred $4 million from her checking account to her savings account. Id. (statement of September 16, 2025, to October 16, 2025). Then, on October 28, 2025, she transferred $200,000 from her savings account to her checking account; a second transfer of the same amount followed on October 30, 2025. RX 5. Thus, the balance in Pobereskin's savings account as of the last period for which a bank statement is in evidence was approximately $3.61 million. Id. That is the amount which remained subject to the TRO until December 24, 2025, when the Court entered the preliminary injunction as to $1.2 million of the account balance. See ECF No. 113.

III. Preliminary Injunction Standard

TRG-I and Pobereskin dispute what standard the Court should apply in determining whether TRG-I is entitled to the "extraordinary remedy" of a preliminary injunction. See, e.g., Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008). TRG-I frames its arguments in reference to the Second Circuit's distinctive formulation of the standard for granting a preliminary injunction, under which a court is to inquire (1) whether the movant has suffered irreparable harm and (2) whether the movant has shown either (a) "likelihood of success on the merits"

14

or (b) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in favor of granting preliminary relief. Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010); see ECF No. 74 at 15-16; ECF No. 104 at 1; ECF No. 110 at 1 & n.3. Pobereskin relies primarily on the four-factor standard for preliminary injunctive relief articulated by the U.S. Supreme Court, under which a movant "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." E.g., New York v. U.S. Dep't of Educ., 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020); see ECF No. 112 at 1; but see ECF No. 88 at 14 (Pobereskin discussing Citigroup Glob. Mkts.). Pobereskin suggests, albeit in passing, that the Second Circuit's "weaker" formulation may no longer be good law. See ECF No. 112 at 1 & n.1.

While the Court is not persuaded that it is at liberty to ignore the Second Circuit's standard for preliminary injunctive relief, see Citigroup Glob. Mkts., 598 F.3d at 35-38 (holding that Supreme Court caselaw did not abrogate the Circuit's "more flexible standard for a preliminary injunction"), the issue is immaterial to the resolution of TRG-I's motion. This is because, assuming that TRG-I is entitled to a preliminary injunction under the Second Circuit's formulation even if it cannot demonstrate likelihood of success on the merits as long as it can show not only "sufficiently serious" questions on the

15

merits plus a "balance of hardships tipping decidedly" toward it, see id. at 35 (emphasis added), TRG-I has not presented sufficient evidence to satisfy the second prong. While, of course, any creditor faces some hardship if it cannot prevent dissipation of funds as to which it is arguably entitled (in the first prong's sense of there being "serious questions" as to the entitlement), by the same token, a third-party owner of funds faces obvious hardship if those funds are tied up. That is why the Second Circuit's formulation of its alternative standard for a preliminary injunction emphasizes that this balance of hardships must tip "decidedly" in favor of the creditor. See id. But here, TRG-I has presented no evidence from which the Court may ascertain, whether quantitatively or qualitatively, the degree of hardship it would face. For instance, no evidence before the Court indicates what proportion of TRG-I's assets or annual revenues is represented by the more than $9 million judgment that TRG-I holds against Chishti. In contrast, Pobereskin has identified several concrete hardships that she would face were the Court to enjoin her from transacting in the Bank of America Account altogether. The Court finds credible her representation that she requires access to at least some of the funds in that account in order to continue paying her, and potentially her husband's, legal and other professional bills and in order to continue supporting Isbei's operations. See Tr. 59:14-20; ECF No. 88 at 23-24; ECF No. 112 at 1-2. Because enjoining Pobereskin from transacting at all in the Bank of America Account would "cripple" her and Chishti's "ability to defend against" what they call "the worldwide litigation

16

launched against us," ECF No. 112 at 2; Tr. at 452:3-5, the Court cannot conclude that the balance of hardships tips "decidedly" in TRG-I's favor, Citigroup Glob. Mkts., 598 F.3d at 35.[13]

Thus, under both the Second Circuit and Supreme Court formulations of the standard for the issuance of a preliminary injunction, TRG-I must show that it is likely to succeed on the merits of its forthcoming turnover motion.[14]

IV.  Likelihood of Success on the Merits

TRG-I premises its motion for a preliminary injunction on its representation that it will shortly move, under Federal Rule of Civil Procedure 69, for an order directing Bank of America to turn over to TRG-I the funds in the Bank of America Account. ECF No. 74 at 2-3. As relevant here, Rule 69 provides that proceedings to execute a money judgment "must accord with the procedure of the state where the court

---

[13] The Court finds, however, that Pobereskin does not require access to the funds in the Bank of America Account in order to pay her ordinary living expenses. The testimony of both Pobereskin and Chishti was that their joint living expenses, though substantial, can for all practical purposes be met by the compensation that Pobereskin receives from her employer. See Tr. at 232:2-233:5 (Pobereskin), 378:22-379:11 (Chishti). That does not mean, however, that Chishti and Pobereskin would not meaningfully be harmed were the Court to enjoin them from using the funds in the Bank of America Account for the extraordinary purpose of funding their ongoing litigation in numerous forums around the world.

