UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE RESOURCE GROUP INTERNATIONAL
LIMITED,

        Petitioner,

   -v-

MUHAMMAD ZIAULLAH KHAN CHISHTI,

        Respondent.

25-cv-1021 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

On April 17, 2026, the Court entered a "bottom-line" Order in which it denied in part the motion of petitioner The Resource Group International Limited ("TRG-I") for turnover of the securities of TRG Pakistan Limited ("TRG-P") and Isbei Limited ("Isbei") held in the name of third party Sarah Jennifer Pobereskin, or so much of those securities as would be sufficient to satisfy the outstanding balance of the judgment that this Court entered against respondent Muhammad Ziaullah Khan Chishti. ECF No. 144. In that Order, the Court concluded that the remaining portions of TRG-I's turnover motion presented issues of fact that must be tried to a jury or, with respect to the equitable doctrine of unclean hands, to the Court. Id. The Court firmly scheduled trial in this matter to commence on May 26, 2026. Id. This Opinion sets forth the reasons for the Court's rulings.

I.   Background and Procedural History

TRG-I's turnover motion represents the latest of its attempts to execute on an arbitration award that was entered against Chishti on

1

April 22, 2025. This Court confirmed that award on June 18, 2025, and judgment was entered on June 20, 2025. See ECF Nos. 40-41. The monetary component of the judgment was originally in the amount of $9,053,606.34, see ECF No. 36-1 at 72; it has since accrued substantial post-judgment interest and has been partially satisfied in the amount of $800,000, see ECF No. 123. The substantial balance remains unsatisfied.

The Court presumes familiarity with the underlying facts of this action, as well as its procedural history through December 24, 2025. See generally The Res. Grp. Int'l Ltd. v. Chishti, 814 F. Supp. 3d 467, 471-76 (S.D.N.Y. 2026).

As relevant here, on January 14, 2026, TRG-I moved under Federal Rule of Civil Procedure 69 and CPLR 5225 and 5240 for turnover of the shares of TRG-P and Isbei held in Pobereskin's name. ECF No. 119. After TRG-I filed its motion, the Court authorized TRG-I and Pobereskin to take limited discovery and, among other things, ordered TRG-I to produce to Pobereskin the discovery that TRG-I had received earlier in this action. See Minute Entry, Mar. 16, 2026.

On March 16, 2026, Pobereskin demanded a trial by jury "on all issues related to the Motion for Turnover so triable." ECF No. 126.[1] The parties subsequently agreed that Pobereskin is entitled to a trial by jury on any issue as to which there are material disputes of fact, except that Pobereskin is not entitled to have a jury determine whether

---

[1] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

2

she may invoke against TRG-I the equitable doctrine of unclean hands. The Court adopted the parties' shared view at oral argument held on April 15, 2026. See 4/15/26 Tr. at 2-3.[2]

In the meantime, the parties briefed and submitted voluminous exhibits with respect to TRG-I's motion for turnover. See ECF Nos. 128 ("TRG-I Mem."), 134 ("Opp'n"), 138 ("Reply"). TRG-I's motion was fully briefed on April 9, 2026, and the Court held oral argument on April 15, 2026. See Minute Entry, Apr. 15, 2026. The Court entered its bottom-line Order on April 17, 2026. ECF No. 144.

## II.  Legal Standards

Federal Rule of Civil Procedure 69 permits a judgment creditor to engage in "proceedings supplementary to and in aid of judgment or execution," and it requires that such proceedings "must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Accordingly, TRG-I brings its motion under CPLR 5225(b), which provides a procedure by which a judgment creditor may obtain a court order requiring a person other than the judgment debtor to turn property over to the judgment creditor. TRG-I also invokes Section 273 of New York's Debtor & Creditor Law ("Section 273"), which provides that certain fraudulent transfers by a judgment debtor are voidable as either actually or constructively fraudulent. See N.Y. Debt. & Credit. Law § 273(a)(1)-(2). As neither party disputes, it is well established that "[a] judgment creditor may use Section 5225(b) as the

---

[2] Citations to "Tr." are to the transcripts of proceedings held before this Court on the date indicated in each citation.

means to set aside a transfer made by a judgment debtor to defraud his creditors" if the judgment creditor satisfies the requirements of Section 273. Universitas Educ., LLC v. Nova Grp., Inc., No. 11 Civ. 1590, 2013 WL 6123104, at *8 (S.D.N.Y. Nov. 20, 2013).

A motion for turnover under Rule 69 and related state-law procedures is akin to a motion for summary judgment. See Citibank, N.A. v. Aralpa Holdings Ltd. P'ship, 714 F. Supp. 3d 416, 431 (S.D.N.Y. 2024). Accordingly, a court "may grant summary relief" on such a motion "where there are no questions of fact, but it must conduct a trial on disputed issues of fact on adverse claims." Id. (quoting CSX Transp., Inc. v. Island Rail Terminal, Inc., 879 F.3d 462, 473 (2d Cir. 2018)). As on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, but the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." PACA Tr. Creditors of Lenny Perry's Produce, Inc. v. Genecco Produce Inc., 913 F.3d 268, 275 (2d Cir. 2019). Turnover may be granted without further proceedings, therefore, only where there are no genuine disputes of material fact and where the movant shows that it is entitled to turnover as a matter of law. Major League Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa, S.A., No. 19 Civ. 8669, 2023 WL 2625794, at *3 (S.D.N.Y. Mar. 24, 2023).

The Court discusses in the following sections of this Opinion the specific standards that TRG-I must satisfy in order to obtain relief under CPLR 5225(b) and Section 273, respectively.

