UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE RESOURCE GROUP INTERNATIONAL LIMITED,

        Petitioner,

  -v-

MUHAMMAD ZIAULLAH KHAN CHISHTI,

        Respondent.

25-cv-1021 (JSR)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

JED S. RAKOFF, U.S.D.J.:

From May 26 through May 29, 2026, the Court held a bench trial on the motion of petitioner The Resource Group International Limited ("TRG-I") for turnover of certain securities held in the name of third-party Sarah Jennifer Pobereskin, the spouse of respondent Muhammad Ziaullah Khan Chishti. TRG-I's motion arises under Federal Rule of Civil Procedure 69 and CPLR 5225(b), which together provide a procedure by which TRG-I, as Chishti's judgment creditor, may seek an order requiring Pobereskin to turn over property proven to be the fruit of any fraudulent transfers that Chishti made to her.

After trial concluded, TRG-I and Pobereskin each submitted, on June 7, 2026, proposed Findings of Fact and Conclusions of Law. See ECF Nos. 167 (TRG-I), 168 (Pobereskin). The Court has now carefully considered all the evidence received at trial, the closing arguments of counsel, and the parties' post-trial submissions. Herein, the Court sets forth its findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a).

1

At a high level, the Court reaches the following conclusions. First, although TRG-I's conduct in its long-running disputes with Chishti and Pobereskin has not been blameless, Pobereskin has not shown that TRG-I's behavior was so egregious as to establish the equitable defense of unclean hands. Second, TRG-I has established, by a preponderance of the evidence, that twenty-five transfers from Chishti to or for the benefit of Pobereskin, representing a net total of $8,675,075.00, were made with the actual intent to hinder, delay, or defraud Chishti's creditors. Third, as to the remaining twenty transfers at issue, TRG-I has not shown that any of them was actually fraudulent. But TRG-I has shown, by a preponderance of the evidence, that Chishti made two of those remaining transfers, totaling $1,153,507.17, without receiving reasonably equivalent value in exchange and at a time when he reasonably should have believed that he would incur debts beyond his ability to pay as they came due.

Accordingly, the Court hereby concludes that twenty-seven transfers are voidable; grants TRG-I's turnover motion in the amount of $9,828,582.17 or the outstanding balance of TRG-I's judgment against Chishti, whichever is less; and orders the specific relief set forth in Section IV herein.

I.    Relevant Procedural History

TRG-I's turnover motion is the latest sally in its campaign to execute on an arbitration award that was entered against Chishti on April 22, 2025. This Court confirmed that award on June 18, 2025, and judgment was entered on June 20, 2025. See ECF Nos. 40-41. The monetary

2

component of the judgment, primarily representing an award of attorneys' fees pursuant to the parties' arbitration agreement, was initially in the amount of $9,055,364.91. ECF No. 36-1 at 72. On January 28, 2026, TRG-I filed a Notice of Partial Satisfaction of Judgment, recording that $800,000 of the judgment had been satisfied in connection with a settlement of proceedings between TRG-I and Pobereskin that the Court describes in greater detail below. ECF No. 123. At the time of TRG-I's filing, the outstanding balance of its judgment against Chishti, inclusive of post-judgment interest that had accrued through January 26, 2026, was $8,448,629.11. Id. at 1. The judgment has not been further satisfied.[1]

On January 14, 2026, TRG-I moved under Rule 69 and CPLR 5225 for turnover of shares of TRG Pakistan Limited ("TRG-P") and Isbei Limited ("Isbei") held in Pobereskin's name, up to the value of TRG-I's judgment against Chishti. ECF No. 119. After TRG-I filed its motion, the Court authorized TRG-I and Pobereskin to take limited discovery on topics related to TRG-I's motion. Among other things, the Court ordered TRG-I to produce to Pobereskin the discovery materials that,

---

[1] The Court has previously summarized the underlying facts of the dispute between TRG-I and Chishti, albeit in the context of TRG-I's motion for a preliminary injunction with respect to other assets belonging to Pobereskin. See The Res. Grp. Int'l Ltd. v. Chishti, 814 F. Supp. 3d 467, 471-76 (S.D.N.Y. 2026) ("Chishti I"). To whatever limited extent, if any, that the findings of fact contained herein are inconsistent with the facts that the Court preliminarily found at that stage of these proceedings, the findings of fact contained herein control, since they are the product of the more extensive trial that the Court recently held.

earlier in this action, TRG-I had received from various third parties. See Minute Entry, Mar. 16, 2026.

TRG-I and Pobereskin filed briefs and voluminous exhibits seeking and opposing the equivalent of summary judgment on TRG-I's turnover motion. Briefing concluded on April 9, 2026, and the Court held oral argument on April 15, 2026. On April 17, 2026, the Court entered a "bottom-line" Order in which it denied TRG-I's motion in part and concluded that the remaining prongs of that motion presented issues of fact for trial. ECF No. 144. The Court scheduled trial to commence on May 26, 2026. Id. at 3. On May 1, 2026, the Court issued an Opinion setting forth the reasons for the rulings contained in the bottom-line Order. The Res. Grp. Int'l Ltd. v. Chishti, --- F. Supp. 3d ---, 2026 WL 1192716 (S.D.N.Y. May 1, 2026) ("Chishti II").

As to the format of the trial, on March 16, 2026, Pobereskin demanded a trial by jury "on all issues related to the Motion for Turnover so triable." ECF No. 126. TRG-I and Pobereskin subsequently agreed that Pobereskin was entitled to a trial by jury on any issue as to which the Court concluded that material disputes of fact existed, except that Pobereskin was not entitled to have a jury determine whether she could invoke against TRG-I the equitable doctrine of unclean hands. See Chishti II, 2026 WL 1192716, at *1. As to unclean hands, the Court initially indicated to the parties its intention to empanel an advisory jury. See Fed. R. Civ. P. 39(c)(1). However, on May 8, 2026, TRG-I and Pobereskin filed a stipulation in which Pobereskin withdrew her demand for a trial by jury, TRG-I consented

to that withdrawal, and the parties agreed to proceed to a bench trial on all issues remaining for adjudication. ECF Nos. 151, 152.

On May 12, 2026, Pobereskin moved to stay the trial, citing a recent decision of the Pakistan Supreme Court that, in her view, presaged an impending change in TRG-I's corporate governance. See ECF No. 153. The Court denied that motion on May 15, 2026, ECF No. 161, and trial commenced, as scheduled, on May 26, 2026. At the start of trial, the Court adopted the parties' joint pretrial consent order. ECF No. 165 ("JPTO").

Four witnesses testified at trial: Chishti, Pobereskin, TRG-I chief executive officer Mohammed Khaishgi, and TRG-I employee Nadeem Elahi. The Court received into evidence excerpts from the prior deposition testimony of TRG-I chief financial officer Hassan Farooq and TRG-I general counsel Pat Costello. See JPTO § VII. The Court also received thousands of pages of documents into evidence. The evidence included the testimony and some of the documents that the Court had received at the preliminary injunction hearing held in mid-December 2025. See ECF No. 166 (compiling evidence).

Following the close of TRG-I's case, Pobereskin moved for judgment as a matter of law. Tr. at 683.[2] The Court reserved judgment on that motion until after all the evidence had been received and counsel for

---

[2] Citations to "Tr." are to the trial transcript. Citations to "Hr'g Tr." are to the transcript of the preliminary injunction hearing. Except where otherwise indicated, all quotations herein omit citations, internal quotation marks, footnotes, brackets, ellipses, and other such non-substantive alterations in source material.

TRG-I and Pobereskin had made their closing arguments. At that time, the Court denied Pobereskin's motion. Id. at 687, 759-60. As noted above, TRG-I and Pobereskin each submitted proposed findings of fact and conclusions of law on June 7, 2026. See ECF Nos. 167, 168.[3]

## II.  Findings of Fact

After carefully considering the parties' pre-trial stipulations, the evidence received at trial, and the parties' post-trial submissions, the Court makes the following findings of fact.

### A.    Undisputed Facts

The following summary of facts that are not disputed between TRG-I and Pobereskin is largely drawn from the parties' joint pretrial consent order. See JPTO ¶¶ 17-36. The Court hereby adopts all the facts to which the parties therein stipulated.

TRG-I is a holding company that specializes in making investments in software, information services, and technology-enabled service companies. Id. ¶ 20. Chishti is a former chairman of TRG-I, as well as a former chief executive officer of TRG-I's affiliate TRG-P and a former chief executive officer of Afiniti Limited, one of TRG-I's portfolio companies. See id. ¶ 21. Chishti married Pobereskin in

---

[3] The parties' proposed findings of fact and conclusions of law are the primary sources that the Court cites in these findings of fact and conclusions of law. TRG-I's proposed findings of fact and conclusions of law are cited by paragraph number as "TRG-I ¶ _," and Pobereskin's proposed findings of fact and conclusions of law are cited as "Pobereskin ¶ _." The numbering of Pobereskin's proposed findings of fact restarts on page 23 of her filing. See ECF No. 168 at 23. For the avoidance of doubt, the Court cites as "Pobereskin ¶ *_" the paragraphs that appear on or after that page.

December 2020, and the couple, who now reside in Puerto Rico, have remained married at all times relevant to these proceedings. Id. ¶ 22; see Chishti I, 814 F. Supp. 3d at 473.[4]

In 2005, Chishti, TRG-I, and others -- including an investment fund affiliated with American International Group ("AIG") -- executed a Preferred Stock Purchase Agreement (the "SPA") that contained, among other things, provisions governing the circumstances in which Chishti could transfer, pledge, or otherwise transact in his shares of TRG-I and TRG-P. See JPTO ¶¶ 1, 18. Specifically, the SPA prohibited Chishti from effecting any "Transfer" -- defined as "any sale, assignment, transfer, pledge, hypothecation, give away, or any other disposition of or encumbrance upon" his TRG-I and TRG-P shares -- without the prior written consent of the AIG investment fund. See PX 126 ("Final Award") at 9-12.[5]

In 2021, Chishti stepped down from his roles at TRG-I, TRG-P, and Afiniti in the wake of widely publicized accusations of sexual harassment and sexual assault. See Chishti I, 814 F. Supp. 3d at 473-74. Shortly thereafter, Chishti and certain entities related to him entered into a series of agreements with TRG-I through which, among

---

[4] At the preliminary injunction stage, the Court made preliminary findings of fact regarding Chishti's and Pobereskin's relationship and marriage, the pre- and post-nuptial agreements into which they entered, and related matters. See id. at 473-75. Pobereskin does not challenge those findings, and the Court hereby adopts and incorporates them by reference.

[5] At all relevant times, PineBridge Investments managed the AIG investment fund. See TRG-I ¶ 173, 338.

7

other things, Chishti redeemed a total of approximately 14 million shares of TRG-I's common and preferred stock for net proceeds of approximately $33.5 million in cash and approximately 1.7 million shares of IBEX, a TRG-I portfolio company that is listed on the NASDAQ. See JPTO ¶¶ 24-28.

On January 6, 2023, TRG-I filed the litigation known as Suit 19 of 2023 ("Suit 19") in Pakistan's Sindh High Court, which sits at Karachi. Id. ¶ 29. Suit 19 sought an injunction in aid of arbitration against Chishti, Pobereskin, four of their lenders, and various Pakistani regulatory authorities that would, among other things, declare that the financial institutions to which Chishti and Pobereskin had pledged their shares of TRG-P were unable to retain those shares as collateral, as well as declare that the SPA barred Chishti and Pobereskin from creating any third-party interests in those shares. See id. The pleading in Suit 19 was verified by Elahi. Id.

On January 12, 2023, TRG-I initiated the arbitration underlying these proceedings, alleging chiefly that Chishti had breached the SPA by selling and pledging his shares of TRG-I and TRG-P without obtaining AIG's consent. Id. ¶ 30; see also The Res. Grp. Int'l Ltd. v. Chishti, 2025 WL 1725454 (S.D.N.Y. June 18, 2025) (confirming arbitration award); 794 F. Supp. 3d 234 (S.D.N.Y. 2025) (denying motion for reconsideration), aff'd, 2026 WL 1480419 (2d Cir. May 27, 2026).