[14] Under both standards, of course, TRG-I must also demonstrate that it faces at least some kind of "irreparable harm" if it does not get the preliminary injunction, but here the parties do not meaningfully dispute that, if TRG-I is likely to succeed on the merits, it faces irreparable harm should it not be able to execute the judgment against at least some of the funds in the Bank of America Account. See ECF No. 104 at 1 n.2; ECF No. 112 at 2-3.

is located." Fed. R. Civ. P. 69(a)(1). In New York, a judgment creditor may move for the turnover of a judgment debtor's property, including property nominally held by a third party "in which the judgment debtor has an interest." CPLR 5225(b). To succeed on such a motion, the judgment creditor must show either that "the judgment debtor is entitled to the possession of such property" or that "the judgment creditor's rights to the property are superior to those of the transferee." Id.

TRG-I asserts three reasons why, under CPLR 5225, it is entitled to the funds in the Bank of America Account. First, TRG-I contends that Chishti has actual control of the Bank of America Account or, in the alternative, that it is an asset he owns jointly with Pobereskin. See ECF No. 110 at 9-15. Second, TRG-I argues that Chishti fraudulently transferred funds into the Bank of America Account with the intent of prohibiting TRG-I from collecting on the judgment. See id. at 6-9. Third, TRG-I maintains that funds in the Bank of America Account represent the proceeds of constructively fraudulent transfers from Chishti to Pobereskin, that is, transfers for which Chishti did not receive reasonably equivalent value and that he made at a time when he intended to incur debts beyond his ability to repay. See id. at 2-6. The Court analyzes each of TRG-I's contentions in turn.

A.   Actual Control

TRG-I's first theory is that Chishti had actual control of the Bank of America Account. In New York, a presumption of ownership attaches to funds that a party holds in a bank account titled in the

18

party's own name. E.g., Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 86 (2d Cir. 2002). Such a presumption can be rebutted only by evidence that another party "actually controlled the disputed funds" or that the possessor "merely held the funds . . . in the manner of a trustee" for the other party. Id. Here, TRG-I has not shown that it is likely to succeed in rebutting the presumption that the funds in the Bank of America Account are Pobereskin's property.

Numerous facts support the conclusion that Chishti does not actually control the Bank of America Account. Pobereskin asserts, and there is no evidence to the contrary, that she is the sole individual to whom the account has been titled since she opened it in 2010. ECF No. 88 at 16-17. As discussed above, Pobereskin's bank statements confirm her representation that most deposits into the account represent compensation and expense reimbursement payments from ghSMART, as well as that most outflows from the account represent her personal expenses. See supra Section II. Moreover, both Pobereskin and Chishti testified that Chishti does not have (and has never had) the ability to directly access or transact in the Bank of America Account. Tr. 236:15-17 ("He has no access to my Bank of America account online, through bankers. He has absolutely no authority whatsoever over my account."), 240:12-22; see ECF No. 88 at 16-17. Although TRG-I contends that Pobereskin is not credible on this point because of contradictions between Chishti's and Pobereskin's testimony regarding his ability to access her accounts at the overseas financial institution JS Bank, see

ECF No. 110 at 14-15; Tr. 144:16-18, the fact that Chishti may have accessed Pobereskin's account at a foreign bank with which he has had a longstanding relationship does not prove that he had the capacity to access her separate (and also longstanding) accounts at Bank of America.

These facts support Pobereskin's representation that, to the extent she has used funds in the Bank of America Account for Chishti's benefit, such as by paying his legal and other professional bills, she has done so voluntarily, rather than at his controlling direction. To be sure, TRG-I has identified certain evidence to the contrary. For instance, while the postnuptial agreement between Chishti and Pobereskin provides that they have a "marital economic regime" of "total separation of property," RX 2 at 3-7, correspondence between the couple about their finances is, at least facially, inconsistent with that provision. See RX 7; ECF No. 110 at 11-12.