4

III. Analysis

TRG-I's motion for turnover presents three independent theories: (1) under CPLR 5225(b), that Chishti actually controls and is entitled to the possession of Pobereskin's shares of TRG-P and Isbei; (2) under Section 273(a)(2), that the shares at issue are the fruit of constructively fraudulent transfers that Chishti made to Pobereskin; and (3) under Section 273(a)(1), that the shares at issue are the fruit of actually fraudulent transfers from Chishti to Pobereskin. Success on any one theory would entitle TRG-I to turnover of the portion of Pobereskin's shares that TRG-I shows are subject to turnover under that particular theory.

Accordingly, the Court discusses each of TRG-I's theories of turnover in turn.

A.    Turnover under CPLR 5225(b)

CPLR 5225(b) "provides for a two-step analysis in determining whether property belonging to a judgment debtor -- but in the possession of a third party -- should be turned over to a judgment creditor." Beauvais v. Allegiance Secs., Inc., 942 F.2d 838, 840 (2d Cir. 1991). At the first step, the statute requires that the judgment debtor "has an interest" in the property the judgment creditor seeks to reach. Id. (quoting CPLR 5225(b)). Then, at the second step, the judgment creditor must establish either that the judgment debtor is "entitled to the possession of such property" or that "the judgment creditor's rights to the property are superior" to those of the third party. Id. (quoting CPLR 5225(b)).

The parties dispute whether TRG-I has satisfied either step of Beauvais. Because the Court has concluded that TRG-I has not satisfied Beauvais' second step, it need not (and therefore does not) reach the parties' arguments as to the first step.

TRG-I primarily contends that Beauvais' second step is satisfied because "a finding of actual control or beneficial ownership sufficient to satisfy the first prong also satisfies this prong." TRG-I Mem. at 18. For this proposition, TRG-I relies on two non-binding decisions, Major League Baseball Properties, supra, and Allstate Insurance Co. v. Mirvis, No. 08 Civ. 4405, 2018 WL 4921631 (E.D.N.Y. Sept. 4, 2018).

Both of TRG-I's cases involve facts materially distinguishable from those of this case. Major League Baseball Properties concerned a defendant that had actual control of funds held in a checking account that was titled in the name of a third-party corporation. See 2023 WL 2625794, at *1. The court concluded that, because the third party "made payments from the [checking] account for the benefit of the [defendant] and at its direction" and because the third party's owner and purported operator testified that she spent barely any time operating the third-party corporation and did not understand its business, the defendant had "actual control" of the checking account and was "able to retrieve the disputed assets." Id. at *5-6. Mirvis, likewise, concerned funds that were held in bank accounts titled in the names of third parties. 2018 WL 4921631, at *11. The defendant wrote the substantial majority of checks and deposit slips associated with certain of those accounts, and on that basis, the court concluded

6

that the defendant had actual control of those accounts. Id. at *11-14.

In contrast to Major League Baseball Properties and Mirvis, this case concerns assets from the ownership of which both Chishti and Pobereskin knowingly benefited. As to the TRG-P shares, the Court has previously found that, sometime in the middle of 2022, Chishti and Pobereskin jointly decided to begin acquiring, in Pobereskin's name, a 10% stake in TRG-P. See The Res. Grp. Int'l, 814 F. Supp. 3d at 474-75. Their plan, if successful, would entitle Pobereskin, under Pakistani law, to call for the election of new directors of TRG-P. To effectuate the plan, Chishti transferred substantial funds for Pobereskin to purchase TRG-P shares; he also directly purchased shares of TRG-P in her name. Id. In total, between September 2022 and September 2023, Chishti transferred some $28 million and some 100,000 TRG-P shares to Pobereskin. See TRG-I Mem. at 3-4. As to Isbei, Pobereskin is and has always been its controlling shareholder and was, for much of the company's existence, its sole director. See The Res. Grp. Int'l, 814 F. Supp. 3d at 474. Isbei's website and certain of its marketing materials have depicted Chishti as Isbei's founder, and Chishti has occasionally referred to himself that way as well. See TRG-I Mem. at 6; Petitioner's Exhibits ("PX") 14-16. Separately, between May 2022 and September 2024, Chishti provided Pobereskin with approximately $14 million with which she purchased debt and equity in Isbei. 12/17/25 Tr. at 64. In April and May 2025, Isbei repaid Pobereskin approximately $800,000 of its outstanding debt to her. See

The Res. Grp. Int'l, 814 F. Supp. 3d at 486.[3] She continues to hold her equity position in Isbei. See id.

Thus, unlike the third parties in Major League Baseball Properties and Mirvis, Pobereskin has benefited, in her own right, from her ownership of the TRG-P and Isbei shares at issue. As she argues and as the Court previously found, the couple formed a joint plan for her to acquire sufficient shares to call for TRG-P board elections. See The Res. Grp. Int'l, 814 F. Supp. 3d at 474-75. Although that plan was intended to benefit Chishti, it was also intended to benefit Pobereskin because the TRG-P shares at issue are and will remain titled in her name. Likewise, as to the Isbei shares, Pobereskin has presented evidence that she is involved in the management of that business. See Opp'n at 6-9; Respondent's Exhibits ("RX") 3-52.[4] Additionally, the Court cannot ignore the fact that Chishti and Pobereskin are married, rather than being commercial joint venturers operating at arms' length,

---

[3] The Court previously held that $500,000 of these repayments likely represented the proceeds of constructively fraudulent transfers executed by Chishti. See The Res. Grp. Int'l, 814 F. Supp. 3d at 486.

[4] TRG-I disputes some of this evidence and argues, among other things, that Pobereskin has served as a mere "front" for Chishti in the operation of Isbei. TRG-I Mem. at 7-8; 4/15/26 Tr. at 15-16. But TRG-I has not shown that Pobereskin lacked involvement in, or familiarity with, Isbei's operations in any manner similar to that of the owner and purported operator of the third party in Major League Baseball Properties. Compare 2023 WL 2625794, at *5-6 (finding, among other things, that owner and purported operator "could not recall any month in which she had spent as much as five hours running the company" and "could not explain" essentials of company's business) with 12/17/25 Tr. at 157-63 (Pobereskin discussing Isbei).

such that a benefit accruing to one spouse is likely to benefit the other spouse as well.