On August 31, 2023, TRG-I filed the litigation known as Suit 1445 of 2023 ("Suit 1445") in the Sindh High Court, in which TRG-I sought a further injunction in aid of arbitration that would declare invalid

certain transfers of TRG-P securities from Chishti to third parties and restrain Chishti and Pobereskin from transferring or creating any third-party interests in their TRG-P shares until the arbitration had concluded. JPTO ¶ 31. Elahi, again, verified the pleading in Suit 1445. Id.

TRG-I's turnover motion concerns the shares that Pobereskin holds in TRG-P and in Isbei, a company incorporated in the Cayman Islands that provides services related to artificial intelligence, marketing, and finance. See id. ¶ 32. Pobereskin has been Isbei's controlling shareholder since its inception and was, from Isbei's founding on March 28, 2022, through September 16, 2025, its sole director. Id. ¶¶ 32-34.

Specifically at issue on TRG-I's turnover motion are forty-five transfers that Chishti made to or for the benefit of Pobereskin. Id. ¶ 35. Summarized briefly, and expressed in U.S.-dollar valuations on which the parties agree, those transfers are as follows:

| Date | Recipient | Amount |
|------|-----------|--------|
| April 14, 2022 | ghSMART | $2,777,704.08 |
| May 19, 2022 | Isbei | $2,500,000.00 |
| September 1, 2022 | Isbei | $2,500,000.00 |
| September 15, 2022 | Pobereskin[6] | $2,425.262.40 |

---

[6] The parties did not stipulate that all but two of the challenged transfers that Chishti made directly to Pobereskin were for the purpose of enabling her to purchase shares or futures of TRG-P, but Pobereskin acknowledges that those transfers were made for that purpose. See Pobereskin ¶¶ 45, 53, 61, 69, 77, *1, *9, *17, *25, *49, *57, *65, *81, *124, *145, *152. The sole exceptions to the rule that Chishti's

9

| September 16, 2022 | Pobereskin | $3,368,420.00 |
| September 19, 2022 | Pobereskin | $1,696,355.00 |
| September 20, 2022 | Pobereskin | $1,616,673.17 |
| September 20, 2022 | Pobereskin | $777,707.69 |
| October 4, 2022 | Pobereskin | $21,618.60 |
| October 4, 2022 | Pobereskin | $4,212,372.00 |
| October 28, 2022 | Pobereskin | $527,628.88 |
| December 30, 2022 | Pobereskin | $478,998.90 |
| January 6, 2023 | Isbei | $700,000.00 |
| January 17, 2023 | Pobereskin | $546,447.50 |
| February 2, 2023 | Isbei | $750,000.00 |
| February 22, 2023 | Pobereskin | $1,045,947.01 |
| March 6, 2023 | Pobereskin | $1,281,259.98 |
| March 7, 2023 | Isbei | $720,000.00 |
| March 21, 2023 | Pobereskin | $5,434,584.93 |
| April 12, 2023 | Isbei | $700,000.00 |
| May 2, 2023 | Isbei | $70,000.00 |
| May 18, 2023 | Isbei | $750,000.00 |
| June 15, 2023 | Isbei | $602,075.00 |
| June 23, 2023 | Pobereskin | 100,000 TRG-P shares |
| June 27, 2023 | Pobereskin | $524,475.00 |

---

transfers to Pobereskin were for the purpose of obtaining TRG-P shares are (1) the transfer that Chishti made to Pobereskin on January 17, 2023, which was for the purpose of investing in Isbei, id. ¶ *41, and (2) the transfer that Chishti made to Pobereskin on May 30, 2025, the purpose of which the parties dispute, id. ¶¶ *265-266.

| | | |
|---|---|---|
| July 17, 2023 | Isbei | $720,000.00 |
| August 16, 2023 | Isbei | $700,000.00 |
| September 21, 2023 | Pobereskin | $276,828.02 |
| September 22, 2025 | Pobereskin | $876,679.15 |
| October 30, 2023 | Isbei | $100,000.00 |
| November 30, 2023 | Isbei | $640,000.00 |
| January 5, 2024 | Isbei | $440,000.00 |
| February 13, 2024 | Isbei | $300,000.00 |
| March 18, 2024 | Isbei | $214,000.00 |
| April 22, 2024 | Isbei | $200,000.00 |
| May 20, 2025 | Isbei | $200,000.00 |
| June 20, 2024 | Isbei | $200,000.00 |
| July 22, 2024 | Isbei | $219,000.00 |
| September 9, 2024 | Isbei | $200,000.00 |
| September 26, 2024 | Isbei | $200,000.00 |
| November 12, 2024 | Isbei | $200,000.00 |
| December 17, 2024 | Isbei | $210,000.00 |
| January 21, 2025 | Isbei | $150,000.00 |
| February 27, 2025 | Isbei | $10,000.00 |
| May 30, 2025 | Pobereskin | $695.311.41 |

See generally ¶ 35. The total value of the transfers exceeded $40 million. See id.

11

B.    Chishti's Transfers

These forty-five transfers -- all of which were made after Chishti resigned his positions with TRG-I and its affiliate entities and while he was unemployed, see Tr. at 340-41 -- may broadly be divided into three categories. The Court addresses each in turn.

First, Chishti made seventeen transfers for the purpose of acquiring TRG-P shares and futures for Pobereskin. All the transfers to Pobereskin that are listed above fall into this category, except the transfers that Chishti made on January 17, 2023, and on May 30, 2025. See supra, n.6. The purpose of the transfers in this category was to accomplish Chishti's ambition of regaining control of TRG-I and its affiliates.

As noted above, Chishti resigned from his positions at TRG-I, TRG-P, and Afiniti in November 2021, after the accusations of sexual misconduct against him became public. See Tr. at 73-74, 471-73. However, within weeks of tendering his resignations, Chishti came to believe that his successors in management at TRG-I, TRG-P, and Afiniti were endangering the companies' prospects and needed to be replaced. Id. at 75. Accordingly, in January 2022, Chishti put his name and the names of several of his associates forward for election to TRG-P's board. Id. at 76, 472-74. But their candidacies failed because, among other reasons, Chishti was under a contractual obligation to vote his own shares in favor of candidates nominated by PineBridge. Id. at 473-74. PineBridge did not support the candidacies of Chishti and his associates because it took the position that any further association

12

with Chishti would be detrimental to the success of TRG-P and its affiliated enterprises. Id. at 474.

In the wake of the January 2022 board elections, Chishti and Pobereskin developed a plan for Pobereskin to acquire at least a ten-percent stake in TRG-P, which, under Pakistani securities law, would entitle her to call for the election of new directors. Tr. at 126, 387; see Chishti I, 814 F. Supp. 3d at 474-76. Between September 2022 and September 2023, Chishti transferred more than $26 million for the purpose of acquiring TRG-P shares and futures in Pobereskin's name. See JPTO ¶ 35.[7] In many instances, Chishti transferred funds to Pobereskin's bank account, transferred those same funds to her brokerage account, and then acquired TRG-P shares in her name. See, e.g., PX 380. Pobereskin's brokers were the same as Chishti's, see Tr. at 385, and there is ample evidence that Chishti directed much, if not all, of the trading activity in Pobereskin's name, see Hr'g Tr. at 69, 124, 340-42.

While the primary goal of Chishti's and Pobereskin's plan was to obtain for her a ten-percent stake in TRG-P, Chishti testified that "the plan was to acquire not just ten percent, but, between us, have the maximum possible shares." Tr. at 130, 143. It was necessary for

---

[7] There is no dispute that, in addition to purchasing shares of TRG-P on the ready market, Chishti also engaged in "leveraged transactions" in which he purchased futures of TRG-P in Pobereskin's name. Tr. at 141-43. For purposes of Chishti's and Pobereskin's plan to call for TRG-P board elections, futures do not count toward Pobereskin's stake in that company. For purposes of assessing TRG-I's turnover motion, however, the Court does not distinguish between transfers involving the purchase of shares and those involving the purchase of futures.

13

Pobereskin to acquire at least ten percent, however, because she would only be able to call for board elections if her holdings passed that threshold. Id. at 143, 306-07.

Chishti and Pobereskin chose to structure the transfers as gifts, rather than loans. Both testified that Pobereskin did not have a "risk appetite" to borrow from Chishti the funds necessary to purchase the desired quantity of TRG-P shares. Tr. at 131, 408-10. However, on at least one occasion, Chishti and Pobereskin contemplated structuring a transaction as a so-called "non-recourse loan," meaning a loan in which Pobereskin would benefit from any appreciation in the value of the shares but would not be exposed to downside risk. See id. at 409-10. But no evidence at trial showed that Chishti and Pobereskin in fact executed the draft loan agreement along these lines that they prepared. See id. at 455-59; PX 512.

Chishti primarily funded his gifts to Pobereskin by drawing down on loan facilities that he maintained at JS Bank. Tr. at 142-43, 387-88. As collateral for these facilities, Chishti pledged his approximately 88 million shares of TRG-P, along with approximately four million shares of TRG-P owned by Pobereskin. See id. at 387; Hr'g Tr. at 296-97, 376. In May 2026, JS Bank foreclosed on the bulk of Chishti's TRG-P shares. Tr. at 61-62. His remaining TRG-P shares, which number approximately four million, remain pledged with another lender. See Tr. at 126.

Second, Chishti made twenty-six transfers for the purpose of investing in Isbei in Pobereskin's name. All of the transfers to Isbei

14

listed in Section II.A, supra, fall into this category, as does the transfer that Chishti made to Pobereskin on January 17, 2023.

Isbei Limited, a Cayman Islands corporation, was formed on March 28, 2022, with Pobereskin as its sole investor. Hr'g Tr. at 55, 226; see Chishti I, 814 F. Supp. 3d at 474. Chishti initially gave Pobereskin $5 million to invest in Isbei, Tr. at 343, and between May 2022 and February 2025, he gave her a total of approximately $14 million (inclusive of the $5 million initial investment) for that purpose, id. at 345.

Chishti represented to Isbei's prospective investors that he had committed at least $10 million to the company. On April 7, 2022, at a time when Pobereskin was the only investor in Isbei, Chishti emailed a prospective investor that the "capital committed so far" was $10 million. PX 79; see Tr. at 166, 343-44. On June 19, 2023, in a summary prepared for another potential investor, Chishti noted that his "family office" had "invested $10m to date" in Isbei, with a "commitment for further $5m." PX 99; see Tr. at 162. In light of these representations by Chishti and his testimony at trial, the Court finds that Isbei, which has yet to turn a substantial profit, has required continued investment to remain a going concern. See id. at 146, 342-43.

Not only was Chishti actively involved in Isbei's formation, he has been actively involved in its operations. As Pobereskin testified, he, not her, is expert in Isbei's business model and technology. Id. at 345. She testified that Chishti is an "unpaid advisor" to Isbei, id. at 346, but the evidence indicates that his role is and has been

15

far more substantial than that. Chishti has represented himself as Isbei's "founder," including in correspondence with prospective investors and government officials. E.g., PX 55-57, 82, 85-86, 96, 99. Isbei's investment presentations have showcased Chishti as the company's founder, whereas those presentations have made no reference to Pobereskin at all. See PX 55-56; Tr. at 152-54. Moreover, Chishti has attempted to persuade former employees of Afiniti to join Isbei, see PX 106; he extended a job offer to a candidate for the role of Isbei's chief executive in China, see PX 82, Tr. at 171; and he has advertised open roles at Isbei via at least one of his social media accounts, see PX 142; Tr. at 171-73. Further, Chishti has routinely corresponded with Isbei employees as if he were a key decision-maker. For instance, Chishti directed one of Isbei's affiliates to incorporate a wholly-owned subsidiary of Isbei in Canada. See PX 106; Tr. at 347.[8]

In contrast with Chishti's role at Isbei, Pobereskin's has been limited. Prior to investing in Isbei, Pobereskin had never invested in a startup with operations in China, and she testified that her approach to investing is generally "risk averse." Tr. at 35, 329, 345-46, 400-01. Moreover, evidence introduced at trial indicates that Pobereskin has repeatedly turned to Chishti for guidance as to whether

---

[8] In September 2025, after the latest of the transfers at issue in these proceedings, Isbei expanded its board to include five directors in addition to Pobereskin. See PX 72. A majority of the new directors have family or business relationships with Chishti: three are former employees of companies where Chishti served as the chief executive officer, and a fourth is Chishti's half-brother. See Tr. at 366-67. Pobereskin was unable to describe the background of the fifth new director, stating only that he is "another investor." Id. at 367.