TRG-I overreaches, however, when it argues that the Bank of America Account was either controlled by Chishti or a joint asset of his and Pobereskin's. First, TRG-I argues that the history of transfers out of the Bank of America Account indicate that the account was "mostly used to benefit" Chishti. ECF No. 110 at 10. While this may be true in recent months, when it is undisputed that Chishti has faced substantial financial pressures and Pobereskin has assisted him in paying many of his expenses, a different pattern emerges when transactions in the account are viewed over a longer horizon. Prior to May 2024, for instance, Pobereskin made few, if any, transfers out

of the Bank of America Account for Chishti's sole benefit. See generally RX 1. Moreover, Chishti has hardly been the account's only beneficiary: throughout her marriage to Chishti, Pobereskin has regularly transferred funds from the Bank of America Account to support her mother, Laurie Baxter. See Tr. 109:22-110:5. And TRG-I's argument that Pobereskin primarily used the Bank of America Account to benefit Chishti neglects the wide range of non-transfer transactions that are reflected on Pobereskin's bank statements. Pobereskin has received millions of dollars of compensation and expense reimbursements from ghSMART, and she has used the account to pay credit card bills and to cover ordinary living expenses, including meals and medications. See generally RX 1.[15] More generally, it was apparent to the Court from its assessment of Pobereskin's character and credibility that, while she understandably sought to be helpful to her husband, she retained her independence and ability to control her account.

Second, TRG-I contends that Chishti and Pobereskin generally "treat[ed] their supposedly separate assets" as joint assets. ECF No. 110 at 12-13. Under this heading, TRG-I points almost exclusively to Chishti's and Pobereskin's shares of TRG-P. Like the arbitrator in the

---

[15] Moreover, evidence presented at the evidentiary hearing undermined the face of certain claims that TRG-I made in its moving papers. For instance, TRG-I asserted that Chishti "has directed more than $3 million dollars directly to the Bank of America Account," ECF No. 74 at 18, but, as discussed in Section II supra, Pobereskin's bank records indicate that many of Chishti's large transfers were immediately reversed. Likewise, TRG-I asserted that Chishti "has had over $4.5 million transferred from the Bank of America Account to others on his behalf," ECF No. 74 at 18, but Pobereskin's bank records put the actual total of non-reversed transfers at closer to $2.2 million.

underlying proceeding, the Court is persuaded that at least some of the TRG-P shares owned in Pobereskin's name were purchased in large part for Chishti's benefit. See ECF No. 36-1. But the fact that Chishti used his assets to purchase those shares, and even the fact that Chishti did so pursuant to what may well have been a "joint plan" with Pobereskin, Tr. 185:15-19, does not transmute an account that Pobereskin owned years before she met Chishti into a joint asset. Similarly, the fact that the investments made in Pobereskin's name with funds provided by Chishti are inconsistent with her risk-averse approach to investing does not mean that Chishti controlled Pobereskin's accounts at Bank of America, which were rarely used to make such investments. See Tr. 181:13-182:4 (Pobereskin discussing investment history).

Relevant caselaw confirms these conclusions. Courts in this Circuit have ordered the turnover of funds from accounts held in the names of third parties only where the evidence suggests a far greater degree of control than is present here. For instance, in Major League Baseball Properties, Inc. v. Corporacion de Television y Microonda Rafa, S.A., No. 19 Civ. 8669, 2023 WL 405768, at *6-15 (S.D.N.Y. Jan. 26, 2023), the court granted the plaintiff's turnover motion where the third party "habitually paid invoices" at the defendant's direction, "all business decisions" by the third party "were to be authorized by" the defendant, and the third party's nominal owner could not competently testify to even the basic details of its operations. Id. at *10-11. In contrast, Pobereskin's bank records indicate that she

primarily used the Bank of America Account for her own purposes, such as receiving compensation from her employer and paying her personal expenses. Although the Court does not fully credit certain aspects of Pobereskin's testimony (see below), there is no question that she is and has been keenly aware of the flow of funds into and out of the Bank of America Account. And while there was contradictory testimony as to whether Chishti ever requested financial assistance from Pobereskin that she did not provide, compare Tr. 109:2-9 (Pobereskin) with Tr. 406:8 (Chishti), there is no evidence that Pobereskin ever sought (let alone was somehow required to seek) Chishti's authorization to transact in the Bank of America Account.