Moreover, even if Pobereskin were similarly situated to the third parties in the cases on which TRG-I relies, the Court is not persuaded by the Major League Baseball Properties court's holding that a judgment debtor's actual control over a third party's assets necessarily means that the judgment debtor is entitled, under CPLR 5225(b), to the possession of such property. That court concluded that, because the judgment debtor was "able to access the funds" at issue, that was tantamount to proof that the judgment debtor could "retrieve the disputed assets." Major League Baseball Props., 2023 WL 2625794, at *6 (quoting Dussault v. Republic of Argentina, 616 F. App'x 26, 27 (2d Cir. 2015) (summary order)).[5] The court's reasoning assumes that a judgment debtor's raw capacity to retrieve disputed assets -- even if by legally impermissible means -- is sufficient to satisfy the second step of Beauvais. That assumption runs contrary to the plain language of CPLR 5225(b), which requires that a judgment debtor must be "entitled to" the possession of the disputed assets, as well as to the Second Circuit's longstanding interpretation of that statute. For instance, in Dussault, the Second Circuit held that the existence of an injunction prohibiting a judgment debtor from retrieving funds from

---

[5] The Court notes that the decision in Mirvis does not contain an analogous holding. Rather, the Mirvis court held primarily that the judgment debtor "actually controlled the disputed funds" without reaching the analytically separate question, under Beauvais, of whether the judgment debtor could retrieve those funds from the third party. See 2018 WL 4921631, at *11-14.

a third party prevented the judgment debtor from being "entitled to the possession" of the funds. 616 F. App'x at 28; see also Ladjevardian v. Republic of Argentina, 663 F. App'x 77, 80 (2d Cir. 2016) (summary order) (similar).

Here, TRG-I contends that Chishti is entitled to the possession of the disputed shares because he had actual control of them or, in the alternative, because Chishti and Pobereskin treated the shares as joint assets. TRG-I Mem. at 19-20. But even assuming, arguendo, that both these premises were true, that would not be sufficient to establish Chishti's legal entitlement to the shares. The shares are in Pobereskin's name, and TRG-I makes no argument that Chishti has the capacity to obtain them from her without her consent. See Reply at 5-6; see also N.Y. Dom. Rel. Law § 50 (providing that spouse's assets are not subject to other spouse's disposal).[6]

For these reasons, the Court concluded that, even assuming that Chishti actually controlled Pobereskin's shares of TRG-P and Isbei, TRG-I has failed to show, as a matter of law, that Chishti is legally

---

[6] TRG-I contends that the Court should not take into account the regime of separate property created by the pre- and postnuptial agreements between Chishti and Pobereskin. On TRG-I's view, those agreements are "not genuine." Reply at 5-6. The Court need not decide whether the agreements are "genuine" -- or, more to the point, whether they have legal effect -- because even assuming that the agreements are somehow without effect, TRG-I has not identified any legal basis on which Chishti could obtain the shares from Pobereskin without her consent.

entitled to the possession of those shares.[7] Thus, the Court denied TRG-I's motion as to its theory of turnover premised on CPLR 5225(b).

B.    Turnover under Section 273

TRG-I argues that turnover of Pobereskin's TRG-P and Isbei shares is independently warranted under Section 273, which, as mentioned, permits a court to void transactions through which a debtor has fraudulently transferred assets. See N.Y. Debt. & Credit. Law § 273(a). Under the statute, transfers may be fraudulent either "actually," where a debtor intends to defraud a creditor, or "constructively," where the debtor engages in transactions beyond the debtor's means. TRG-I contends that the transfers Chishti made in reference to Pobereskin's shares of TRG-P and Isbei are fraudulent in both regards.

1.    Actual Fraudulent Transfer

Under Section 273(a)(1), a transfer may be voided where a debtor "made the transfer . . . with actual intent to hinder, delay[,] or defraud any creditor of the debtor." Section 273(b) provides that "[i]n determining actual intent under [Section 273(a)(1)], consideration may be given, among other factors," to as many as eleven circumstances that are often referred to as "badges of fraud." A creditor seeking relief under Section 273(a)(1) must prove the debtor's actual intent by a preponderance of the evidence. See id. § 273(c). Although the ultimate question is what the debtor's intent actually

---

[7] TRG-I makes no separate argument, and therefore the Court does not express any view, as to whether TRG-I's "rights to the property are superior to those of" Pobereskin. See CPLR 5225(b).

was, nevertheless, "[b]ecause direct evidence of fraudulent intent is often elusive, courts will consider badges of fraud[,] which are circumstances that accompany fraudulent transfers so commonly that their presence gives rise to an inference of intent." Haines v. West, 176 A.D.3d 1619, 1620 (4th Dep't 2019). A defendant's actual intent "is ordinarily a question of fact that will preclude summary judgment," but "where a plaintiff shows by clear and convincing evidence that a defendant had the intent to 'hinder, delay[,] or defraud' creditors . . . , summary judgment will be granted." Jensen v. Jensen, 256 A.D.2d 1162, 1163 (4th Dep't 1998) (collecting cases).