16

she should approve contracts and transactions on behalf of Isbei. E.g., PX 60, 67, 90; Tr. at 361-64. In July 2024, for instance, she forwarded an email to Chishti, writing, "Hi Love – are you keeping an eye on and responding to these emails from my gmail account? I'd appreciate it if you do I don't know what should be approved or not!" PX 67 at 1. Chishti responded in the affirmative. Id. The deposition that Pobereskin gave in the underlying arbitration indicated that she was unfamiliar with many details of Isbei's operations. See Tr. at 353-60. At trial, similarly, Pobereskin appeared uncertain about some of Isbei's finances and operations, such as the details of a $20 million transaction that Isbei contemplated entering into with JS North Asia Investment Limited. See id. at 368-72.

Third, Chishti made two transfers that were not related to either TRG-P or Isbei. On April 14, 2022, Chishti transferred more than $2.77 million to Pobereskin's employer, ghSMART, to facilitate Pobereskin's exercise of an option to purchase equity in that company. See Chishti I, 814 F. Supp. 3d at 472. The Court discussed this transfer at length in connection with TRG-I's motion for a preliminary injunction, see id. at 471-75, and hereby incorporates its prior findings by reference. Then, on May 30, 2025, Chishti transferred $695,311.41 to one of Pobereskin's accounts at Bank of America. See id. at 476. The Court also incorporates by reference its prior findings as to this transfer. Specifically, the sum that Chishti transferred "represented substantially all of Chishti's liquid United States assets at the time." Id. Although Chishti and Pobereskin both testified that the

17

transfer constituted "a repayment of certain amounts that [Pobereskin] had paid on Chishti's behalf to his lawyers and other professionals," the Court did not -- and now, for the same reasons, still does not -- find that explanation credible. See id.

C.   Chishti's Financial Condition

The Court received at trial voluminous bank and investment records detailing Chishti's assets and liabilities between April 2022 and May 2025, the period when he made the challenged transfers. The parties agree on certain aspects of Chishti's financial condition, but they disagree as to others.

1.   Assets

The parties agree on the value of the assets that Chishti held in bank and brokerage accounts at institutions in the United States and Bahrain. Therefore, the Court hereby incorporates by reference the recitation of the balances of those accounts set forth in the parties' submissions. See Pobereskin ¶¶ 31-84, *1-259; TRG-I, App'xs C-I.

However, TRG-I and Pobereskin vigorously dispute the value of two of Chishti's primary assets: his shares of TRG-P and his shares of Afiniti. Accordingly, the Court addresses those assets in detail.

TRG-P Shares. As to Chishti's shares of TRG-P, TRG-I urges the Court to adopt the valuation given by Chishti's accountants in a "Statement of Financial Condition" dated March 6, 2019. TRG-I ¶ 507. That statement valued the approximately 84.8 million shares of TRG-P that Chishti then held at approximately $1.2 million. PX 7 at 5, 7; TRG-I ¶¶ 168-169. The statement noted that the valuation reflected a

18

steep discount from the shares' then-current market value of approximately $13.6 million because of the restrictions that the SPA imposed on Chishti's ability to transfer the shares without AIG's written consent. PX 7 at 7. TRG-I contends that the Court should accept the accountants' valuation of these securities because (1) Chishti adopted the accountants' valuation when he testified at the underlying arbitration in September 2024, and (2) the SPA's restrictions on Chishti's ability to transfer his shares were the same in 2019 as they were between 2022 and 2025. See TRG-I ¶¶ 171-174, 507.

Pobereskin argues that Chishti's years-old financial statement should not dictate how the Court values his TRG-P shares during the period at issue. Pobereskin ¶ 5. Rather, she contends, the Court should treat Chishti's shares as having their full market value throughout that period because (1) the arbitrator authorized Chishti to "freely sell" the TRG-P shares that he acquired between October 4, 2005, and October 10, 2022, id. ¶ 2; (2) Chishti sold and pledged his shares at or near market price until TRG-I obtained the injunctions in Suits 19 and 1445, id. ¶ 3; and (3) JS Bank, to which Chishti pledged his shares, valued his shares at their market price even after being informed of the restrictions that the SPA imposed on Chishti's ability to transfer the shares, id. ¶ 4.

The Court agrees with Pobereskin that the value of Chishti's TRG-P shares on December 31, 2018, is not dispositive of the value that they held during the period from 2022 through 2025. But the Court agrees with TRG-I that it is not appropriate to value those shares at

19

their full market price because of both the restrictions imposed by the SPA and the injunctions entered by the Pakistani courts.[9] Accordingly, the Court values Chishti's TRG-P shares by discounting their market price at any given point in time by the same proportion that Chishti's accountants discounted their market price as of December 31, 2018, i.e., approximately 91.2%.[10] As an illustration, TRG-P's share price on December 31, 2024, was 70.67 Pakistan rupees. Under the Court's analysis, each of Chishti's shares as of that date was worth 5.83 rupees, or, at that day's exchange rate, just over two United States cents.

Afiniti Shares. The parties also dispute the value of Chishti's Afiniti shares. TRG-I contends that the Court should treat these shares as worthless during the entire period at issue. See TRG-I ¶¶ 239-293. In support of this view, TRG-I makes several arguments. First, TRG-I points out that Chishti's shares of Afiniti were common shares, meaning

---

[9] The arbitrator granted Chishti an equitable "carve out" from the SPA's restrictions on his ability to transfer the shares of TRG-P that he acquired between October 4, 2005, and October 10, 2022. See Final Award at 58-59. However, that carve-out came into effect only upon the issuance of the arbitrator's merits award ("Partial Final Award") on February 4, 2025, and thus did not affect the value of Chishti's shares prior to that date. Additionally, because Chishti sold and repurchased all of his TRG-P shares as part of a transaction dated November 19, 2024, he held no shares that were subject to the carve-out on the date the arbitrator entered the Partial Final Award. See TRG-I ¶ 174 n.6.

[10] As noted above, Chishti owned approximately 88 million shares in TRG-P of December 18, 2025. TRG-I ¶ 229. JS Bank foreclosed on nearly all those shares in May 2026. Id. ¶ 230; Tr. at 61. There is insufficient evidence in the record for the Court to find the exact number of shares that Chishti owned on specific dates from 2019 through late 2025.

that, if Afiniti were sold or another "liquidity event" occurred, they would be redeemed only after the company's debt and preferred shares. Id. ¶¶ 242-245. According to TRG-I, Chishti never believed that Afiniti had a value high enough that he stood to receive any payment in connection with common shares. Id. ¶¶ 245-246. Second, TRG-I contends that Chishti "saw Afiniti's bankruptcy coming" in late 2021 and continued to hold that view until Afiniti announced its restructuring on September 20, 2024. Id. ¶¶ 248-264. Thus, according to TRG-I, Chishti himself valued the shares at zero. Third, TRG-I argues that Chishti's shares were subject to various restrictions on their transfer or sale that substantially reduced any value they might have had, and there is no evidence that Chishti could have found a willing buyer for them had he tried. Id. ¶¶ 267-272.

For her part, Pobereskin argues that Chishti's Afiniti shares held value at all times prior to the announcement of Afiniti's restructuring. Pobereskin ¶¶ 6-12. Pobereskin points to testimony by herself and Chishti in which they explained that Chishti's past statements about Afiniti's lack of value reflected a lack of confidence in the managers who succeeded him, rather than in Afiniti's underlying business model. Id. ¶ 7. Pobereskin also relies on two third-party sources: (1) a valuation of Afiniti carried out by the professional services firm Grant Thornton in November 2023, id. ¶ 8, and (2) the valuation of Afiniti reflected on TRG-I's own balance sheet for 2023, id. ¶ 9. Finally, Pobereskin contends that Khaishgi's testimony that

21

Afiniti lacked value was self-serving and contradicted by contemporaneous documents. Id. ¶¶ 10-11.

The Court finds that the documentary evidence more accurately reflects Afiniti's value than any testimony offered by Chishti, Pobereskin, or Khaishgi. That is not only because each witness was plainly biased but also because Grant Thornton's report and TRG-I's balance sheet were prepared roughly contemporaneously with the valuations that they reflect. Moreover, Grant Thornton's report reflects the analysis of an independent third party. For these reasons, the Court adopts Grant Thornton's valuation of $4.23 per share "of common stock on a minority, non-marketable basis." RX 111 at 3. As this language indicates, the valuation reflects a discount -- 29% -- for lack of marketability. Id.; see also id. at Scheds. 1, 8.

Conflicting evidence was introduced at trial about the number of Afiniti shares that Chishti held. Compare RX 30 at 3 n.vii (3,021,975 shares) with PX 7 at 3 (2,564,927 shares); Tr. at 236 ("[a] little under 4 million" shares), 251 ("[a]pproximately 4 million shares"). In the absence of conclusive documentary evidence, the Court finds that Chishti held 3,021,975 shares of Afiniti during the period from his first transfer to Pobereskin to the date of Afiniti's bankruptcy. At Grant Thornton's discounted valuation of $4.23 per share, the Court concludes that Chishti's Afiniti shares were worth $12,782,954.

### 2. Liabilities

The parties agree on the amounts of the debts that Chishti owed to the Internal Revenue Service ("IRS") and to JS Bank. See generally

Pobereskin ¶¶ 31-84, *1-259; TRG-I, App'x B (rows 1, 15-18, 22-27, 29-36, 39-41, 46-49, 51-59, 61, 64-65, 69-71, 76-77, 80, 86, 99-102, 106-07). They also agree that Chishti received numerous invoices for legal services between 2022 and 2025. See TRG-I ¶¶ 15-26; Pobereskin ¶¶ 13-16. They disagree, however, as to what factual conclusions the Court should draw in connection with these liabilities.

IRS Liability. As the Court previously held, Chishti incurred a debt to the IRS upon the consummation of his redemption transactions in early 2022. See Chishti II, 2026 WL 1192716, at *6-8. The liquidated amount of that debt, which was due on April 15, 2023, was $10,301.648.42. TRG-I, App'x B (row 1). It is undisputed that Chishti did not pay the IRS on April 15, 2023, and that he had not satisfied his debt to the IRS as of the date of trial. See Tr. at 77.[11] On March 9, 2024, Chishti filed with the IRS a "Request for a Collection Due Process or Equivalent Hearing," in which he sought a determination of hardship that would forestall collection proceedings. PX 45 at 27-28; Tr. at 82. Neither in that request nor in his subsequent communications with the IRS did Chishti fully disclose his liquid assets, including his holdings of shares of IBEX and the cash that he maintained in foreign bank accounts. See PX 44-45; Tr. at 87.

---

[11] Chishti testified that he requested and obtained an extension of time to file his federal tax return for tax year 2022. Tr. at 282-83. But an extension of time to file a return does not, as a matter of law, defer the date on which Chishti's tax payment was due. See Internal Revenue Service, Topic No. 304, Extensions of Time To File Your Tax Return, https://www.irs.gov/taxtopics/tc304. Nor, for that matter, have Chishti's subsequent attempts to avoid IRS collection activities deferred the due date of his tax payment. See id.