Allstate Insurance Company v. Mirvis, No. 08 Civ. 4405, 2018 WL 4921631, at *11-14 (E.D.N.Y. Sept. 4, 2018), is likewise inapposite. In that case, the defendant personally executed the vast majority of transactions involving two disputed accounts, which were "opened at [the defendant's] direction for him to use in his own discretion." Id. at *11-13. Here, Pobereskin opened the Bank of America Account more than a decade before she married Chishti, and not even TRG-I suggests that Chishti personally executed any transactions in the account or had discretion to do so.

For these reasons, the Court concludes that TRG-I is unlikely to succeed in rebutting the presumption that the funds in the Bank of America Account belong to Pobereskin or in showing that Chishti controlled the account.

23

B.    Actual Fraudulent Conveyance

TRG-I's remaining theories are both based on the premise that its interest in the funds held in the Bank of America Account is superior to Pobereskin's interest because those funds represent the proceeds of fraudulent conveyances from Chishti to Pobereskin.

Broadly speaking, New York law recognizes two types of fraudulent conveyances. The Court discusses the first type, actually fraudulent conveyances, in this subsection before turning to the second type, constructively fraudulent conveyances, in the following subsection.

A transfer is actually fraudulent, and for that reason voidable, if it is made "with actual intent to hinder, delay[,] or defraud any creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a)(1). Under the New York Debtor and Creditor Law, a court deciding whether a transfer is actually fraudulent must consider as many as eleven so-called "badges of fraud," such as, for example, whether the transfer is to an "insider," the transfer was concealed, the transfer was of substantially all the debtor's assets, or the transfer occurred shortly before or after the debtor incurred a substantial debt. Id. § 273(b)(1)-(11). A judgment creditor need only prove fraudulent intent by a preponderance of the evidence. Id. § 273(c).

While TRG-I initially contended that all of Chishti's transfers to Pobereskin -- both those involving the Bank of America Account and otherwise -- were made with the intent to defraud Chishti's creditors, ECF No. 74 at 19-21, its post-hearing brief focuses on three sets of transfers: (1) a May 30, 2025, transfer directly into the Bank of

America Account in the amount of $695,311; (2) the $2.77 million that Chishti paid on Pobereskin's behalf to purchase shares in ghSMART in April 2022; and (3) the approximately $14 million that Chishti invested on Pobereskin's behalf in Isbei between 2022 and 2025. See ECF No. 110 at 6-9. The Court concludes that TRG-I is likely to succeed in showing that the first of these transfers, but not the other two, was made with actual fraudulent intent.

Numerous badges of fraud are present in connection with the May 30, 2025, transfer. It was to a classic "insider," Chishti's spouse. See N.Y. Debt. & Cred. Law § 273(b)(1). The transfer was concealed from TRG-I, Chishti's creditor, which learned about it only well after post-judgment asset discovery had commenced. See id. § 273(b)(3), (b)(7); ECF No. 74 at 4-6. Pobereskin herself testified that the transfer was of "substantially all" Chishti's United States cash. See N.Y. Debt. & Cred. Law § 273(b)(5); Tr. 88:17-89:7, 220:6-20. Finally, "the transfer occurred . . . shortly after a substantial debt was incurred" because Chishti made it within weeks of the underlying arbitration award, which required him to pay more than $9 million in attorney's fees and costs. N.Y. Debt. & Cred. Law § 273(b)(10). In contrast, no evidence apart from the couple's testimony supports Pobereskin's explanation that Chishti made this transfer after she demanded repayment for legal and other expenses that she had advanced on his behalf. See ECF No. 104 at 4-5. Pobereskin's testimony that she was a "frustrated wife" who sought repayment after advancing these expenses, Tr. 89:1-7, is belied by the fact that, within days of

receiving the supposed repayment from Chishti, she continued paying hundreds of thousands of dollars on his behalf, see RX 9 at 3-4. Pobereskin's separate and at least partially contradictory testimony that she paid Chishti's expenses out of a "feeling of fairness" because he had given her more than $40 million over the course of their marriage, Tr. 78:6-17, additionally undercuts her claim that the $695,311 transfer was a repayment that she demanded.

Both because the transfer was accompanied by numerous badges of fraud and because no alternative explanation is more persuasive, the Court concludes that TRG-I is likely to succeed in showing that Chishti made the $695,311 transfer with actual fraudulent intent.