TRG-I argues that the transfers Chishti made to Pobereskin "after or shortly before" he failed to pay a federal tax bill of some $14 million are characterized by seven of the eleven statutory badges of fraud. See TRG-I Mem. at 28-30.[8] While Pobereskin concedes that one, or possibly two, of the badges of fraud are present with respect to Chishti's transfers, she contends that TRG-I has not proven the other badges. See Opp'n at 25-28. Based on the parties' arguments and the evidence that TRG-I has presented in support of its motion, the Court has decided that TRG-I has not shown by clear and convincing evidence that Chishti acted with the actual intent to hinder, delay, or defraud any creditor. However, because a reasonable jury could reach that

---

[8] At oral argument, TRG-I contended for the first time that an eighth badge of fraud, whether "the transfer or obligation was disclosed or concealed," was also present. See N.Y. Debt. & Credit. Law § 273(b)(3); 4/15/26 Tr. at 20-21. Because TRG-I did not refer to this badge of fraud in any of its papers and Pobereskin had no notice prior to oral argument, the Court declines to consider it.

conclusion with respect to one or more of the transfers that Chishti made, the Court has determined that the factual issues related to TRG-I's actual fraudulent conveyance theory must be decided by a jury.

The Court discusses each potentially applicable badge of fraud in turn.

First, there is no doubt, and Pobereskin acknowledges, that the transfers at issue were all made "to an insider" because Pobereskin is, and was at all relevant times, Chishti's spouse. N.Y. Debt. & Credit. Law § 273(b)(1). See Opp'n at 26 n.18; Reply at 11.

Second, the parties dispute whether Chishti "retained possession or control of the property transferred after the transfer." N.Y. Debt. & Credit. Law § 273(b)(2). The parties reiterate their arguments as to whether Chishti actually controlled Pobereskin's shares. See Opp'n at 26; Reply at 11.[9] Each party has proffered credible evidence in support of its position. Among other things, TRG-I points to evidence that Chishti purchased certain of Pobereskin's TRG-P shares in his own name, that he communicated with others as if the shares were his, and that Chishti pledged the shares as collateral for a loan facility under which only he could borrow. TRG-I Mem. at 15-16. As to Isbei, TRG-I primarily relies on evidence that Isbei has held Chishti out as its founder, that Pobereskin has directed Chishti to monitor Isbei's operations for her, that Pobereskin has used proceeds from Isbei to pay Chishti's personal debts, and that Isbei's executives have

---

[9] As discussed above, the Court did not need to resolve these arguments in reference to TRG-I's theory of turnover under CPLR 5225(b).

13

communicated with Chishti as if he, not Pobereskin, has been in charge. Id. at 16-17. Pobereskin, in contrast, asserts that she has allowed Chishti to use her TRG-P shares as collateral and that those shares, however they were purchased, are legally her sole property. Opp'n at 17. She also challenges TRG-I's claims about her role at Isbei, proffering evidence that she has been directly involved in the conduct of that company's business. Id. at 7-9, 17-18. Thus, a jury could reasonably find either that this badge of fraud is present or that it is absent, particularly with respect to the Isbei shares.

Third, the parties disagree as to whether Chishti "had been sued or threatened with suit" prior to making any transfers. See N.Y. Debt. & Credit. Law § 273(b)(4). According to TRG-I, Chishti "faced a tsunami of litigation prior to many of" the transfers. TRG-I Mem. at 28-29. TRG-I bases this argument primarily on the fact that it commenced the arbitration underlying this action on January 12, 2023, and that Afiniti sued Chishti for, among other things, trade secrets violations on February 2, 2023. Id. TRG-I also points to the Notice of Lien concerning Chishti's unpaid tax liability that the Internal Revenue Service ("IRS") delivered to Chishti on February 14, 2024. Id. In response, Pobereskin contends that TRG-I only began seeking an award of the attorneys' fees it incurred in connection with the arbitration in February 2025; that Chishti "had no reason to believe" that the arbitrator would enter a fee award of more than $9 million; and that one of the litigations that Chishti initiated resulted in a monetary judgment in his favor. Opp'n at 26-27. But Pobereskin's arguments

14

largely miss the mark, at least as to the transfers that Chishti made after January 12, 2023, because this badge of fraud concerns the _fact_ or _threat_ of litigation, rather than the entry or potential entry of any specific award or judgment. See N.Y. Debt. & Credit. Law § 273(b)(4). Moreover, TRG-I is correct to point out that the Stock Purchase Agreement ("SPA") underlying the arbitration expressly provides for the payment of attorneys' fees by the losing party, so Chishti was on notice from the commencement of the arbitration that he might be liable to pay TRG-I's attorneys' fees. Reply at 11-12. Accordingly, a reasonable jury could find that this badge of fraud is present for transfers occurring after January 12, 2023, but not for transfers occurring before that date.

Fourth and fifth, two closely related badges of fraud concern whether "the transfer was of substantially all the debtor's assets," N.Y. Debt. & Credit. Law § 273(b)(5), and whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred," id. § 273(b)(9). The parties' arguments with respect to these badges largely track the arguments that they advance with respect to TRG-I's constructive fraudulent conveyance theory, which the Court discusses in the following section of this Opinion. For present purposes, the Court observes that TRG-I's arguments appear to improperly conflate Chishti's many transfers. Even if it is true that Chishti now lacks meaningful assets -- a point Pobereskin disputes, see Opp'n at 27 -- Chishti could only have transferred "substantially all" his assets or "became insolvent" in

15

reference to any transfer that finally depleted his assets, not in reference to earlier transfers that he made when he still had assets remaining. See TRG-I Mem. at 29; Reply at 12. Accordingly, a reasonable jury could find this badge satisfied only in reference to the transfers that Chishti made latest in time.[10]