Then, on April 23, 2025, Chishti filed with the United States Tax Court a petition disputing the IRS's determination with respect to collection activities against him. PX 44. In that petition, Chishti represented that he previously worked for TRG-P, then left "the company" in 2022 and subsequently "received a redemption of stock by which he received shares in the company worth approximately $50 million." Id. at 4. He also represented that Pakistani court orders prohibited him from "sell[ing] enough of his shares in the company in order to pay off his income tax liability." Id. at 5. As the Court has previously observed, these statements "were at least ambiguous, if not affirmatively misleading," because Chishti used the term "company" to refer interchangeably to TRG-P and IBEX and because he failed to disclose that he received IBEX stock that was not subject to any court order or other restriction. See Chishti I, 814 F. Supp. 3d at 485 n.19. Moreover, Chishti did not acknowledge to the IRS that he had pledged his TRG-P shares as collateral to JS Bank or other lenders, that he had transferred more than $40 million to Pobereskin, or that he had transferred $2 million to his mother, all after incurring the tax liability at issue. See TRG-I ¶¶ 92, 95-96. Pobereskin does not deny that Chishti failed to disclose these facts to the IRS.

Separate from the liability to the IRS that Chishti incurred in connection with tax year 2022, Chishti conceded at trial that he has also not paid his federal taxes, including "further interest and penalties," for tax years 2023 and 2024. See Tr. at 77. However, there is no evidence before the Court as to the amount of those unpaid tax

bills or, given that Chishti was unemployed in those years, the nature of the taxable events that they reflect.

Attorneys' Fees. Chishti has engaged a wide range of lawyers in the United States, United Kingdom, Pakistan, and other jurisdictions. At trial, the Court received into evidence numerous invoices for legal services. At a high level, this evidence reflects Chishti's regular payment of such invoices through approximately mid-November 2023, when he began to pay some invoices only in part. See TRG-I, App'x B (starting at row 110). Beginning in January 2024, Chishti began leaving invoices from some law firms entirely unpaid while still paying other firms in whole or in part. See id. (starting at row 116). Chishti's pattern of nonpayment intensified in the summer of 2024, when he began leaving hundreds of thousands of dollars of attorneys' fees unpaid. E.g., id. (starting at row 145). Chishti testified that he presently owes more than $2 million to the Pakistani firm Bawaney & Partners, see Tr. at 91-94; $1 million to the United States firm Cozen O'Connor, see Tr. at 99-100; and approximately one million pounds to the British firm Michelmores, see id. 100-01. In March 2025, the law firm of Brown Rudnick sued Chishti and Pobereskin in federal court for more than $3 million in unpaid fees. See Tr. at 95-96. Chishti ultimately settled with Brown Rudnick and granted the firm a charging lien. Id. Chishti testified that his debt to Brown Rudnick had been "rescheduled" to late May 2026. Id.[12]

---

[12] This paragraph is not intended as an exhaustive accounting of Chishti's present liabilities to providers of legal services. See TRG-

25

Pobereskin acknowledges that Chishti failed to pay Brown Rudnick by the end of March 2025. Pobereskin ¶ 16. As to Chishti's other debts to law firms, Pobereskin contends that the "invoices that TRG-I did introduce at trial, and which counsel for both parties actually discussed with witnesses," reflected "Chishti's regular payment of all debts incurred from the beginning of the transfer period through early 2025." Id. ¶ 14. Pobereskin does not deny, however, that Chishti testified to having other unpaid legal bills.

D.    TRG-I's Litigation Activities

Because Pobereskin has asserted the equitable defense of unclean hands, the Court turns, finally, to facts concerning TRG-I's conduct.

As mentioned above, Pobereskin's unclean hands defense focuses on Suits 19 and 1445, which TRG-I initiated in the Sindh High Court and in which it obtained ex parte injunctive relief that, in the case of Suit 19, prohibited Chishti's lenders from creating third-party interests in his TRG-P shares, see Pobereskin ¶ *272, and, in the case of Suit 1445, prohibited Chishti and Pobereskin from selling or pledging their TRG-P shares, see id. ¶ *273.

TRG-I began seeking this relief after it wrote to four of Chishti's lenders on October 10 and October 13, 2022, informing the lenders of TRG-I's view that Chishti's pledges of TRG-P shares as

---

I ¶ 24. The Court finds that Chishti has been less than candid with regard to the extent of his liabilities to lawyers. For instance, Chishti omitted the debts discussed in this paragraph from a series of sworn affidavits that he submitted to the Commercial Court of the Supreme Court of Bermuda. See TRG-I ¶¶ 19-23.

collateral for loan facilities had violated the SPA. See TRG-I ¶ 339; PX 160-63. TRG-I received no response from the lenders, but the lenders appear to have informed Chishti of TRG-I's correspondence because, on October 20, 2022, Chishti wrote to TRG-I to assert his view that the SPA "imposes no restriction" on his "ability to pledge any of" his shares. PX 171; Tr. at 40-41. TRG-I responded to Chishti on October 25, 2022, informing him directly of TRG-I's view that he had violated the SPA. PX 168; Tr. at 41-42. Chishti does not recall responding to TRG-I's October 25, 2022, correspondence. Id. at 42.

In anticipation of bringing the arbitration underlying these proceedings, TRG-I initiated Suit 19 on January 6, 2023. In that suit, TRG-I sought declaratory and injunctive relief prohibiting Chishti's lenders from retaining as collateral, or taking any further action with respect to, TRG-P shares that Chishti or Pobereskin had pledged or intended to pledge in violation of the SPA. RX 36 at 37. TRG-I also sought an order cancelling such pledges of shares that Chishti or Pobereskin had already executed. Id. at 39. TRG-I's pleading included the following allegations, which the Court quotes at length:

> The Plaintiff [TRG-I] had always been represented that [Chishti], and others, are fully abiding by the terms of the Stock Purchase Agreement, and as a necessary corollary thereto, also adhering to the restrictions on transfers as imposed by Section 8.6 thereof. However, it was only later that it was discovered that [Chishti] and [Pobereskin], along with the Defendants No. 1 to 4 [JS Bank and other lenders], were in fact intentionally and willingly violating the Stock Purchase Agreement and specifically Section 8.6(a). Id. ¶ 9.
>
> [I]n the course of investigating [Chishti's] illegal pledging activity, it was also learnt that [Chishti] had encumbered his

TRG[-]P shares in violation of the Stock Purchase Agreement as early as the year 2019. Id. ¶ 17.

The cause of action accrued to the Plaintiff on [September 30, 2022] and thereafter when the Plaintiff came to know that the Defendant[s] Nos. 1 to 4 had pledged/encumbered approximately 89% of [Chishti's] TRGP shareholding; on [October 10, 2022] when the Plaintiff sent letters to the Defendants No. 1 to 4; on [October 10-14, 2022], when the Plaintiff sent letters and emails to the Defendants No. 1 to 4 as well as the State Bank of Pakistan, Pakistan Stock Exchange, and the [Securities and Exchange Commission of Pakistan], and thereafter on [November 4, 2022], when further correspondence was sent to the Defendants No. 1 to 4, to which no response was received thereby. The cause of action occurred on other dates as mentioned above and continues to date. Id. ¶ 33.

On January 6, 2023, the Sindh High Court granted in part the relief that TRG-I requested. Specifically, it ordered that "the [lender] defendants Nos. 1 to 4 are restrained from creating any third party interest in any manner whatsoever in relation to TRG[-]P securities pledged with them by" Chishti or Pobereskin. RX 112 at 2. The Sindh High Court otherwise denied the requested relief. See id.; TRG-I ¶ 356. Six days later, on January 12, 2023, TRG-I filed the arbitration underlying these proceedings. See Final Award at 3.

Then, on August 31, 2023, TRG-I, joined this time by TRG-P, filed Suit 1445. In that suit, the plaintiffs sought an order prohibiting Chishti and Pobereskin from "transferring, selling, or creating any third party interests in" their TRG-P shares. RX 37 at 29-33. Again, the Sindh High Court granted the requested relief in part. It ordered that Chishti "shall not sell and/or transfer any of his shares" in TRG-P and directed various Pakistani securities authorities to

"maintain status-quo in respect of the registered shareholding" of Chishti in TRG-P. RX 113 at 3.

The complaints in Suits 19 and 1445 were both verified by Elahi, who was at the time employed by one of TRG-I's subsidiaries. See Tr. at 649-51, 680. Elahi lacked personal knowledge of the facts asserted in either complaint, and he testified that he read those pleadings, at most, hours before they were filed. Id. at 652-54. Elahi verified the complaints after being briefed by TRG-I's in-house and external counsel, who, he assumed, had carried out appropriate investigations. See id. at 651-54, 680. Khaishgi also reviewed the complaints, at least cursorily. See id. at 495; TRG-I ¶ 361. And in prior deposition testimony designated for admission at trial, TRG-I's general counsel testified that the company initiated Suit 19 after he undertook an investigation of the allegations asserted therein. Cf. Transcript of Sept. 10, 2024, Arbitration Hr'g at 749.

Chishti did not fully abide by either of the Pakistan courts' injunctions, despite being aware of them. After the Sindh High Court entered the injunction in Suit 19, Chishti both pledged and sold some of his shares of TRG-P. See Tr. at 33-36; PX 227. And after that court entered the injunction in Suit 1445, Chishti pledged further shares of TRG-P to JS Bank. Tr. at 36-37; PX 380 at 3.

Pobereskin requests that the Court infer various facts about TRG-I's conduct, including (1) that TRG-I's management "put into action a plan to permanently entrench themselves in power," Pobereskin ¶ *268; (2) that TRG-I initiated Suits 19 and 1445 in retaliation for Chishti's

29

attempts to regain control of the company, id. ¶¶ *272-273; and (3) that TRG-I has intentionally delayed "merits hearings" in those lawsuits, id. ¶ *274. But the Court declines to make those or any of the related findings that Pobereskin requests because she introduced little evidence at trial, apart from her and Chishti's ipse dixits and certain orders of the Pakistani courts, to support her claims. See, e.g., RX 40-41. Thus, while Pobereskin's assertions are not inherently implausible, the Court finds that she has not proven them by a preponderance of the evidence.

III. Conclusions of Law

With the foregoing findings of fact in mind, the Court now turns to the three sets of legal issues that were raised at trial. First, the Court concludes that Pobereskin is not entitled to invoke the equitable defense of unclean hands. Then, the Court considers whether Chishti made the challenged transfers to Pobereskin with actual fraudulent intent. Finding that Chishti's intent was actually fraudulent with respect to twenty-five of the transfers, the Court then determines that two, but not more, of the remaining twenty transfers are voidable as constructively fraudulent.[13]

---

[13] The Court acknowledges that the terms "actual fraudulent transfer" and "constructive fraudulent transfer" are vestigial. When New York adopted a form of the Uniform Voidable Transactions Act in 2020, it replaced those terms with references to transactions that are "voidable" because of either a debtor's "actual intent" or the debtor's present or future financial circumstances. Compare N.Y. Debt. & Credit. Law §§ 273-274 (2019) with N.Y. Debt. & Credit. Law § 273 (2026). The Court retains the vestigial terms, however, because they continue to be used in recent caselaw and by the parties in this case.

A.    Unclean Hands

The equitable defense of unclean hands permits a court to deny injunctive relief "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue." Hermès Int'l v. Rothschild, 678 F. Supp. 3d 475, 493 (S.D.N.Y. 2023). "Typically, only behavior that is truly unconscionable and brazen justifies this per se bar on injunctive relief." Id. As this Court has previously observed, the party asserting an unclean-hands defense must satisfy an "exacting" standard. Id. (collecting cases involving "egregious conduct").