TRG-I is unlikely to succeed, however, in showing that Chishti made the two other sets of transfers with actual intent to hinder, delay, or defraud his creditors generally or TRG-I in particular. See N.Y. Debt. & Cred. Law § 273(a)(1). These transfers were all made before -- in some cases years before -- the arbitrator entered the fee award of more than $9 million against Chishti. See generally RX 9. As Pobereskin argues and TRG-I does not dispute, Chishti did not have reason to predict that the arbitrator would enter such a substantial award against him because both sides presented plausible arguments and the arbitrator granted Chishti a meaningful portion of the equitable relief he sought. ECF No. 88 at 22. And while the transfers that Chishti made in connection with ghSMART and Isbei were attended by at least one badge of fraud because they were made to an "insider," namely, Pobereskin, absent from them are the many other badges of

fraud that accompanied the $695,311 transfer into the Bank of America Account.

C.    Constructive Fraudulent Conveyance

New York law recognizes that a transfer need not be made with actual fraudulent intent in order to be voidable as fraudulent.[16] A transfer is constructively fraudulent if it is made "without receiving a reasonably equivalent value in exchange," so long as either the debtor "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small" or the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." N.Y. Debt. & Cred. Law § 273(a)(2)(i)-(ii). Because the statute permits a transfer to be voided where a debtor acted unreasonably, proof of the debtor's intent is not necessary. Moreover, because the statute addresses both present and potential future creditors, a debtor can act unreasonably in transferring funds even if the debtor had sufficient financial resources to effectuate the transfer at the time.

TRG-I contends that the transfers that Chishti made in order to purchase ghSMART shares in April 2022 and to purchase equity and debt in Isbei between 2022 and 2025 were constructively fraudulent. ECF No.

---

[16] Where a transfer is voidable as fraudulent, a creditor "may levy execution on the asset transferred or its proceeds." N.Y. Debt. & Cred. Law § 276(b).

110 at 3-6.[17] On TRG-I's view, Chishti received no equivalent value for these transfers, and he made them at a time when he intended to engage in further transactions for which his remaining assets were unreasonably small and that would have left him unable to pay his debts as they became due. Id. The Court agrees as to a portion of the transfers that Chishti made to fund Isbei, but disagrees as to the remaining transfers.

### 1.    Purchase of ghSMART Shares

There is no dispute that, on April 14, 2022, Chishti wired funds to purchase $2.77 million of ghSMART shares in Pobereskin's name. See RX 9. Nor is there any dispute that Pobereskin realized some $4.658 million in July 2025 from the mandatory redemption of approximately two-thirds of the shares that Chishti purchased on her behalf. Accordingly, if the transfer that Chishti made to purchase Pobereskin's shares was constructively fraudulent, TRG-I may have a superior interest in the relevant portion of the sales proceeds. See N.Y. Debt. & Cred. Law § 276(b). The Court concludes, however, that TRG-I is unlikely to show that the transfer was constructively fraudulent.

On the one hand, Chishti did not receive "a reasonably equivalent value in exchange for the transfer." See id. § 273(a)(2). Pobereskin testified that she regarded this transfer as belated compensation for

---

[17] TRG-I also contends that the $695,311 transfer that Chishti made to Pobereskin on May 30, 2025, was constructively fraudulent, id. at 2-3, but the Court need not address that argument because it has already concluded that Chishti made the May 2025 transfer with the actual intent to defraud his creditors.

the contributions Chishti had failed to make, under the couple's premarital agreement, to their joint checking account. Tr. 48:9-16. The facts, however, belie that view. As discussed above, the maximum sum Chishti could have been required to contribute to the couple's joint checking account was $1 million per year. See RX 3 ¶ 2(a)(i)-(iii). At the time that Chishti purchased the ghSMART shares in Pobereskin's name, he and Pobereskin had been married for approximately fifteen months. Because there is no evidence before the Court that Chishti ever contributed to the couple's joint checking account, the likely (and maximum) amount of his arrears was $1.25 million. His purchase of $2.77 million of ghSMART shares was more than twice that amount and, hence, was not reasonably equivalent in value to the supposedly missed contributions.