Sixth, TRG-I contends that "the value of the consideration received" by Chishti was not "reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred" because, as both Chishti and Pobereskin testified, all the transfers at issue were effectively gifts. See N.Y. Debt. & Credit. Law § 273(b)(8); The Res. Grp. Int'l, 814 F. Supp. 3d at 485. Pobereskin attempts to rebut this point by citing a single, non-binding decision that collects cases purportedly standing for the proposition that "indirect benefits of the kind Chishti received" can constitute reasonably equivalent value. Opp'n at 27 (citing In re Akanmu, 502 B.R. 124, 131 (Bankr. E.D.N.Y. 2013)). But not only are the facts of this case substantially distinguishable from situations such as a debtor contributing to the costs of a child's wedding or receiving a reduction in the debtor's own debt by making payments on behalf of a third party, see Akanmu, 502 B.R. at 131, Pobereskin offers nothing more than her own ipse dixit that any "indirect benefits" that accrued to Chishti were reasonably equivalent to the tens of millions of

---

[10] TRG-I implicitly concedes that this badge is not satisfied with respect to Chishti's earlier-in-time transfers because, as TRG-I acknowledges, "he had liquid assets sufficient to pay certain of his debts in April 2023." Reply at 12.

dollars he transferred. See Opp'n at 27. Accordingly, no reasonable jury could find this badge to be absent.

Seventh, and finally, the parties dispute whether Chishti made any of his transfers "shortly before or shortly after a substantial debt was incurred." See N.Y. Debt. & Credit. Law § 273(b)(10). TRG-I argues that Chishti transferred more than $4 million shortly before his $14 million federal tax bill was due, as well as that he transferred at least another $12 million while his debt to the IRS was outstanding. TRG-I Mem. at 30. Pobereskin argues that these transfers are not relevant to this badge of fraud because Chishti "incurred" his federal tax debt in January 2022, when he received nearly $60 million in cash and stock upon redeeming his shares of TRG-I. Opp'n at 27; The Res. Grp. Int'l, 814 F. Supp. 3d at 483. Accordingly, Pobereskin contends, none of the transfers were made "shortly before or shortly after" Chishti incurred his tax debt because Chishti did not begin making the transfers until, at the earliest, the middle of 2022. See Opp'n at 21-22, 27. As the Court discusses below, Pobereskin advances a similar argument in connection with TRG-I's theory of constructive fraudulent conveyance.

Both text and precedent support Pobereskin's arguments. As to the text, this badge of fraud concerns transfers that a debtor makes in close proximity to the time when "a substantial debt was incurred." N.Y. Debt. & Credit. Law § 273(b)(10) (emphasis added). Under the Debtor and Creditor Law, through which New York adopted the Uniform Voidable Transactions Act, "debt" specifically means "liability on a

17

claim," id. § 270(e), while a "claim," as relevant here, means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured[,] or unsecured," id. § 270(c). Accordingly, the IRS acquired a "claim" against Chishti upon the consummation of his redemption transaction in January 2022. See The Res. Grp. Int'l, 814 F. Supp. 3d at 474. The IRS acquired its claim even though its "right to payment" was not yet "liquidated" (because the final amount of Chishti's tax bill for calendar year 2022 was dependent on a further eleven months of events) nor "matured" (because Chishti's tax bill was not due until April 15, 2023). Accordingly, Chishti incurred his "debt" to the IRS in January 2022.

Courts have frequently distinguished between the date on which a tax liability is "incurred" and the date on which "it is payable." E.g., In re Columbia Gas Transmission Corp., 37 F.3d 982, 985-86 (3d Cir. 1994) (collecting cases); In re Garfinckels, Inc., 203 B.R. 814, 819-20 (Bankr. D.D.C. 1996). And in the context of Section 273, specifically, this Court has observed that the statute is not concerned with "old debt" that is scheduled "to come due after" a purportedly fraudulent transfer. In re Nine W. LBO Sec. Litig., 505 F. Supp. 3d 292, 320 n.34 (S.D.N.Y. 2020).[11]

---

[11] This Court's opinion in In re Nine West concerned the predecessor statute to the present Section 273. Below, the Court discusses in greater detail the relationship between the former and present statutes and rejects TRG-I's view that caselaw interpreting former N.Y. Debt. & Credit. Law § 275 is categorically inapplicable to the present Section 273.

Because TRG-I focuses on Chishti's debt to the IRS and does not allege in any detail that Chishti incurred any specific other debts "shortly before or shortly after" he made any of the transfers at issue, a reasonable jury could not conclude, on the record presently before the Court, that this badge of fraud is present. See N.Y. Debt. & Credit. Law § 273(b)(10).

To summarize, the Court has concluded that, of the seven badges of fraud that TRG-I argues are applicable to Chishti's transfers, no reasonable jury could find that one of those badges is present, no reasonable jury could find that two of those badges are absent, and a reasonable jury could find either way with respect to the remaining badges. As a result, and in the absence of any direct evidence of Chishti's intent with respect to any transfer, TRG-I has not shown by clear and convincing evidence that Chishti actually intended to defraud any creditor. TRG-I is only entitled to turnover, therefore, if a jury concludes, by a preponderance of the evidence, that Chishti had such intent. See N.Y. Debt. & Credit. Law § 273(c).

### 2.    Constructive Fraudulent Transfer

Next, Section 273(a)(2) provides that transfers may be voided as constructively fraudulent where a debtor, "without receiving a reasonably equivalent value in exchange for the transfer," either "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur, or believed or reasonably should have believed that the debtor would

incur, debts beyond the debtor's ability to pay as they became due." N.Y. Debt. & Credit. Law § 273(a)(2)(i), (ii). As with Section 273(a)(1), a creditor bears the burden of proving a constructively fraudulent transfer by a preponderance of the evidence. Id. § 273(c).