As she has done at previous stages of this litigation, Pobereskin contends that TRG-I has unclean hands with respect to its turnover motion because, in 2023, TRG-I sought and obtained the injunctions in Suits 19 and 1445 by falsely representing to the Sindh High Court "that TRG-I lacked knowledge of Chishti's pledging of TRG-P shares prior to late 2022." Pobereskin ¶ *338; ECF No. 140 at 28-31. Pobereskin argues that TRG-I is collaterally estopped from arguing that its allegedly false representations to the Sindh High Court were true because, in the arbitration proceedings, the arbitrator concluded that TRG-I actually knew that Chishti had been pledging his TRG-I and TRG-P shares. Pobereskin ¶ *339; ECF No. 140 at 29-30 & n.20; see Chishti II, 2026 WL 1192716, at *9 n.13.

Pobereskin's unclean hands defense fails, however, because the evidence adduced at trial did not establish that TRG-I's representations were false or its conduct egregious.

31

As noted above, Pobereskin primarily challenges as false the allegations contained in Paragraphs 9, 17, and 33 of Suit 19. Her argument boils down to the claim that, as the arbitrator concluded, TRG-I had knowledge of Chishti's pledging activity prior to September 30, 2022, and that TRG-I's representations to the Sindh High Court were therefore false. Pobereskin ¶ *338. Pobereskin points to the arbitrator's findings, among others, that TRG-I's chief financial officer "routinely assisted [Chishti] during the relevant time period with his Transfers of TRG-P and TRG-I Shares and kept detailed business records thereof for compliance purposes," that Chishti's transfers "were reported to the Pakistani regulatory authorities by TRG-P and disclosed in TRG-P's Annual Reports," and that "at least two of [Chishti's] sales of TRG-P shares were affirmatively disclosed to the TRG-P Board of Directors." Final Award at 48. The arbitrator also found that AIG, for whose benefit the restrictions in Section 8.6(a) of the SPA were imposed, "consistently had sufficient knowledge of [Chishti's] purchases and sales of TRG-P shares." Id. at 49. Although the arbitrator reached this conclusion with respect to Chishti's "purchases and sales," he reached a different conclusion with respect to Chishti's pledging. "In contrast to [Chishti's] explicitly-disclosed purchases and sales of TRG-P shares, Respondent's pledging activity was apparently not disclosed to the [AIG] Board of Directors as part of Board Meetings, and as noted above, the disclosures of [Chishti's] pledging activity in the TRG-P Annual Reports . . . were at best opaque." Id. at 50; cf. TRG-I ¶ 349 (contending that TRG-I

lacked knowledge that Chishti's "alleged earlier transfers were made without the consent" of investors).

Assuming, arguendo, that the arbitrator's findings have preclusive effect on TRG-I, see Pobereskin ¶ *339, each of the disputed allegations in Suit 19 is susceptible of at least one reasonable interpretation that is not inconsistent with the arbitrator's findings. Thus, the Court does not agree with Pobereskin that these allegations are false.

First, Paragraph 9 alleges that TRG-I "had always been represented" that Chishti was "fully abiding by the terms of the Stock Purchase Agreement" and that "it was only later that it was discovered" that Chishti had not been doing so. RX 36 ¶ 9. As the Court and counsel discussed at trial, see Tr. 500-03, 658-61, the phrase "had always been represented" is infelicitous. In the context of Paragraph 9 as a whole, the Court construes this phrase to mean that TRG-I had "always" been under the impression, from whatever information it had received or failed to receive, that Chishti's conduct was compliant with the SPA until some indeterminate "later" point that TRG-I learned otherwise. But the use of the passive voice leaves open the possibility that what is instead alleged is that Chishti himself had "always" represented to TRG-I that his conduct was compliant with the SPA. (Either way, the Court takes the word "always" to be a rhetorical flourish, referring to the period of time before TRG-I allegedly discovered Chishti's violations of the SPA.) And, indeed, the arbitrator concluded that Chishti violated the SPA because, among

other things, Chishti pledged his TRG-P shares "without seeking or obtaining the prior written approval of AIG." See Final Award at 28, 54-55. The arbitrator's finding that TRG-P knew of Chishti's pledging is not inconsistent with the arbitrator's conclusion that Chishti violated the SPA by not obtaining AIG's consent. Thus, the arbitrator's finding that TRG-P knew of Chishti's pledging is also not inconsistent with Paragraph 9.[14]

Similar analysis applies to Paragraph 17, which alleges that TRG-I, "in the course of investigating [Chishti's] illegal pledging activity," at some indeterminate point "learnt" that Chishti had breached the SPA "as early as the year 2019" by pledging certain TRG-P shares as collateral for a loan from JS Bank. RX 36 ¶ 17.[15] As with Paragraph 9, the allegation that TRG-I determined that Chishti had violated the SPA via his 2019 pledge to JS Bank is not inconsistent with the arbitrator's finding that TRG-P had actual knowledge of his

_____

[14] Pobereskin argues that TRG-I has offered a "tortured, post hoc reading of Suit 19" because, on her view, the language of TRG-I's pleading in Suit 19 solely concerns TRG-I's knowledge of Chishti's transfers, not also whether AIG's approval for those transfers had been obtained. See Pobereskin ¶¶ *354-356. But Paragraph 9 of Suit 19 and the other paragraphs discussed below refer to alleged violations of "the terms of the Stock Purchase Agreement," which requires AIG's approval for certain transfers. As further support for the Court's conclusion that TRG-I's interpretation of Suit 19 is not "post hoc," TRG-I's October 25, 2022, letter to Chishti cites the very section of the SPA that prohibits him from transferring shares "without the prior written consent of holders of at least a majority of the then issued AIG Shares." PX 168.

[15] Pat Costello, TRG-I's general counsel, testified at the arbitration that he "bec[a]me aware" of Chishti's pledging activity no later than January 2022, if not earlier. See Transcript of Sept. 10, 2024, Arbitration Hr'g at 613-14.

pledging activity. Moreover, Paragraph 17 is ambiguous as to when TRG-I "learnt" of Chishti's breach.

In contrast to Paragraphs 9 and 17, Paragraph 33 contains legal conclusions rather than factual representations. Specifically, it asserts that the cause of action underlying Suit 19 accrued to TRG-I on certain enumerated dates in September, October, and November 2022. Id. ¶ 33. At trial, neither party presented argument or evidence as to how and when causes of action for declaratory and injunctive relief arise under Pakistani law. See Fed. R. Civ. P. 44.1 (requiring "party who intends to raise an issue about a foreign country's law" to "give notice by a pleading or other writing"). Accordingly, Pobereskin has given the Court no basis to conclude that Paragraph 33 is false.

Pobereskin also contends, but only by implication, that certain representations that TRG-I made in the pleading in Suit 1445 were false. See Pobereskin ¶¶ *341, 344, 347-348, 363 (referring in passing to Suit 1445). As noted above, in that suit, TRG-I primarily sought an order prohibiting Chishti from "transferring, selling, or creating any third party interests in" his TRG-P shares and prohibiting JS Bank and other financial institutions from "effectuating, registering, processing[,] or recognizing the transfer of" any TRG-P shares from Chishti to any third party, including, expressly, Pobereskin. RX 37 at 31. But Pobereskin does not identify any specific factual misrepresentations in TRG-I's pleading in Suit 1445.

Accordingly, Pobereskin has not succeeded in showing that TRG-I made false representations in its pleadings in either Suit 19 or Suit

35

1445. It necessarily follows that she has not shown that TRG-I's conduct amounted to "fraud, deceit, unconscionability, or bad faith." See Hermès Int'l, 678 F. Supp. 3d at 493.

That said, however, TRG-I's conduct was not blameless. Elahi testified that he verified both Suit 19 and Suit 1445 based solely on brief discussions with TRG-I's counsel. See Tr. at 652, 679-80. He specifically admitted that he "didn't read each and every clause" of the complaints "at the time" that he verified them and that he only saw the complaint in Suit 19 "at the time it was being filed," less than an hour before he signed it. Tr. at 653-54, 656-57. "I may have read one or two or three, sort of, clauses." Id. at 653. Moreover, Elahi testified that he never read the SPA, nor personally conducted any investigation into either suit's allegations. Id. at 659, 662-66, 680-81. TRG-I should not have requested an employee to verify lawsuits as to which he lacked personal knowledge, and Elahi should not have done so. Contra TRG-I ¶¶ 354-355. But TRG-I's and Elahi's failures in this respect do not amount to the kind of "unconscionable" or "brazen" conduct that Pobereskin is required to prove in order to sustain her unclean-hands defense, even had she identified actual falsehoods in TRG-I's pleadings. See Hermès Int'l, 678 F. Supp. 3d at 493.

B.    Actual Fraudulent Conveyance

Having determined that Pobereskin may not avail herself of the doctrine of unclean hands, the Court now turns to the merits of TRG-I's turnover motion. As narrowed by the Court's ruling at the summary judgment stage, see generally Chishti II, that motion asserts that

Chishti made forty-five transfers to or for the benefit of Pobereskin that are voidable on account of being actually and constructively fraudulent. See JPTO ¶ 35 (listing transfers at issue). In this section, the Court addresses TRG-I's arguments that each of the forty-five transfers is voidable as actually fraudulent.[16]

Under Section 273 of the New York Debtor and Creditor Law, a transfer may be voided where a debtor "made the transfer . . . with actual intent to hinder, delay[,] or defraud any creditor of the debtor." N.Y. Debt. & Credit. Law § 273(a)(1). "In determining actual intent," the statute provides that "consideration may be given, among other factors," to eleven circumstances that are often referred to as "badges of fraud." Courts look to these badges because "direct evidence of fraudulent intent is often elusive." Haines v. West, 176 A.D.3d 1619, 1620 (4th Dep't 2019). But the eleven statutory badges are illustrative rather than exhaustive, and a court may consider any circumstance reasonably tending to reveal a debtor's actual intent at the time of a transfer.[17]

---

[16] The Court discusses all forty-five transfers because the circumstances of any given transfer may affect the Court's assessment of one or more other transfers. However, as noted above, the parties have stipulated that, in consideration of the payment that Pobereskin made in partial satisfaction of this Court's judgment against Chishti, TRG-I "will not . . . seek any further recovery in respect of" either (1) a transfer in the amount of $695,311.41 that Chishti made to Pobereskin on May 30, 2025, or (2) $500,000 of the transfers that Chishti made to Pobereskin in connection with the purchase of debt or equity in Isbei. ECF No. 121 at 3-4. The effect of that stipulation is reflected in the Court's ultimate conclusions herein.

[17] Because the statutory badges of fraud are illustrative, no particular number of them need be present (or absent) to support the

To obtain relief under Section 273(a)(1), a creditor must prove the debtor's actual intent by a preponderance of the evidence. See N.Y. Debt. & Credit. Law § 273(c). The Court discusses the nine statutory badges of fraud that TRG-I argues are present as to one or more of Chishti's transfers, then turns to consider other circumstances bearing on Chishti's intent.

### 1.    Insider Recipient

The first statutory badge of fraud is whether a transfer was made "to an insider." N.Y. Debt. & Credit. Law § 273(b)(1). TRG-I and Pobereskin both agree that this badge is present as to all forty-five of the transfers at issue. TRG-I ¶ 399; Pobereskin ¶ *294.

### 2.    Lack of Reasonably Equivalent Consideration

The parties also agree that another statutory badge of fraud, whether "the value of the consideration received" by Chishti was not "reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred," N.Y. Debt. & Credit. Law § 273(b)(8), is present as to all forty-five transfers, see TRG-I ¶ 448; Pobereskin ¶ *294. Although Pobereskin contested this badge at

---

conclusion that a given transfer was made with the actual intent to hinder, delay, or defraud a creditor. E.g., In re Nine W. LBO Secs. Litig., 505 F. Supp. 3d 292, 321 (S.D.N.Y. 2020). Courts in this Circuit have sometimes held transfers to be actually fraudulent where only a minority of the eleven statutory badges were present. E.g., Cadle Co. v. White, No. 02 Civ. 30, 2006 WL 798900, at *7 (D. Conn. Mar. 21, 2006); In re Extended Stay, Inc., No. 09-13764, 2020 WL 10762310, at *89 (Bankr. S.D.N.Y. Aug. 8, 2020) ("While the presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose.").

the summary judgment stage, see Chishti II, 2026 WL 1192716, at *7, she conceded its presence at the conclusion of trial, see Tr. at 734, and in her post-trial submission, see Pobereskin ¶ *294.