On the other hand, there is insufficient evidence for the Court to conclude, in reference to the time at which Chishti purchased the ghSMART shares, either that he was about to engage in transactions for which his remaining assets were unreasonably small or that he intended or reasonably should have believed he was about to incur debts that would be beyond his ability to pay at the time they became due. See N.Y. Debt. & Cred. Law § 273(a)(2)(i)-(ii). While there are substantial disagreements between the parties about the value of Chishti's assets and liabilities in April 2022 and thereafter, TRG-I has not meaningfully disputed that Chishti had at least $18 million of relatively liquid net assets, namely, cash and shares of Ibex, along with tens of millions of dollars of illiquid assets, namely, shares

29

of Afiniti and TRG-P. See ECF No. 110 at 4 (acknowledging that Chishti received "nearly $60 million in cash and Ibex stock" in "January 2022," of which some $18 million in "liquid assets" would remain "after paying his creditors (including the IRS)"); Tr. 203:10-13.[18] In light of Chishti's overall financial position at the time, spending $2.77 million to purchase Pobereskin's ghSMART shares neither left him with unreasonably small assets nor placed him in a position where he would be unable to pay his debts on time. See N.Y. Debt. & Cred. Law § 273(a)(2)(i)-(ii).

TRG-I's response is that, by April 14, 2022, Chishti had already decided not only to purchase the ghSMART shares in Pobereskin's name but also to fund tens of millions of dollars of investments on her behalf in TRG-P and Isbei. ECF No. 110 at 5. Because Chishti knew he would be making "over $40 million" in other transfers at the time he purchased the ghSMART shares, TRG-I argues, it was unreasonable for him to believe that these transactions would have left him able to pay his creditors. Id. The difficulty with this argument is that TRG-I has not shown, by a preponderance of the evidence, that Chishti had decided to make these other transfers at the time he bought Pobereskin's ghSMART shares. As to the purchase of TRG-P shares, Chishti testified that he devised the plan for Pobereskin to acquire sufficient shares

---

[18] Although TRG-I subsequently obtained injunctive relief in the courts of Pakistan barring Chishti and Pobereskin from selling their shares of TRG-P, TRG-I had not even applied for such relief at the time that Chishti purchased the ghSMART shares in Pobereskin's name. See RX 11, 12 (pleadings seeking injunctive relief dated January 6, 2023, and August 31, 2023, respectively).

to call for new board elections in "middle to early" 2022 but that he could not be more specific as to the date. Tr. 338:5-15. His first purchases of TRG-P shares took place several months later, in September 2022. Tr. 64:8-9; RX 9 (transactions commencing September 15, 2022). TRG-I has offered no documentary evidence showing that Chishti and Pobereskin developed their plan before mid-April 2022. As to Isbei, both Chishti and Pobereskin testified that they decided to establish that company in "early 2022," which likely refers to the period before April 14 of that year. See Tr. 56:18-24 (Pobereskin); 331:1-7 (Chishti). But unlike their plan to regain control of TRG-P, which required that Pobereskin acquire ten percent of that company's publicly traded stock, their decision to establish Isbei did not entail the commitment of any specific sum of money. As the Court discusses at greater length below, Chishti's initial investment in Isbei was of approximately the same value as the amount he spent to purchase the ghSMART shares, and Chishti engaged in only a handful of Isbei-related transactions in 2022. Hence, there is insufficient evidence for the Court to conclude that, when Chishti purchased shares of ghSMART, he expected or intended to make investments in Isbei in amounts that would leave him unable to pay his creditors.

Accordingly, TRG-I is not likely to succeed in showing that Chishti's April 14, 2022, transfer to purchase shares of ghSMART was constructively fraudulent. The Court does not discount, however, what it views as the strong possibility that Chishti and Pobereskin offered self-serving testimony regarding the nature and timing of their plans.

31

Indeed, much of Chishti's testimony over the course of the evidentiary hearing was, in the Court's view, frequently lacking in complete candor. The Court therefore does not rule out the possibility that TRG-I may, at a later stage of these proceedings, be able to present evidence that Chishti acted unreasonably in purchasing Pobereskin's ghSMART shares because he contemporaneously intended to engage in further transactions that would eventually render him unable to pay his debts.

### 2.    Transfers to Fund Isbei

As Pobereskin testified, Chishti invested some $14 million to purchase equity and debt in Isbei in her name. Tr. 64:3-4. There is no dispute that Chishti received no equivalent value for these transfers, which Pobereskin characterized as "gifts." Id. The Court divides its discussion of the Isbei-related transfers into two periods of time: those made prior to 2023, the year in which Chishti failed to timely pay more than $10 million in United States federal taxes, and those made in and after 2023.