As an initial matter, TRG-I's papers are not a model of clarity as to whether it is pursuing one or both prongs of Section 273(a)(2). TRG-I's opening brief sets out both prongs of the statute, TRG-I Mem. at 20-21, but focuses on the theory that Chishti made his transfers at a time when he had incurred debts beyond his ability to pay as they came due, id. at 23-26. The opening brief does not contend, in any detail, that Chishti engaged in transactions for which his remaining assets were unreasonably small. That theory emerges only in TRG-I's reply brief, where it argues that "[n]o reasonable juror could fail to find that Chishti's series of transfers would leave him with unreasonably small assets in light of his obligations." Reply at 8-11. While the Court is not obligated to consider arguments raised for the first time on reply, it has the discretion to do so. E.g., Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009). The Court elects to exercise that discretion because TRG-I's opening brief recited both prongs of Section 273(a)(2), but the Court is mindful that Pobereskin has not had the opportunity to respond in writing to TRG-I's arguments under one of those prongs.

Under either prong, the statute first requires TRG-I to show that Chishti made any transfer "without receiving a reasonably equivalent value in exchange." See N.Y. Debt. & Credit. Law § 273(a)(2). TRG-I

argues that this prerequisite is satisfied because Chishti and Pobereskin have acknowledged that he "gifted" her TRG-P shares and funds to purchase TRG-P and Isbei shares. See TRG-I Mem. at 22; 12/17/25 Tr. at 65-66; 12/18/25 Tr. at 288, 309; The Res. Grp. Int'l, 814 F. Supp. 3d at 485. Pobereskin's opposition papers do not address this issue, thereby conceding it.[12]

The Court analyzes TRG-I's arguments under each prong of Section 273(a)(2). It begins with Section 273(a)(2)(ii) because that is where TRG-I chiefly focuses its attention.[13]

a.    Debts Beyond Chishti's Ability To Pay

Under this prong, TRG-I primarily argues that, when Chishti engaged in the challenged transfers, "he knew that he would have more

_____

[12] Pobereskin's failure to contest this component of TRG-I's constructive fraudulent conveyance theory casts further doubt on her arguments, discussed above, that "the value of the consideration received" by Chishti "was reasonably equivalent to the value of the asset transferred." See N.Y. Debt. & Credit. Law § 273(b)(8).

[13] Relevant to both prongs of Section 273(a)(2) is Pobereskin's invocation of the equitable doctrine of unclean hands. According to Pobereskin, TRG-I is barred from contending that Chishti's shares of TRG-P may not be counted among his assets because TRG-I made allegedly false statements to the courts of Pakistan in order to obtain an injunction barring Chishti from selling those shares. See Opp'n at 28-31. Moreover, Pobereskin reasons, TRG-I is estopped from arguing that the allegedly false statements at issue -- specifically, that TRG-I had no knowledge until late 2022 that Chishti had pledged his shares as collateral -- were false because the arbitrator in this action decided otherwise. Id. TRG-I responds that the arbitrator did not conclude that it had actual knowledge of Chishti's pledging and that, in any case, the relevant orders of the courts of Pakistan do not cite TRG-I's statements about its knowledge. The Court reserves judgment on Pobereskin's unclean hands defense until after the conclusion of the jury trial. See infra n.17. For now, however, the Court observes that the arbitrator specifically concluded that "Claimant TRG-I had actual knowledge of Respondent's Transfers." ECF No. 36-1 at 49.

than $10 million in tax liability, a debt that his gifts to his wife would render him unable to pay." TRG-I Mem. at 23. Because there is uncontested evidence that Chishti was aware of his liability to the IRS as early as January 2022, TRG-I argues, any transfers he made from that point forward that he knew or should have known would render him unable to pay his tax bill when it came due on April 15, 2023, are voidable as constructively fraudulent. Id. at 23-24. Specifically, TRG-I contends that, between January and September 2023, Chishti transferred approximately $9.98 million to Pobereskin for the purpose of purchasing TRG-P shares in her name. Id. It then contends that "a substantial majority" of the $14 million that Chishti transferred to Pobereskin for the purpose of investing in Isbei was also transferred after or shortly before Chishti's tax bill was due. Id. Chishti made these transfers, TRG-I argues, without a reasonable expectation of being able to pay "his tax liability, the loan facility for which he had pledged TRG-P shares under his and his wife's names, and mounting legal costs" as those debts came due. Id. at 24-26.

Pobereskin objects to TRG-I's reasoning in three primary respects, which the Court discusses in turn. First, Pobereskin argues that, as a matter of law, Section 273(a)(2)(ii) "requires an allegation not that the transferor intended for old debt to come due after the transfer but that the transferor intended to incur new debt after the transfer." Opp'n at 22 (quoting In re Nine West, 505 F. Supp. 3d at 320 n.34) (emphasis added). According to Pobereskin, the only "new debt" pertinent to TRG-I's constructive fraudulent conveyance theory

is the arbitration award in TRG-I's favor, and she argues that Chishti did not intend to incur that debt because he had no basis to believe that he would lose the arbitration. Id. Because Chishti had already incurred his IRS debt at the time he made the challenged transfers, Pobereskin says TRG-I's reliance on that debt represents a "fatal pleading deficiency." Id.[14]

As mentioned above, this Court has previously held that a party seeking to invalidate a transfer as constructively fraudulent must allege "that the transferor intended to incur new debt after the transfer" and that an allegation "that the transferor intended for old debt to come due after the transfer" is insufficient. In re Nine West, 505 F. Supp. 3d at 320 n.34. TRG-I contends that In re Nine West and the other authorities on which Pobereskin relies have been abrogated by amendments to New York's Debtor and Creditor Law that took effect in 2020. See Opp'n 6-7. To be sure, the amendments in question made at least one change to the requirements applicable to a constructive