TRG-I contends that the presence of these two badges -- insider status and lack of reasonably equivalent consideration -- is, without more, sufficient for the Court to conclude that Chishti had the actual intent to hinder, delay, or defraud his creditors. See TRG-I ¶¶ 449-451. In making this argument, TRG-I chiefly relies on Weihai Lianqiao Int'l Coop Grp., Ltd. v. A Base IX Co. LLC, 799 F. Supp. 3d 195 (S.D.N.Y. 2025), appeal pending, No. 25-2042 (2d Cir.), in which another court in this District, following a bench trial, concluded that a transfer from a husband to a wife for which the wife provided no consideration was "presumptively fraudulent." Id. at 255.

Weihai Lianqiao is not binding on this Court, and the Court respectfully declines to follow it. That is because, as Pobereskin persuasively argues, Weihai Lianqiao relies on caselaw interpreting Section 273's predecessor statute. See Pobereskin ¶¶ *295-296. Until April 4, 2020, New York law provided that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Credit. Law § 273 (2019). New York courts interpreted the former Section 273 to create a burden-shifting framework; that is, "when a transfer is made without fair consideration, a presumption of insolvency and fraudulent transfer

39

arises, and the burden shifts to the transferee to rebut that presumption." E.g., Cheek v. Brooks, 188 A.D.3d 785, 787 (2d Dep't 2020) (quoting Battlefield Freedom Wash, LLC v. Song Yan Zhou, 148 A.D.3d 969, 971 (2d Dep't 2017) and collecting cases). Following this line of cases, the court in Weihai Lianqiao held that the husband's transfer to his wife was "presumptively fraudulent" and that the husband's explanation that he made the transfer for estate-planning purposes "fails to rebut that presumption." 799 F. Supp. 3d at 255. But the present Section 273(a)(1), which governs all of Chishti's transfers, refers to neither insolvency nor consideration.

Accordingly, and in light of all the circumstances of this case, the Court concludes that the presence of the two statutory badges discussed thus far is insufficient to demonstrate, by a preponderance of the evidence, that Chishti had the actual intent to hinder, delay, or defraud any creditor.

3.   Retention of Possession or Control

The next statutory badge of fraud is whether "the debtor retained possession or control of the property transferred after the transfer." N.Y. Debt. & Credit. Law § 273(b)(2). TRG-I contends that this badge is present as to the transfers involving both TRG-P and Isbei securities because Chishti engaged in "[t]ransactions with the transferred assets" that were "at [his] direction and for his benefit." See United States v. Loftis, No. 06 Civ. 1633, 2009 WL 10678612 (N.D. Tex. Mar. 5, 2009) (interpreting related provision of federal law); TRG-I ¶¶ 401-416.

The Court concludes that this badge is present as to the Isbei transfers, but not the TRG-P transfers. As to the Isbei transfers, the evidence at trial showed that Chishti, rather than Pobereskin, is and has been the prime mover behind Isbei. See id. ¶¶ 412-414. For instance, and as already discussed in greater detail above, Chishti (1) directed an Isbei agent to incorporate an Isbei subsidiary in Canada; (2) offered an individual the role of chief executive of Isbei China; and (3) represented himself as Isbei's "founder" in fundraising pitches, marketing materials, and letters to government officials. See PX 23-25, 82, 99, 106. In contrast, the evidence showed that Pobereskin often -- although not always -- sought Chishti's direction as to the decisions she made on Isbei's behalf. E.g., PX 60. Moreover, she has evinced unfamiliarity with Isbei's operations, both contemporaneously and in her testimony at various points in these proceedings. On July 17, 2024, for instance, she wrote to Chishti: "Hi Love – are you keeping an eye and responding to these emails from my gmail account? I'd appreciate if you do I don't know what should be approved or not!" PX 67; see TRG-I ¶ 413. As a witness both in the underlying arbitration and before this Court, Pobereskin appeared to be uncertain about various details of Isbei's operations. E.g., Tr. at 356-58. While the Court recognizes that the nominal founder of a start-up who holds a demanding full-time job and works on a different continent from most of the start-up's employees may not be fully aware of all of the start-up's day-to-day activities, the Court is skeptical that Pobereskin, as opposed to Chishti, has actually guided Isbei's development.

Accordingly, TRG-I has shown that Chishti retained control of the assets involved in the Isbei transfers.

Pobereskin resists this conclusion on the basis that Chishti's involvement in Isbei's management is insufficient to establish his possession or control of Pobereskin's interest in that company. See Pobereskin ¶ *298. But courts have often concluded that influence over the management of a company can be evidence of control of that company's equity. See, e.g., Loftis, 2009 WL 10678612, at *4; In re Tronox Inc., 503 B.R. 239, 283-84 (Bankr. S.D.N.Y. 2013); cf. SE Prop. Holdings, LLC v. Center, No. 15 Civ. 33, 2017 WL 3403793, at *20 (S.D. Ala. Aug. 8, 2017) (similar, as to real property).

However, there is insufficient evidence for the Court to reach the same conclusion as to the TRG-P transfers. TRG-I has put forward only limited proof that Chishti purchased certain TRG-P shares in his own name and then transferred them into Pobereskin's name. See ECF No. 111-23. Even had that documentary evidence been more extensive, it would have shown nothing more than the uncontested fact that Chishti made transfers for Pobereskin's benefit. See Pobereskin ¶¶ *299-301. What TRG-I has not demonstrated is that Chishti continued exercising control over Pobereskin's TRG-P shares after the transfers were effectuated. Contra TRG-I ¶ 405. And, as the Court noted at the summary judgment stage, the couple's plan for Pobereskin to acquire a ten-percent stake in TRG-P required that Pobereskin be the owner and controller of her shares throughout the entire period at issue. See Chishti II, 2026 WL 1192716, at *4.

42

#### 4.    Concealment of Transfers

This badge concerns whether a "transfer or obligation was disclosed or concealed." N.Y. Debt. & Credit. Law § 273(b)(3). It is present only with respect to the transfer of $695,311.41 that Chishti made to Pobereskin on May 30, 2025. That is because, on April 21, 2025, Chishti signed a petition to the Tax Court in which he failed to disclose that transfer -- or any of the others that he had previously made. PX 44. Pobereskin's rejoinder on this point, that a "failure of affirmative disclosure is not concealment," Pobereskin ¶ *307, is unsupported by any authority.

The Court notes, moreover, that in the months since the arbitrator entered the underlying award against Chishti, he has repeatedly been less than candid about his transfers, not only before the Internal Revenue Service, see PX 30 at 5-7, but also before the courts of Bermuda, see Tr. at 85-86, 89-101, and before this Court. As the Court discusses at greater length below, Chishti's pattern of making ambiguous or misleading statements affects the Court's assessment of his intent as to all the transfers at issue.

#### 5.    Litigation or Threat of Litigation

The next badge inquires whether, "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." N.Y. Debt. & Credit. Law § 273(b)(4). This badge is present with respect to each of the transfers Chishti made on or after October

43

28, 2022.[18] On October 25, 2022, after TRG-I's counsel had written to several of Chishti's lenders to advise them of TRG-I's view that the lenders' transactions with Chishti had violated the SPA, TRG-I's outside counsel wrote to Chishti directly, warning him that TRG-I was investigating "whether in fact there had been a breach" of the SPA and indicating that TRG-I was concerned about "immediate and irreparable harm as a result of [his] actions." PX 168; see also PX 158, 160-63 (related correspondence); TRG-I ¶ 424. This communication from TRG-I's counsel to Chishti intimated that TRG-I was considering litigation, such that it would have been reasonable for Chishti to believe he was being threatened with suit. PX 168; TRG-I ¶ 425. Any lingering ambiguity dissolved on January 12, 2023, when TRG-I filed the underlying arbitration. Shortly thereafter, on February 2, 2023, Afiniti sued Chishti, Pobereskin, Isbei, and entities related to Isbei in federal court in the District of Columbia. See Afiniti, Ltd. v. Chishti, No. 23 Civ. 303 (D.D.C. Feb. 2, 2023); TRG-I ¶ 425. And since that time, Chishti has been sued in numerous forums, with much of that litigation continuing to the present day.

---

[18] Pobereskin does not meaningfully dispute that this badge is present for each of the transfers that Chishti made after January 12, 2023. See Pobereskin ¶ *309. As the Court discusses in this paragraph, however, evidence at trial indicated that TRG-I was at least preparing for litigation as early as October 25, 2025. Moreover, the Court is unpersuaded by Pobereskin's argument that this badge should "be afforded little weight" because either Chishti ultimately succeeded in litigation or the outcomes of litigation were unforeseeable at the time. Id. ¶ *310. Whether or not Chishti ultimately prevailed, the litigation brought against him gave him, at minimum, a motive to transfer funds in order to hinder, delay, or defraud his creditors.

6.    Transfer of Substantially All Assets

This badge concerns whether "the transfer was of substantially all the debtor's assets." N.Y. Debt. & Credit. Law § 273(b)(5). It applies only to the $695,113.41 transfer that Chishti made on May 30, 2025, because, out of all the transfers, that one alone left him without meaningful assets. See Chishti I, 814 F. Supp. 3d at 476 (citing Pobereskin's testimony at preliminary injunction hearing).

TRG-I contends that the other transfers, if viewed collectively, were of substantially all Chishti's assets and that the Court should assess the transfers as a "pattern or series of transactions" that had the "cumulative effect" of dissipating substantially all of Chishti's assets. TRG-I ¶¶ 428-434. TRG-I's argument in this regard shares certain features with its arguments about constructive fraudulent conveyance, which the Court addresses in detail below. Here, however, the plain text of the statute -- which refers to a "transfer" in the singular -- prohibits the Court from concluding that this badge is present as to any transfer that left Chishti with meaningful assets.

TRG-I's primary authority to the contrary, In re Kaiser, 722 F.2d 1574 (2d Cir. 1983), is inapposite. See TRG-I ¶ 428. That case was decided under bankruptcy law, which, in contrast to Section 273, considers one of the badges of fraud to be "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors." See id. at 1582-83. That distinctive formulation of bankruptcy law does not rewrite Section

45

273, which repeatedly refers to a "transfer" in the singular. Accordingly, the Court declines TRG-I's invitation to apply this badge on anything other than a transfer-by-transfer basis.

Thus, based on the Court's assessment of Chishti's financial condition, as set forth in Section III.C below, only the May 30, 2025, transfer was of substantially all Chishti's assets.

### 7.    Concealment of Assets

This badge has to do with whether "the debtor removed or concealed assets." N.Y. Debt. & Credit. Law § 273(b)(8). TRG-I has advanced no allegation that Chishti "removed" assets, but it contends that Chishti concealed certain assets from the IRS when, on March 9, 2024, he requested a hearing to stay the collection activity that the IRS might otherwise take against him. PX 45 at 27-33; see TRG-I ¶¶ 80, 441-445. Chishti requested that hearing on the basis that, among other things, a Pakistani court order prohibited him "from selling or transferring any of his shares of [TRG-I] and any related entities in order to satisfy his 2022 income tax liability." PX 45 at 31. But neither in that document nor in his other communications with the IRS did Chishti acknowledge that he held millions in cash in foreign bank accounts. See TRG-I ¶¶ 83-85; Pobereskin ¶ *188(e) (including foreign bank accounts in Chishti's assets as of relevant date). Chishti also failed to acknowledge that he held shares of IBEX that were only partially encumbered. See TRG-I ¶¶ 82, 441. And, as discussed above, Chishti also concealed relevant information about his financial condition when

46

he petitioned the Tax Court for relief. Pobereskin does not contest TRG-I's analysis in any of these respects.