The transfers to purchase equity in Isbei that Chishti made in calendar year 2022 add up to $5 million. See RX 9 (transactions dated May 19, 2022; September 8, 2022; and September 12, 2022). The Court concludes that these transfers were likely not constructively fraudulent for the same reason that Chishti's purchase of ghSMART shares was likely not constructively fraudulent: it was reasonable, at the time, for Chishti to expect that making these transfers would not render him unable to pay his creditors. As noted above, in 2022,

32

Chishti had at least $18 million in relatively liquid assets, and he purchased less than $8 million in shares of ghSMART and Isbei. Hence, the transfers likely did not leave him unable to pay the primary obligation that he knew would shortly be due, namely, the approximately $10 million in taxes that he owed to the United States government.

With the passage of time, however, Chishti's Isbei-related transfers became increasingly unreasonable. Chishti spent another approximately $2.87 million to purchase equity in Isbei prior to April 15, 2023, when his tax bill was due. See RX 9 (transactions of January 9, 2023; February 6, 2023; March 8, 2023; April 14, 2023); Tr. 257:23-258:4. And then, after he failed to pay his taxes on time, Chishti continued purchasing equity and debt in Isbei -- at least another $7 million between May 3, 2023, and January 22, 2025. See RX 9 (transactions of May 3 and 22, 2023; June 20, 2023; July 21, 2023; August 17, 2023; November 7, 2023; December 1, 2023; January 8, 2024; February 21, 2024; March 19, 2024; April 22, 2024; May 21, 2024; June 21, 2024; July 23, 2024; September 5, 2024; October 1, 2024; November 19, 2024; December 25, 2024; and January 22, 2025); contra Tr. 366:4-5 (Chishti characterizing these transactions as "a very small tail of purchases in Isbei").

TRG-I has presented evidence of numerous circumstances that made these purchases unreasonable:

First, by early 2023, TRG-I had obtained an injunction in Pakistan limiting Chishti's capacity to liquidate his TRG-P shares, which meaningfully constrained him from accessing one of his most substantial

33

remaining assets. See RX 11. A second, similar injunction followed later in 2023. See RX 12. Second, Chishti made the bulk of these investments in Isbei at a time when he and Pobereskin had borrowed heavily to finance the purchase of TRG-P shares. See Tr. 302:5-9, 368:16-369:23, 450:2-8; PX 38. Third, Chishti continued making millions of dollars in investments in both Isbei and TRG-P even after TRG-I initiated the arbitration underlying these proceedings. See ECF No. 36-1. Fourth, and finally, there is no evidence that Chishti had secured meaningful regular income, from employment or otherwise, during this period. He nevertheless continued to invest substantial sums in Isbei while defaulting on his tax obligations.[19]

For these reasons, the Court concludes that TRG-I is likely to succeed in showing that the investments that Chishti made in Pobereskin's name in Isbei after January 1, 2023, were constructively fraudulent and, hence, voidable. See N.Y. Debt. & Cred. Law § 273(a)(2)(i)-(ii). Thus, TRG-I is likely entitled to "levy execution on the . . . proceeds" of these transfers. See id. § 276(b).

---

[19] With regard to Chishti's unpaid United States taxes, the Court received into evidence a petition, dated April 21, 2025, that Chishti submitted pro se to the United States Tax Court. See PX 39. In that petition, Chishti sought relief from a decision of the Internal Revenue Service regarding his tax liability for calendar year 2022. Cross-examination revealed that certain statements contained in that petition were at least ambiguous, if not affirmatively misleading. See, e.g., Tr. 357:7-361:19. The petition also omitted what the Court regards as material facts; it did not, for instance, disclose that Chishti invested tens of millions of dollars in Pobereskin's name during the tax year in question. See Tr. 362:5-8.

The next issue, then, is whether any proceeds of the constructively fraudulent transfers remain in the Bank of America Account. Records prepared by Pobereskin indicate that she has used the Bank of America Account to engage in five Isbei-related transactions. See generally RX 9. On February 28, 2025, the Bank of America Account received $350,000 from the sale of Isbei stock. Id. On March 3, 2025, Pobereskin lent Isbei $150,000 from the Bank of America Account. Id. On April 14, 2025, the Bank of America Account received a loan repayment from Isbei in the amount of $200,000. Id. Two other loan repayments followed, one for $100,000 on April 25, 2025, and the other for $500,000 on May 15, 2025. Id. Thus, the Bank of America Account has received net transfers of $1 million from Isbei.