---

[14] Pobereskin bases this argument on New York's pleading requirements for a "special proceeding" commenced under CPLR 5225(b). She reasons that, under CPLR 402, TRG-I's "petition" in such a special proceeding must "comply with the requirements for a complaint in an action." See Opp'n at 21 n.14. However, Pobereskin fails to acknowledge that "there is no provision for such a special proceeding under the Federal Rules of Civil Procedure" and that "the Second Circuit has explained that a party" in TRG-I's shoes "need not commence a special proceeding." Major League Baseball Props., Inc., 2023 WL 2625794, at *3. Accordingly, the pleading requirements for special proceedings in state court do not apply when a judgment creditor "proceed[s] by motion under Rule 69(a)." Id. Thus, Pobereskin's citation to AG Worldwide v. Red Cube Mgmt. AG, 01 Civ. 1228, 2002 WL 417251 (S.D.N.Y. Mar. 15, 2002), in which the plaintiff initiated a standalone special proceeding under CPLR 5225 and 5227, is inapposite.

fraudulent transfer claim. The Debtor and Creditor Law's former Section 275 provided that a conveyance is voidable as fraudulent "as to both present and future creditors" where it is made "without fair consideration" and where "the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature." N.Y. Debt. & Credit. Law § 275 (2020). The present Section 273(a)(2)(ii) likewise provides that constructively fraudulent transfers may be voided in reference to both present and future creditors, requires that such transfers must have been made without a debtor's having received reasonably equivalent value, and provides that a creditor may state a claim by showing that a transferor had the subjective intent or belief that he would incur debts beyond his ability to pay. See N.Y. Debt. & Credit. Law § 273(a)(2)(ii). But the present statute permits a creditor to show, as an alternative to demonstrating the transferor's subjective intent or belief, that the debtor "reasonably should have believed" that he would incur debts beyond his ability to pay. Id. That addition does not, however, change the fact that Section 273(a)(2)(ii), like the former Section 275, is a forward-looking provision. That is, it refers to the debts a debtor "will" or "would" incur, not debts that the debtor has already incurred. As a result, Pobereskin is correct that a debtor's transfer is voidable under Section 273(a)(2)(ii) only when, at the time that the transfer is made, the debtor anticipated or should have anticipated taking on further debts. Chishti's liability to the IRS, which, as discussed above, he incurred in January 2022, does not

fall into that category in reference to the transfers Chishti began making later in 2022 or thereafter.[15]

That does not mean, however, that TRG-I's constructive fraudulent transfer claim necessarily fails. TRG-I's opening brief refers to debts that Chishti incurred after he began making the transfers that TRG-I challenges as fraudulent. For instance, TRG-I refers to Chishti's obligation to JS Bank, which offered him a substantial loan facility for which he pledged, as collateral, the TRG-P shares held in Pobereskin's name. See TRG-I Mem. at 12 n.8, 25. TRG-I also refers, albeit in passing, to debts that Chishti incurred to his lawyers. See id. at 21, 25; 4/15/26 Tr. at 18. Accordingly, TRG-I may be able to meet its burden under Section 273(a)(2)(ii) by showing that Chishti made any challenged transfer at a time when he intended, believed, or should have believed that an anticipated debt would be beyond his ability to pay at the time that it came due.

Second, Pobereskin argues that while TRG-I may have established that Chishti did not pay his debt to the Internal Revenue Service at the time it was due, whether he was unable to pay that debt is a

_____

[15] TRG-I relies on a case decided under the present Section 273(a)(2)(ii) for the proposition that "an indication of oncoming insolvency alone is sufficient to make a showing of constructive fraud." Reply at 6 n.6 (citing PowX Inc. v. Performance Sols., LLC, No. 24 Civ. 1389, 2026 WL 592251 (S.D.N.Y. Mar. 3, 2026)). But PowX Inc. does not refer to "oncoming insolvency," let alone hold that an indication of it is sufficient to prove a constructive fraudulent transfer. See PowX Inc., 2026 WL 592251, at *9. Even had the court reached that conclusion, the facts of PowX Inc. are meaningfully distinguishable. There, the debtor liquidated its assets before monetary damages were awarded against it, whereas here, Chishti engaged in the challenged transfers after incurring his tax liability.

25

separate matter. According to Pobereskin, Section 273(a)(2)(ii) requires TRG-I to show that Chishti had a "good indication of oncoming insolvency" at the time of each challenged transfer, not simply that he failed to pay. See Opp'n at 22-24. Although many of the cases that Pobereskin cites for this proposition were decided under the former Section 275, TRG-I does not meaningfully contest Pobereskin's reliance on them. See Reply at 6-7. Hence, and in light of the Court's discussion above, TRG-I may prove its constructive fraudulent transfer theory under the present Section 273(a)(2)(ii) by showing either that Chishti subjectively intended or believed or that he reasonably should have believed that he would be rendered unable to pay his debts.

Several disputes of material fact preclude the Court from concluding that Chishti made any constructively fraudulent transfers under this prong of Section 273(a)(2). Based on charts representing Chishti's assets and liabilities during calendar years 2023, 2024, and 2025 on a monthly basis, Pobereskin contends that Chishti had no indication of oncoming insolvency until the arbitrator in this action entered the fee award against him. See RX 86-88. Pobereskin's charts assume that Chishti's assets included (1) at all relevant times, TRG-P shares worth tens of millions of dollars; and (2) through September 2024, Afiniti shares worth at least $5 million. See id. TRG-I challenges the validity of both assumptions. As to Chishti's TRG-P shares, TRG-I contends that they are not liquid assets because of restrictions imposed by the SPA; that Chishti had no intention to sell them because his and Pobereskin's joint goal was to acquire at least

a 10% stake in TRG-P; that Chishti has admitted that, because of Pakistan's currency controls, the shares are worth only a fraction of their apparent market value; and that Chishti has pledged those shares as collateral for a loan facility under which he has borrowed more than the shares are worth. See Reply at 9-11; TRG-I Mem. at 25-26.[16] The truth of each of these contentions is material to whether Chishti intended or believed, or reasonably should have believed, that his debts were beyond his ability to pay as they became due. Likewise, as to Chishti's Afiniti shares, TRG-I contends that those shares were illiquid at all relevant times and that, by the time Chishti began making the challenged transfers, Chishti had publicly stated his view that "the equity value of that business may now be zero." Reply at 9. Again, the truth of these contentions is material to Chishti's subjective intent or belief or to what he reasonably should have believed. A reasonable jury could reach any number of different conclusions as to the parties' factual disputes, which go to the heart of whether Chishti subjectively had, or objectively should have had,