Accordingly, the Court concludes that Chishti began concealing his assets from at least the IRS on March 9, 2024, and holds that this badge is present for all of the transfers on or after that date.

### 8.    Insolvency

Whether Chishti "was insolvent" at the time that he made any of the transfers or "became insolvent shortly after" is the concern of the next statutory badge of fraud. N.Y. Debt. & Credit. Law § 273(b)(9). The Debtor and Creditor Law expressly defines "insolvency" as the state in which "the sum of the debtor's debts is greater than the sum of the debtor's assets." Id. § 271(a). Because of this distinct statutory definition, the Court applies the so-called "balance sheet" test for insolvency in connection with this badge, comparing Chishti's total assets (whether liquid or not) to his total liabilities (whether immediately due or not). See Pobereskin ¶ 317. TRG-I contends that Chishti was insolvent in this sense by the end of August 2023, TRG-I ¶ 437, while Pobereskin asserts that Chishti became insolvent only in April 2025, Pobereskin ¶ *319.

Both parties' calculations rest on different premises from the factual findings that the Court reached above. Specifically, TRG-I values Chishti's Afiniti shares as worthless, while Pobereskin values Chishti's TRG-P shares at their market price. See supra, Section II.C.1. Applying the Court's findings that, throughout the period at issue, the Afiniti shares were worth $12,782,954 and the TRG-P shares

47

were worth 8.8% of their market price, the Court concludes that Chishti became insolvent, in the statutory sense, at the end of April 2024 and remained insolvent thereafter. The Court therefore concludes that this badge of fraud is present with respect to the transfers that Chishti made on or after May 1, 2024.

9.    Incurrence of Substantial Debt

The final statutory badge of fraud that TRG-I invokes is whether "the transfer occurred shortly before or shortly after a substantial debt was incurred." N.Y. Debt. & Credit. Law § 273(b)(10).

In one sense, this badge is most relevant to the $695,113.41 transfer that Chishti made on May 30, 2025, because, of all the transfers, that one alone occurred after the arbitrator entered the monetary award against Chishti exceeding $9 million. However, with respect to that award, the Court previously held that Chishti "did not have reason to predict that the arbitrator would enter such a substantial award against him." See Chishti I, 814 F. Supp. 3d at 482. Accordingly, the Court gives relatively less weight to this badge with reference to that transfer because it was reasonable for Chishti not to believe that he would incur the fee award prior to the arbitrator's decision on April 22, 2025.

This badge is present with respect to various transfers that Chishti made shortly before or shortly after drawing down funds from his credit facilities at JS Bank. See Pobereskin ¶¶ *330-331. Each of those transactions represented the incurrence of new debt because, as the Court previously explained, debt is incurred when a creditor

acquires a "claim," meaning "a right to payment," against the debtor. See Chishti II, 2026 WL 1192716, at *7. JS Bank acquired a claim against Chishti each time he drew down from its credit facilities. But, as Pobereskin points out, Chishti availed himself of JS Bank's credit facility primarily in 2022, in connection with transfers as to which few other badges of fraud are present. Pobereskin ¶¶ *330-331.

The Court declines to adopt TRG-I's view that this badge of fraud is present, at least to any meaningful extent, in connection with the obligations that Chishti incurred to his lawyers. See TRG-I ¶¶ 460-461. Although those obligations were all "debts" in the relevant sense, many of them were not "substantial," and Chishti incurred them in the course of long-running litigations. While he initiated some of those litigations, others were initiated against him, and so the Court concludes that Chishti's debts to his lawyers do not shed meaningful light on his intent in making the transfers at issue.

10.  Other Considerations

As discussed above, Section 273(b) identifies the statutory badges of fraud as considerations that, "among other factors," may support a finding of actual fraudulent intent. Here, the evidence at trial revealed several further circumstances that tend to show that Chishti made many of the challenged transfers with the intent to hinder, delay, or defraud his creditors.

First, the Court finds it significant that Chishti's testimony and written submissions to this Court, other courts, and administrative agencies over a period of at least a year have contained multiple,

49

material misstatements of fact. Indeed, during Chishti's trial testimony, the Court noted that TRG-I had offered "umpteen examples" of Chishti's alleged misstatements, which were so numerous as to be "cumulative." Tr. at 105-06.[19] Although Chishti asserted that at least some of his misstatements were the result of deliberately ambiguous questions put by TRG-I's counsel, see, e.g., id. at 129-30, he offered few clarifications while under examination by Pobereskin's counsel. Accordingly, the Court reiterates its prior observation that "much of Chishti's testimony" at trial was "frequently lacking in complete candor." See Chishti I, 814 F. Supp. 3d at 484. It also notes the similar observations of other courts and tribunals, which have characterized Chishti's representations as "often tailored to meet the needs of his own defense and divorced from reality," Spottiswoode v. Chishti, AAA No. 01-17-0007-4093 (Apr. 19, 2019), https://tinyurl.com/bdy748en, and "iteratively re-molded to fit the facts," Final Award at 28 n.9. Chishti's lack of candor weighs in favor of a finding of his actual intent to hinder, delay, or defraud his creditors. See TRG-I ¶¶ 383-387.

---

[19] The misstatements discussed at trial included, among others, Chishti's representation to the Internal Revenue Service that the injunctions imposed on him by the courts of Pakistan affected his ability to sell not only his TRG-P shares but also his shares of "TRG International, Afiniti Ltd., and Ibex," see PX 45; his representation in the petition he submitted to the Tax Court that he received shares of TRG-P worth approximately $50 million, when in fact he received shares of Ibex, PX 44; and his representation that he did not testify at the underlying arbitration that Afiniti was insolvent when, in fact, he testified to exactly that effect, see Tr. at 64.

Second, Chishti transferred millions of dollars in connection with the founding of Isbei, which provides services similar to those offered by Afiniti. Indeed, Afiniti sued Chishti, Pobereskin, Isbei, and related entities for, among other things, theft of trade secrets, computer fraud, and breach of contract just before Chishti made the bulk of the transfers to fund Isbei. See Afiniti v. Chishti, ECF No. 1.[20] Although the Court may not credit the allegations in Afiniti's complaint for their truth, it does not escape the Court's notice that Chishti transferred millions of dollars to one of Afiniti's competitors at the very time that he faced a risk of meaningful financial liability to Afiniti. That conduct weighs strongly in favor of a finding that Chishti had the actual intent to hinder, delay, or defraud.

Third, however, the Court cannot ignore the ample evidence that Chishti engaged in many of the transfers at issue, at least in part, for purposes other than hindering, delaying, or defrauding creditors. See Pobereskin ¶¶ 17-29. TRG-I has not contested the Court's earlier finding that Chishti and Pobereskin jointly developed a plan for her to "acquire a sufficient stake in TRG-P that would entitle her, under Pakistani law, to call for the election of new directors who, Chishti and Pobereskin hoped, would be more favorable to Chishti than the current directors and management." Chishti I, 814 F. Supp. 3d at 474. Nor has TRG-I denied that Chishti and Pobereskin have attempted to

---

[20] Indeed, on the very day that Afiniti filed its complaint in federal court, Chishti transferred $700,000 to Isbei for an investment in Pobereskin's name. See JPTO ¶ 35.

build Isbei into a profitable business. Thus, the fact that many of the transfers may have had dual purposes -- both to avoid Chishti's creditors and to accomplish Chishti's own business ambitions -- militates somewhat against a finding of actual fraudulent intent.

That said, Chishti and Pobereskin both acknowledged that there were other ways that Chishti could have accomplished at least some of his commercial goals without making tens of millions of dollars of gifts to Pobereskin. For instance, Chishti did not give any of his TRG-P shares to Pobereskin, even though he testified that was an option that was legally available to him during, at least, calendar year 2022. See Tr. at 127-28. Nor did he loan any meaningful amount of funds to Pobereskin, even though Pobereskin testified that she might well have agreed to a "capped downside loan" in which she would not have faced a risk of loss. See Tr. at 409-10; Pobereskin ¶ 30. The fact that Chishti and Pobereskin could have accomplished their plan, at least in part, without transferring funds without consideration undercuts Pobereskin's argument that Chishti acted for legitimate supervening purposes. But see Pobereskin ¶ 30.[21]

---

[21] In reaching this conclusion, the Court does not credit Pobereskin's testimony that she and Chishti could not have achieved their goals by means of loans because she was unwilling to accept the risks associated with borrowing. See Tr. at 409. Separate from the evidence that the one specific type of loan that Chishti and Pobereskin actually considered would not have exposed her to such risks, her argument is logically flawed because the only reason she has given for why she and Chishti could not have structured their transactions as loans was that she was unwilling. A factor that was in Pobereskin's control cannot be a reason that she was unable to act.

Indeed, in the fraudulent conveyance context, courts have distinguished between a debtor's "legitimate business reason for the challenged transactions" and a debtor's "legitimate supervening purpose for the manner in which the transfer[s were] structured." In re Tronox, 503 B.R. at 289 (emphasis added); ASARCO LLC v. Ams. Mining Corp., 396 B.R. 278, 391-93 (Bankr. S.D. Tex. 2008). Proof of the latter, not the former, establishes a defense to a claim of actual fraudulent conveyance where the creditor's claim, like TRG-I's here, is that the debtor has pursued a legitimate business objective in a fraudulent manner. See In re Tronox, 503 B.R. at 289. Pobereskin's supposedly contrary authority, In re Lyondell Chem. Co., 554 B.R. 635, 653 (S.D.N.Y. 2016), simply restates the general principle that a "legitimate supervening purpose" can serve as a defense to a claim of actual fraudulent conveyance but does not rebut the caselaw that TRG-I has cited. See Pobereskin ¶ *292.

11. Conclusion as to Actual Fraudulent Transfer

Balancing all the foregoing considerations with respect to each of the transfers at issue, the Court concludes that those transfers (1) that Chishti made to Pobereskin or for Pobereskin's benefit, (2) that were in connection with Isbei, and (3) that occurred on or after October 25, 2022, were made with the intent of hindering, delaying, or defrauding Chishti's creditors.[22] The transfers that

---

[22] The Court also concludes that TRG-I has shown that the $695,311.41 transfer that Chishti made to Pobereskin on May 30, 2025, supposedly for repayment of expenses advanced by her on his behalf, was made with actual fraudulent intent. See Chishti I, 814 F. Supp. 3d at 481-82.

satisfy all of these criteria total $9,165,075. However, as discussed above, TRG-I has already stipulated that it will not seek recovery from Pobereskin in connection with $500,000 of transfers concerning Isbei. Subtracting that amount leaves a net total of $8,675,075. With respect to actual fraudulent conveyance, TRG-I's turnover motion is hereby granted to that extent.

Although at least two badges of fraud are present with respect to each of the remaining transfers, the Court concludes that TRG-I has not established, by a preponderance of the evidence, that Chishti made those transfers to hinder, delay, or defraud creditors. With respect to actual fraudulent conveyance, TRG-I's turnover motion is hereby denied as to those transfers.

C.    Constructive Fraudulent Conveyance

The Court now turns to the last prong of TRG-I's turnover motion, which seeks to void the same forty-five transfers as constructively fraudulent. This prong of TRG-I's motion is moot as to the twenty-five transfers that, as the Court has just concluded, Chishti made with actual fraudulent intent. Accordingly, the Court proceeds to analyze the remaining twenty transfers. It concludes that only two of them satisfy either of the standards for constructive fraudulent transfer set forth in Section 273(a)(2).

---

But TRG-I has stipulated that it will not seek recovery from Pobereskin in connection with that transfer. See ECF No. 123. Thus, the Court does not include the amount of that transfer in its calculations of the value Pobereskin must turn over.