Pobereskin has dissipated the proceeds of some of these transfers. After receiving the $350,000 stock sale payment on February 28, 2025, and loaning $150,000 back to Isbei on March 3, 2025, Pobereskin transferred $210,000 -- more than the net proceeds of the sale and loan -- to (i) an account in her name outside Bank of America ($60,000), (ii) an account of Chishti's ($100,000), and (iii) one of the law firms representing Chishti ($50,000). See RX 1 (statement of February 13, 2025, to March 14, 2025). Then, after receiving $300,000 in loan repayments from Isbei on April 14 and 25, 2025, Pobereskin transferred $120,000 to accounts in her name outside Bank of America, as well as $200,000 to Chishti's counsel in Bermuda. See id. (statements of March 15, 2025, to April 15, 2025, through May 15, 2025, to June 12, 2025); Tr. 217:11-23 (Pobereskin testifying that purpose of loan repayments

35

was to assist with payment of Chishti's legal expenses), 218:18-219:5 (similar). These transfers again exceeded the proceeds that Pobereskin received from Isbei and, indeed, left her with an account balance of only $20,499.06 as of May 15, 2025. See RX 1 (statement of May 15, 2025, to June 12, 2025).

Pobereskin did not, however, dissipate the $500,000 that she received from Isbei on May 15, 2025. From that date through the date that the Court entered the TRO, each of Pobereskin's relevant bank statements reflects an ending balance of approximately $1 million or more. See id. (checking account statements of May 15, 2025, to June 12, 2025; June 13, 2025, to July 16, 2025; July 17, 2025, to August 14, 2025; and August 15, 2025, to September 15, 2025 and savings account statement of September 16, 2025, to October 16, 2025); RX 5 (savings account statement of October 17, 2025, to November 12, 2025). Accordingly, TRG-I is likely to succeed in showing that approximately $500,000 of the funds in the Bank of America Account represent the proceeds of Chishti's constructively fraudulent transfers to Isbei.[20]

---

[20] The total amount of proceeds from the transfers that TRG-I is likely to show were fraudulent is less than the balance of the Bank of America Account as of the date the Court entered the TRO. To determine the precise amount of funds as to which TRG-I may be entitled to obtain a turnover order, the Court is likely to apply the so-called "lowest intermediate balance rule," which assumes that, where tainted and untainted funds are commingled in a single account, the potentially tainted funds remain in the account so long as the account's balance does not fall below the amount of the potentially tainted funds. See, e.g., In re Drexel Burnham Lambert Grp., Inc., 142 B.R. 633, 637 (S.D.N.Y. 1992); United States v. Miller, 295 F. Supp. 3d 690, 703-04 (E.D. Va. 2018). The amount of the Court's preliminary injunction, restricting Pobereskin from transferring $1.2 million of the funds in the Bank of America Account, represents the approximate sum of (1) the

## V.    Conclusion

For all the foregoing reasons, the Court concludes that TRG-I is likely to succeed in showing that (1) the transfer of $695,311 that Chishti made into the Bank of America Account on May 30, 2025, is voidable because Chishti acted with the actual intent to defraud TRG-I; and (2) the transfer of approximately $500,000 that Pobereskin received from Isbei on May 15, 2025, represents the proceeds of constructively fraudulent transfers that Chishti made to Isbei in and after 2023. Hence, TRG-I is likely to succeed in obtaining a turnover order in the amount of as much as $1.2 million because TRG-I is likely to be able to demonstrate that its interest in those funds is superior to Pobereskin's. See CPLR 5225(b).

Because there is no meaningful dispute that TRG-I will suffer irreparable harm if it is unable to execute this Court's judgment against any funds that are subject to turnover, the Court granted a preliminary injunction prohibiting Chishti, Pobereskin, and those acting in concert with them from transferring or transacting in $1,200,000 of the funds held in the Bank of America Account. See Citigroup Glob. Mkts., 598 F.3d at 35; ECF No. 123. The Court otherwise denied TRG-I's motion for a preliminary injunction because, at least on the evidentiary record developed to date, TRG-I is unlikely to succeed in showing that Chishti actually controlled the Bank of America

---

actually fraudulent transfer that Chishti made to Pobereskin on May 30, 2025, and (2) the remaining proceeds of the constructively fraudulent transfers that Chishti made in connection with Isbei.

37

Account or that other transfers into that account were actually or constructively fraudulent.

New York, NY  
January 5, 2026

JED S. RAKOFF, U.S.D.J.