---

[16] In what Pobereskin styles as a separate objection to TRG-I's constructive fraudulent transfer theory, she contends that Chishti's loan facility is not under-secured. See Opp'n at 24-25. Specifically, Pobereskin contends that Chishti's TRG-P shares have never been worth less than approximately $15.4 million, while the balance of his loan facility has never been more than $13.9 million (and has, since April 2024, been less than $10 million). See id. at 24 n.17. However, when Chishti testified before this Court on December 22, 2025, he represented that the shares were worth "about" $12.5 million. 12/22/25 Tr. at 372. Pobereskin contends that Chishti's testimony about the value of the shares reflected inaccurate assumptions put to him by TRG-I's counsel. Whether Chishti testified accurately is yet another issue of material fact that a reasonable jury could decide either way.

27

any indication of oncoming insolvency. Accordingly, these issues must be decided by the jury.

Third, Pobereskin contends that because Chishti "lacked the subjective intent to incur new debts beyond his ability to pay them," that "is enough to establish, as a matter of law, that Chishti made . . . no constructively fraudulent transfers." Opp'n at 25. This argument, however, reflects a fundamental misunderstanding of Section 273(a)(2)(ii), under which, as the Court has repeatedly discussed, a transfer may be voided as constructively fraudulent where a debtor "should have believed," even if he did not actually intend, that he would be unable to pay his debts as they come due.

To sum up, for the reasons given above, TRG-I's constructive fraudulent transfer claim under Section 273(a)(2)(ii) is limited to those debts that Chishti intended or believed he would incur, or that he reasonably should have believed he would incur, after he made any challenged transfer. For TRG-I to succeed on this prong of its motion as to any particular transfer, the jury would need to conclude, by a preponderance of the evidence, that Chishti had or should have had a "good indication of oncoming insolvency" at the time of that specific transfer. Because Section 273(a)(2)(ii) incorporates both subjective and objective standards, the jury need not determine what Chishti actually intended or believed.

 b.    Unreasonably Small Assets

In contrast to Section 273(a)(2)(ii), which focuses on a debtor's ability to pay future debts, Section 273(a)(2)(i) permits a transfer

to be voided where the debtor receives no reasonably equivalent value and "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."

Interpreting an identically worded provision of Pennsylvania law, the Second Circuit has indicated (although on a non-precedential basis) that Section 273(a)(2)(i)'s phrase "unreasonably small" refers to "a situation where a transaction leaves a debtor technically solvent but doomed to fail." In re Adelphia Commc'ns Corp., 652 F. App'x 19, 21 (2d Cir. 2016) (summary order). "The test for whether assets are 'unreasonably small' focuses on reasonable foreseeability and is satisfied if at the time of the transaction the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future." Id.

Accordingly, TRG-I argues that Chishti made the transfers that enabled Pobereskin to obtain her shares of TRG-P and Isbei despite knowing that the transfers would leave him with unreasonably small assets in light of his obligations, particularly his federal tax bill. Reply at 8-9. TRG-I contends that the "business" or "transaction" at issue under Section 273(a)(2)(i) is the "aggregate" set of transfers that Chishti made to Pobereskin because Chishti purportedly understood that "the first dollars of his transfers were pointless without the last dollars." Id. at 7-8. As the Court noted above, TRG-I did not advance these arguments in its opening brief, so Pobereskin has not had an opportunity to respond to them.

But even had these issues been fully briefed and even had the Court adopted TRG-I's view of Section 273(a)(2)(i), the parties' factual disputes would preclude the Court from granting TRG-I's motion under this prong of the statute. TRG-I's argument that Chishti's "aggregate" transfers would leave him with unreasonably small assets assumes, among other things, TRG-I's view that Chishti's shares of TRG-P and Afiniti were practically worthless at the time that he began making his transfers. See Reply at 7-11. In contrast, on Pobereskin's view of Chishti's financial situation, he was not "technically solvent but doomed to fail" until April 22, 2025, when the arbitrator entered the more than $9 million fee award against him and his liability to the IRS remained outstanding. See Opp'n at 13-16. As the Court discussed above, many of the parties' disagreements as to the particulars of Chishti's financial situation are material to whether Chishti's transfers would leave him with unreasonably small assets. Accordingly, and because a reasonable jury could side with either party, these issues must be decided by the jury.

IV.  Conclusion

For the reasons set forth above, the Court's bottom-line Order of April 17, 2026, denied TRG-I's motion for turnover with respect to TRG-I's theory that Chishti actually controlled Pobereskin's shares of TRG-P and Isbei, as well as ordered a trial on TRG-I's theories that those shares are the fruits of actually and constructively

fraudulent transfers.[17] Trial is firmly scheduled to commence on May 26, 2026, in courtroom 14B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York.

New York, NY
May ___, 2026

JED S. RAKOFF, U.S.D.J.

---

[17] In the event that the jury concludes that Chishti made any fraudulent transfers, the Court will, after holding a separate bench trial, find facts and reach conclusions of law as to Pobereskin's argument that TRG-I's purportedly unclean hands preclude it from obtaining turnover of her assets.

31