That provision indicates that transfers are voidable as constructively fraudulent where a debtor, "without receiving a reasonably equivalent value in exchange for the transfer," either "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." N.Y. Debt. & Credit. Law § 273(a)(2)(i), (ii). As with Section 273(a)(1), TRG-I bears the burden of proving any constructively fraudulent transfer by a preponderance of the evidence. Id. § 273(c).

Under each prong, the statute first requires TRG-I to show that Chishti made any transfer "without receiving a reasonably equivalent value in exchange." See N.Y. Debt. & Credit. Law § 273(a)(2). As noted above, Pobereskin has conceded that she did not receive reasonably equivalent value for any of the transfers. See also Chishti II, 2026 WL 1192716, at *9. With that initial step satisfied, and in light of the Court's findings of fact, the Court addresses the prongs of Section 273(a)(2) in turn.

### 1.    Unreasonably Small Assets

Section 273(a)(2)(i) provides that a transfer is voidable as constructively fraudulent where the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." This test is satisfied where a creditor shows, by a

preponderance of the evidence, that a challenged transfer was made at a time when the debtor had "such minimal assets that insolvency was inevitable in the reasonably foreseeable future." Chishti II, 2026 WL 1192716, at *12 (quoting In re Adelphia Commcn'ns Corp., 652 F. App'x 19, 21 (2d Cir. 2016) (summary order)). The statute's phrase "unreasonably small" refers to "a situation where a transaction leaves a debtor technically solvent but doomed to fail." Id.

TRG-I contends that, in assessing whether any given transfer satisfies Section 273(a)(2)(i), the Court should not consider that transfer on its own but, rather, as part of Chishti's overall plans (1) to acquire for Pobereskin a stake of ten percent or more, and to maximize the couple's overall stake, in TRG-P and (2) to found Isbei. See TRG-I ¶¶ 484, 509-521. But TRG-I's focus on these two plans is not necessarily consistent with the text of the statute. Section 273(a)(2)(i) refers to a debtor engaging in a "business" or a "transaction," both of which terms appear in the singular. The ordinary meaning of "business," that is, a "commercial enterprise carried on for profit," including "every trade, occupation, and profession," plainly contemplates that a person engaging in a business may undertake more than one relevant "transaction." See Business, Black's Law Dictionary (12th ed. 2024). But if a transfer represents a "transaction" alone, standing apart from a "business," it is not clear to the Court that Section 273(a)(2)(i) permits the amalgamation of factually distinct transfers for purposes of assessing whether a debtor was about to render his assets unreasonably small.

Chishti's plan to found Isbei was certainly a "business" in which he was "about to engage." Accordingly, if the Court had not already concluded that the Isbei-related transfers were actually fraudulent, the Court would proceed to consider whether those transfers, collectively, would have left Chishti with unreasonably small assets at any point in time.

In contrast, Chishti's plan to acquire TRG-P shares for Pobereskin and himself does not constitute a "business" for purposes of Section 273(a)(2)(i). The statute therefore requires the Court to analyze individually each "transaction," i.e., transfer, that was related to the acquisition of TRG-P shares.

The Court assesses each of those transfers by reference to whether they left Chishti with net assets of $1 million or less at the end of the relevant month. See TRG-I ¶¶ 524.[23] The Court's starting point is the calculations of Chishti's monthly assets and liabilities proffered by TRG-I, see id. ¶ 527, adjusted in light of the Court's factual findings about the value of Chishti's TRG-P and Afiniti shares during the period at issue, see supra Section II.C.1. After performing the requisite calculations, the Court concludes that none of the transfers that the Court has not already found to be voidable would have left Chishti with less than $1 million in net assets.

---

[23] The Court uses net assets of $1 million or less as a proxy for determining whether Chishti's remaining net assets were ever "unreasonably small." See id. ¶ 524. Because no transfer left Chishti with assets less than this amount, the Court need not decide whether "unreasonably small" means some lower threshold.

2.    Debts Beyond Chishti's Ability To Pay

The second prong of Section 273(a)(2) inquires whether a debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." N.Y. Debt. & Credit. Law § 273(a)(2)(ii). At the summary judgment stage, the Court held that TRG-I's constructive fraudulent transfer claim under this prong is "limited to those debts that Chishti intended or believed he would incur, or that he reasonably should have believed he would incur, <u>after</u> he made any challenged transfer." <u>Chishti II</u>, 2026 WL 1192716, at *12 (emphasis added). For that reason, the Court held, TRG-I could not predicate its constructive fraudulent transfer claim on Chishti's IRS debt because he incurred it in January 2022, prior to any of the transfers that TRG-I is challenging. <u>See</u> <u>id.</u> at *10-11. The Court noted that, in order to succeed on this aspect of its constructive fraudulent transfer claim, TRG-I would need to show that Chishti "subjectively had, or objectively should have had, any indication of oncoming insolvency" in connection with some later-incurred debt. <u>Id.</u> at *11.

TRG-I now argues that Chishti reasonably should have believed that he would incur two other kinds of substantial debts at the time that he made the challenged transfers: (1) debts to JS Bank that he incurred each time that he drew funds down on the loan facilities that lender made available to him, and (2) debts to lawyers and adversaries that he incurred in connection with the numerous legal proceedings concerning his attempts to regain control over TRG-I and to discredit

58

his accuser. See TRG-I ¶¶ 532-534. According to TRG-I, Chishti should have reasonably believed that he would incur these debts -- and thus, on TRG-I's view of his financial situation, should have had an indication of oncoming insolvency -- because his debts to JS Bank were essential to his plan to amass TRG-P shares; because, as early as October 25, 2022, he was on notice of litigation that could result in substantial monetary awards against him; and because he chose to initiate legal proceedings of his own. See id. ¶¶ 532, 535.

The Court agrees with TRG-I that Chishti intended and believed, as well as reasonably should have believed, that he would incur substantial debts to JS Bank. That is because Chishti and Pobereskin both testified that Chishti intentionally obtained financing from JS Bank for the purpose of funding the acquisition of some $25 million in TRG-P shares in Pobereskin's name. See Tr. at 96-97, 118-23, 387-88; TRG-I ¶ 46. The Court also agrees with TRG-I that, at least with reference to the litigation that was a foreseeable consequence of Chishti's attempt to reassert control over TRG-I and its affiliate entities, Chishti at least reasonably should have believed that he would incur substantial debts to his attorneys. TRG-I ¶¶ 534-535.

But, for the same reasons that it set forth at an earlier stage of these proceedings, the Court does not agree with TRG-I that Chishti reasonably should have believed that he would incur the fee award associated with the arbitrator's ruling in the underlying proceedings. See Chishti I, 814 F. Supp. 3d at 482. "Chishti did not have reasonable to predict" that award "because both sides presented plausible

59

arguments and the arbitrator granted Chishti a meaningful portion of the equitable relief he sought." Id.

Accordingly, the Court returns to its analysis of Chishti's finances to determine whether, in reference to any of the remaining transfers, there was an indication of oncoming insolvency in light of the debts that Chishti should reasonably have expected to incur to JS Bank and his attorneys. The Court identifies only two transfers as to which Chishti should have had such an indication. Those are the transfers that Chishti made on September 21, 2023, and September 22, 2023. These transfers occurred at a time when Chishti faced oncoming insolvency because, between the end of August 2023 and the end of September 2023, he dissipated nearly $5 million in his Charles Schwab brokerage account, see PX 451 at 235, 246, and also dissipated nearly $1.15 million in two JS Bank accounts, see PX 340. That more than $6 million decrease in his cash position occurred at the same time as TRG-P's share price was rising, thereby increasing the amount he would need to spend in order to acquire a ten-percent stake in TRG-P for Pobereskin. See TRG-I, App'x M.

The Court assesses Chishti's financial position at the time of the September 21 and 22 transfers based on the following figures:

Assets: $15,663,653.77 in bank and cash collateral accounts,[24] plus $12,782,954 in Afiniti shares, plus $2,424,453 in TRG-P

---

[24] The parties do not dispute this total. Compare PX 518, Sheet C (summing values of all but TRG-P shares) with Pobereskin ¶¶ *146(a)-(f), *153(a)-(f).

shares,[25] for a total of $30,871,060.77 in assets.

Debts: Pending debts of $13,942,793.21 to JS Bank and $10,301,648.42 to the Internal Revenue Service, plus reasonably anticipated debts of $7,659,878.47 to JS Bank to finance further purchases of TRG-P shares, plus nonliquidated anticipated debts to counsel, for a total of at least $31,904,320.10 in pending and reasonably anticipated debts.

Because Chishti's assets were less than his pending and reasonably anticipated debts, the Court concludes that Chishti had an indication of oncoming insolvency at the time that he (1) transferred the rupee equivalent of $276,828.02 to Pobereskin on September 21, 2023, and (2) transferred the rupee equivalent of $876,679.15 to Pobereskin on September 22, 2023.[26] Those two transfers are therefore voidable as constructively fraudulent.

IV.  Conclusion

For the reasons set forth above, the Court concludes that twenty-five transfers that Chishti made to or for the benefit of Pobereskin

---

[25] The Court calculates the value of Chishti's TRG-P shares by multiplying the publicly reported share price on September 20, 2023 (89.45 PKR), see https://dps.psx.com.pk/company/TRG, by Chishti's approximately 88 million shares, see Hr'g Tr. at 296-97, then converting the resulting sum into U.S. dollars at the contemporaneous exchange rate of 1 PKR to $0.0035, see https://www.exchangerates.org.uk/PKR-USD-spot-exchange-rates-history-2023.html, then discounting the shares to 8.8% of their market price, see supra Section II.C.1.

[26] TRG-I contends that a total of twelve transfers between September 15, 2022, and September 22, 2023, occurred when Chishti's net assets, inclusive of his expected expenditures in connection with TRG-P and Isbei, were in the negative at month's end. See TRG-I ¶ 525 (chart; rows 4-11, 24-25, 28-29). But TRG-I's calculation of Chishti's negative net assets at the time of all but the last two of those transfers is more than offset by the approximately $12.7 million value that the Court has assigned to Chishti's Afiniti shares, so the Court does not agree that Chishti had an indication of oncoming insolvency at the time of the earlier transfers. See id. (rows 4-11, 24-25).

were made with actual fraudulent intent. Accordingly, under Section 237(a)(1), those transfers are voidable in favor of TRG-I, and the Court hereby voids them. The sum of those transfers, net of the amount indicated in the parties' stipulation in connection with Pobereskin's prior payment, is $8,675,075.00. Moreover, the Court concludes that two transfers that Chishti made to Pobereskin were made without receiving a reasonably equivalent value in exchange and at a time when Chishti reasonably should have believed that he would incur debts beyond his ability to pay as they came due. Accordingly, under Section 237(a)(2)(ii), those transfers are voidable in favor of TRG-I, and the Court hereby voids them. Those two transfers totaled $1,153,507.17.

The Court hereby orders Pobereskin to turn over to TRG-I, within thirty days of the entry of judgment, a sum no greater than the amount of the judgment TRG-I holds against Chishti and also no greater than $9,828,582.17, the total of the transfers hereby voided.

As an exercise of the Court's equitable authority to "limit[], condition[], regulat[e], extend[], or modify[] the use of any enforcement procedure, see CPLR 5240, the Court hereby orders that Pobereskin may satisfy this obligation by turning over to TRG-I either so much of the ownership interest in the securities of TRG-P and/or Isbei that she holds, cash, or a combination of TRG-P and/or Isbei securities and cash. To the extent that Pobereskin elects to satisfy the Court's order by turning over securities, she and Chishti are hereby ordered to execute all documents, make all filings, and provide all approvals and authorizations necessary to effectuate the transfer

62

of the ownership interest in those securities to TRG-I and to cancel her ownership interest in those securities in TRG-I's favor.

Consistent with the foregoing, the Clerk of Court is respectfully directed to enter judgment against Pobereskin and to terminate the motion at docket entry 119.

SO ORDERED.

New York, NY
June ___, 2026

_____
JED S. RAKOFF, U.S.D.J.